TAB 2

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 03-10945 (MFW) |
| Fleming Companies, Inc., et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors.[1] | ) | Objection Deadline: **September 26, 2005** |
| | ) | **at 4:00 p.m. ET** |
| | ) | Hearing Date: **October 3, 2005** |
| | ) | **at 2:00 p.m. ET** |

**NOTICE OF MOTION OF THE RECLAMATION CREDITORS' TRUST TO**
**(i) ENFORCE THE REORGANIZATION PLAN AND CONFIRMATION ORDER,**
**(ii) ENJOIN THE POST-CONFIRMATION TRUST FROM PURSUING CLAIMS**
**AGAINST EMPLOYEES OF RECLAMATION CREDITORS TO RECOVER**
**RCT ASSETS FROM THEIR RECLAMATION CREDITOR EMPLOYERS**
**AND, (iii) DETERMINE THAT THE PCT'S CLAIMS AGAINST**
**EMPLOYEES OF RECLAMATION CREDITORS CONSTITUTE RCT ASSETS**

To:    (i) The Office of the United States Trustee; (ii) those persons who have requested, both prior to and after the creation of the current service list, notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure; and (iii) counsel to the Post Confirmation Trust

On August 25, 2005, the Reclamation Creditors' Trust (the "RCT"), created pursuant to the Third Amended and Revised Plan of Reorganization of Fleming Companies, Inc. and its Filing Subsidiaries Under Chapter 11 of the United States Bankruptcy Code (the "Plan"),[2] confirmed by an order of this Court (the "Confirmation Order"), filed with the Court its *Motion of the Reclamation Creditors' Trust to (i) Enforce the Reorganization Plan and Confirmation Order, (ii) Enjoin the Post-Confirmation Trust from Pursuing Claims Against Employees of Reclamation Creditors to Recover RCT Assets from Their Reclamation Creditor Employers and, (iii) determine that the PCT's Claims Against Employees of Reclamation Creditors Constitute RCT Assets* (the "Motion").

---

[1]    At pertinent places herein, references are made to "Fleming," for Fleming Companies, Inc., public parent company of the Debtors. The Debtors are: Core-Mark International, Inc.; Fleming Companies, Inc.; ABCO Food Group, Inc.; ABCO Markets, Inc.; ABCO Realty Corp.; ASI Office Automation, Inc.; C/M Products, Inc.; Core-Mark Interrelated Companies, Inc.; Core-Mark Mid-Continent, Inc.; Dunigan Fuels, Inc.; Favar Concepts, Ltd.; Fleming Foods Management Co., L.L.C., Fleming Foods of Texas, L.P.; Fleming International, Ltd.; Fleming Supermarkets of Florida, Inc.; Fleming Transportation Service, Inc.; Food 4 Less Beverage Company, Inc.; Fuelserv, Inc.; General Acceptance Corporation; Head Distributing Company; Marquise Ventures Company, Inc.; Minter-Weisman Co.; Piggly Wiggly Company; Progressive Realty, Inc.; Rainbow Food Group, Inc.; Retail Investments, Inc.; Retail Supermarkets, Inc.; RFS Marketing Services, Inc.; and Richmar Foods, Inc.

[2]    All capitalized terms not otherwise defined herein shall have the respective meanings ascribed to them in the Plan.

A    18559
8|25|05

**You are required to file a response, if any, to the Motion on or before September 26, 2005 at 4:00 p.m.**

At the same time, you must also serve a copy of the response upon the following:

Mark J. Friedman, Esq.
DLA Piper Rudnick Gray Cary US LLP
6225 Smith Avenue
Baltimore, MD  21209-3600
Telephone:  (410) 580-4153
Facsimile:  (410) 580-3001

Steven K. Kortanek (Del. Bar No. 3106)
Klehr, Harrison, Harvey, Branzburg &
 Ellers LLP
919 Market Street, Suite 1000
Wilmington, DE  19801
Telephone:  (302) 426-1189
Facsimile:  (302) 426-9193 (fax)

**A HEARING ON THE MOTION WILL BE HELD ON OCTOBER 3, 2005 @ 2:00 P.M. ONLY IF OBJECTIONS ARE TIMELY FILED, BEFORE THE HONORABLE MARY F. WALRATH ON OCTOBER 3, 2005, 2:00 P.M. AT THE UNITED STATES BANKRUPTCY COURT LOCATED AT 824 NORTH MARKET STREET, 5TH FLOOR WILMINGTON, DELAWARE 19801**

IF YOU FAIL TO RESPOND IN ACCORDANCE WITH THIS NOTICE, THE COURT MAY GRANT THE RELIEF REQUESTED IN THE MOTION WITHOUT FURTHER NOTICE OR HEARING.

Dated:  August 25, 2005

KLEHR, HARRISON, HARVEY, BRANZBURG &
ELLERS LLP

_____/s/ Michael W. Yurkewicz_____
Steven K. Kortanek (Del Bar No. 3106)
Michael W. Yurkewicz (Del Bar No. 4165)
919 Market Street, Suite 1000
Wilmington, Delaware  19801
Telephone:  (302) 552-5503
Facsimile:  (302) 426-9193

– and –

DLA PIPER RUDNICK GRAY CARY US LLP
Mark J. Friedman
6225 Smith Avenue
Baltimore, Maryland  21209-3600
Telephone:  (410) 580-4153
Facsimile:  (410) 580-3001

Counsel to the Reclamation Creditors' Trust

A     4

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Fleming Companies, Inc., et al., | ) | Case No. 03-10945 (MFW) |
| | ) | (Jointly Administered) |
| Debtors.[1] | ) | |
| | ) | Objection Deadline: **September 26, 2005** |
| | ) | **at 4:00 p.m. ET** |
| | ) | Hearing Date: **October 3, 2005** |
| | ) | **at 2:00 p.m. ET** |

**MOTION OF THE RECLAMATION CREDITORS' TRUST TO
(i) ENFORCE THE REORGANIZATION PLAN AND CONFIRMATION ORDER,
(ii) ENJOIN THE POST-CONFIRMATION TRUST FROM PURSUING CLAIMS
AGAINST EMPLOYEES OF RECLAMATION CREDITORS TO RECOVER
RCT ASSETS FROM THEIR RECLAMATION CREDITOR EMPLOYERS
AND, (iii) DETERMINE THAT THE PCT'S CLAIMS AGAINST
EMPLOYEES OF RECLAMATION CREDITORS CONSTITUTE RCT ASSETS**

The Reclamation Creditors' Trust of Fleming Companies, Inc. (the "RCT"), created

pursuant to the Debtors' and the Official Committee of Unsecured Creditors' Third Amended

and Revised Joint Plan of Reorganization of Fleming Companies, Inc. and Its Filing Subsidiaries

Under Chapter 11 of the Bankruptcy Code (the "Plan"),[2] moves this Court for the entry of an

appropriate order against the Post-Confirmation Trust (the counterpart trust created under the

Plan (the "PCT")), to (i) enforce the Plan and Confirmation Order (Dkt. No. 9045), (ii) enjoin the

PCT from pursuing claims filed against employees of Reclamation Creditors to recover RCT

---

[1]  At pertinent places herein, references are made to "Fleming," for Fleming Companies, Inc., public parent company of the Debtors. The Debtors are: Core-Mark International, Inc.; Fleming Companies, Inc.; ABCO Food Group, Inc.; ABCO Markets, Inc.; ABCO Realty Corp.; ASI Office Automation, Inc.; C/M Products, Inc.; Core-Mark Interrelated Companies, Inc.; Core-Mark Mid-Continent, Inc.; Dunigan Fuels, Inc.; Favar Concepts, Ltd.; Fleming Foods Management Co., L.L.C., Fleming Foods of Texas, L.P.; Fleming International, Ltd.; Fleming Supermarkets of Florida, Inc.; Fleming Transportation Service, Inc.; Food 4 Less Beverage Company, Inc.; Fuelserv, Inc.; General Acceptance Corporation; Head Distributing Company; Marquise Ventures Company, Inc.; Minter-Weisman Co.; Piggly Wiggly Company; Progressive Realty, Inc.; Rainbow Food Group, Inc.; Retail Investments, Inc.; Retail Supermarkets, Inc.; RFS Marketing Services, Inc.; and Richmar Foods, Inc.

[2]  All capitalized terms not otherwise defined herein shall have the respective meanings ascribed to them in the Plan.

Assets from their Reclamation Creditor employers, in violation of the Plan and Confirmation Order, and (iii) determine that the PCT claims being litigated against employees of Reclamation Creditors constitute RCT Assets (the "Motion").

<u>**Overview of PCT's Violation of Plan and Confirmation Order**</u>

At the beginning of December, 2004, over three months after the August 23, 2004 Plan Effective Date and over four months after Plan confirmation on July 27, 2004, the PCT asserted to the RCT that "very valuable" claims existed against Reclamation Creditors[3] arising from their alleged participation in Fleming's pre-petition accounting fraud involving financial statement irregularities and earnings overstatements (the "EO Claims").

Notwithstanding the autonomy granted to the RCT in the liquidation and recovery of RCT Assets (Plan, Art. VI.A.) (identical to the PCT's rights respecting PCT assets), the PCT demanded at the time that the RCT effectively suspend its entire claim reconciliation and asset recovery process because Reclamation Creditors, which the PCT was then unwilling or unable to identify, (i) allegedly had participated in the Fleming accounting fraud and allegedly were liable for EO Claims and (ii) had to be sued to provide support for the PCT's own (as yet unfiled) litigation claims and strategy against Fleming's pre-petition auditor Deloitte & Touche LLP ("Deloitte"). The PCT asserted that it was essential for it to sue targeted Reclamation Creditors along with Deloitte in order to optimize its tactical litigation position against, and its potential recovery from, Deloitte.

---

[3]    The Plan defines a Reclamation Creditor as "any Claim Holder that asserts that all, or any portion, of its Claim is entitled to be granted priority and/or to be secured by a lien in accordance with 546(c)(2) of the Bankruptcy Code and also those identified on the Reclamation Claim Summary by Claimant of the Debtors dated November 21, 2003." (Plan, Art. I.B.148).

BALT1:4189888

A      6

The RCT resisted. The RCT was unwilling to jeopardize the Plan-mandated RCT resolution process for 600 Reclamation Creditors based upon unexplained tort claims that purportedly existed against unnamed Reclamation Creditors. The RCT further countered that because any EO Claims constituted RCT Assets,[4] any decisions concerning the pursuit of EO Claims against specific Reclamation Creditors resided with the RCT, and should be made by the RCT consistent with (and not in contradiction of) the RCT resolution process.

Pursuant to the Plan, the RCT is obligated to address the reconciliation and recovery of RCT Assets, and the reconciliation and satisfaction of the RCT's liabilities (defined as the "Reclamation Liabilities" in the Plan, Art.V.H.). It is charged to do so through a consensual approach, based on uniform rules governing the consideration of claims and defenses, and developed in accordance with an overall integrated, business-oriented, "rough justice" approach (Plan, Art. X.F.4.). By acceding to the PCT's demands to abandon the RCT's Plan-mandated resolution process in favor of a wholesale resort to litigation (at that point, when the RCT was just beginning to actually settle with Reclamation Creditors, or ever), the RCT would have (i) failed to perform its Plan functions; (ii) defeated the very purpose the RCT was created to serve; and (iii) deprived Reclamation Creditors of the precise Plan elements that were negotiated and obtained at their behest and compose the linchpin for their overwhelming support for confirmation of the Plan.

Following the initial PCT "EO" demands and RCT response, various exchanges ensued between the RCT and the PCT. In particular, the RCT endeavored to find a means to avoid

---

[4] The Plan defines RCT Assets as "deductions, over-wires, preference claims, Causes of Action and other rights of the Debtors as against Reclamation Creditors, other than the post-petition deductions and post-petition over-wires with respect to the Fleming Convenience business which shall be transferred to Core-Mark Newco." Plan, Art. I.B.145. The Plan defines Causes of Action broadly to include essentially any form of claim "whether direct, indirect, derivative or otherwise." Plan, Art. I.B.36.

derailment of the RCT settlement process and preserve the Plan framework for Reclamation Creditors. Gradually and painstakingly (and in large measure a result of the RCT's insistence that the PCT identify targeted Reclamation Creditors and communicate the bases upon which the PCT believed that EO Claims exist against them), the universe of the EO Claim-targeted Reclamation Creditors began to shrink.

Ultimately, near the end of March, 2005, the PCT advised the RCT that the RCT should permit the PCT to commence EO Claim litigation against six Reclamation Creditors.[5] The RCT refused, responding that the RCT itself would continue its own investigation into the facts underlying the EO Claim assertions, including the historic business relationship between Fleming and these six Reclamation Creditors, in order to assess the appropriate manner in which to proceed.[6]

At the end of March, in the consolidated multi-district litigation for the securities class action cases commenced against Fleming and others in the United States District Court for the Eastern District of Texas (the "Texas Litigation"),[7] the PCT filed EO Claims against Deloitte and others. As a result of the RCT's refusal to acquiesce in the PCT's request that the RCT assign its rights to the alleged EO Claims against the final six targeted Reclamation Creditors (as these EO Claims unequivocally are RCT Assets), the PCT could not sue those Reclamation Creditors. The

---

[5]  The six Reclamation Creditors are Kraft Foods Global, Inc. ("Kraft"), Frito-Lay, Inc. ("Frito-Lay"), Marigold Foods LLC a/k/a Kemps LLC ("Marigold"), Digital Exchange Systems, Inc. ("Dexsi"), Dean Foods Company ("Dean") and Food Marketing Group a/k/a Daymon Worldwide, Inc ("FMG").

[6]  Following the PCT's initial EO Claim-related assertions, as the number of targeted Reclamation Creditors began to shrink (but before the number became the ultimate 6), the RCT formulated a process, which included among other things, the acquisition of information from a number of the then remaining targeted Reclamation Creditors, in order to investigate the PCT's assertions. This process, which is ongoing, has proven, and continues, to be extremely costly for the RCT in terms of both time and money. It has also required the RCT to hire conflicts counsel to conduct aspects of the investigations for certain of the targeted Reclamation Creditors.

[7]  The PCT, for purposes of the Texas Litigation, is the successor to Fleming. The Texas Litigation is briefly described in the Disclosure Statement approved in conjunction with the Plan (Dkt. No. 8224) in the excerpt (p. 29-31) attached as Exhibit 1. Essentially, the securities class action cases assert a Fleming accounting fraud and fraudulent public statements/disclosures by Fleming regarding Fleming business operations and profits.

- 4 -

A    8

PCT chose to circumvent the Plan with an "end run," by suing, not the Reclamation Creditors themselves, but eight individual, current and former employees of the six Reclamation Creditors (sometimes herein, the "Reclamation Creditor Employees"). The PCT contends that EO Claims against the Reclamation Creditor Employees are not claims against Reclamation Creditors, and therefore are not RCT Assets (a contention which the RCT, of course, disputes).

The PCT's "end run" and true objective are evident, however, from even a cursory review of the PCT's Complaint in the Texas Litigation (Exhibit 2). In it, the PCT makes it clear that its actual target is the Reclamation Creditors themselves, not their Employees. The PCT attempts to use the Employees as pawns to allege specifically and directly that indemnification liability should be imposed upon the Reclamation Creditors themselves to cover (and therefore pay the PCT for) damages allegedly caused by the Reclamation Creditors through their Employees who were acting within the course and scope of their employment.[8]

Accordingly, the EO Claims against Reclamation Creditor Employees themselves fall squarely within the Plan definition of Causes of Action transferred to the RCT as RCT Assets. Specifically, to ensure that claims asserted under any guise are covered, the term "Cause of Action" is defined to include, but not be limited to, all Claims "whether direct, indirect, derivative or otherwise..." (Plan, Art.I.B.36). Thus, although couched as indemnification liability (rather than, for example, respondeat superior), because the causes of action asserted in the PCT's Complaint against Reclamation Creditor Employees ultimately seek recovery against

---

[8] By suing the Reclamation Creditor Employees, it is clear the PCT hopes to draw the targeted Reclamation Creditors into the Texas Litigation as parties to defend themselves against indemnification liability and/or to defend the Reclamation Creditor Employees.

Reclamation Creditors, they constitute Causes of Action against Reclamation Creditors within the meaning of the Plan.[9]

As a direct result of the PCT's EO Claim allegations, the RCT process has faced delay and obstacles in the accomplishment of its work and objectives. The RCT acknowledges its success in overcoming some of these obstacles, as described in the First RCT Status Report and Notice of Payment of Class 3(B) TLV Reclamation Claims (the "RCT Status Report," filed August 9, 2005, Dkt. No. 11469). Nevertheless, the PCT's commencement of litigation to recover RCT Causes of Action, without RCT permission and in direct conflict with the RCT settlement process, requires redress by this Court.[10] The RCT seeks this Court's intervention to preserve the RCT's rights to conduct its affairs in administering RCT Assets and Reclamation Liabilities in accordance with the rights and responsibilities allocated to it under the Plan. Each Reclamation Creditor, including those targeted by the PCT, are entitled to have its claims and liabilities addressed through, and by means of, that Plan-mandated process.

The PCT attempt to recover RCT Assets from these six Reclamation Creditors raises concerns beyond whether the PCT can deny, by edict, these six their right to resolution through

---

[9] "'Cause of Action' means, including but is not limited to, all Claims, actions, choses in action, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims and cross claims (including, but not limited to, all claims in any avoidance, recovery, subordination or other actions against Insiders and/or any other Persons under the Bankruptcy Code, including sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553) of the Debtors, the Debtors in Possession and/or the Estates (including, but not limited to, those actions listed in this Plan, Exhibit A filed herewith and the Disclosure Statement that are or may be pending on the Effective Date or instituted by Core-Mark Newco, the Reorganized Debtors, the PCT or the RCT as applicable, after the Effective Date against any Person based on law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, known or unknown." (emphasis added, Plan, Art. I.B.36).

[10] The fact that the PCT has already resolved its claims with Deloitte (and dismissed the claims against Deloitte in the Texas Litigation), plays a role in the RCT's decision to bring this Motion. As noted above, the PCT initially asserted that it was essential to sue targeted Reclamation Creditors along with Deloitte for the PCT to optimize its litigation tactical position against Deloitte, and thus its recovery potential. Notwithstanding the Deloitte resolution, however, the PCT has confirmed to the RCT that it still intends to pursue the EO Claims against Reclamation Creditors and the Reclamation Creditor Employees in the Texas Litigation.

- 6 -

the RCT settlement process, and thereby unilaterally circumscribe the Plan's inclusion of these Causes of Action as RCT Assets. The RCT has always been highly sensitive to the risks to the overall integrity of the RCT and its process inherent in a selective application of the RCT rules and settlement process. In December 2004, when the PCT first raised the "EO Claim" specter against unspecified Reclamation Creditors, the RCT had not formally consummated a settlement with a single Reclamation Creditor (although several agreements in principle had been reached). At the time of filing of this Motion, the RCT likely will not have entered into final settlements with perhaps one-third or more of the Reclamation Creditors. The continued confidence of the Reclamation Creditor community in the RCT's promise and performance of the uniform application of the RCT rules and settlement process, and in the autonomy of the RCT's decision-making (free from Debtor and PCT influence), has been and remains critical to RCT success. Preservation of that confidence has been and remains necessary to avoid (i) any prospect of additional delay, (ii) additional administrative expense, and (iii) most importantly, any risk of an ultimate RCT deficit. Ironically, any such deficit would ultimately become the burden of the PCT, and would prime the PCT's distribution obligations to its principal beneficiaries, general unsecured creditors. (Plan, Art. V.G.7).

As provided in the Plan, it is for the RCT to decide whether and when litigation will or will not be initiated against the Reclamation Creditors (and, as the Plan also provides, whether and when the RCT might assign any RCT Assets to the PCT). It is not for the PCT to decide. Having exercised its unilateral action to do so in circumvention of the Plan, the PCT should be compelled by this Court to stop.

BALT1:4189888

A    11

## Jurisdiction

1.      This Court has jurisdiction over the Motion under 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

2.      Venue of this proceeding and the Motion is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested are 11 U.S.C. §§ 105 and 1142.

4.      Notwithstanding confirmation and the achievement of the Effective Date of the Plan, the Plan (Article XIII) provides that this Court retains jurisdiction to (i) enter such orders as may be necessary or appropriate to implement the Plan, (ii) resolve disputes that arise in connection with the Plan, (iii) issue injunctions, (iv) take such other actions as may be necessary or appropriate to restrain interference with and for enforcement of the Plan and (v) (to the extent of its subject matter jurisdiction) determine other matters that may arise in connection with the Plan and its implementation.

## Background to Plan

5.      Virtually from their inception and continuing through the negotiation of the Plan, these bankruptcy cases were extremely contentious both in general and as between the Debtors and Reclamation Creditors, in particular.  From the perspective of Reclamation Creditors, the contentiousness arose from the Debtors' persistent efforts to invalidate Reclamation Claims and other secured and/or priority rights of Reclamation Creditors.  When the Debtors' efforts to dispose of these rights summarily were stymied[11], they filed approximately 570 adversary proceedings against Reclamation Creditors in January, 2004 to pursue their objectives.  The

---

[11]    In December, 2004 this Court in effect denied the Debtors' Combined Amended Reclamation Report and Motion to Determine that Reclamation Claims are Valueless (Dkt. No. 4596) and by Order (Dkt. No. 5096) provided that the validity of Reclamation Claims was to be determined by adversary proceedings.

BALT1:4189888

effect of that massive litigation onslaught, however, was to bury reorganization prospects beneath a litigation morass that portended incalculable expense and delay at the same time that it fundamentally threatened the survival of the ongoing Fleming Convenience business.

6.     Amidst that environment of conflict and uncertain reorganization prospects, the Court, on February 2, 2004, directed the appointment of an Official Committee of Reclamation Creditors (the "OCRC") to represent the interests of Reclamation Creditors in, among other matters, negotiating a reorganization plan.  Immediately thereafter, the OCRC and the Debtors commenced negotiations over the possibility of achieving a consensual resolution to disputes relating to all claims Reclamation Creditors had against the Debtors (reclamation included) and all claims that the Debtors had against the Reclamation Creditors.  From the outset, resolution from the OCRC's perspective had to be based on a "global" disposition concept that completely separated the resolution of claims by and against Reclamation Creditors from the Debtors and any successor to them.  The OCRC strongly believed that form of framework, and only that form of framework, could ever lead to a consensual reorganization plan that the OCRC (and its constituents) could support.

7.     The version of a reorganization plan being promoted by the Debtors when the OCRC was appointed[12] provided no such acceptable framework.  The Debtors had proposed the formation of a single post-confirmation trust (which became the PCT) to administer all of the Debtors' post-confirmation assets and liabilities, except those owned by the Fleming Convenience business, which was to be spun out to general unsecured creditors.  Under this Plan, the PCT, viewed universally by Reclamation Creditors as simply another face of the Debtors,

---

[12] The Debtors and the Official Committee of Unsecured Creditors ("OCUC") had filed their "Second Joint Plan of Reorganization" on March 26, 2004 (Dkt. No. 7352).

BALTI:4189888

A     13

would have possessed expansive rights and substantial resources to endeavor to maximize collections from, and minimize recoveries by, Reclamation Creditors, and simply to litigate and spend them into submission. Given (a) the years of uneasy relationships between the Debtors and many of its vendors and (b) the Debtors' tactics and actions in the bankruptcy cases and related proceedings, the OCRC and its constituents were convinced that such a plan would doom them and the PCT to extensive and incalculably expensive litigation, and possibly administrative insolvency.

8.      Against that backdrop, the linchpin of the framework for a consensual reorganization plan was therefore a complete extrication of Reclamation Creditors from any involvement with the Debtors or the PCT in the resolution of all disputes. The two-trust concept was intended by the OCRC as a vehicle for resolution of all Reclamation Creditor claims and liabilities without the confrontational rancor and litigiousness that had characterized the Debtors' bankruptcy strategies (a continuation of which they feared from the PCT).

9.      Since anything other than the two-trust framework was a virtual non-starter from the outset, the major focus of most of the Plan negotiations was the economic feasibility of the second trust structure, which, in turn, hinged on whether the value of the Debtors' claims against Reclamation Creditors would be sufficient to satisfy all claims of Reclamation Creditors against the Debtors. In other words, the pivotal question was only whether Reclamation Creditors could collect enough from themselves in the aggregate to be able to pay themselves enough in the aggregate.[13] Thus, the OCRC sought to have the Debtors identify all categories of claims against Reclamation Creditors.

---

[13] To bolster the recovery rights of Reclamation Creditors due to OCRC concerns of a shortfall, negotiations involved (i) guaranties from Core-Mark for TLV Reclamation Claims on an unlimited basis and for Non-TLV

*(footnote continued to next page)*

- 10 -

10.    On April 19, 2004, the Debtors, the OCUC and the OCRC executed an initial term sheet which was subject to a two week due diligence contingency to enable the OCRC to evaluate the economic feasibility of the second trust framework.  During that time, the OCRC and its advisors were afforded certain specified opportunities, as set forth in a "Common Interest Agreement," to conduct due diligence "pertaining to [the Debtors'] estimates of the amount or value of, among other things, offsets, deductions and preference claims under 11 U.S.C. § 547 against Reclaiming Creditors" and all other claims against Reclamation Creditors identified by the Debtors.

11.    At no time during any of the Plan negotiations, including this due diligence process, did the Debtors or any of their professionals ever communicate to the OCRC a belief that EO Claims might exist against any Reclamation Creditor and/or its employees (although mention was made of the existence of EO Claims against former officers and directors of Fleming and Fleming's former auditor, Deloitte) (See Exhibit 1, p. 30-31).  By the time of the due diligence process, the Debtors had available to them a report prepared by PricewaterhouseCoopers LLP (the "PwC Report") as forensic accountants to the Audit and Compliance Committee of the Fleming Board of Directors (which was not provided to the OCRC).  The Audit and Compliance Committee of the Fleming Board of Directors also had special legal counsel working with PwC in connection with the preparation of the PwC Report. Moreover, the Debtors were aware of an ongoing Securities and Exchange Commission ("SEC") investigation of the Debtors as described in the Disclosure Statement (Exhibit 1, p. 30-31).  Yet,

---

*(footnote continued from previous page)*
Reclamation Claims on a limited basis and (ii) the obligation of the PCT to satisfy all Reclamation Claims in full subject to various categories of PCT priority obligations as set forth specifically in the Plan (Art. V.G.7).

BALT1:4189888

despite all of this information, the Debtors at no time advised the OCRC that any EO Claim was contemplated, or might even exist, against any Reclamation Creditor and/or its employees.

12.    Had the existence of any EO Claim against Reclamation Creditors and/or its employees been disclosed by the Debtors at the time, the OCRC would have insisted on their explicit identification as RCT Assets (just as the OCRC did with respect to offsets, deductions, preference claims, etc.), rather than exposing Reclamation Creditors to the prospect of leaving any such claim with the PCT for resolution outside the contemplated RCT settlement process. Absent specific disclosures, Reclamation Creditors needed assurance that no claim against them could be left outside the scope of the RCT. The Cause of Action definition in the Plan, which included Claims "whether direct, indirect, derivative or otherwise," serves this purpose. Accordingly, Claims against Reclamation Creditors, through the Reclamation Creditor Employees, are also expressly included within the scope of RCT Causes of Action.

13.    On or about May 3, 2004, the OCRC waived the due diligence contingency and, together with the Debtors and the OCUC, entered into the Revised Term Sheet to resolve the treatment of Reclamation Creditors in connection with a consensual reorganization plan.[14] The major focus of the Revised Term Sheet (Exhibit 3), which was incorporated into the Plan, was the creation of the RCT and its undertakings to create a fair, uniform and efficient process by which to resolve claims against, and liabilities owed to, Reclamation Creditors. That process was mandated to be business oriented, nonlitigious and consensual. (Exhibit 3, ¶4.6)

---

[14]    Significantly, the Plan treatment for Reclamation Creditors also represents a "settlement" approved by this Court. To address the Debtors' concerns as to whether the Revised Term Sheet would overcome objections by Reclamation Creditors to Plan confirmation, a motion was filed at the Debtors' request, pursuant to Section 105 of the Bankruptcy Code and Bankruptcy Rule 9019(a), to seek approval of the Revised Term Sheet as a settlement between the Debtors and Reclamation Creditors to resolve their disputes and to address the treatment of Reclamation Creditors under the Plan. That motion (Joint Motion of Debtors, Official Committee of Unsecured Creditors and Official Committee of Reclamation Creditors for Approval of Settlement and Support Agreement pursuant to Bankruptcy Code Section 105(A) and Bankruptcy Rule 9019(a) (Dkt. No. 7938)) was approved by this Court on May 25, 2004 (Dkt. No. 8225).

14.    As the Plan and the Disclosure Statement describe, the RCT was formed to satisfy liabilities to Reclamation Creditors with RCT Assets (which consist of all of the claims of the Debtors against Reclamation Creditors, except limited, inapplicable, post-petition claims related to Fleming Convenience).

15.    The Plan affords both the PCT and the RCT with virtually autonomous discretion in the resolution of liabilities and recovery on claims (subject to the procedural rights of creditors).

### RCT Resolution Process

16.    Pursuant to Article X.A.1. of the Plan (subject to conditions no longer applicable), the RCT (like the PCT with respect to PCT liabilities) has "exclusive authority to file objections, settle, compromise, withdraw or litigate to judgment objections to Claims" which are the obligation of the RCT to address.  Moreover, as provided therein (subject to conditions no longer applicable), the RCT "may settle or compromise any Disputed Claim allocated to the RCT on behalf of the Reorganized Debtors without approval of the Bankruptcy Court."[15]

17.    Similarly, with respect to any of the RCT Assets that constitute a Cause of Action under Article VI.A, the RCT (just like the PCT with respect to PCT assets) retains and has the exclusive right to "enforce any and all such Claims, rights or Causes of Action" and to "commence, pursue and settle the Causes of Action" that constitute RCT Assets in accordance with the Plan.  Moreover, as also provided therein, the RCT has "the exclusive right, authority and discretion to institute, prosecute, abandon, settle or compromise any and all such claims,

---

[15]    This right is qualified with respect to the determination of the General Unsecured Claims of Reclamation Creditors which, according to the Plan, must be determined in accordance with methodology developed by the RCT and approved by the Bankruptcy Court, which approval was obtained in April, 2005 (Dkt. No. 10814).

rights and Causes of Action without the consent or approval of any third party and without any

further order of court."

: 18. As provided by the Plan, the RCT was charged with creating a rules based process

that was to be business oriented, nonlitiguous, consensual and premised on a principle of "rough

justice."

The Plan commands the RCT to develop:

> [A] series of rules which can be applied in the reconciliation of
> Reclamation Claims and other RCT Assets. These rules shall be
> applied on a consensual basis . . . [and] shall not be mandatory. In
> the event a consensual reconciliation is not achieved . . . , there
> may be alternative dispute resolution procedures made available on
> terms adopted by the advisory board of the RCT. In any event,
> each Reclamation Creditor reserves its rights to seek allowance
> and reconciliation of its Reclamation Claim in accordance with the
> Bankruptcy Code and Bankruptcy Rules process as qualified by
> the Plan.

Plan, Art. X.F.4.

19. Thereafter, commencing on the Effective Date[16] and continuing through mid-

November 2004, the RCT Board, its Chair, the RCT Representative, and their advisors began to

formulate, refine, test and implement "Rules" (the "Rules") for the consensual reconciliation and

resolution of RCT Assets and Reclamation Liabilities. The RCT Chair and Board Members

actively engaged in the development of the Rules and in evaluating procedures that, from a

business perspective, fit the RCT's mission. Relying on their extensive individual and collective

industry knowledge, familiarity with the principles of trade credit, bankruptcy acumen, and

historical experience with the Debtors, the RCT Board largely shaped the development of the

---

[16] The RCT Chair planned for and convened the first RCT Board meeting on August 23, 2004, the Effective Date of
the Plan.

BALT1:4189888

Rules. They employed the RCT Representative and advisors primarily to provide, where necessary, any requisite support for their decisions and the work necessary to implement them.

20.    The PCT's assertion of the existence of EO Claims against Reclamation Creditors posed a substantial challenge to the RCT process. As described in the RCT Status Report (and as mandated by the Plan), the Rules (and, indeed, the entire success of the RCT process) are premised upon the voluntary participation by Reclamation Creditors in providing detailed information to the RCT to reconcile and determine the RCT Assets and Reclamation Liabilities. The information voluntarily provided forms the basis for the RCT's recoveries against them, i.e., Reclamation Creditors, believing wholeheartedly in the RCT's promise of uniform, fair and consensual resolution, essentially all admitted to their own liability for certain categories of RCT Assets sought to be collected from them. A confrontational approach with Reclamation Creditors would have been, and continues to be, entirely inconsistent with this consensual approach and the successful results to date. Moreover, Reclamation Creditors could not and can not be expected to settle with the RCT on a piecemeal basis, leaving claims against them (such as EO Claims) to be litigated while resolving all of their other claims against, and liabilities to, the RCT.

### Impact of PCT Alleged EO Claims Against
### Reclamation Creditors Upon the RCT Settlement Process

21.    In early December 2004, the RCT's settlement process was disrupted by the PCT's first-time assertion regarding the existence of the EO Claims against an unspecified number of Reclamation Creditors, the basis for which the PCT was unwilling to provide to the RCT.[17] The

---

[17] As noted earlier, this was the first time the PCT advised the RCT about its belief that RCT Assets might include EO Claims against Reclamation Creditors. The subject had never been raised to the OCRC and its representatives at any time during the pre-confirmation due diligence period and all Term Sheet and Plan

*(footnote continued to next page)*

PCT insisted that the RCT should (a) suspend the RCT settlement process entirely and refrain from proceeding to settlement with any Reclamation Creditor and (b) authorize the PCT to commence litigation against unspecified Reclamation Creditors based on the alleged EO Claims.

22.     The RCT resisted and immediately demanded information from the PCT as to the basis of its assertions.

23.     In response, the PCT provided the RCT with the PwC Report (but which had not been provided previously to the OCRC). In addition, the PCT referred the RCT to the mid-September 2004 announcement by the SEC of the settlement of enforcement proceedings against Fleming "for securities fraud and other violations arising from material earnings overstatements during late 2001 and the first half of 2002" (Exhibit 4). In connection therewith, the SEC also announced the settlement of enforcement proceedings against (i) three of the six Reclamation Creditors (Dean, Marigold and Dexsi) that the PCT has targeted in the Texas Litigation and (ii) five of the current or former employees of those three Reclamation Creditors. In addition, the SEC also announced the settlement of enforcement proceedings against the former employees of two of the other Reclamation Creditors (Kraft and Frito-Lay) that the PCT has targeted in the Texas Litigation.[18]

---

*(footnote continued from previous page)*

negotiations. While the Disclosure Statement devotes two pages (Exhibit 1, p. 30-31) to a discussion of the SEC investigation of the Debtors and the Debtors' own internal investigation relating to accounting irregularities, there is no reference to the prospect of any purported claims of the Debtors against Reclamation Creditors in connection with these irregularities. All that is stated which in any way relates to the conduct of any Reclamation Creditors is a single sentence that three Reclamation Creditor public companies had announced they were notified by the SEC that the SEC was considering filing charges against those companies in connection with their business dealings with "Fleming, including whether employees of those companies aided Fleming in accelerating revenue improperly."

[18]  With respect to these five Reclamation Creditors (no enforcement proceeding was initiated by the SEC against the sixth Reclamation Creditor (FMG) which the PCT has targeted in the Texas Litigation), the settlement of the enforcement proceedings was based on "offers of settlement" in which the SEC allegations were neither admitted nor denied. The enforcement proceedings and companion civil proceedings that were settled involved SEC allegations that the three Reclamation Creditors and the seven Reclamation Creditor Employees had "aided and

*(footnote continued to next page)*

24.    Faced with these new assertions of the potential existence of additional RCT Assets that had never previously been disclosed, either orally or in written documents, the RCT immediately began to formulate an approach (one that was consistent with its Plan-mandated charge to achieve cost-effective, consensual resolution with litigation as a last-resort) to evaluate the PCT's allegations while at the same time avoiding the derailment of the entire RCT process.[19]

25.    Beginning in November 2004, the RCT Board (having developed its Rules within three months following the Effective Date), had began to conduct informational and settlement conferences with a number of large and mid-sized Reclamation Creditors for the purpose of verifying whether the overall RCT Rules and contemplated resolution process would meet with acceptance.

26.    In early December 2004, based on the high degree of acceptance the RCT Board received for their Rules and process at these preliminary meetings, the RCT (at virtually the same time the PCT first made its EO assertions), (i) sought to reach actual settlements or agreements in principle with a number of large and mid-sized Reclamation Creditors and (ii) determined to adopt its Rules for application to the reconciliation and resolution process with all

---

*(footnote continued from previous page)*

abetted" Fleming's violations of certain provisions of the Securities Act of 1933 and the Exchange Act of 1934 and certain rules thereunder. In each case, agreed civil penalties were entered. The individuals, all of whom were sued by the PCT in the Texas Litigation, are as follows: John Robinson (a senior dairy division executive with Dean); James Green and Christopher Thorpe (CEO and Vice President of Marigold, respectively); Stephen Schmidt and Rosario Coniglio (President and principal stockholder of Dexsi); Bruce Jensen (former National Account Director for Frito-Lay) and John Adams (former Regional Manager for Kraft).

[19] "Derailment" was a very real fear of the RCT for numerous reasons. The number of PCT Reclamation Creditor targets was unspecified as was the basis for the EO Claims. Reclamation Creditors were not going to settle piecemeal with a "carveout" for claims to be litigated against them by the PCT. Furthermore, certain targets were TLV Reclamation Creditors, which the RCT is obligated to pay before any Non-TLV Reclamation Creditors (Plan, Art. III.B.5.). Protracted EO Claim litigation with them had the potential to bring the RCT process to a complete standstill with respect to settling with, collecting from, and paying to, other TLV Reclamation Creditors and all Non-TLV Reclamation Creditors. (These two classes of Reclamation Creditors are defined by the Plan at Art. I.B. 105, 166.)

- 17 -

Reclamation Creditors (despite the disruptions caused by the PCT's EO Claim assertions described below).

27.    For many weeks, however, the necessity of developing an approach to address the PCT's EO Claim allegations caused the RCT to defer entering into any formal settlement agreements with any Reclamation Creditors. "EO" obstacles affected not only the RCT settlement process but also its distribution abilities, as already noted above. Prolonged litigation with any TLV Reclamation Creditor had the potential to postpone indefinitely any distribution to Non-TLV Reclamation Creditors (and even other TLV Reclamation Creditors).

28.    Various exchanges ensued between the RCT and the PCT as the RCT attempted to preserve the RCT settlement process. The RCT focused upon efforts to (i) have the PCT identify Reclamation Creditors which it had targeted (ii) explain the reasons therefore and (iii) evaluate the basis for the PCT allegations. Based on information from the RCT Board Members about industry practices, information the RCT procured (voluntarily) from certain targeted Reclamation Creditors and, in certain other cases, for reasons both explained and unexplained by the PCT, the PCT agreed to the elimination of certain Reclamation Creditor as EO Claim targets.

29.    Gradually and painstakingly, the number of Reclamation Creditors against which the PCT asserted that EO Claims existed began to shrink as a result of the RCT approach. With respect to a limited list that remained, the RCT continued to formulate a process, including acquiring information from those Reclamation Creditors, in order to investigate the PCT's assertions. The process has proven extremely time consuming and costly for the RCT and has necessitated the retention of conflicts counsel in connection with the investigations of certain targeted Reclamation Creditors. The "EO Process" necessitated by the PCT's allegations

- 18 -

essentially delayed the RCT's settlement process by three months (until mid-March, 2005) and still continues to slow progress.

### Texas Litigation

30.    Near the end of March, 2005, the PCT notified the RCT that the PCT was required, as Fleming's successor, to file its answer in the Texas Litigation, and simultaneously to file its complaint against Deloitte. The PCT contended that it would be best positioned if the EO Claims against the final six, then-targeted Reclamation Creditors were also filed at the same time.

31.    In response, the RCT reiterated the ongoing nature of its own investigation into the business relationship of the Debtors with these Reclamation Creditors (with a specific focus on transactions which the PCT had identified as challengeable). The RCT advised that it would determine how best to proceed in light of the PCT's allegations and in the context of the RCT's own settlement process. The RCT declined to assign to the PCT the right to pursue any Cause of Action against these six Reclamation Creditors and also declined to commence litigation itself pending the completion of its own investigation.[20]

32.    On March 31, 2005, the PCT filed its Cross-Complaint and Original Complaint of the Post-Confirmation Trust and Original Answer of Defendants the Fleming Companies, the Post-Confirmation Trust and Core-Mark (the "Complaint", Exhibit 2). In the Complaint the PCT filed a cross-complaint against Deloitte and against Mark Hansen, Neil Rider and Mark Shapiro (all senior Fleming management). In addition, causes of action were asserted against a number of other former Fleming officers and employees.

---

[20]    Since these six Reclamation Creditors had been previously identified among a larger, targeted group, the RCT's own investigative process with respect to them was already under way, and the RCT had entered into tolling agreements as to certain limitations periods with each of these six Reclamation Creditors.

BALT1:4189888

A    23

33.    Moreover, and despite the RCT's refusal to authorize the PCT to commence litigation against the six Reclamation Creditors, the PCT did so anyway by also alleging EO Claims against the seven current or former employees of Reclamation Creditors (identified in footnote 18) and against a current employee of FMG. These individuals are collectively referred to as Vendor Officers in the Complaint and are alleged by the PCT to have been "acting within the course and scope of their authority" and to have assisted the individual Fleming officers and employees "in wrongfully manipulating Fleming's financial statements to the detriment of Fleming and its creditors."

34.    The PCT did so even though the claims against the Reclamation Creditor Employees constitute Causes of Action that belong to the RCT. Such claims unequivocally are an assertion of claims "direct, indirect, derivative or otherwise," by the PCT against the six Reclamation Creditors, and represent a blatant effort to recover from them in contravention of the Plan. By doing so, the PCT's design, whether through its own action, or as a result of the reactions by the Reclamation Creditor Employees, or the Reclamation Creditors themselves, is to draw the Reclamation Creditors into the Texas Litigation to address the PCT's allegations concerning the Reclamation Creditors' indemnification liability.

35.    The transparency of the PCT guise is readily evidenced by the PCT's express efforts to impose indemnification liability on Reclamation Creditors themselves on behalf of the Reclamation Creditor Employees, to wit:[21]

---

[21] In the Complaint, the PCT contends the Reclamation Creditor Employees are jointly and severally liable for "hundreds of millions of dollars of damages." Surely, the PCT looks not to the eight individual Reclamation Creditor Employees for such recovery but rather directly to the Reclamation Creditors themselves.

- 20 -

(A)    Paragraph 3 of the Complaint alleges that the Vendor Officers "'on behalf

of their respective employers'... each had actual and apparent authority to engage in

transactions with Fleming."

(B)    Paragraph 4 of the Complaint alleges that:

The Vendor Officers, and the Vendors who employed them,
knowingly participated in and induced the breach of fiduciary
obligations owed to Fleming by the Fleming Officer Defendants.
They also made negligent representations and entered into a
conspiracy to injure Fleming.

The PCT concludes therefore that the Vendor Officers are liable to Fleming.

(C)    Throughout the Complaint, the PCT asserts claims directly against the

Reclamation Creditors (Kraft, paragraphs 61 through 66; Dexsi, paragraphs 67 through

72; Marigold, paragraphs 73 through 78; Frito-Lay, paragraphs 79 through 81; Dean,

paragraphs 82 through 85; and FMG, paragraph 87 through 92).

(D)    The Vendor Officers have been sued for

(i) knowing participation in a breach of fiduciary duty by
the Fleming officers and employees;

(ii) negligent misrepresentation to Deloitte; and

(iii) civil conspiracy with the officer and employee
defendants.

(E)    Count VI of the PCT Complaint, entitled "Course and Scope of

Employment, Liability of Agent," makes its intention plain.

(F)    Paragraph 120 of the PCT Complaint states as follows:

Each of the Vendor Officer Defendants was acting within the
course and scope of their employment as officers, agents or
employees of the Vendors that employed them. The Vendors are,
therefore, responsible to indemnify the Vendor Officer Defendants
for any damages they are compelled to pay to the PCT as a result
of this recovery in this action.

BALT1:4189888

36.    By the foregoing means, the PCT seeks direct recovery against the Reclamation Creditors, and seeks to recover RCT Assets without any entitlement to do so under the Plan and Order confirming it.

### Legal Basis for the Relief Sought by the RCT

A.    The Court Possesses Post-Confirmation
      Jurisdiction to Grant the Relief Sought by the RCT

37.    The RCT is entitled to this Court's protection to assure that it is allowed to exercise the rights and powers granted to it under the Plan.[22] Neither the RCT nor the Court need look further than this Court's decision in In re Continental Airlines, 236 B.R. 318 (Bankr. D. Del. 1999), aff'd, 2000 WL 1425751 (D. Del. Sept. 12, 2000), aff'd, 279 B.R. F.3d 226 (3d Cir.), cert. denied, 537 U.S. 944, 123 S.Ct. 345 (2002), for support for the proposition that this Court possesses the requisite subject matter jurisdiction to sustain the RCT's Motion.  A court has inherent authority to enforce its own orders.  236 B.R. at 325-26; accord Cox v. Zale Delaware, Inc., 239 F.3d 910, 917 (7th Cir. 2001); In re Chateaugay Corp., 213 B.R. 633, 640 (S.D.N.Y. 1997).  "In the bankruptcy context, courts have specifically and consistently held that the bankruptcy court retains jurisdiction, inter alia, to enforce its confirmation order."  Continental, 236 B.R. at 326.  In addition, the Court noted, further authority is provided by Rule 3020(d) of the Federal Rules of Bankruptcy Procedure, which states that, "[n]otwithstanding the entry of the

---

[22]    Also, as the Court ruled in Continental, the relief sought by the RCT – to enjoin the PCT's pursuit of the Complaint -- is properly sought by means of the Motion.  Continental.  Id. at 326-27.  An adversary proceeding seeking injunctive relief is not required when a party seeks instead to enforce existing Section 1141 and 524 injunctions and the terms of a confirmation order.  Id. at 327; accord In re Woods, 316 B.R. 522, 525 (Bankr. N.D. Ill. 2004) (citing Continental); In re Petrie Retail, Inc., 304 F.3d 223 (2nd Cir. 2002).  This Court observed that jurisdiction existed to protect its confirmation order, to prevent interference with the execution of the Plan and otherwise to aid its operation.  Id. at 326.  Although Bankruptcy Rule 7001(7) requires the commencement of an adversary proceeding "to obtain an injunction or other equitable relief," that Rule is inapplicable where the relief sought is the enforcement of an injunction previously obtained.  Id.

order of confirmation, the court may issue any other order necessary to administer the estate." Id.

38.    The Court also observed that Section 1142 of the Bankruptcy Code provides additional statutory support for this Court's jurisdiction of the RCT's Motion. Id. at 324. Subsection 1142(b) provides in relevant part that, "[t]he court may direct the debtor and any other necessary party to . . . perform any other act . . . necessary for the consummation of the plan." Although the Court noted that Section 1142 provides only limited authority for post-confirmation jurisdiction and, in particular, frequently fails to permit such post-confirmation jurisdiction with respect to claims arising post-confirmation (id. at 324), that limitation, as noted below, is absent in connection with the RCT's Motion.

39.    The RCT is asking the Court to enjoin the PCT from pursuing claims against the Reclamation Creditors and Reclamation Creditor Employees in the Texas litigation because, under the Plan and Confirmation Order, the PCT had no right to file them and has no right to pursue them. All EO Claims unquestionably arose pre-confirmation, and were impermissibly asserted by the PCT post-confirmation. Their filing and prosecution represent an impermissible "end run" to circumvent this Court's Confirmation Order and undermine the RCT's ability to perform and fulfill its Plan-mandated obligations.[23]

---

[23]  The relief sought in Continental was quite similar. That case concerned, among other issues, the enforcement of a plan and confirmation order providing for certain treatment of claims with respect to which airline pilots subsequently sought different treatment in another court. Specifically, Continental sought a determination of whether the confirmation order barred the airline pilots' collateral action seeking a declaratory judgment that Continental was obligated to specifically perform in accordance with the terms of a collective bargaining agreement rather than being liable for money damages. Resolving this issue, the Court concluded that the confirmation order should be enforced so as to preclude the airline pilots from prosecuting the collateral action. Continental, 236 B.R. at 321-23.

B.     The EO Claims Against Reclamation Creditor Employees are RCT Assets

40.     There is no doubt that the Court retains post-confirmation jurisdiction for purposes of interpreting and clarifying the terms of a plan that it confirmed. E.g., In re Resorts Intern., Inc., 372 F.3d 154, 168 (3d Cir. 2004) ("when a matter affects the interpretation, implementation, consummation, execution, or administration of a confirmed plan or incorporated litigation trust agreement, retention of post-confirmation bankruptcy court jurisdiction is normally appropriate."); In re LaRoche Industries, Inc., 312 B.R. 249, 257 (Bankr. D. Del. 2004); In re Linc Capital, Inc., 310 B.R. 847, 855 (Bankr. N.D. Ill. 2004). No doubt the PCT will argue, as it has to the RCT, that, since Reclamation Creditor Employees are not Reclamation Creditors, the PCT is entirely free to use those Reclamation Creditor Employees as conduits to impose liability directly on Reclamation Creditors. The Plan, however, was never intended to produce this result, either by the facile and disingenuous devices being employed by the PCT or any other means. Because the Debtors never disclosed that EO Claims existed against Reclamation Creditors or Reclamation Creditor Employees, such claims were not explicitly identified as RCT Assets. However, the definition of Cause of Action is, and was intended to be, expansive enough to include such claims as RCT Assets. Given all of the facts and history of these cases pre-confirmation, the Court should not permit the Plan's specific silence on these types (i.e., EO Claims) of claims against Reclamation Creditor Employees to unduly restrict the Plan's scope of Cause of Action to be exploited by the PCT to get their hands on RCT Assets.

41.     Reorganization plans have been analogized to contracts for purposes of applying the principles of contract construction and interpretation. Linc Capital, 310 B.R. at 856. When the parties' intentions are apparent from a reading of the entire agreement, those intentions will control and govern construction over the meaning of any particular word or phrase. Kmart

- 24 -

A    28

Corporation v. Newell Rubbermaid Incorporated (In re Kmart Corp.), 310 B.R. 107, 125 (Bankr. N.D. Ill. 2004).

42.    Accordingly, in determining whether to grant the Motion, this Court should examine the Plan as a whole, and interpret it to effectuate the mutual intention of the parties as such intent existed at the time of "contracting." Those intentions are to be ascertained from the language of the Plan as viewed as a contract. Id.

43.    During the Plan confirmation process, Reclamation Creditors negotiated and voted for a Plan, and became parties to a Bankruptcy Rule 9019 "settlement," that contemplated and provided for those Reclamation Creditors' compete extrication from any post-confirmation involvement with the Debtors or their successors in the resolution of their claims by and against Fleming. The sole, explicit and limited exception was post-petition claims relating to Fleming Convenience. The Reclamation Creditors negotiated, "settled for" and supported a confirmation plan which provided a specific type of process (the RCT process) for resolution of claims against them and their claims against the Debtors.

44.    The Court is now called upon to decide whether the PCT shall be permitted to circumvent and undermine the intent, meaning and terms of the Plan by pursuing EO Claims against Reclamation Creditors – claims that were never asserted or disclosed to exist at any time during which Reclamation Creditors were negotiating, "settling" with the Debtors and supporting the Plan.

45.    The Court is further called upon to decide whether the PCT shall be permitted to similarly undermine the intent, meaning and terms of the Plan by pursing Reclamation Creditor Employees as pawns in order to recover RCT Assets from Reclamation Creditors simply because the PCT is precluded from doing so directly. The PCT should not be permitted to capitalize on

- 25 -

the Debtors' utter failure to disclose either the fact or prospect of EO Claims, to then construe the Plan to exclude Causes of Action against the Reclamation Creditor Employees from the definition of RCT Assets (while insisting that the Reclamation Creditors are liable for damages arising from the Employees' actions within the scope of their employment), and to then leapfrog on to Reclamation Creditors themselves to thereby deny them the Plan benefits for which they negotiated.

46.    The Court is also further called upon to decide whether the scope of the definition of "Cause of Action" in the Plan is to be accorded its intended effect. This Court must determine that when Causes of Action against Reclamation Creditors were transferred to the RCT on the Effective Date whether or not such Causes of Action truly included all of those against Reclamation Creditors "whether direct, indirect, derivative, or otherwise." Further, the Court must determine whether Reclamation Creditor Employees can be held "hostage" by the PCT to pursue indemnification liability against Reclamation Creditors as an asset of the PCT.

47.    To give full effect to the Plan, the PCT must not be permitted directly or indirectly to pursue Reclamation Creditors. The RCT settlement process, as the Plan dictates, must prevail. It is for the RCT to determine whether and how the EO assertions of the PCT should be addressed and not by a circumvention of the Plan through a blatant exploitation of Reclamation Creditor Employees.

48.    The appropriate relief herein is to enjoin the PCT as requested, to preclude the PCT from pursuing the EO Claims against the Reclamation Creditor Employees, and to permit the RCT to exercise its settlement process as the Plan contemplates.

BALT1:418988S

A    30

WHEREFORE, the RCT requests the entry of an order which enjoins the PCT from pursuing the EO Claims against the Reclamation Creditor Employees in the Texas Litigation and determines that any such claims constitute RCT Assets.

Dated:  August 22, 2005

Respectfully submitted:

**KLEHR, HARRISON, HARVEY,
BRANZBURG & ELLERS LLP**


_____/s/ Michael W. Yurkewicz_____
Steven K. Kortanek (Del. Bar No. 3106)
Michael W. Yurkewicz (Del Bar No. 4165)
919 Market Street
Suite 1000
Wilmington, DE 19801
Telephone:  (302) 552-5503
Facsimile:  (302) 426-9193

-- and --

DLA PIPER RUDNICK GRAY CARY US LLP
Janice L. Duban
203 N. LaSalle Street, Suite 1900
Chicago, IL 60601
Telephone:  (312) 368-7097

Mark J. Friedman
6225 Smith Avenue
Baltimore, MD 21209
Telephone:  (410) 580-4153

Daniel J. Carrigan
1200 19th Street, N.W.
Washington, DC 20036
Telephone:  (202) 861-3840

BALT1:4189888

A    31

# EXHIBIT 1

Operating Reports as required by the Guidelines. Each Monthly Operating Report includes for the relevant period, among other things, (a) information regarding the Debtors' cash receipts and disbursements, (b) an income statement (prepared on an accrual basis), (c) a balance sheet (prepared on an accrual basis), (d) a statement regarding the status of the Debtor's post-petition taxes and (e) a statement regarding the status of accounts receivable reconciliation and aging.

6.    Pending Litigation And The Automatic Stay

a.    *Directors' & Officers' Litigation*

In re Fleming Companies Inc. Securities and Derivative Litigation, United States District Court for the Eastern District of Texas, Texarkana Division, Case No. MDL 1530. During 2002, a number of securities class action cases were commenced by and on behalf of persons who purchased Fleming's publicly traded securities. The actions named Fleming and certain of Fleming's directors and officers as defendants and sought damages under either or both of the Securities Exchange Act of 1934 (the "Exchange Act") and the Securities Act of 1933 (the "Securities Act"). Various parties to those actions asked the Judicial Panel on Multidistrict Litigation (the "JPML") to consolidate that litigation, then consisting of 14 separately filed cases, in a single court. On June 25, 2003, the JPML issued an order directing that all of those actions be transferred to the Eastern District of Texas, Texarkana Division, for coordinated or consolidated pretrial proceedings. During the same time period, two derivative actions were filed on Fleming's behalf, seeking damages from various of Fleming's directors and officers for alleged violations of securities laws. Those derivative actions have been, or are in the process of being, administratively closed or dismissed without prejudice.

On February 20, 2003, while the JPML proceedings were pending, a class action generally captioned *Massachusetts State Carpenters Pension Fund, etc. v. Fleming Companies, Inc., et al.*, was filed in the 160th District Court, Dallas County, Texas, and thereafter removed to the United States District Court for the Northern District of Texas, Dallas Division, as Case No. 3-03CV0460-P. That action named Fleming, various of Fleming's directors and officers, Lehman Brothers, Inc., Deutsche Bank Securities, Inc., Wachovia Securities, Morgan Stanley & Co., Inc., and Deloitte & Touche, L.L.P., as defendants, and sought damages under the Securities Act. Subsequently, on April 17, 2003, an identical action (except for the elimination of Fleming as a defendant) was commenced in the Eastern District of Texas, Texarkana Division, as Case No. 03-CV-83, where it could be, and ultimately was, consolidated with the Fleming securities litigation pending in that Court. Meanwhile, the District Court for the Northern District of Texas denied the plaintiffs' motion to dismiss that action without prejudice. Ultimately, the action was transferred to the Eastern District of Texas where it, too, was consolidated with the litigation pending in that district.

On June 27, 2003, eighty individual plaintiffs commenced an action against various present and former directors and officers of Fleming and against Deloitte & Touche. That action, captioned *Rick Fetterman, et al., v. Mark Hansen, et al.*, United States District Court for the Northern District of Texas, Dallas Division, Case No. 3:03-CV-1435 (L), sought damages for alleged violations of the Exchange Act and certain Texas securities statutes. The JPML has transferred that case to the Eastern District of Texas as a "tag-along" case, and it has been consolidated with the other cases pending in that district.

On August 28, 2003, sixty-three individual plaintiffs commenced an action against various present and former directors and officers of Fleming and against Deloitte & Touche, L.L.P. That action, captioned *Christopher L. Doucet, et al. v. Mark Hansen, et al.*, United States District Court for the Northern District of Texas, Dallas Division, Case No. 3-03-CV-1950 H, sought damages for alleged violations of the Exchange Act and certain Louisiana securities statutes and under theories of fraud, misrepresentation and conspiracy. A "tag along" notice has been filed with the JPML, but the case has not yet been transferred to the Eastern District of Texas for consolidated or coordinated pretrial proceedings in that court.

amended by Docket No. 6969]; 1/1/04-1/31/04 [Docket No. 7188]; 2/1/04 - 2/29-04 [Docket No. 7612]; 3/1/04 - 3/31/03 [Docket No. 8048].

29

See Article VI.N.9. herein for a discussion of the effects the Plan and certain provisions therein will have on the directors and officers litigation.

b.    *SEC Investigation*

The lawsuits described above encompass allegations dealing with accounting, financial reporting and other disclosures and claim that Fleming falsely inflated its securities prices by means of accounting fraud and false public statements about its business operations and profit. Shortly after the first lawsuit was filed, the *Wall Street Journal* published an article on September 5, 2002, citing examples where Fleming allegedly had taken certain aggressive deductions against its suppliers.

These events prompted an informal inquiry by the SEC. On November 13, 2002, Fleming announced that the SEC had initiated an informal inquiry related to Fleming's vendor trade practices, the presentation of second quarter 2001 adjusted earnings per share data in Fleming's second quarter 2001 and 2002 earnings press releases, Fleming's accounting for drop-ship sales transactions with an unaffiliated vendor in Fleming's discontinued retail operations, and its calculation of comparable store sales in its discontinued retail operations.

The SEC converted the informal inquiry into a formal investigation on February 13, 2003. The formal investigation has focused on whether any persons or entities engaged in any acts, transactions, practices or courses of business which operated or would operate as a fraud or a deceit upon purchasers of Fleming securities or upon other persons in violation of the federal securities laws. Fleming has answered questions submitted by the SEC and has produced documents to the SEC. The SEC has interviewed several current and former employees of Fleming as well as third parties. Fleming continues to be in discussions with the SEC and intends to continue to fully cooperate with the SEC. Kraft Foods, Dean Food and Frito-Lay recently announced they have been notified that the SEC is considering filing charges against those companies in connection with their business dealings with Fleming, including whether employees of those companies aided Fleming in accelerating revenue improperly.

After receiving notice of the informal SEC inquiry, Fleming undertook an independent investigation related to the same topics. The Audit and Compliance Committee of the Board of Directors of Fleming ("Audit Committee") engaged independent legal counsel and independent accounting consultants to assist in connection with the independent investigation. The independent investigation included a review of transactions that occurred during the 2000, 2001 and 2002 time periods. These periods are the subject of the SEC investigation. The scope of the independent investigation included the original topics identified by the SEC as well as issues related to the timing of recording revenue, documentation of certain vendor transactions and certain initiatives undertaken for the purpose of increasing reported income.

On April 17, 2003, Fleming issued a press release (the "April 17 Release") announcing that it would have to restate its 2001 annual and quarterly financial statements and 2002 quarterly financial statements previously filed with the SEC and that it would revise its previously announced 2002 fourth quarter and annual financial results. Fleming announced that the restatements and revisions reflected significant business issues and developments affecting it, including the recent termination of Fleming's supply agreement with Kmart and events leading to Fleming's voluntary Chapter 11 bankruptcy filing on April 1, 2003, as well as adjustments identified in connection with the continuing independent investigation by the Audit Committee into certain accounting and disclosure issues.

The April 17 Release also reported that the restatements of the results for the full-year 2001 and the first three quarters of 2002 would reduce the pre-tax financial results from continuing operations for such periods by an aggregate amount of not more than $85 million and that the restatements would mainly correct the timing of when certain vendor transactions are recognized and the balance of certain reserve accounts.

The April 17 Release also announced that Fleming would have to revise its previously announced 2002 fourth quarter and annual financial results to reflect a loss from continuing operations. In accordance with Statement of Financial Accounting Standards ("SFAS") No. 142, Fleming announced that it expected to record a non-cash adjustment to continuing operations for a full impairment of goodwill currently

valued at approximately $645 million, due to an overall decrease in the value of Fleming. In accordance with SFAS No. 144, Fleming also announced that it would record an additional impairment charge to discontinued operations of approximately $90 million related to retail store operations held for sale, due to a reduction in the net realizable value of such operations. In accordance with SFAS No. 109, Fleming announced that it had determined that it would record a non-cash charge against continuing operations in the fourth quarter of 2002 relating to its deferred tax assets in the range of $275-325 million, due to uncertainties as to whether net operating losses would be utilized against future tax payments. Fleming also announced that its fourth quarter 2002 pre-tax loss from continuing operations would be increased by expenses totaling not more than $80 million as a result of a number of factors, including increased vendor payback rates, the Kmart contract cancellation and corrections identified as a result of the Audit Committee's independent investigation.

Finally, Fleming announced on April 17, 2003, that it would early adopt EITF 02-16, Accounting by a Reseller for Cash Consideration Received from a Vendor, retroactive to the beginning of fiscal year 2002. This rule requires cash consideration received from a vendor to be recorded as an adjustment to the prices for the vendor's products and therefore characterized as a reduction of cost of sales when recognized in the customer's income statement. Fleming announced that the 2002 effect of adopting EITF 02-16 was expected to reduce the pre-tax loss from 2002 annual results in the range of $5-15 million, although the cumulative effect that would be recorded as of the beginning of 2002 was expected to be an expense of not more than $45 million.

In a Form 12b-25 filed by Fleming with the SEC on June 4, 2003, Fleming announced that its 2000 annual financial statements previously filed with the SEC would require restatement. The June 4th announcement stated that it expected the related restatements of the results for the full-year 2000 to reduce consolidated pre-tax financial results for such period by an aggregate amount of not more than $2 million, reflecting an increase in 2000 pre-tax loss from continuing operations of not more than $6 million and a decrease in 2000 pre-tax loss from discontinued operations of not more than $4 million. As stated in the June 4th announcement, those restatements would principally correct the timing of when certain vendor transactions were recognized and would reflect other adjustments and corrections identified as a result of the Audit Committee's independent investigation.

c.     *Labor-Related Claims*

During the prepetition and post-petition period, the Debtors had several labor-related claims filed against them by individual employees and/or union representatives for grievance/arbitration claims for vacation, pay, health and welfare payments, severance pay and discrimination claims, the majority of which the Debtors believe, if allowed, will be General Unsecured Claims.

In connection with the wind-down of their Wholesale Distribution Business, the Debtors closed several facilities in various states, including Wisconsin, for which there are currently claims pending by the Wisconsin Department of Workforce Development for claims under Section 109.07 of the Wisconsin Statutes based on insufficient notice of the facility closings.

In addition, except as set forth in the Benefits Schedule, the Debtors will have withdrawn from all "multiemployer plans" (as such term is defined in Section 3(37) of ERISA) prior to the Effective Date. As a result, several multiemployer benefit plans have filed proofs of claims against the Debtors' estates. The Debtors propose to treat these claims as General Unsecured Claims.

d.     *Significant Prepetition Litigation*

(1)     *DiGiorgio Corp. v. Fleming Companies, Inc., et al.*, United States District Court for the District of New Jersey, Case No. 02-2887-DMC. DiGiorgio alleged that Fleming breached a non-compete agreement with respect to supplying certain grocery items in Connecticut, New York and parts of New Jersey. DiGiorgio sought injunctive relief and an unspecified amount of damages and requested an audit of Fleming's books and an order extending the term of the non-compete agreement beyond its scheduled June 2004 expiration date. Fleming denied that it breached the agreement and, additionally, claimed that the non-

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

|  |  |  |
|---|---|---|
| IN RE FLEMING COMPANIES SECURITIES LITIGATION<br><br>This Document Relates to All Actions | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | Civil Action No.<br>   05-03-1530 (TJW)<br><br>Case No. MDL- 1530<br><br>   Judge T. John Ward |

## CROSS-COMPLAINT AND ORIGINAL COMPLAINT OF THE POST-CONFIRMATION TRUST AND ORIGINAL ANSWER OF DEFENDANTS THE FLEMING COMPANIES, THE POST-CONFIRMATION TRUST AND CORE-MARK

## TABLE OF CONTENTS

I.      Jurisdiction and Venue . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.     Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IV.     Deloitte Failed to Perform a Competent Audit and Breached
        its Professional Obligations to Fleming . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

V.      Fleming's Financial Statements Were Manipulated . . . . . . . . . . . . . . . . . . . . . 17

VI.     Wrongful Vendor Deductions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

VII.    Falsely Documented Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        A. Kraft Foods and Adams . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

        B. Digital Exchange and Defendants Coniglio and Schmidt . . . . . . . . . . . . . . 22

        C. Marigold and Defendants Green and Thorpe . . . . . . . . . . . . . . . . . . . . . . . 25

        D. Frito-Lay and Defendant Jensen . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        E. Dean Foods and Defendant Robinson . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

        F. FMG/Daymon and Defendant Peter Frank . . . . . . . . . . . . . . . . . . . . . . . . . 31

        G. Dole Food Company and Defendants Michael Cavallero
        and Dole Fresh Fruit Company . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

VIII.   The Role of Fleming's Outside Directors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

COUNT I
Professional Negligence and Negligent Misrepresentation
Against Deloitte & Touche LLP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

COUNT II
Breach of Fiduciary Duty . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

ii

COUNT III
    Knowing Participation in Breach of Fiduciary Duty .......................... 42

COUNT IV
    Negligent Misrepresentation Against Vendor Officers and Dole Fresh Fruit ......... 44

COUNT V
    Civil Conspiracy: Fleming Officer Defendants and Vendor Officer Defendants
      and Dole Fresh Fruit Company ............................................ 45

COUNT VI
    Course and Scope of Employment, Liability of Agent ......................... 46

COUNT VII
    Exemplary Damages against Defendant Deloitte & Touche ..................... 47

COUNT VIII
    Exemplary Damages against Fleming Officers,
    Vendor Officers and Dole Fresh Fruit ...................................... 47

IX. Additional Claims Against Deloitte .......................................... 48

COUNT IX
    Avoidance of Preferential Transfers – 11 U.S.C. § 547 ........................ 48

COUNT X
    Avoidance of Fraudulent Transfers – 11 U.S.C. § 548 ......................... 49

COUNT XI

    Avoidance of Fraudulent Transfers – 11 U.S.C. § 544 & Applicable State Law ...... 49

COUNT XII
    For Recovery of Property – 11. U.S.C. § 550 ................................ 50

ORIGINAL ANSWER OF FLEMING COMPANIES
    AND THE POST-CONFIRMATION TRUST AND CORE-MARK .............. 51

First Defense: Failure to State a Claim for Relief .................................. 51

Second Defense: Discharge in Bankruptcy ....................................... 51

iii

Third Defense: Limitation of Liability . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Fourth Defense: Lack of Capacity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Original Answer . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 90

iv

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

|  |  |
|---|---|
| IN RE FLEMING COMPANIES SECURITIES LITIGATION<br><br>This Document Relates to All Actions | § Civil Action No.<br>§     05-03-1530 (TJW)<br>§<br>§ Case No. MDL- 1530<br>§<br>§     Judge T. John Ward |

**CROSS-COMPLAINT AND ORIGINAL COMPLAINT OF THE
POST-CONFIRMATION TRUST AND
ORIGINAL ANSWER OF DEFENDANTS THE FLEMING COMPANIES,
THE POST-CONFIRMATION TRUST AND CORE-MARK**

1.  Pursuant to Fed. R. Civ. P. 13, the Post-Confirmation Trust ("PCT") as third party plaintiff, files this cross-complaint against Defendants Deloitte & Touche, LLC, Mark Hansen, Neal Rider, and Mark Shapiro.

2.  In addition, pursuant to Fed. R. Civ. P. 18 and 20, the PCT files this original complaint against Defendants Thomas Dahlen, Jim Thatcher, Steven Davis, Albert "Al" Abbood, Scott Northcutt, Charles Myers and Phillip Murphy, each of whom is a former employee of Fleming Foods[1]; and Defendants James Green, President of Marigold Foods LLC; Christopher Thorpe, Vice-President of Marigold Foods LLC; John Kenneth Adams, Regional Manager of Kraft Foods; Rosario Coniglio, majority owner of Digital Exchange Systems, Inc.; Steven Schmidt, President of Digital Exchange Systems, Inc.; Bruce Keith Jensen, Director of National Accounts for Frito-Lay, Inc.; John D. Robinson, Senior Vice President of Sales and Marketing for Dean Dairy Group, a division of Dean Foods Company; Peter Frank, Chief Financial Officer of Daymon Worldwide and Daymon

---

[1]Messrs. Hansen, Rider, Shapiro, Northcutt, Dahlen, Abbood, Murphy, Thatcher, Davis and Myers may be referred to collectively as the "Fleming Officer Defendants."

Worldwide Trading, Inc., formerly known as Food Marketing Group ("FMG"); and Michael J.

Cavallero, President North America Tropical Fresh Fruit for Dole Food Company, Inc. and an officer

of Dole Fresh Fruit Company, (collectively, the "Vendor Officers"); and Defendant Dole Fresh Fruit

Company. Each of these Vendor Officers was an officer of the former Fleming vendors described

below, and each of the Vendor Officers--while acting within the course and scope of their authority--

assisted Messrs. Hansen, Rider, Shapiro, Northcutt, Dahlen, Abbood, Murphy, Thatcher, Davis and

Myers in wrongfully manipulating Fleming's financial statements to the detriment of Fleming and

its creditors.

3.    Briefly, the Vendor Officers--on behalf of their respective employers--Kraft Foods

Company, Marigold Foods, LLC, Digital Exchange Systems, Inc., Dean Foods Company, Frito-Lay,

Inc., Defendant Dole, Daymon Worldwide and Daymon Worldwide Trading, Inc., and Dole Fresh

Fruit Company (the "Vendors")--each had actual and apparent authority to engage in transactions

with Fleming. Fleming was a legitimate business, and there were legitimate aspects to its business,

but the Vendor transactions at issue in this Complaint were not legitimate. Instead, these

transactions injured Fleming, were wrongful, and ended by deepening Fleming's insolvency beyond

repair.

4.    The Vendor Officers, and the Vendors who employed them, knowingly participated in

and induced the breach of fiduciary obligations owed to Fleming by the Fleming Officer Defendants.

They also made negligent misrepresentations and entered into a conspiracy to injure Fleming. The

Vendor Officers and Defendant Dole Fresh Fruit are therefore liable jointly and severally with the

Fleming Officers for the hundreds of millions of dollars of damages that Fleming sustained as a

result of their joint, and knowing, misconduct.

2

5.   The injury to Fleming, however, could not have occurred without the additional negligence and gross negligence of Deloitte–which failed utterly to perform competently its work as Fleming's public auditor.

## I.   Jurisdiction and Venue

6.   This Court has original jurisdiction of the action pursuant to 28 U.S.C. § 1331, because the PCT has been named as a defendant in an action by Lead Plaintiff, Jackson Capital Management LLC, arising under the federal securities laws.   *See* Fifth Consolidated Amended Class Action Complaint ("FAC") at ¶¶ 18 and 28.

7.   This Court has supplemental jurisdiction, pursuant to 28 U.S.C. §1367, of the claims asserted by the PCT in its cross-claim and complaint.   The FAC contains detailed allegations concerning the involvement of the Vendors and the Vendor Officers in the manipulation of Fleming's financial statements, *see e.g.* FAC at ¶¶ 211-212 (Kraft, Digital Exchange, Dean Foods, Marigold Foods and Frito-Lay); 213 (FMG/Daymon and Dole, regarding "front-end margin recognition"), and concerning Deloitte's negligent audit.   The PCT's claims are so related to the claims in the FAC that they form part of the same case or controversy.   As a result, joinder of the Vendor Officers–whose conduct is specifically at issue in the FAC is expressly permitted under 28 U.S.C. §1367(a) and is likewise authorized under Fed. R. Civ. P. 18 and 20.

## II.   Parties

8.   The Post Confirmation Trust ("PCT"), is a Delaware liquidating trust created under the confirmed plan of reorganization of the Fleming Companies.   Castellamare Advisors, LLC is the PCT representative.   The PCT has been authorized by its Board to pursue the claims asserted in this complaint.

3

9. Cross-Defendant Deloitte & Touche LLP ("Deloitte") is a public accounting firm that served as outside auditor to Fleming Foods, Inc. at all times relevant to this complaint.

10. Defendant Mark Hansen was Fleming's Chief Executive Officer and Chairman of its Board of Directors from November of 1998 until March of 2003. He was a fiduciary to Fleming and owed it duties of candor, honesty and loyalty.

11. Defendant Neal J. Rider was Fleming's Chief Financial Officer, and later its Executive Vice President, from January 2000 to February of 2003. He was a fiduciary to Fleming and owed it duties of candor, honesty and loyalty.

12. Defendant Mark D. Shapiro was Fleming's Senior Vice-President, Financial Officer from 2001 to February of 2003. He was a fiduciary to Fleming and owed it duties of candor, honesty and loyalty.

13. Defendant Thomas Dahlen was Fleming's President of Retail Group from April 2001 through December 31, 2002. He was a fiduciary to Fleming and owed it duties of candor, honesty and loyalty.

14. Defendant Scott Northcutt was Fleming's Executive Vice-President, Human Resources and Procurement. He was a fiduciary to Fleming and owed it duties of candor, honesty and loyalty.

15. Defendant Al Abbood was Fleming's Vice President of Procurement from October 2001 to May 2002. He was a fiduciary to Fleming and owed it duties of candor, honesty and loyalty.

16. Defendant Charles Myers was Fleming's Vice-President of Merchandising during the relevant period. He was a fiduciary to Fleming and owed it duties of candor, honesty and loyalty.

17. Defendant Phillip Murphy was a Fleming Senior Vice President of Procurement during the relevant period. He was a fiduciary to Fleming and owed it duties of candor, honesty and loyalty.

4

A    44

18. Defendant Steven Davis was Fleming's Executive Vice-President, Wholesale during the relevant period. He was a fiduciary to Fleming and owed it duties of candor, honesty and loyalty.

19. Defendant Jim Thatcher was a Fleming officer during the relevant time period. He was a fiduciary to Fleming and owed it duties of candor, honesty, and loyalty.

20. Non-party Marigold Foods, LLC ("Marigold") is a Delaware limited liability company with its principal place of business in Minnesota.

21. Defendant James Green ("Green") is a resident of Minnesota and is the President and Chief Executive Officer of Defendant Marigold.

22. Defendant Christopher Thorpe ("Thorpe") is a resident of Minnesota who is Vice President of Financial Services for Defendant Marigold.

23. Non-Party Kraft Foods, Inc. ("Kraft") is a Virginia corporation, with its principal place of business in Northfield, Illinois.

24. Defendant John Kenneth Adams ("Adams") is a resident of Dallas, Texas, and was an officer and Regional Manager of Kraft Foods, Inc. with responsibility for its relationship with Fleming.

25. Non-Party Digital Exchange Systems, Inc., ("Dexsi") is a Delaware corporation with its principal place of business in Florida.

26. Defendant Rosario Coniglio ("Coniglio") is a resident of New Jersey and is the majority owner of Defendant Dexsi. He is actively involved in the Dexsi's high level business decisions, and was personally involved in and authorized the transactions with Fleming that are at issue in this complaint.

5

A    45

27. Defendant Steven Schmidt ("Schmidt") is a resident of Florida and is the President and founder of Defendant Dexsi.

28. Defendant Bruce Keith Jensen ("Jensen") is a resident of Florida, and was an officer and Director of National Accounts at Defendant Frito-Lay, Inc., a division of PepsiCo.

29. Non-Party Frito-Lay, Inc. is a convenience foods division of PepsiCo, which is headquartered in New York.

30. Defendant John D. Robinson ("Robinson") is a resident of Texas, and was senior Vice President of Sales and Marketing for Dean Dairy Group, a division of Dean Foods Company.

31. Non-Party Dean Foods Company is a Delaware corporation with its principal place of business in Dallas, Texas.

32. Defendant Peter Frank is the Chief Financial Officer of Daymon Worldwide Trading, Inc. He is a retired partner of the accounting firm PricewaterhouseCoopers, where he served as its Global Risk Management Partner, and as a member of its Policy Board and Management Committee. He was previously Vice Chairman of Price Waterhouse LLP.

33. Non-Party Daymon Worldwide, Inc. is a Delaware corporation, with its principal place of business at 700 Fairfield Avenue, Stamford, Connecticut 06902.

34. Non-Party Daymon Worldwide Trading, Inc. is a Delaware corporation, with its principal place of business in Connecticut.

35. Defendant Michael J. Cavallero is resident of California and is the President, North America Tropical Fresh Fruit, of Dole Food Company, Inc.

36. Defendant Dole Fresh Fruit Company ("Dole") is a Nevada corporation, with its principal place of business in Lawrence, Kansas.

6

37.  Non-Party Dole Food Company, Inc. ("DFC") is the parent company of Defendant Dole.

38.  Non-party Fleming Foods was an Oklahoma corporation with its principal place of business at 1945 Lakepoint Drive, in Lewisville, Texas.  It was—before it collapsed into bankruptcy—the nation's leading wholesale distributor of consumable goods.  It was destroyed as a result of the events recited in this Complaint.

### III.  Factual Background

39.  Before it collapsed, Fleming was the nation's leading distributor of grocery and consumer products.  It held a dominant market position and generated revenues in excess of $16 billion per year.  Before the events recited in this Complaint, Fleming was a viable, valuable and legitimate business.  After and as a result of the wrongful and negligent acts of the defendants, however, Fleming was rendered massively insolvent, collapsed into bankruptcy and was destroyed.

40.  The Fleming Post Confirmation Trust, the PCT, was created under Fleming's confirmed bankruptcy plan.  Its task is to recover for Fleming's creditors the damages that were caused, and the value of the business that was lost as a result of the wrongful conduct of those who caused Fleming's collapse.

41.  It is important to note that, as a legitimate business, Fleming had no interest in manipulating its own financial statements.  To the contrary, Fleming had an independent board—which was ignorant of the wrong perpetrated on Fleming—that had put in place procedures to ensure that Fleming's business transactions were controlled, were in its best interests and were reported accurately to its shareholders and creditors.  Fleming's senior management, a number of whom participated in the scheme to defraud and injure Fleming, had fiduciary obligations to act

A    47

solely in Fleming's best interest and additionally had duties of candor to the Fleming Board and Fleming's shareholders–duties that they repeatedly breached in order to enrich themselves at Fleming's expense.

42. The scheme described below was short in duration, but its consequences were permanent. Beginning in the latter half of 2001, and continuing through 2002, Fleming's officers embarked upon a scheme to accelerate Fleming's recognition of revenue and income. The purpose of this scheme was to artificially inflate Fleming's financial results, so as to generate large–but unearned–performance bonuses for themselves. As a result of its artificially inflated income, these officers then caused Fleming to incur over $500 million in public, trade and bank debt that Fleming could and would not have incurred had its financial results been reported accurately. The incurrence of this debt first rendered Fleming insolvent, and then deepened its insolvency beyond repair, so that what was one of the nation's largest grocery wholesalers was plunged into bankruptcy and dismembered–leaving its creditors with unpaid, unsecured debts that exceed $3 billion.

43. The scheme of these officers was a breach of their fiduciary obligations to Fleming–but they could not have wreaked this havoc alone. As the Securities and Exchange Commission has observed:

> It takes two to tango. Without suppliers providing or agreeing to false transaction documents, Fleming could not have misled investors as it did.

See SEC Press Release dated September 14, 2004. This case however, is not about two dancers: it is about a willing orchestra of reckless accountants, venal Fleming officers and corrupt vendors and vendor officers who–acting "in concert"–played a siren song that caused Fleming to founder on the rocks of debt it should never have incurred, and that it ultimately could not pay.

8

A    48

### IV. Deloitte Failed to Perform a Competent Audit and Breached
### its Professional Obligations to Fleming

44. Fleming's financial statements could not, and would not, have been misstated had Defendant Deloitte & Touche performed its professional duties as Fleming's auditor in conformity with Generally Accepted Auditing Standards (GAAS) and assured that Fleming's financial statements conformed to Generally Accepted Accounting Principals (GAAP). Deloitte was the outside auditor for Fleming for a number of years, including during 2000, 2001 and 2002. In that capacity, Deloitte issued unqualified audit opinions for Fleming for the years 2000 and 2001, and unqualified review reports for the first three quarters of 2002. The 2000 audit opinion was issued on or about February 14, 2001 (except for certain information relating to long-term debt and contingencies, which was dated March 22, 2001). The 2001 audit opinion was issued on or about February 23, 2002. In addition to its audit and review work, Deloitte issued comfort letters in connection with Fleming's debt issuances in 2001 and 2002. There is, therefore, no argument that Deloitte did not intend (or could not foresee) that Fleming would incur additional debt in reliance upon Deloitte's audit opinion and comfort letters.

45. The audit opinions issued by Deloitte for the years 2000 and 2001 each reported that Deloitte had performed its audits in accordance with GAAS, and represented that the financial statements they were engaged to audit were in conformity with GAAP. The unqualified review reports issued by Deloitte for the first three quarters of 2002 were also purportedly performed in accordance with AICPA standards, and provided assurances that no material modifications needed to be made to Fleming's financial statements for them to be in accordance with GAAP. Each opinion and report was "unqualified." Deloitte never reported: any departures from GAAS; any

9

exceptions to GAAP; any required disclosures that were missing or inadequate; or that the audited financial statements failed, in any way, to fully and fairly depict the financial position results of operations or cash flows of Fleming.

46. In reality, however, the audit and review work that Deloitte performed for Fleming fell far short of the professional standards required of an auditor. Deloitte's audits and quarterly reviews were not performed in accordance with GAAS, and Deloitte failed to report that Fleming's financial statements were not in conformance with GAAP. In performing its work and issuing its unqualified audit opinions and review reports, Deloitte breached its professional obligations as Fleming's auditor by:

- Pursuing grossly negligent audit plans, considering material one-time nonrecurring or unusual transactions and vendor discount practices in violation of AU 230 (due professional care in the performance of work), 311 (planning and supervision), 316 (consideration of fraud), and 319 (consideration of internal control).

- Turning a blind eye to wrongful and fraudulent vendor deductions that had been called to its attention in several ways, including by Fleming's internal auditor, Ernst & Young, and by Fleming's vendors, in violation of at least AU 312 (consideration of audit risk and materiality), 316 (consideration of fraud), 319 (consideration of internal controls), 325 (communication of internal control matters), 326 (evidential matter) and 333 (management representation).

- Failing to demand adequate reserves for wrongful vendor deductions, in violation of AU 326 (evidential matter) and 342 (accounting estimates).

- Failing to perform competent additional procedures that should have been performed in light of the unusual transactions with the Vendors, as required by AU 230 (due professional care), 312 (audit risk and materiality), 316 (consideration of fraud), 326 (evidential matter) and 342 (accounting estimates).

- Failing to critically evaluate significant unexpected differences in the relationships among Fleming's financial data from one period to the next, and failing to corroborate

10

management responses explaining those unexpected differences with other evidence, as required by AU 329 (analytical procedures).

- Failing to pursue sufficient audit confirmations concerning transactions with the Vendors–particularly when none were provided or resulted in conflicting evidence and or adequate alternative procedures and the transactions were significant to Fleming's income statement–in violation of AU 316 (consideration of fraud), 326 (evidential matter), and 330 (confirmation process).

- Preparing and pursuing an audit plan that did not properly consider material one-time transactions and Fleming's vendor discount practices, in violation of AU 311 (planning and supervision).

- Failing to plan and execute its review procedures in 2002 in light of the unusual transactions, allegations of fraud prior audit issues, and internal control weaknesses within the financial reporting process that Deloitte was aware of through its work in preceding years and quarters, in violation of U 722 (interim financial information).

- Failing to maintain an independent and skeptical mindset in the planning and performance of the audit, in violation of AU 230 (due professional care in the performance of work), 311 (planning and supervision), 312 (consideration of audit risk and materiality), and relying excessively and without sufficient evidence on management representations, in violation of AU 316 (consideration of fraud) and 333 (management representations).

- Failing to require and demand that the company properly disclose its significant accounting policies, principles and methods, including revenue recognition, inventory pricing, reserve determination, lending activities and supply contracts as required by APB No. 22 and changes in those accounting policies, principles and methods as required by APB No. 20.

- Failing to require the company to recognize revenue in the manner required by SAB 101.

- Failure to require proper disclosure in accordance with GAAP of purchase obligations, significant contingencies and equity method investees among others.

- Failure to accurately report that the financial statements were not in accordance with GAAP on a consistent basis in violation of AU 410 (adherence to GAAP) and 420 (consistency of GAAP).

11

A    51

● Failure to accurately report the inadequacy of disclosures in violation of AU 431. (adequacy of disclosure).

47. Deloitte's most egregious failures occurred in connection with its 2001 audit and 2002 quarterly reviews. In that time period, Deloitte was aware of a number of issues and irregularities involving Fleming's up-front revenue recognition policies and internal controls. It also knew that certain indicators of potential for fraud existed. Despite its awareness of numerous red flags, however, Deloitte proceeded with a lack of skepticism and a lack of due care in the planning phase of their audit work, and the audit procedures Deloitte implemented were woefully inadequate as a result. Deloitte's failure to properly plan its audit process in light of the issues, problems and unusual transactions at Fleming that came to its attention violated GAAS accounting standards, including those identified above. Furthermore, Deloitte was also negligent in its performance of those audit procedures that it did put in place and in the preparation of its financial statement opinion under GAAP—all which permitted Fleming's officers to manipulate Fleming's financial statements and caused Fleming to slide into insolvency and then worsen that insolvency by issuing additional debt.

48. For example, as alleged in more detail below, in the fourth quarter of 2001 Fleming's officers engaged in a number of large and unusual transactions with Fleming vendors involving significant up-front payments. Applicable accounting rules required that these payments be amortized ratably; instead, they were immediately reflected in full as revenue on Fleming's financial statements. Deloitte recognized the problems associated with these transactions. In one instance, Deloitte discovered that Fleming had inappropriately recognized up-front vendor revenue as income, in violation of SAB 101, and had Fleming change that accounting. In another instance, however,

12

A    52

Deloitte learned about another, similar wrongful entry but did *not* make Fleming change its accounting–even though Deloitte knew or should have known that the audit confirmation letter it received from the vendor conflicted with the terms of the agreement between Fleming and that vendor. Despite its awareness of these unusual transactions, Deloitte failed to properly conduct its 2001 audit to ensure that Fleming's financial statements, and in particular Fleming's accounting for these unusual transactions, were in accordance with GAAP. If Deloitte had adequately conducted its audit, it would have learned that these transactions were not properly accounted for. In addition, Deloitte also had an obligation to take Fleming's unusual vendor transactions in the fourth quarter of 2001 into account when planning its 2002 audit. But Deloitte failed to satisfy even that obligation, and did not adequately adjust its audit procedures in 2002 in light of these transactions.

49. Deloitte was also aware of issues and irregularities relating to Fleming's practice of taking deductions from vendor invoices. As alleged in more detail below, Fleming's practice of unilaterally taking deductions from vendor invoices increased dramatically at the end of 2001, even as the reserves Fleming maintained to pay back disputed deductions decreased.

50. On January 15, 2002, Deloitte received an anonymous phone call from one of Fleming's vendors complaining of Fleming's increasing practice of taking deductions off of vendor invoices. That vendor - who said he was calling on behalf of a group of Fleming vendors - accused Fleming's officers of using that practice to inflate current earnings by taking a deduction of vendor invoices, recognizing higher income in the current period as a result, and then paying back some or all of the deduction in a later period. Despite this extraordinary complaint, and, an explicit warning

13

that Fleming's officers were manipulating Fleming's earnings, Deloitte failed to appropriately plan its audit to account for the issues raised by the anonymous vendor, and failed to ensure that no such improper practices were taking place.

51. In addition, Deloitte failed to require sufficient audit evidence from Fleming's officers on the issue of vendor deductions, and it failed to maintain a sufficiently skeptical view of Fleming's vendor deductions in light of the allegations of fraud and earnings management that had come to Deloitte's attention.  Deloitte was required to make such adjustments to its audit and review practices, but failed to do so.  In fact, Deloitte had not yet completed its 2001 audit at the time that it received the complaint regarding Fleming's vendor deduction practices and the allegation that Fleming's officers were attempting to manipulate 2001 earnings.  Any reasonably prudent auditor in that situation would have ensured during the course of its 2001 audit that there was no improper revenue recognition by Fleming's officers as a result of vendor deduction practices.  Deloitte negligently failed to conduct its 2001 audit with appropriate diligence and skepticism, however, and as a result Fleming's officers continued to manipulate the company's earnings *in exactly the manner that Fleming's vendor had reported to Deloitte*.  Deloitte's failure to stop Fleming's officers from using improper vendor deductions to manage earnings, after having been alerted to that exact problem, was extraordinarily negligent.

52. In addition to its knowledge of problematic vendor transactions and practices at Fleming, Deloitte also knew that Fleming had a number of factors that put it in the high risk category for fraud and earnings manipulation.  Fleming was a company with a high employee turnover rate, an emphasis on meeting planned earnings, bonuses largely tied to earnings numbers, and a number of internal control problems.  More importantly, as a company with over $15 billion in revenue but

14

only $23 million in net income, Fleming's finances were particularly susceptible to changes to or additions of items that dropped directly to income, such as rebates and deductions, as opposed to revenue items. Deloitte failed to adequately plan its audit in light of these risk factors, as it was required to do, and negligently conducted its audit and review practices such that it failed to uncover the improprieties of the Fleming officers. Considering the unusual vendor transactions, internal control problems, and other factors pointing to a high risk of fraud, Deloitte had a duty to make additional inquiries and employ adequate procedures to ensure compliance with GAAP. Instead, Deloitte failed to take Fleming's internal control problems and unusual vendor transactions seriously enough, and placed undue reliance on the information that Fleming's officers - the very officers that were manipulating Fleming's earnings - provided to them. GAAS required, and any reasonably competent auditor would have displayed, far greater diligence and skepticism than Deloitte applied to the planning and execution of its audit and review processes.

53. The extent of Deloitte's negligence and asleep-at-the-wheel approach is further evidenced by Deloitte's response to concerns that Ernst & Young raised in late 2002. In September 2002, Ernst & Young completed an internal control audit of Fleming. In the course of that internal audit, Ernst and Young concluded that the controls over Fleming's vendor arrangements were unacceptable, and recommended that Fleming revisit its accounting treatment for up-front payments from vendors and vendor rebates. This was the very same issue that had been the subject of the anonymous vendor complaint to Deloitte. A copy of Ernst & Young's report was sent to Deloitte. Yet even after being told by Ernst & Young that Fleming's controls were unacceptable and that Fleming's income recognition practices were a problem, and despite its receipt of an explicit, detailed and unresolved vendor complaint, Deloitte proceeded to issue an unqualified review report

15

A    55

for the third quarter of 2002. Deloitte again–as it always had–failed to properly adjust its audit planning, failed to require sufficient evidence from Fleming to support its accounting, and failed to question Fleming's officers and information with the required level of skepticism in light of the issues and problems that had come to Deloitte's attention since late 2001.

54. Finally, by April 2003, *after* Fleming had filed for bankruptcy protection, Deloitte finally concluded that Fleming had a number of material weaknesses in its internal controls, including with respect to vendor deductions and up-front recognition of revenue from vendors. Those are the very same issues that Deloitte became aware of and failed to pursue as early as the fourth quarter of 2001. Deloitte had received a complaint from one of Fleming's vendors about those exact problems fifteen months earlier in January 2002. It heard the same concerns again, this time from Ernst & Young, in 2002. Yet Deloitte waited until April 2003 - long after Fleming had burdened itself with hundreds of millions of dollars of additional debt and had filed for bankruptcy protection - to acknowledge that Fleming's internal controls with respect to its vendor transactions were material weaknesses.

55. Throughout 2001 and 2002, then, Deloitte learned of unusual transactions, allegations of fraud, questionable revenue recognition practices, and problems with internal controls at Fleming. In violation of its duties under GAAS, however, Deloitte failed to properly plan its audit procedures to account for the issues and problems that came to its attention. In addition, Deloitte was negligent in the conduct of the audit procedures that it did implement, and as a result these and other acts of negligence failed to require Fleming's officers to prepare Fleming's financial statements in accordance with GAAP. Deloitte's opinion that Fleming's financial statements were prepared in accordance with GAAP was, as a result, wholly negligent and materially misleading.

16

## V. Fleming's Financial Statements Were Manipulated

56. Beginning in the fourth quarter of 2001, in a misguided effort to meet Wall Street expectations, the Fleming officers engaged in a number of transactions that were designed to accelerate Fleming's ability to recognize vendor income that it had not earned, or that it might later have to refund to vendors. These transactions accounted for as much as 65% of Fleming's income in the fourth quarter of 2001 and 30 % in the first quarter of 2002. Ultimately, Fleming announced that it would have to restate its financial results for 2001 and 2002. This restatement, if made, would have eliminated 80% of Fleming's net income for 2001, and deepened Fleming's operating loss for 2002. These wrongful transactions that caused this restatement, and gravely injured Fleming, took at least these two forms, each of which is described below:

## VI. Wrongful Vendor Deductions

57. In the first wrongful practice, the Fleming officers caused Fleming to take increasing numbers of wrongful deductions from vendors' invoices for a variety of pretextual reasons. The increased rate and amount of deductions was a means by which Fleming's officers could create the *appearance* that Fleming's income was increasing, because deductions *lowered* (albeit fictitiously) its cost of goods sold. In reality, however, Fleming's officers were not taking legitimate deductions, but were taking deductions solely in order to generate income in the current quarter. Because the deductions were wrongful, the Fleming officers knew that they would eventually have to be repaid to the vendors. This required that reserves be created, so as to ensure that Fleming did not overstate its income. *See* SFAS 5, *Accounting for Contingencies.*

58. By November of 2001, Fleming's disputed deduction balance exceeded $60 million, and Fleming's procurement personnel recognized that *at least* $20 million of that amount–if not

17

more–would have to be repaid to vendors. Deloitte was aware that vendor deductions were a significant risk factor in Fleming's audit. Vendor deductions had increased 20% from $309 million in 2000, to $381 million in 2001, and an additional 11%–to approximately $427 million–in 2002. Any prudent audit plan for a company like Fleming would and should have included a more careful scrutiny of vendor deduction practices, than the "plan" Deloitte implemented–particularly given the significance of these items to Fleming's income statement and the rapid rise in the amount of deductions taken by Fleming's officers between 2000 and 2002. For example, AU 312 requires the auditor to plan the audit so that audit risk will be limited to a low level, and the procedures employed should be specifically designed to obtain assurance of detecting misstatements. Deloitte was keenly aware that this area of Fleming's business had high inherent risk, and it was aware of the related control weaknesses at Fleming, but Deloitte nonetheless failed to plan for, prepare and execute an audit plan adequately designed to detect misstatements in connection with Fleming's vendor deduction practices.

59. Under AU 342, as the circumstances and procedures at Fleming relating to vendor deductions changed, and as Fleming officers increased the rate of vendor deductions, Deloitte should have recognized–and any competent auditor would have recognized–that those changes made it inappropriate to use historical methods for assessing the amount of required reserves. Indeed, a proper, professional audit would have revealed not only that Fleming's reserves of $8.8 million were woefully inadequate in light of the anticipated $20 million repayment requirement; it would also have revealed that Fleming's officers were *inexplicably* reducing the rate at which Fleming reserved for deductions even as they *increased* the rate at which Fleming took deductions. This practice of reducing the rate of reserving for paybacks significantly affected future periods, and should have

18

been disclosed prominently in Fleming's financial disclosures. APB 20 requires disclosure of the effect on net income and earnings per share for a change in an estimate - like the estimate of reserves in this case - that affects future periods. Nonetheless, this change was not disclosed and Deloitte was negligent and grossly negligent in failing to require Fleming's officers to disclose it.

60. Deloitte's indolence and indifference to its professional obligations compounded the harm to Fleming in three ways. First, it overstated Fleming's income and created the false impression that it would be able to assume more debt than it could. Second, it understated the amount that Fleming was likely to have to repay to vendors in future periods, thus jeopardizing Fleming's ability to realize steady, predictable income. Third, it damaged Fleming's relationships with its vendors, in an industry where vendor relationships are an important part of a company's long term viability. All of these harms could have been prevented had the Fleming officers adhered to their fiduciary obligations to act in Fleming's best interests, and had Deloitte properly discharged its obligation to perform a professional audit of Fleming's financial statements.

## VII. Falsely Documented Transactions

### A. Kraft Foods and Adams

61. Kraft and Defendant Adams–at the request of Defendant Abbood and in concert with him and with other Fleming employees whom they knew owed fiduciary obligations to Fleming–knowingly entered into false transactions that caused Fleming's income for the 4th quarter of 2001 to be overstated by 12%; caused its income for the 1st quarter of 2002 to be overstated by 11%; and falsely assured Deloitte (and thus Fleming) that these transactions were legitimate–when they were not.

19

A    59

62. Specifically, in December of 2001, Adams–acting on behalf of and within the course and scope of his authority as an officer and agent of Kraft–agreed to accelerate and improperly document the payment of $1.65 million under a "no-divert" agreement between Kraft and Fleming. Adams and Kraft knew that this payment had not been earned by Fleming at the time that Fleming's officers requested the payment be accelerated. Nonetheless, with knowledge that Abbood and other Fleming officers would use the letter to manipulate Fleming's financial reports for the quarter, Adams–on behalf of Kraft and with its actual or apparent authority–agreed to and did sign a letter (which was countersigned by Abbood) stating that the $1.65 million payment was being made to "offset the administrative costs associated with" the no-divert agreement. Neither Fleming's records nor the "no divert agreement" stated that any "administrative costs" were owed to Kraft, because none were owed. This false side letter was used by Abbood and other Fleming officers–and as Adams and Kraft intended; specifically, the letter was used to support booking the entire $1.65 million payment as a reduction in the costs of goods sold and, thus, as income to Fleming for the 4th quarter of 2001. This entry was false and misleading–and Kraft and Defendants Adams and Abbood knew it was false when it was made.

63. Kraft and Defendant Adams then compounded their wrongdoing when Adams, on behalf of Kraft and with its actual or apparent authority, negligently signed an audit confirmation letter falsely representing to Deloitte--and thus to Fleming--that Fleming was entitled to offset $1.65 million in "administrative costs" against Kraft–when Kraft, Adams and Abbood knew this was not true. As a result of Kraft and Defendant Adams' knowing participation in the breach of Abbood's fiduciary duty, the breach by other Fleming officers of their fiduciary obligations, and their negligent representations to Fleming and Deloitte that these payments had been earned–when they had

20