not–Kraft and Defendant Adams caused Fleming's income for the 4th Quarter to be overstated by 12%.

64.    This false entry would have been prevented by a competent audit performed by Deloitte. A simple comparison of the letter with the "no divert" agreement would and should have revealed that this payment was not legitimate and could not be recognized as income in the Fourth Quarter of 2001. Fleming's officers, however, used this letter to support booking the entirety of the payment as income in the Fourth Quarter of 2001. They could not have done this without the knowing and intentional assistance of Kraft and Adams and the negligence of Deloitte. Nor could this income have been recognized without the willingness of Kraft and Adams to make false and reckless representations to Deloitte and Fleming concerning the nature of these payments, without regard to the true nature of the underlying "no-divert" agreement and the lack of any obligation under it to pay so-called "administrative costs."

65.    Kraft and Defendant Adams, in concert with and with knowledge that they were fiduciaries, again assisted Abbood and other former Fleming employees in manipulating Fleming's financial statements in the first quarter of 2002. Specifically, in order to assist Fleming's officers in filling an earnings shortfall, Kraft agreed to mis-characterize a $5.6 million payment that was due to be made *in the future* as a result of an extension of the Kraft "no-divert" agreement. Defendant Adams, acting within the course and scope of his authority as an agent and officer of Kraft, agreed to sign a letter falsely characterizing this $5.6 million sum as payment of a purported "2001 shortfall" under a Kraft Preferred Vendor Agreement with Fleming. The letter was sent to Defendant Abbood and written at his request. As Abbood, the other Fleming officers, Kraft and Adams all knew–and as Deloitte in the exercise of reasonable care should have known--there was no such

21

shortfall under the Preferred Vendor Agreement. Abbood and the other Fleming officers, however, with the knowledge and consent of Kraft and Adams, used the Kraft side letter to justify taking the entire $5.6 million as an offset to expenses in the first quarter of 2002. As a result of this false characterization of the nature of this payment, Fleming's earnings for that first quarter were overstated by 11%.

66. Defendant Adams has consented to the entry of a consent judgment with the Securities and Exchange Commission concerning these facts. This judgment finds that Adams caused Fleming's financial statements, and its books and records, to be inaccurate in violation of Section 17 of the Securities Act of 1933, Section 13 of the Securities Exchange Act of 1934, and Rules 12b, 13a and 13b. The actions of the Fleming officers with whom Kraft and Adams dealt in these transactions were not authorized by Fleming, were in violation of Fleming's policies, were a breach of these officers' fiduciary obligations to Fleming, and were–together with the wrongful acts of the vendors and Deloitte–the proximate cause of damage to Fleming.

### B. Digital Exchange and Defendants Coniglio and Schmidt

67. Digital Exchange ("Dexsi") and Defendants Coniglio and Schmidt–at the request of Fleming employees whom they knew owed fiduciary obligations to Fleming–entered into false transactions that caused Fleming's income for the 4th quarter of 2001 to be overstated by 15% and caused 10% of its income for the 1st quarter of 2002 to be misstated.

68. In December of 2001, in order to address an anticipated earnings shortfall at Fleming, Defendant Abbood and other Fleming officers contacted Defendants Coniglio and Schmidt and demanded that Dexsi make a payment of $2 million to Fleming. The payment was to be accompanied by a false side letter characterizing the payment as one for past performance, so that

22

the entirety of the $2 million could be recognized immediately as income. Coniglio and Schmidt knew that Abbood and the other Fleming officers owed fiduciary obligations to Fleming, and they knew that if they provided the requested false documentation, it would be used to mis-characterize Fleming's financial statements, in violation of the Fleming officers' fiduciary obligations to Fleming. Nonetheless, Coniglio and Schmidt agreed, on behalf of Dexsi, to make the requested payment and signed the false side letter. The letter was addressed to and received by Defendant Abbood.

69. Even as they executed this false letter, however, Dexsi and Defendants Coniglio and Schmidt negotiated a separate agreement–that was concealed from Fleming's Outside Directors–which obligated Fleming to "repay" the $2 million by paying a higher than normal amount for diverting purchases from Dexsi. None of the $2 million payment should therefore have been recognized as income in the 4th quarter. Yet, as a result of the false side letter, *all of the $2 million was recognized as income*. This–as was anticipated and intended by Dexsi and Defendants Coniglio and Schmidt--caused Fleming's income for the quarter to be overstated by 15%. Defendants Coniglio and Schmidt then compounded their wrongdoing, and that of Dexsi, when they signed a false audit confirmation letter that wrongly and negligently represented that the $2 million payment was "not connected to any future commitments by Fleming and was not refundable."

70. Dexsi and Defendants Coniglio and Schmidt again knowingly assisted Defendant Abbood and other former Fleming officers in manipulating Fleming's financial statements in the first quarter of 2002. In April of 2002, Fleming was again facing a potential earnings shortfall, and this time Abbood and other former Fleming officers demanded that Dexsi cough up $4 million to fill the gap. Dexsi and Defendants Coniglio and Schmidt knew this request was in breach of the Fleming officers' fiduciary obligations to Fleming. Nonetheless, on April 10, 2002, Dexsi and Defendants

23

Coniglio and Schmidt knowingly signed a false letter, again addressed to Defendant Abbood, asserting that the $4 million payment was being made to reimburse purported "warehouse expenses" that had been incurred during the first quarter of 2002. Defendant Abbood then fabricated a fictitious "warehouse expense"invoice as window dressing for the fraud. In fact, as Abbood, the Fleming officers, Dexsi and Defendants Coniglio and Schmidt all knew, payment of "warehouse expenses" was not the true purpose of the payment. This is evident from the fact that Dexsi and Defendants Coniglio and Schmidt and the former Fleming officers agreed that Dexsi would be permitted to "recoup" the $4 million payment by charging higher diverting prices to Fleming in the future.

71. The false side letter, as had been anticipated and intended by Dexsi, Coniglio and Schmidt, was used by Defendant Abbood and other former Fleming officers to justify recording the entire $4 million as an offset to Fleming's expenses in the first quarter of 2002. This was in breach of the Fleming officers' fiduciary obligations to Fleming, and caused Fleming's income for the first quarter of 2002 to be overstated by 10%.

72. Dexsi and Defendants Coniglio and Schmidt have each consented to the entry of a consent judgment with the Securities and Exchange Commission concerning these facts. That judgment finds that Dexsi and Defendants Coniglio and Schmidt each caused Fleming's financial statements, and its books and records, to be inaccurate in violation of Section 17 of the Securities Act of 1933, Section 13 of the Securities Exchange Act of 1934, and Rules 12b, 13a and 13b. The actions of the Fleming officers with whom Dexsi and Defendants Coniglio and Schmidt dealt in these transactions were not authorized by Fleming, were in violation of Fleming's policies, were a breach of these officers' fiduciary obligations to Fleming, and were—together with the wrongful acts

24

of the vendors and the negligence of Deloitte–the proximate cause of damage to Fleming.

### C. Marigold and Defendants Green and Thorpe

73. As a quid pro quo for obtaining a commitment from certain Fleming officers to cause Fleming to enter into a three year ice cream supply agreement (the "Supply Agreement") that would become effective in March of 2002, Marigold and Defendants Green and Thorpe entered into a false transaction that caused Fleming's income to be misstated by 15% for the 4th quarter of 2001. Marigold and Defendants Green and Thorpe knew and understood that the Fleming employees with whom they were dealing were fiduciaries to Fleming. They also understood that the actions of the Fleming employees were in breach of their fiduciary obligations to Fleming.

74. The Supply Agreement contemplated an up front payment of $2 million by Marigold, which Fleming would then earn out over time. Defendant Tom Dahlen signed this agreement on behalf of Fleming, and was well aware of its terms. Both Defendant Dahlen and Defendant James Thatcher, Fleming's Group Vice President for Sales, understood that the "earn out" provision of the Supply Agreement meant that the income associated with the payment could only be recognized ratably over the term of the Supply Agreement. In December of 2001, however, certain Fleming officers demanded that Marigold, acting through Defendants Green and Thorpe, sign a side letter describing this payment as a "non-refundable rebate of 2001 purchases." Marigold and Defendants Green, Thorpe and Dahlen all knew that there had been no such purchases, each knew that this was not truly a rebate payment, and all of them knew that the requested letter was false. Ma... and Defendants Green and Thorpe nonetheless authorized and signed the side letter–which was addressed to Jim Thatcher of Fleming–so that the entire amount of the payment could be recognized ... '01. Marigold and Defendants Green and Thorpe–with the consent of Dahlen and Thatcher–th. . led

25

A    65

in the Supply Agreement a penalty provision that would allow Marigold to recoup the $ 2 million payment if Fleming did not purchase a specified volume of product in the ensuing year.

75. Dahlen, Thatcher and other Fleming officers used the side letter (as Marigold and Defendants Green and Thorpe understood and intended they would) to book the entire $ 2 million payment as an offset to Fleming's expenses in the fourth quarter of 2001. This entry caused a 15% misstatement of Fleming's income for this quarter–a misstatement that could not have occurred but for the wrongful and negligent acts of Marigold and Defendants Green, Thorpe and Dahlen.

76. Marigold and Defendants Green and Thorpe compounded their wrongful and negligent acts by signing a false audit confirmation letter stating that the $2 million payment was a "rebate for actual 2001 purchases," was "not connected to any future commitments," and was not refundable. These statements were false when they were made, and these Defendants knew they were false. Fleming and its Outside Directors were ignorant of these falsehoods and of this wrongful transaction. Furthermore, the actions of the Fleming officers were known by Marigold and Defendants Green and Thorpe to be in breach of the Fleming officers' fiduciary obligations to Fleming.

77. Marigold and Defendants Green, Thorpe Dahlen and Thatcher, however, were not the sole cause of harm to Fleming from the Marigold transactions. A competent audit by Deloitte could and should have detected and prevented this false entry. In fact, a simple comparison of the terms of the Supply Agreement–which provided for recoupment of the $2 million payment–and the statements in the side letter–which asserted that the $2 million was non-refundable–would have revealed that these documents were inconsistent and could not both be true. At that point, a competent auditor would have performed further procedures to ferret out the truth–but Deloitte apparently never even compared the two documents, much less investigated to determine why $2

26

A    66

million of income was being recognized based upon two, entirely inconsistent, documents. Plainly, then, the negligence of Deloitte also contributed to cause the harm Fleming sustained as a result of this transaction.

78. Marigold and Defendants Thorpe and Green have each consented to the entry of a consent judgment with the Securities and Exchange Commission concerning these facts. This judgment finds that each of them caused Fleming's financial statements, and its books and records, to be inaccurate in violation of Section 17 of the Securities Act of 1933, Section 13 of the Securities Exchange Act of 1934, and Rules 12b, 13a and 13b. The actions of the Fleming officers with whom Marigold and Defendants Green and Thorpe dealt in these transactions were not authorized by Fleming, were in violation of Fleming's policies, were a breach of these officers' fiduciary obligations to Fleming, and were–together with the wrongful acts of Fleming's vendors and Deloitte–the proximate cause of damage to Fleming.

### D. Frito-Lay and Defendant Jensen

79. Frito-Lay and Defendant Jensen–at the request of Defendant James Thatcher and other Fleming employees whom Jensen and Frito-Lay knew owed fiduciary obligations to Fleming–entered into a false transaction with Fleming that caused Fleming's income for the 4th quarter of 2001 to be overstated by at least 3%. Specifically, in December of 2001, Defendant Jensen–acting within the course and scope of his employment at Frito-Lay–agreed to execute a side letter falsely characterizing a $400,000 incentive payment as a "non-refundable" compensation payment to Fleming for transactions in 2001. The letter was addressed to Defendant James Thatcher, Fleming's Group Vice President for Sales. Frito Lay and Defendant Jensen knew this statement was untrue, because the $400,000 payment had not been earned in 2001, but was instead *to be earned*

27

A     67

for product displays in 2002. (In fact, Defendant Jensen later authored a letter in October 2002 disavowing the "non-refundable" nature of the "incentive" payment.) Nonetheless, Defendant Jensen–with the actual and apparent authority of Frito-Lay–signed the requested letter on behalf of Frito-Lay, and sent it to Thatcher. Frito's side letter was then used by Fleming's officers–as Frito and Jensen intended–to recognize the entirety of the $400,000 payment as income to Fleming for the fourth quarter of 2001. The wrongful acts of Frito-Lay and Defendant Jensen therefore caused Fleming's income for this quarter to be overstated by 3%.

80. Defendant Jensen has agreed to the entry of a consent judgment in which the Securities and Exchange Commission found that his wrongful acts on behalf of Frito-Lay caused Fleming's financial statements, and its books and records, to be misstated in violation of the Section 17 of the Securities Act and Section 13 of the Exchange Act. The actions of the Fleming officers with whom Frito-Lay and Defendant Jensen dealt in these transactions were not authorized by Fleming, were in violation of Fleming's policies, were a breach of these officers' fiduciary obligations to Fleming. They were also–together with the wrongful acts of Fleming's vendors and Deloitte–the proximate cause of damage to Fleming.

81. This was not the first occasion on which Frito-Lay was willing to assist a customer in misstating its financial statements. The Securities and Exchange Commission has also charged two other Frito Lay employees, Thomas Taylor and David Stone, with using an identical "pull forward" transaction to help KMart recognize $2.8 million in income in the year 2000, even though those monies were not actually due until 2001. Significantly, Defendant Al Abbood–who was then employed by KMart–was also charged in this scheme.

28

A    68

## E. Dean Foods and Defendant Robinson

82. Dean Foods and Defendant Robinson–at the request of Fleming employees whom they knew owed fiduciary obligations to Fleming–likewise entered into a false transaction with Fleming in the 1st quarter of 2002 that caused Fleming's income for that quarter to be overstated by 6%. Specifically, in March of 2002, Defendant Dahlen executed a Supply Agreement with Dean Foods, pursuant to which Dean would supply Fleming's retail operations with milk for a period of three years. Defendant Dahlen was, therefore, well aware of the terms of the Dean Supply Agreement and the nature of the payments to be made under it–including the fact that it included an up-front payment of $2.5 million that would, under applicable accounting rules, have to be recognized ratably over the term of the agreement.

83. As the agreement was being finalized, however, certain Fleming officers demanded that Dean Foods sign a side letter acknowledging that the $2.5 million payment was a "rebate" for "past performance." Although Fleming had been a sizeable customer of Dean Foods in the past, Dean Foods and Defendants Dahlen and Robinson all knew that there had been no "past performance" under this agreement and that *no rebate was owed at all.* Nevertheless, Defendant Robinson–acting within the course and scope of his authority as an authorized agent of Dean Foods--gave Fleming the requested side letter. This letter, like a number of others, was addressed to Defendant James Thatcher. Dean Foods and Defendant Robinson gave Thatcher the side letter with the full understanding that the Fleming officers–in violation of their fiduciary obligations to Fleming–intended to use the letter to recognize the full $2.5 million payment as income, through an offset of expenses for the first quarter of 2002.

29

84. Dean Foods and Defendant Robinson knew the side letter was false when they signed it, and a competent audit by Deloitte would have discovered this falsehood and prevented it from being used to manipulate Fleming's income. This is so because Dean Foods, in an effort to protect itself from the risk that it would pay Fleming $2.5 million for nothing, actually required that a term be *added back* into the Supply Agreement to specify that Fleming would pay a prorated portion of $2.5 million as a penalty if Fleming failed to perform fully under the Supply Agreement. Thus, as was true in the case of the Marigold Agreement, the Dean Foods Supply Agreement contained terms that established that the entire $2.5 million had not been earned and could be recouped, even as the"side letter" recited that the $2.5 million *had* been earned and was *non-refundable*. Both statements could not simultaneously be true–yet Deloitte not only failed to perform any additional procedures to clarify the inconsistency, they permitted the entire $2.5 million payment to be recognized fully in the first quarter of 2002.

85. Dean Foods and Defendant Robinson have each consented to the entry of a consent judgment with the Securities and Exchange Commission concerning these facts. The judgment finds that each of them caused Fleming's financial statements, and its books and records, to be inaccurate in violation of Section 17 of the Securities Act of 1933, Section 13 of the Securities Exchange Act of 1934, and Rules 12b, 13a and 13b. The actions of Dahlen, Thatcher and the other Fleming officers with whom Dean Foods and Defendant Robinson dealt in these transactions were not authorized by Fleming, were in violation of Fleming's policies, were a breach of these officers' fiduciary obligations to Fleming, and were–together with the wrongful acts of the Fleming vendors and Deloitte–the proximate cause of damage to Fleming.

30

86. Dexsi, Dean Foods, Marigold, and Defendants Adams, Congilio, Schmidt, Green, Thorpe, Jensen, and Robinson have all admitted that they committed the above-described acts for the express purpose of assisting Fleming's officers in manipulating Fleming's financial statements. Each of these defendants, moreover, has admitted–and the Securities and Exchange Commission has found--that their conduct was "a cause of Fleming's inflated earnings in violation of GAAP." *See* SEC Consent Judgment against Dean Foods and Defendant John D. Robinson at ¶ 2; SEC Consent Judgment against Defendant Jensen at ¶ 2; SEC Consent Judgment against Marigold and Defendants Green and Thorpe at ¶ 2; SEC Consent Judgment against Defendant Adams at ¶ 2; SEC Consent Judgment against Dexsi and Defendants Coniglio and Schmidt at ¶ C.   The misconduct of the Fleming vendors was not limited, however, to these transactions. As described below, two other vendors–Dole and FMG/Daymon–also materially assisted Fleming's officers in breaching their fiduciary obligations to Fleming and in causing the misstatement of Fleming's financial statements.

### F. FMG/Daymon and Defendant Peter Frank

87. FMG/Daymon is a major grocery diverting company.  Defendant Peter Frank is the Chief Financial Officer of Daymon Worldwide and Daymon Worldwide Trading, Inc., which was formerly known as Food Marketing Group (FMG). Defendant Frank is a certified public accountant and was the former Global Risk Management Partner for the accounting firm, PriceWaterhouseCoopers. Fleming was among FMG's most significant customers, and FMG and its senior officers, including Defendant Frank, were intimately familiar with Fleming's business. As a result, FMG was willing to be accommodating when Defendant Abbood and other Fleming officers insisted that FMG assist them in manipulating Fleming's financial statements.

31

A    71

88. Specifically, on December 14, 2001, FMG entered into a forward agreement with Fleming obligating Fleming to undertake $100 million of forward purchases from FMG in the year 2002. Defendant Frank was well aware of this agreement and understood is terms. Defendants Frank and Abbood also understood that, under this agreement, FMG would pay Fleming a monthly rebate on purchases *during 2002* which--if fully performed--would amount to $2,000,000 of expense offset and, therefore, income to Fleming in the year 2002. As he had with other vendors, Defendant Abbood then sought FMG's assistance in wrongfully pulling that revenue forward into the year 2001. First, Abbood demanded that FMG sign a "side letter" specifying that the $2,000,000 was in fact a "rebate" for purchases in 2001. FMG and Defendants Abbood and Frank all knew that no such rebate was owed for 2001.

89. Rather than refuse outright, for fear that Abbood would retaliate and award its diverter business to Dexsi, Defendant Frank caused FMG to take a different route. On December 14, 2001, Defendant Frank caused an FMG employee (Joe Lipovich) to execute an FMG "credit memo" describing the payment as a "rebate on FMG's business with Fleming Divisions." Frank's strategy, and the text of the memo, carefully created the *impression* that the payment was a rebate for business in 2001--in part because the "credit memo" was dated December 14, 2001--even though Frank knew that this was not the truth. FMG then gave the misleading "credit memo" to Abbood, with the full knowledge that Abbood intended to use it to recognize the entire $2 million payment as income in 2001, *even though not one penny of this payment was actually due or earned in 2001.*

90. Defendant Frank, as a skilled and highly sophisticated accountant, reasonably understood and anticipated that Abbood and other Fleming officers would use FMG's credit memo to manipulate Fleming's financial statements, in breach of their own fiduciary obligations to

32

A    72

Fleming—and Frank proved to be right. Not long after Frank caused the "credit memo" to be delivered to Defendant Abbood, he and other Fleming officers used this false and misleading document to cause Fleming to recognize the full $2,000,000 payment from FMG as income in the 4th Quarter of 2001. This manipulation was not authorized by Fleming; it was not known to Fleming's Outside Directors; and it was in breach of fiduciary obligations that Abbood and other Fleming officers owed to the company. More to the point, the manipulations of FMG and Defendants Frank and Abbood caused an additional 15% overstatement of Fleming's earnings for the 4th Quarter of 2001.

91. Defendant Frank was given a last opportunity to correct the mis-impression that he and FMG had consciously created by the misleading FMG "credit memo." Defendant Deloitte, after it received the memo, sent FMG an audit confirmation. In it, Deloitte asked FMG to clarify whether the full $2 million payment actually *was* a rebate for 2001 purchases. Defendant Frank learned of the audit confirmation and therefore *knew* that Abbood and other Fleming officers had done what he anticipated: they had used FMG's misleading "credit memo" to book the entire $ 2 million payment as income in 2001, even though *none of it* had actually been earned in 2001. Despite having been afforded an opportunity to clear this up, and thus prevent a huge misstatement of Fleming's income, Defendant Frank, instead, prevented FMG from clarifying *in any way* its misleading "credit memo." He also told Fleming's employees that FMG would *not* be sending *any* response at all to the audit confirmation request. This act of conscious concealment—in the face of a duty on the part of Frank and FMG to speak—furthered the injury done to Fleming and assisted Fleming's officers in concealing their wrongdoing.

92. Notwithstanding the actions of Defendants Frank and Abbood, there is no question that a competent audit would and should have revealed this fraud. Ironically enough, in this instance Deloitte actually bestirred itself to *ask* for an audit confirmation verifying that FMG's $2 million "rebate" payment had been earned in 2001. This was the least that any competent accountant would have done, given that the FMG "credit memo"–with its 2001 date and a reference to rebates–contradicted the FMG Agreement, which said that the payments *would be* earned in *2002*. Yet Deloitte inexplicably failed to follow up, or to perform any additional procedures, when the audit confirmation it had concluded *was* necessary *simply never materialized*. Deloitte apparently did nothing, it certainly said nothing to Fleming's Audit Committee, and it made no further effort to confirm whether any portion of the $2 million payment could legitimately be recognized in 2001. Deloitte simply permitted the recognition of a $2 million payment–none of which had been earned–and went right back to sleep. The negligence of Deloitte, like the negligent and wrongful acts of Defendants Frank and Abbood, were the proximate cause of the injury Fleming sustained as a result of the wrongful FMG "credit memo."

### G.  Dole Food Company and Defendants Michael Cavallero and Dole Fresh Fruit Company

93.  Defendant Cavallero's manipulations of Fleming's financial statements were undertaken at the behest of Fleming's officers and were within the scope of his authority as agent for Defendant Dole Fresh Fruit Company and Dole Food Company. They were, however, slightly different from the transactions described in the above paragraphs.

94. In December of 2000, Defendant Myers and other Fleming officers asked Dole and four other vendors to sign identical, "transition fee letters" specifying that certain lump sum payments

34

A    74

were "in recognition of [Fleming's] past actions and ...not refundable." This odd, formulaic

language, which "coincidentally" appeared in *every one* of the 2000 transition fee letters, originated

with a blank, template letter prepared on Fleming's computer system by an unknown Fleming

employee.

95. On December 11, 2000, Dole and Cavallero agreed to sign a transition fee letter,

pursuant to which Dole agreed to pay Fleming the sum of $1,000,000 in 2000. The letter read:

> Dear Charlie:
>
> Your company's decision to establish the Customer Support Center in Lewisville in 2000 was beneficial not only to yourselves but to your supply chain partners as well. Your centralized procurement operation brings scale to a process that was previously fragmented. The elimination of redundant procurement costs translates to lower cost of goods to Fleming and to your retail customers.
>
> It should not be overlooked that centralized procurement delivers benefits to your suppliers as well. Not only is it more efficient to represent our products at a central location, it now should be easier to implement promotional programs through Fleming which translate to increased sales for us both.
>
> In order to defray partially the substantial costs Fleming has incurred in the establishment of the Customer Support Center, you have solicited a transition payment from Dole of $1,000,000. ***This payment is in recognition of your past actions and is not refundable.***
>
> We look forward to a continuing, profitable relationship with Fleming.
>
> Sincerely,
> Mike Cavallero
> Vice President, Sales & Marketing

96. While there is no question that payments of transition fees can be legitimate in the

grocery business, these payments were highly suspicious–and they became even more alarming when

a second round of *identically worded transition letters* appeared to support the recognition of income

in the 4th Quarter of 2001. Among the most bizarre aspects of the 2001 letters was that Dole–having

35

agreed in 2000 to pay $1,000,000 "to partially defray the substantial costs Fleming has incurred in

the establishment of the Customer Support Center"--agreed to pay *another* $1,000,000 based upon

an identically worded letter in 2001.    Specifically, on December 17, 2001, Defendant

Cavallero–acting within his authority as an officer and agent of both Defendant Dole Fresh Fruit and

Dole Food Company–sent Defendant Myers a second transition fee letter confirming a second,

$1,000,000 payment to be made by Dole. The letter read as follows:

> Dear Charlie:
>
> Your company's decision to establish the Customer Support Center in Lewisville
> in 2000 was beneficial not only to yourselves but to your supply chain partners as
> well. Your centralized procurement operation brings scale to a process that was
> previously fragmented. The elimination of redundant procurement costs translates
> to lower cost of goods to Fleming and to your retail customers.
>
> It should not be overlooked that centralized procurement delivers benefits to your
> suppliers as well.    Not only is it more efficient to represent our products at a
> central location, it now should be easier to implement promotional programs
> through Fleming which translate to increased sales for us both.
>
> In order to defray partially the substantial costs Fleming has incurred in the
> establishment of the Customer Support Center, and under the recent K-Mart
> addition, you have solicited a transition payment from Dole of $1,000,000. *This
> payment is in recognition of your past actions and is not refundable.*
>
> We look forward to a continuing, profitable relationship with Fleming.
>
> Sincerely,
> Mike Cavallero
> President, North America Tropical Fresh Fruit

97.    There were only three differences between the 2000 and 2001 letters that Defendant

Cavallero, acting within the scope of his authority and on behalf of both Dole entities, sent to

Defendant Myers.    First, the letters are dated one year apart.    Second, having cemented Dole's

relationship with Fleming through the first $1,000,000 payment, Defendant Cavallero had now

36

become President of Dole's North American Tropical Fresh Fruit operations. Third, although the

2001 letter contains an added statement asserting that the second $1 million payment was being

made for the Customer Support Center "and under the recent K-Mart addition," this statement was

materially false. In fact, in December of 2001, Dole and Defendants Dole Fresh Fruit, Cavallero and

Myers knew that K-Mart was failing, and that Fleming's relationship with K-Mart was failing right

along with it. K-Mart eventually filed for bankruptcy on January 22, 2002--a mere month after the

Cavallero letter recited, falsely, that the transition payment was being made "under the recent K-Mart

addition." Stated simply, Defendants Dole Fresh Fruit, Myers and Cavallero–through slightly

different means–were also joint and willing participants in the concerted effort to manipulate

Fleming's financial statements. Dole Food Company and Defendants Dole Fresh Fruit and Cavallero

knew, at the time of these transactions, that Myers was a fiduciary to Fleming. Each of them also

knew that Myers' actions in soliciting two, identical transition fees to support the immediate

recognition of income that had not been earned was a breach of Myers' fiduciary obligations to

Fleming. Yet all of them intentionally and recklessly participated in this wrongful conduct, with

utter disregard for the fact that the false statements in these transition fee letters would be used to

misstate Fleming's income and, ultimately, result in its deepened insolvency and collapse.

98. The events surrounding the transition fee letters are also another example of the

negligent and grossly negligent manner in which Deloitte discharged its obligations as Fleming's

auditor. As described above, applicable professional standards required Deloitte to exercise due

professional skepticism in the performance of its audit. *See* AU 230. In particular, a competent

auditor is required to consider significant and unexpected differences in financial data, *see* AU 329,

and should obtain corroboration when significant, unexpected differences arise. There were clear

37

A    77

and obvious reasons that a competent auditor would and should have been suspicious of the transition fee letters and investigated further. First, these transition fee letters are unusual in timing because, with rare exceptions, they are executed in the final month of the fiscal year. Second, they are unusual in amount; indeed, all involve the payment of neat, round numbers. Third, it is highly unusual–and beyond the realm of probability–that letters from nine different vendors, in different product lines, in different parts of the country would all send letters to Fleming that contained this *identical*, stilted paragraph:

> In order to defray partially the substantial costs Fleming has incurred in the establishment of the Customer Support Center, you have solicited a transition payment from Dole of $1,000,000. *This payment is in recognition of your past actions and is not refundable.*

Finally, while three of the letters are addressed to Defendant Myers, four are literally addressed "Dear Fleming,"–a form of salutation that is distinctive, to say the least. These facts were both known to and knowable by Deloitte in the exercise of reasonable professional care, yet Deloitte apparently performed little *if any* diligence to determine whether these obviously fraudulent, obviously identical, obviously collusive and manipulative letters reflected legitimate transactions. Had Deloitte planned and performed a proper audit, they would have discovered these facts--and the fraudulent $1 million of Dole-related "income" that was recognized in the 4th Quarter of 2001 would not have been recorded. Thus, as is true of all of the other transactions at issue in this complaint, the wrongful actions of Fleming officers, its vendors and Deloitte were, individually and jointly, the proximate cause of damage to Fleming.

38

A    78

## VIII.  The Role of Fleming's Outside Directors

99.  The majority of Fleming's Board of Directors was comprised of independent, outside directors.  These directors acted with reasonable diligence in the performance of their duties.  They were entitled to rely, and reasonably relied, upon opinions provided to them from outside professionals including, specifically, the financial statement opinions prepared and presented to them by Defendant Deloitte & Touche.  Fleming's board had put in place procedures that limited the discretion of its agents and employees.  These procedures required the Fleming officers and employees to pursue their job duties only through legitimate and lawful means.  Paramount among these procedures, of course, was the fiduciary obligation that every officer and every employee owed to Fleming.  These fiduciary obligations, if discharged, and the Board-imposed procedures, if followed, would have prevented the fraudulent and misleading transactions identified above.

100.  As a majority of Fleming's Board, the Outside Directors could and would have stopped these fraudulent transactions had any of these facts come to their attention during the relevant time period.  The Outside Directors were ignorant and innocent of the wrongdoing described above.  More important, the actions of the officers described above were a breach of their fiduciary obligations to Fleming, were antithetical to its interests, and were not authorized by Fleming or its Board.  Accordingly, the wrongdoing of the Fleming officer defendants may not be imputed to Fleming or the PCT in this case.

### COUNT I

**Professional Negligence and Negligent Misrepresentation
Against Deloitte & Touche LLP**

101.  The PCT incorporates in this count all of the allegations contained above.

39

A    79

102. As Fleming's public auditor, Deloitte owed Fleming professional obligations and duties of care. These included the duty to perform their audit work in conformity with Generally Accepted Auditing Standards, so as to ensure that Fleming's financial statements were presented in accordance with Generally Accepted Accounting Principles. For the reasons stated above, Deloitte breached these obligations, and failed to perform its audit work with that degree of care and competence that a reasonably skilled professional would have exercised in the same or similar circumstances. In many instances, moreover, Deloitte's departure from the standards of care and professionalism applicable to a public auditor was so extreme as to constitute gross negligence. Deloitte's professional negligence, and its gross negligence, were a proximate cause of damages to Fleming. These damages include, but are not limited to, the hundreds of millions of dollars in additional debt that Fleming assumed based upon false representations made to it--by Deloitte and others--concerning its financial results and the amount of its net income.

103. In addition, as Fleming's public auditor, Deloitte was specifically retained in order to provide to Fleming's Board and its shareholders an opinion on Fleming's financial statements. This opinion, on which Fleming's Board was entitled to and did rely, stated that–having performed an audit in accordance with Generally Accepted Auditing Standards–Deloitte was of the opinion that Fleming's financial statements (including its net income numbers) were prepared in accordance with Generally Accepted Accounting Principals and "presented fairly, in all material respects, the consolidated position of the Fleming Companies, Inc. and subsidiaries at December 29, 2001."

40

A    80

Deloitte's opinion was provided to Fleming's Board in a transaction–namely the provision of professional services–in which Deloitte had a financial interest. For the reasons stated above, however, Deloitte was negligent and grossly negligent in preparing and disseminating this false opinion to the Outside Directors of Fleming's Board.

104. Deloitte also knew, foresaw and intended that the Outside Directors of Fleming–who constituted a majority of its Board--would rely upon Deloitte's "clean" opinion in conducting themselves as directors of Fleming. In fact, in connection with every debt issuance at issue in this complaint, Deloitte specifically provided a "comfort letter" to Fleming's Directors reassuring them of the accuracy of Fleming's financial statements. The Outside Directors of Fleming's Board actually and justifiably relied upon Deloitte's clean audit opinion in the performance of their duties, and in decisions they made, as Fleming's directors. Specifically, in ignorance of the true facts, and having been misled by Deloitte's negligent audit opinions and comfort letters, the Outside Directors of Fleming authorized Fleming to undertake transactions–including the borrowing of hundreds of millions of dollars of debt and the issuance of additional equity–that would not and could not have occurred had Fleming's financial statements and net income been stated fairly. These transactions, which were proximately caused by Deloitte's negligence, gross negligence and negligent misrepresentations, rendered Fleming insolvent, deepened its insolvency by hundreds of millions of dollars and ultimately caused its irredeemable destruction.

105. By virtue of Fleming's confirmed Plan of Reorganization, the PCT is entitled to recover on behalf of Fleming and its creditors all damages they suffered as a result of Deloitte's acts of negligence, gross negligence and negligent misrepresentation.

## COUNT II

### Breach of Fiduciary Duty

106. The PCT incorporates the allegations set out above.

107. Each of the Fleming Officer Defendants owed Fleming fiduciary obligations of care, candor, and loyalty. As described in the paragraphs above, the actions of each of the Fleming Officer Defendants was a breach of the officer's individual, fiduciary obligations to Fleming.    These breaches were conscious, in that the officers were aware that their actions were wrongful and antithetical to Fleming's best interests at the time they committed them.   These breaches also constituted self-dealing. As described above--both individually and in concert with the vendor officers and with one another--the Fleming officers consciously manipulated Fleming's financial results in order to cause Fleming to pay to them bonuses and other excessive forms of compensation that the Fleming officers had not earned and that they knew Fleming did not owe.  The Fleming Officers' wrongful conduct and breach of their fiduciary duty was, therefore, the proximate cause of hundreds of millions of dollars of damages to Fleming–damages that the PCT is entitled to recover by virtue of Fleming's confirmed Plan of Reorganization.

108. In addition, because the bonuses and compensation "earned" by Fleming's officers for the years 2001, 2002 and 2003 were the result of the officers' fraudulent manipulation of Fleming and the result of those officers' breaches of fiduciary duty, their bonuses and compensation should be disgorged to the PCT.

## COUNT III

### Knowing Participation in Breach of Fiduciary Duty

109. The PCT incorporates in this count all of the allegations contained above.

42

A      82

110. Each of the Vendor Officer Defendants and Defendant Dole Fresh Fruit Company knew that the Fleming officers with whom they were dealing were fiduciaries to Fleming. Each of the Vendor Officer Defendants and Defendant Dole Fresh Fruit Company also knew that, as fiduciaries, the Fleming officers were required: to engage only in honest transactions; to be candid with Fleming, its Outside Directors and its auditors about the transactions they executed in the course of their employment; to act with reasonable care toward Fleming and its interests; and to place loyalty to Fleming ahead of the officers' own, personal interests.

111. Each of the Vendor Officers and Dole Fresh Fruit Company knew they were dealing with Fleming employees who were fiduciaries, yet they knowingly and actively participated in the Fleming officers' breach of their fiduciary obligations. As described above, the Vendor Officers and Dole knew that the Fleming officers were manipulating Fleming's financial results. The Vendor Officers and Dole also knew, at the outset, that this conduct was a breach of the Fleming Officers' fiduciary obligations. Nevertheless, the Vendor Officers and Dole willingly and recklessly participated in this breach of duty, and knowingly supplied false documents to the Fleming Officers. The Vendor officers and Dole knew, at the time, that it was wrong to do so, their false documents would be used to support further manipulations of Fleming's financial statements.

112. The Securities and Exchange Commission has already found that the wrongful conduct of many of the Vendor Officers was a cause of the misstatement in Fleming's financial records. In fact, the knowing participation of all of the Vendor Officers and Defendant Dole Fresh Fruit in the Fleming Officers' breach of their fiduciary obligation was the proximate cause of hundreds of millions of dollars of damages to Fleming. Furthermore, as parties who knowingly participated in the Fleming Officers' breach of their fiduciary obligations, the Vendor Officers and

43

Dole Fresh Fruit became joint tortfeasors with the Fleming Officers as a matter of law. As a result, the Vendor Officers and Dole are jointly and severally liable with the Fleming Officers for all damages caused by their wrongful and reckless conduct.

## COUNT IV

**Negligent Misrepresentation Against Vendor Officers and Dole Fresh Fruit**

113. The PCT incorporates in this count all of the allegations above.

114. Each of the Vendor Officers and Dole entered into side letters, or signed other misleading documents, in the course of business transactions with Fleming in which the Vendor Officers and their employers–including Defendant Dole–had a pecuniary interest. The Vendor Officers were acting within the course of their employment, and with the actual or apparent authority of their employers, when they signed these documents. The Vendor Officers and Dole executed these misleading documents, which contained false information, with the knowledge and intention that they would be relied upon by Fleming's auditors and its Board in the preparation and publication, respectively, of Fleming's financial statements. The Vendor Officers and Dole–each of whom knew the true facts concerning their transactions with Fleming–did not exercise reasonable care when: they signed the false side letters; signed (or refused to return) audit confirmations that had been precipitated as a result of the side letters; or, recklessly communicated this misleading information to Fleming.

115. Fleming justifiably relied on this information in at least two ways. First, the information contained in the side letters was used to support false entries in Fleming's internal financial statements. These entries could and would not have been made had the Vendor Officers and Dole exercised reasonable care in the manner in which they communicated information about

44

their contracts to Fleming. Second, the information contained in the side letters and, in particular, in the audit confirmation letters, was relied on by Deloitte in the course of its audit. While Deloitte's audit was performed negligently, Fleming's Outside Directors were unaware of Deloitte's negligence. Instead, believing that Fleming's audited financial statements were accurate–and without knowledge that those statements incorporated false information about vendor contracts that had been negligently supplied to Deloitte and Fleming by the Vendor Officer Defendants and Defendant Dole–Fleming's Outside Directors approved the issuance of hundreds of millions of dollars in debt that Fleming was actually unable to pay. The false financial results were also used to induce the Board to award bonuses to the Fleming officers based upon this same, false information. None of these damages would have been incurred but for–and all of these damages proximately resulted from–the Fleming Outside Directors' reasonable, justifiable and intended reliance–on behalf of Fleming–on the false information that the Vendor Officers and Dole Fresh Fruit negligently misrepresented to Fleming concerning these transactions.

116. The PCT, pursuant to Fleming's confirmed Plan of Reorganization, is authorized to recover these damages.

## COUNT V

### Civil Conspiracy: Fleming Officer Defendants and Vendor Officer Defendants and Dole Fresh Fruit Company

117. The PCT incorporates in this count all of the allegations described above.

118. Each of the Fleming Officer Defendants, each of the Vendor Officer Defendants and Defendant Dole Fresh Fruit knew that it was unlawful to falsify the financial statements of Fleming, a public company. Each of them also knew that it was unlawful to mail--or to transmit over the

45

interstate wires--false documents to Fleming. Finally, each of them knew that it was unlawful to falsify a transaction as the "quid" in exchange for a "quo" of excess inventory purchases, unearned or preferential treatment, or other favors that were bestowed on these vendors in breach of the Fleming Officer Defendants' obligations as fiduciaries to Fleming.

119. Yet despite this shared knowledge, each of the Fleming Officer Defendants, and each of the Vendor Officer Defendants, Dole Fresh Fruit and other vendors agreed to form--and actually formed--an overarching conspiracy whose shared goal was the manipulation of Fleming's financial statements. Each of the Fleming Officer Defendants agreed with at least one of the Fleming Vendor Officers or Dole Fresh Fruit to falsify Fleming's financial records, to create false documents and to commit acts of commercial bribery in violation of Texas Penal Code 32.42. Likewise, each of the Fleming Vendor Officers and Dole Fresh Fruit agreed with at least one of the Fleming Officer Defendants to falsify Fleming's financial records, to create false documents and to commit acts of commercial bribery in violation of Texas Penal Code 32.43. Finally, as described above, there were many overt acts committed in furtherance of this conspiracy, and Fleming suffered hundreds of millions of dollars in damages that were proximately caused as a result. Each of the Fleming Officer Defendants, each of the Vendor Officer Defendants and Dole Fresh Fruit are therefore jointly and severally liable for civil conspiracy and the actual damages that proximately resulted from it.

## COUNT VI

### Course and Scope of Employment, Liability of Agent

120. Each of the Vendor Officer Defendants was acting within the course and scope of their employment as officers, agents, or employees of the Vendors that employed them. The Vendors are, therefore, responsible to indemnify the Vendor Officer Defendants for any damages they are

46

A    86

compelled to pay to the PCT as a result of its recovery in this action.

121. As agents, however, the Vendor Officers are also personally liable for their own wrongdoing and for the damages that they caused.

## COUNT VII

### Exemplary Damages against Defendant Deloitte & Touche

122. The PCT incorporates in this paragraph all of the allegations in the preceding paragraphs.

123. As described above, Defendant Deloitte was not merely negligent but was grossly negligent and severely reckless in the provision of its professional services to Fleming. As a result, Deloitte is not liable for only the actual damages proximately caused by its wrongdoing, it is liable for exemplary damages pursuant to Tex. Civ. Prac. & Rem. Code Chapter 41.

## COUNT VIII

### Exemplary Damages against Fleming Officers, Vendor Officers and Dole Fresh Fruit

124. The PCT incorporates in this paragraph all of the allegations in the preceding paragraphs.

125. The Fleming Officers, the Vendor Officers and Dole Fresh Fruit were not merely negligent, they were grossly negligent and consciously engaged in intentional, malicious conduct that was calculated to harm and actually harmed, Fleming. In particular, as fiduciaries and persons dealing with fiduciaries, these Defendants were held to a high standard of honor and integrity–a standard they deliberately, intentionally and knowingly breached through the execution of deliberately forged and falsified documents; acts of commercial bribery in violation of Texas Penal

47

A    87

Code Section 32.43; and securing the execution of Fleming's financial statements by deception.

126. The conduct of these defendants was so egregious that the PCT is entitled to recover an award of exemplary damages. Importantly, given the extreme nature of this conduct, and the fact that it was committed knowingly and intentionally, the jury's award of exemplary damages should not be capped pursuant to Tex. Civ. Prac. & Rem. Code §41.008.

### IX. Additional Claims Against Deloitte

127. In addition to the damages set out above, Deloitte is also liable to disgorge to the PCT the following fraudulent and wrongful transfers for the reasons set out in this section.

- On January 23, 2003, Fleming transferred $150,000 to Deloitte.

- On January 29, 2003, Fleming transferred $363,350 to Deloitte.

- On March 3, 2003, Fleming transferred $363,350 to Deloitte.

- On March 11, 2003, Fleming transferred $407,855 to Deloitte.

- On March 28, 2003, Fleming transferred $625,965 to Deloitte.

128. The transfers to Deloitte set forth in this section, which totals $1,557,095, shall hereinafter be referred to as the "Deloitte Transfers."

129. Fleming filed for bankruptcy protection on April 1, 2003.

### COUNT IX

### Avoidance of Preferential Transfers – 11 U.S.C. § 547

130. All paragraphs of this Complaint are hereby incorporated by reference.

131. The Deloitte Transfers were all made to or for the benefit of Deloitte, for or on account of antecedent debts.

48

132. The Deloitte Transfers were all made within 90 days before April 1, 2003, the date Fleming filed for bankruptcy protection.

133. Fleming was insolvent at the time of each of the Deloitte Transfers.

134. The Deloitte Transfers enabled Deloitte to receive more than it would have if: (a) Fleming's bankruptcy had been filed under chapter 7 of the Bankruptcy Code; and (b) the Deloitte Transfers had not been made.

## COUNT X

### Avoidance of Fraudulent Transfers – 11 U.S.C. § 548

135. All paragraphs of this Complaint are hereby incorporated by reference.

136. Fleming received less than reasonably equivalent value in exchange for the Deloitte Transfers; and, in addition: (a) was insolvent on the dates that the Deloitte Transfers were made; (b) was engaged in a business or a transaction, or was about to engage in business or a transaction, for which any property remaining with it was an unreasonably small capital; and/or (c) intended to incur, or believed that it would incur, debts that would be beyond the its ability to pay as such debts matured.

## COUNT XI

### Avoidance of Fraudulent Transfers – 11 U.S.C. § 544 & Applicable State Law

137. All paragraphs of this Complaint are hereby incorporated by reference.

138. The Deloitte Transfers constitute fraudulent transfers avoidable under § 544(b)(1) of the Bankruptcy Code in that: (a) there exists at least one creditor that (i) may avoid the Deloitte Transfers under the Uniform Fraudulent Transfer Act (the "UFTA"), as adopted by the state of Texas (Tex. Bus. & Com. Code Ann. § 24.001 et seq.) or other applicable law, and (ii) holds an unsecured

49

A   90

claim that is allowable under § 502 of the Bankruptcy Code or that is not allowable only under § 502(e) of the Bankruptcy Code; and (b) the Deloitte Transfers otherwise meet the elements of a fraudulent transfer under the UFTA or other applicable law.

139. The Deloitte Transfers may be avoided by at least one creditor under Texas law, or other applicable law, in that: (a) such creditor's claim arose before or within a reasonable time after the Deloitte Transfers were made; (b) Fleming made the Deloitte Transfers without receiving a reasonably equivalent value in exchange for the transfers; and (c) Fleming either (i) was engaged or was about to engage in a business or a transaction for which its remaining assets were unreasonably small in relation to the business or transaction; or (ii) intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond its ability to pay as they became due.

140. In addition, the Deloitte Transfers may be avoided by at least one creditor under Texas law, or other applicable law, in that: (a) such creditor's claim arose before the Deloitte Transfers were made; (b) Fleming made the Deloitte Transfers without receiving reasonably equivalent value in exchange for the transfers; and (c) Fleming was insolvent at the times or became insolvent as a result of same.

## COUNT XII

### For Recovery of Property – 11. U.S.C. § 550

141. All paragraphs of this Complaint are hereby incorporated by reference.

142. PCT is entitled to avoid the Deloitte Transfers described above pursuant to 11 U.S.C. §§ 544, 547 and/or 548.

143. Deloitte was the initial transferee of the Deloitte Transfers and/or the person for whose benefit the Deloitte Transfers were made.

50

A    91

144. Pursuant to 11. U.S.C. § 550(a), PCT is entitled to recover from Deloitte an amount

to be determined at trial that is not less than the sum of the Deloitte Transfers.

## ORIGINAL ANSWER OF FLEMING COMPANIES
## AND THE POST-CONFIRMATION TRUST AND CORE-MARK

The Fleming Companies, the Post-Confirmation Trust file and Core-Mark file this original

answer to the Fifth Consolidated Amended Class Action Complaint ("Complaint") filed against them

in this action.

### First Defense: Failure to State a Claim for Relief

The complaint fails to state a claim upon which relief can be granted.

### Second Defense: Discharge in Bankruptcy

The claims asserted in the complaint against Fleming have been discharged in bankruptcy.

The only proper party in this action is the Post-Confirmation Trust. Accordingly, the claims in this

action against Fleming must be dismissed.

### Third Defense: Limitation of Liability

Recovery on the claims asserted in the Complaint is expressly limited and capped, under

the terms of Fleming's confirmed Plan of Reorganization, at the amount of insurance coverage—if

any—that is available to cover Plaintiffs' claims.

### Fourth Defense: Lack of Capacity

Core-Mark International, Inc. is not the successor to the liabilities of Fleming, and it is not

subject to liability for Fleming's conduct. The only proper party to this action, under the Stipulation

and by virtue of the Confirmed Plan of Reorganization, is the Post-Confirmation Trust. Accordingly,

51

the claims against Core-Mark must be dismissed for failure to state a claim on which relief can be granted.

### Original Answer

Unless otherwise admitted below, all allegations in the Complaint are expressly denied. This answer will respond to the complaint in accordance with the numbered paragraphs contained in the Fifth Amended Complaint.

1. Admitted, except that it is denied that Jackson Capital suffered any of the damages it claims.

2. Admitted, except that it is denied that the plaintiffs listed suffered the damages they claim.

3. The PCT admits that there existed a scheme among certain of Fleming's officers and certain of its vendors to manipulate the financial statements of Fleming, and that its auditors failed adequately or professionally or competently to audit Fleming's financial statements. The PCT denies, however, that Fleming was a party to that scheme or benefitted from it. The PCT admits that there were articles published on September 4 and 5, about Fleming's vendor deductions–and those articles speak for themselves. The PCT is without information or belief sufficient to respond to the assertion that Fleming has been characterized as "Flem-ron."

4. The PCT admits that Fleming previously operated wholesale and retail grocery businesses, that Defendant Hansen was appointed its CEO in 1998, and that the company adopted a strategic plan to improve the performance of all of its business units. The remaining allegations of this paragraph are denied.

52

A    93

5. The PCT admits that one part of Fleming's strategic plan involved the development and operation of lower priced retail grocery stores known generally as "price impact" stores. The remaining allegations of this paragraph are denied.

6. The PCT admits that Fleming's earnings showed improvement for a number of years after 1998, and that its stock price improved as well. It is also admitted that Fleming offered both debt and equity pursuant to registration statements that were filed with the Securities and Exchange Commission in 2001. The remaining allegations of this paragraph are denied.

7. Denied.

The PCT admits that there were articles concerning Fleming on the Dow Jones Newswire and in the Wall Street Journal on September 4 and 5, 2002, but denies that Plaintiffs have characterized them accurately. The allegations of this paragraph are, therefore, denied.

8. The PCT admits that Deloitte did not properly audit Fleming's financial statements, its accounting for its vendor deductions or the reserves that it maintained for them. The PCT also admits that Ernst & Young failed to perform an appropriate internal audit function for Fleming. The PCT further admits that Hansen and Rider knew--or were reckless in not knowing--that the deductions in question were improper. The PCT is without knowledge or belief concerning the content of the unspecified "assurances" allegedly made by Hansen and Shapiro that are the subject of this paragraph, and so is without information or belief sufficient to respond to it.

9. The PCT is without information or belief sufficient to respond to Plaintiffs' characterization of an unspecified announcement by Fleming on September 5, 2002, or concerning the effect of any such announcement on the price of Fleming's stock.

10. The PCT admits that Fleming announced the SEC had commenced an informal inquiry on November 13, 2002. The PCT denies, however, that plaintiffs have accurately characterized the content of Fleming's January 14, 2003 press release. The PCT is without information or belief sufficient to respond to Plaintiffs' characterization of the unspecified "assurances" Defendant Shapiro allegedly provided to the public in February of 2003.

11. The PCT admits that Fleming announced on or about February 25, 2002 that the SEC had upgraded its investigation of Fleming's conduct. It is without information or belief sufficient to respond to Plaintiffs' characterization of how the market allegedly responded to this announcement.

12. The PCT admits that Fleming's financial statements for at least the years 2000, 2001 and 2001 were consistently false, but deny that Plaintiffs have accurately characterized the reason the financial statements were false. In fact, Fleming's financial statements were consistently false note merely because of improper practices with regard to the taking of, and accounting for, vendor deductions–practices that should have been revealed and prevented by an appropriate external and internal audits performed by Deloitte & Touche and by Ernst & Young–but also with regard to accounting for vendor allowances, inventory, transition fees and other significant transactions. The PCT is without information or belief sufficient to respond to the question which of the unspecified defendants named as a group in this paragraph manipulated Fleming's same store sales figures.

13. The PCT admits that certain of its former officers and employees, with knowledge or reckless disregard of the true facts, prepared financial statements that were materially inaccurate as to Fleming's financial condition, its assets and its liabilities. These inaccuracies could and should have been detected and prevented by appropriate, competent and professional external and internal

54

audit services provided to Fleming by Deloitte & Touche and Ernst & Young. The PCT denies that

the Audit Committee had actual knowledge that Fleming's financial statements were misleading.

The PCT further denies that plaintiffs have accurately characterized the transactions that caused

Fleming's financial statements to be inaccurate and misleading, and it denies the remaining

allegations of this paragraph.

14. The PCT admits that Defendants Hansen, Rider and Shapiro acted intentionally and in

violation of their fiduciary duties to Fleming in participating in conduct that caused Fleming's

financial statements to be materially misleading.   The PCT is without information or belief

sufficient to respond to Plaintiffs' assertion in this paragraph concerning unspecified false statements

to the investing public.

15. The PCT admits that Deloitte & Touche's failure to conduct an appropriate, adequate

and professional audit of Fleming in conformity with GAAS, and its failure to cause Fleming's

financial statements to be presented in conformity with GAAP, as has been described above, caused

Fleming to publish materially inaccurate statements of its financial condition, assets and liabilities.

The PCT admits that Fleming's inaccurate financial statements were incorporated in Fleming's

Registration Statements in reliance on Deloitte & Touche's assurance–in the form of a clean audit

opinion–that Fleming's financial statements were prepared and presented fairly in all material

respects, and in accordance with Generally Accepted Accounting Principles. The PCT is without

information or belief sufficient to respond to Plaintiffs' allegations concerning the Underwriter

Defendants. The PCT admits, however, that Fleming incurred hundreds of millions of dollars of

additional debt and liabilities that it would not, and could not have, incurred had Deloitte & Touche

adequately, competently and professionally audited and opined on Fleming's financial statements.

16. The PCT is without information or belief sufficient to respond to Plaintiffs' assertions concerning the pricing of Fleming's stocks and bonds during the alleged class period.

17. Admitted. The Court also has Supplemental Jurisdiction over the PCT's cross-claims pursuant to 28 U.S.C. §1367.

18. Admitted.

19. Admitted.

20. The PCT is without information or belief sufficient to respond to the allegations in this paragraph.

21. The PCT is without information or belief sufficient to respond to the allegations in this paragraph.

22. The PCT is without information or belief sufficient to respond to the allegations in this paragraph.

23. The PCT is without information or belief sufficient to respond to the allegations in this paragraph.

24. The PCT admits that Fleming was an Oklahoma corporation with its principal executive offices in Lewisville, Texas. It also admits that Fleming's stock was traded on the New York Stock Exchange, but is without information or belief sufficient to respond to the allegation concerning the number of outstanding shares of Fleming stock that existed at any given point in time.

25. Admitted.

26. Admitted.

27. The PCT admits the first three sentences of paragraph 28. The PCT denies, however, that it is fully liable for Fleming's conduct described in the Complaint. Instead, by operation of the

Plan, any liability of the PCT that is found is limited expressly solely to the amount of insurance coverage that exists, if any, under Fleming's directors' and officers' liability insurance policies.

28. Admitted.

29. The PCT admits that the quoted language appears in the Stipulation, and that Plaintiffs have the right to sue the PCT under the Plan. The PCT denies, however, that the PCT is fully liable for Fleming's conduct. The PCT also denies Plaintiffs' allegation that they are "not precluded" from suing Debtors in this action. In fact, Plaintiffs' claims under the Plan are: a) limited solely to a claim against the PCT; and, b) further limited "solely to the extent of available insurance coverage."

30. Denied.

31. The PCT admits that Hansen served as Fleming's CEO and admits he signed the registration statements. The PCT denies, however, that the registration statements "contained the false statements detailed" in the complaint.

32. The PCT admits that Rider served as Fleming's CFO and admits he signed the registration statements. The PCT denies, however, that the registration statements "contained the false statements detailed" in the complaint.

33. The PCT admits that Shapiro served as Fleming's CAO and admits he signed the registration statements. The PCT denies, however, that the registration statements "contained the false statements detailed" in the complaint.

34. The PCT admits that Dahlen was Fleming's Executive Vice-President, but is without information or belief sufficient to enable it to confirm the relevant dates.

35. No response is required to this allegation.

36. The PCT admits that Hansen, Rider, Shapiro and Dahlen knew–or were reckless in not knowing–Fleming's true financial condition. The last sentence of this paragraph is also admitted.

37. The first sentence of this paragraph states a legal conclusion that requires no response. The second and third sentences of this paragraph are admitted. The PCT denies, however, that the actions of these officers are attributed to Fleming. The conduct of these officers was not actually or implicitly authorized. The conduct also injured Fleming and was undertaken not for the purpose of benefitting Fleming but, rather, in order to benefit the officers and certain vendors at Fleming's expense. The last sentence of this paragraph is, likewise, a legal conclusion that requires no response.

38. The allegations in this paragraph state legal conclusions concerning the conduct of the officers that do not require a response. To the extent a response is necessary, the PCT admits that the officers had duties to Fleming, and duties under the federal securities laws, to accurately account for an report Fleming's financial condition–and that the officers violated those duties when they (in concert with others, and as a result of the auditors' negligence) caused Fleming to prepare, file and publish materially inaccurate financial statements.

39. The PCT admits that Hallett was a director of Fleming and a member of its audit committee. The PCT also admits that Hallett signed Fleming's registration statements. The PCT denies, however, that the registration statements "contained the false statements detailed" in the complaint.

40. The PCT admits that Peterson was a director of Fleming and a member of its audit committee. The PCT also admits that Peterson signed Fleming's registration statements. The PCT denies, however, that the registration statements "contained the false statements detailed" in the complaint.

41. This paragraph does not require a response.

42. Admitted.

43. The first sentence of this paragraph states a legal conclusion that requires no response. The second and third sentences of this paragraph are admitted. The last sentence of this paragraph is, likewise, a legal conclusion that requires no response.

44. The PCT denies that the Audit Committee had actual knowledge that Fleming's financial statements were materially false and misleading. The PCT also denies that the Audit Committee knowingly caused Fleming to issue and file materially false and misleading financial statements. Instead, the Audit Committee was entitled to rely upon and did rely upon the clean (but negligently prepared) audit opinions that were provided to it by Deloitte & Touche concerning Fleming's financial statements. The Audit Committee had no reason to know, and in the exercise of reasonable diligence could not have known, that Deloitte's opinion was negligently prepared or that certain of Fleming's officers were conspiring with certain of Fleming's vendors to defraud Fleming. The Audit Committee also had no reason to know, and in the exercise of reasonable diligence could not have known, that Ernst & Young had negligently performed its internal audit function on behalf of Fleming.

45. The PCT is without information or belief sufficient to respond to this question.

46. The PCT admits that Baum was a director of Fleming. The PCT also admits that Peterson signed Fleming's registration statements. The PCT denies, however, that the registration statements "contained the false statements detailed" in the complaint.

47. The PCT admits that Duberstein was a director of Fleming. The PCT also admits that Duberstein signed Fleming's registration statements. The PCT denies, however, that the registration

59

statements "contained the false statements detailed" in the complaint.

48. The PCT admits that Dykes was a director of Fleming. The PCT also admits that Dykes signed Fleming's registration statements. The PCT denies, however, that the registration statements "contained the false statements detailed" in the complaint.

49. The PCT admits that Hamada was a director of Fleming. The PCT also admits that Hamada signed Fleming's registration statements. The PCT denies, however, that the registration statements "contained the false statements detailed" in the complaint.

50. The PCT admits that Hernandez was the general counsel of Fleming, and that he signed Fleming's registration statements. The PCT denies, however, that the registration statements "contained the false statements detailed" in the complaint.

51. This paragraph requires no response.

52. Admitted.

53. Admitted.

54. The PCT admits the allegations of this paragraph in their entirety with one exception. This paragraph contains allegations related to "the scheme alleged below." Plaintiffs have not accurately described the wrongful conduct of Fleming's officers and vendors, or the nature of Deloitte's accounting errors, and so while the PCT alleges that there was a scheme among Fleming's officers and vendors to defraud Fleming, and that Deloitte and Ernst & Young could and should have prevented it, the Plaintiffs' allegations concerning what the scheme involved, and who participated in it, are incorrect and are therefore denied.

55. Admitted.

56. Admitted.

60

57. This paragraph states a legal conclusion that requires no response.

58. The PCT admits that listed investment banking firms are prestigious, highly competent investment banking firms who provided services to Fleming in connection with its public offerings of securities. The PCT is without information or belief sufficient to respond to the allegations concerning whether these underwriting firms "participated in the preparation of the false and misleading June Registration Statement," or the nature of the access to information that they had prior to the issuance and offering of any Fleming securities.

59. The PCT is without information or belief sufficient to enable it to respond to this allegation.

60. The PCT is without information or belief sufficient to enable it to respond to this allegation.

61. The PCT is without information or belief sufficient to enable it to respond to this allegation.

62. This paragraph states a legal conclusion that requires no response.

63. The PCT is without information or belief sufficient to enable it to respond to this allegation but it is denied that any of Fleming's Outside Directors knew of, or in the exercise of reasonable diligence should have known of, the misstatements and omissions contained in the Registration Statement or in Fleming's audited financial statements.

64. The PCT admits that Lead Plaintiff purports to bring this action in the capacity, and on behalf of, the class members listed in this paragraph.

65. The PCT admits that Lead Plaintiff has purported to exclude from its class of plaintiffs the persons and entities identified in this paragraph.

61

66. The PCT is without information or belief sufficient to enable it to respond to the allegations in this paragraph.

67. Admitted.

68. The PCT is without information or belief sufficient to respond to the allegations in this paragraph.

69. The PCT admits that Robert Stauth was terminated as Fleming's CEO, but is without information or belief sufficient to enable it to respond to the remaining allegations in this paragraph.

70. Admitted that this announcement occurred on or about November 30, 1998.

71. The PCT is without information sufficient to enable it to respond to this allegation.

72. The PCT is without information sufficient to enable it to respond to this allegation.

73. The PCT is without information sufficient to enable it to respond to this allegation.

74. The PCT is without information sufficient to enable it to respond to this allegation.

75. The PCT is without information sufficient to enable it to respond to this allegation, but admits that Fleming's Form 10K for the year 2000 contained the quoted language.

76. The PCT is without information sufficient to enable it to respond to this allegation.

77. The PCT is without information sufficient to enable it to respond to this allegation, but admits that Fleming's press release contained the quoted language.

78. The PCT is without information sufficient to enable it to respond to this allegation, but admits that Fleming's press release contained the quoted language.

79. The PCT is without information sufficient to enable it to respond to this allegation.

80. The PCT is without information sufficient to enable it to respond to this allegation.

81. The PCT is without information sufficient to enable it to respond to this allegation.

A   103

82. The PCT is without information sufficient to enable it to respond to this allegation.

83. The PCT is without information sufficient to enable it to respond to this allegation, but admits that Fleming's press release contained the quoted language.

84. The PCT is without information sufficient to enable it to respond to this allegation.

85. The PCT is without information sufficient to enable it to respond to this allegation.

86. The PCT is without information sufficient to enable it to respond to this allegation.

87. The PCT is without information sufficient to enable it to respond to this allegation, but admits that Fleming's press release contained the quoted language.

88. The PCT is without information sufficient to enable it to respond to this allegation.

89. The PCT is without information sufficient to enable it to respond to this allegation, but admits that Fleming's press release contained the quoted language.

90. The PCT is without information sufficient to enable it to respond to this allegation, but admits that Fleming's press release contained the quoted language.

91. The PCT is without information sufficient to enable it to respond to this allegation.

92. The PCT is without information sufficient to enable it to respond to this allegation, but admits that Fleming's press release contained the quoted language.

93. The PCT is without information sufficient to enable it to respond to this allegation.

94. The PCT is without information sufficient to enable it to respond to this allegation.

95. The PCT is without information sufficient to enable it to respond to this allegation.

96. The PCT is without information sufficient to enable it to respond to this allegation.

97. The PCT is without information sufficient to enable it to respond to this allegation.

98. The PCT is without information sufficient to enable it to respond to this allegation.

63

99.  The PCT is without information sufficient to enable it to respond to this allegation.

100.  The PCT is without information sufficient to enable it to respond to this allegation.

101.  The PCT is without information sufficient to enable it to respond to this allegation.

102.  The PCT is without information sufficient to enable it to respond to this allegation.

103.  The PCT is without information sufficient to enable it to respond to this allegation.

104.  The PCT is without information sufficient to enable it to respond to this allegation.

105.  The PCT is without information sufficient to enable it to respond to this allegation.

106.  The PCT is without information sufficient to enable it to respond to this allegation.

107.  The PCT is without information sufficient to enable it to respond to this allegation.

108.  The PCT is without information sufficient to enable it to respond to this allegation.

109.  The PCT is without information sufficient to enable it to respond to this allegation.

110.  The PCT is without information sufficient to enable it to respond to this allegation.

111.  The PCT is without information sufficient to enable it to respond to this allegation.

112.  The PCT is without information sufficient to enable it to respond to this allegation.

113.  The PCT is without information sufficient to enable it to respond to this allegation.

114.  The PCT is without information sufficient to enable it to respond to this allegation.

115.  The PCT is without information sufficient to enable it to respond to this allegation.

116.  The PCT is without information sufficient to enable it to respond to this allegation.

117.  The PCT is without information sufficient to enable it to respond to this allegation.

118.  The PCT is without information sufficient to enable it to respond to this allegation.

119.  The PCT is without information sufficient to enable it to respond to this allegation.

120.  The PCT is without information sufficient to enable it to respond to this allegation.

121. The PCT is without information sufficient to enable it to respond to this allegation.

122. The PCT admits that Fleming announced in February of 2001 that it had entered into a contract with Kmart Corporation, but it is without information sufficient to enable it to respond to the remaining allegations in this paragraph.

123. The PCT is without information sufficient to enable it to respond to this allegation.

124. The PCT is without information sufficient to enable it to respond to this allegation.

125. The PCT is without information sufficient to enable it to respond to this allegation.

126. The PCT is without information sufficient to enable it to respond to this allegation.

127. The PCT is without information sufficient to enable it to respond to this allegation.

128. The PCT is without information sufficient to enable it to respond to this allegation.

129. The PCT is without information sufficient to enable it to respond to this allegation.

130. The PCT is without information sufficient to enable it to respond to this allegation.

131. The PCT is without information sufficient to enable it to respond to this allegation.

132. The PCT is without information sufficient to enable it to respond to this allegation.

133. The PCT is without information sufficient to enable it to respond to this allegation.

134. The PCT is without information sufficient to enable it to respond to this allegation.

135. The PCT is without information sufficient to enable it to respond to this allegation.

136. The PCT is without information sufficient to enable it to respond to this allegation.

137. The PCT is without information sufficient to enable it to respond to this allegation.

138. The PCT is without information sufficient to enable it to respond to this allegation.

139. The PCT is without information sufficient to enable it to respond to this allegation.

140. The PCT is without information sufficient to enable it to respond to this allegation.

141. The PCT is without information sufficient to enable it to respond to this allegation.

142. The PCT is without information sufficient to enable it to respond to this allegation.

143. The PCT is without information sufficient to enable it to respond to this allegation.

144. The PCT admits that the officers' wrongdoing was not limited to improper vendor deduction practices, but it is without information sufficient to enable it to respond to the remainder of this allegation.

145. The PCT is without information sufficient to enable it to respond to this allegation.

146. The PCT is without information sufficient to enable it to respond to this allegation.

147. The PCT is without information sufficient to enable it to respond to this allegation.

148. The PCT is without information sufficient to enable it to respond to this allegation, but it admits that the officers' wrongdoing was not limited to improper vendor deduction practices.

149. The PCT is without information sufficient to enable it to respond to this allegation

150. The PCT is without information sufficient to enable it to respond to this allegation.

151. The PCT is without information sufficient to enable it to respond to this allegation.

152. The PCT is without information sufficient to enable it to respond to this allegation.

153. The PCT denies that Fleming tried to weaken its internal controls. To the contrary, Fleming retained Ernst & Young to perform its internal control function on a company wide basis in order to strengthen its control environment. Accordingly, the allegations of this paragraph are denied.

154. The PCT admits that Fleming endeavored to centralize its divisional accounting operations in Oklahoma City in an effort to strengthen its internal control function, but it denies the remaining allegations of this paragraph.

66

155. The PCT is without information sufficient to enable it to respond to this allegation.

156. The PCT is without information sufficient to enable it to respond to this allegation.

157. The PCT is without information sufficient to enable it to respond to this allegation.

158. The PCT is without information sufficient to enable it to respond to this allegation.

159. The PCT is without information sufficient to enable it to respond to this allegation.

160. The PCT admits that Fleming contracted with Ernst & Young to provide its internal audit functions during the class period. The PCT is without information or belief sufficient to respond to the remaining allegations of this complaint.

161. The PCT is without information sufficient to enable it to respond to this allegation.

162. The PCT is without information sufficient to enable it to respond to this allegation.

163. The PCT is without information sufficient to enable it to respond to this allegation.

164. The PCT admits that certain of Fleming's officers engaged in the practice described in this paragraph, but deny that they were authorized to do so or that this conduct should be imputed to Fleming.

165. The PCT is without information sufficient to enable it to respond to this allegation.

166. The PCT is without information sufficient to enable it to respond to this allegation.

167. The PCT is without information sufficient to enable it to respond to this allegation.

168. The PCT is without information sufficient to enable it to respond to this allegation.

169. The PCT is without information sufficient to enable it to respond to this allegation.

170. The PCT admits that vendor deductions were accrued improperly, were accounted for inaccurately, and that the reserves associated with them were inaccurate and inadequate–but it is without information or belief sufficient to permit it to respond to the remaining allegations in this

67

paragraph.

171. The PCT is without information sufficient to enable it to respond to this allegation.

172. The PCT is without information sufficient to enable it to respond to this allegation.

173. The PCT is without information sufficient to enable it to respond to this allegation.

174. The PCT is without information sufficient to enable it to respond to this allegation.

175. The PCT is without information sufficient to enable it to respond to this allegation.

176. The PCT is without information sufficient to enable it to respond to this allegation.

177. The PCT is without information sufficient to enable it to respond to this allegation.

178. The PCT is without information sufficient to enable it to respond to this allegation.

179. The PCT is without information sufficient to enable it to respond to this allegation, but admits that the quoted language appears in the Wall Street Journal article.

180. The PCT is without information sufficient to enable it to respond to this allegation, but admits that the quoted language appears in the Wall Street Journal article.

181. The PCT is without information sufficient to enable it to respond to this allegation, but admits that the quoted language appears in the Wall Street Journal article.

182. The PCT is without information sufficient to enable it to respond to this allegation, but admits that the quoted language appears in the Wall Street Journal article.

183. The PCT is without information sufficient to enable it to respond to this allegation.

184. The PCT is without information sufficient to enable it to respond to this allegation.

185. The PCT is without information sufficient to enable it to respond to this allegation, but admits that the quoted language appears in the Wall Street Journal article.

186. The PCT is without information sufficient to enable it to respond to this allegation, ut

68

admits that the quoted language appears in the Wall Street Journal article.

187. The PCT is without information sufficient to enable it to respond to this allegation, but admits that the quoted language appears in the Wall Street Journal article.

188. The PCT is without information sufficient to enable it to respond to this allegation.

189. The PCT is without information sufficient to enable it to respond to this allegation.

190. The PCT is without information sufficient to enable it to respond to this allegation.

191. The PCT is without information sufficient to enable it to respond to this allegation.

192. The PCT is without information sufficient to enable it to respond to this allegation.

193. The PCT is without information sufficient to enable it to respond to this allegation.

194. The PCT is without information sufficient to enable it to respond to this allegation.

195. The PCT is without information sufficient to enable it to respond to this allegation.

196. The PCT is without information sufficient to enable it to respond to this allegation.

197. The PCT is without information sufficient to enable it to respond to this allegation.

198. The PCT is without information sufficient to enable it to respond to this allegation.

199. The PCT is without information sufficient to enable it to respond to this allegation.

200. The PCT is without information sufficient to enable it to respond to this allegation.

201. The PCT is without information sufficient to enable it to respond to this allegation.

202. The PCT is without information sufficient to enable it to respond to this allegation.

203. The PCT is without information sufficient to enable it to respond to this allegation.

204. The PCT is without information sufficient to enable it to respond to this allegation.

205. The PCT is without information sufficient to enable it to respond to this allegation.

206. The PCT is without information sufficient to enable it to respond to this allegation.

207. The PCT is without information sufficient to enable it to respond to this allegation.

208. The PCT is without information sufficient to enable it to respond to this allegation.

209. The PCT is without information sufficient to enable it to respond to this allegation.

210. The PCT is without information sufficient to enable it to respond to this allegation.

211. This paragraph purports to characterize certain orders issued by the Securities and Exchange Commission, which speak for themselves, so that no response is required to them. The PCT admits, however, that certain former Fleming vendors–which included at least Kraft, Kemps, Frito Lay, Dexsi and Dean Foods, and their duly authorized agents, employees and officers–assisted certain former Fleming officers in violations of their fiduciary duties that injured Fleming. The PCT also admits that these violations included, but were not limited to, manipulation of Fleming's accounting records, manipulation of Fleming's earnings, manipulations of its vendor deductions and mis-characterization of amounts that vendors had paid to Fleming or that were due to Fleming from vendors. The PCT denies, however, that these activities were authorized by Fleming. In fact, these activities violated Fleming's policies, were ultra vires, were unknown to Fleming's outside directors, and were contrary to the best interests of Fleming, its shareholders and its creditors. These activities, moreover, were materially assisted and aided by the incompetent audit of Fleming's accounts that was performed by its public auditors, Deloitte & Touche.

212. This paragraph purports to characterize the contents of the PWC Report. That report, which was an incomplete assessment of the transactions and conduct that injured Fleming–and caused its financial statements to be inaccurate--reached certain conclusions that are set out in the text of the report itself. The PWC report speaks for itself, but it is not characterized with complete accuracy in the allegations contained in paragraph 213.

70

A   111

213.  This allegation does not identify which transactions are included in the category of "numerous other transactions identified in PWC's report contributed to Fleming's inflation of earnings and other manipulations during the class period." As a result, the PCT is unable to admit or deny the truth of this allegation.

214.  The PCT admits the allegations in this paragraph.

215.  The PCT is without information sufficient to admit or deny the allegations in this paragraph.

216.  The PCT is without information sufficient to admit or deny the allegations in this paragraph.

217.  The PCT admits this allegation, but denies that Fleming intended to mislead the investing public by the filing of this Form 10Q.

218.  The PCT admits this allegation, but denies that Fleming intended to mislead the investing public by the filing of this Form 10Q.

219.  The PCT admits this allegation, but denies that Fleming intended to mislead the investing public by the filing of this Form 10Q.

220.  The PCT admits this allegation.

221.  The PCT admits this allegation.

222.  The PCT is without information sufficient to admit or deny the allegations in this paragraph.

223.  The PCT is without information sufficient to admit or deny the allegations in this paragraph.

224.  The PCT admits that it filed Form 10Q for the second quarter of 2001, but denies that

it intended to mislead the investing public by the filing of this Form 10Q.

225. The PCT admits that the Form 10Q made the referenced statement concerning D & T, but denies that Fleming intended to mislead the investing public by the filing of this Form 10Q.

226. The PCT is without information or belief sufficient to admit or deny the allegations in this paragraph.

227. The PCT admits that Fleming's earnings were inflated by improper vendor deductions, and by certain other manipulations. These manipulations were contrary to Fleming's best interest, were not authorized and would and should have been prevented by a professionally performed audit by Deloitte & Touche. The PCT also incorporates in this paragraph its response to paragraphs 102-214 of the Fifth Amended Complaint.

228. The PCT is without information or belief sufficient to enable it to admit or deny the allegations in this paragraph.

229. The PCT is without information or belief sufficient to enable it to admit or deny the allegations in this paragraph.

230. The PCT is without information or belief sufficient to enable it to admit or deny the allegations in this paragraph.

231. The PCT admits the allegations of this paragraph.

232. The PCT is without information or belief sufficient to enable it to admit or deny the allegations in this paragraph.

233. The PCT is without information or belief sufficient to enable it to admit or deny the allegations in this paragraph.

234. The PCT admits that it filed Form 10Q for the 3rd Quarter of 2001, but denies that in

72

A    113

doing so Fleming intended to mislead the investing public.

235. The PCT admits that the statements concerning a review by Deloitte & Touche appear in the Form 10Q for the 3rd Quarter of 2001, but denies that Fleming intended to mislead the investing public by including them in its 10Q.

236. The PCT is without information or belief sufficient to enable it to admit or deny the allegations in this paragraph.

237. The PCT is without information or belief sufficient to enable it to admit or deny the allegations in this paragraph.

238. The PCT admits this allegation.

239. The PCT is without information or belief sufficient to enable it to admit or deny the allegations in this paragraph.

240. The PCT is without information or belief sufficient to enable it to admit or deny the allegations in this paragraph.

241. The PCT is without information or belief sufficient to enable it to admit or deny the allegations in this paragraph.

242. The PCT is without information or belief sufficient to enable it to admit or deny the allegations in this paragraph.

243. The PCT is without information or belief sufficient to enable it to admit or deny the allegations in this paragraph.

244. The PCT admits that Fleming issued a press release on February 13, 2002 that contained, at least in part, the statements quoted in this paragraph.

245. The PCT admits that, as of February 2002, Fleming's net income for 2001, and for the

first quarter of 2002, had been artificially inflated by the wrongful acts of certain former Fleming vendors and officers, without the knowledge or consent of Fleming or its Outside Directors. This inflation resulted, at least, from improper vendor deductions for which inadequate reserves were taken; and, fictitious and falsely documented transactions with Kraft, Frito-Lay, Desxi, Marigold, Dole, and FMG/Daymon, that were used to accelerate the recognition of millions of dollars of income that had not been–and that might never be–earned. The PCT is, at this time, without information or belief sufficient to permit it to respond to allegations concerning an allegedly fictitious "Store 11," falsification of same store retail sales, or improper classification of recurring charges.

246. The PCT is without information or belief sufficient to enable it to admit or deny the allegations in this paragraph.

247. The PCT admits that Fleming filed its Form 10K for 2001, and that it contained the statements made in this paragraph.

248. The PCT admits that Fleming's Form 10K contained false statements that were included in it as a result of breaches of fiduciary duty by Fleming's former officers, the negligence of Fleming's accountants, Deloitte & Touche, and the knowing participation in those misstatements by Kraft, Frito-Lay, Dexsi, Marigold, Dole and FMG/Daymon and their duly authorized agents and employees. These misstatements were made without the knowledge or consent of Fleming or its Outside Directors, and included misstatements of net income as a result of wrongful vendor deductions, inadequate reserves for vendor deductions, and fictitious and falsely documented transactions with these vendors. The PCT is, at this time, without information or belief sufficient to permit it to respond to allegations concerning an allegedly fictitious "Store 11," falsification of

74

same store retail sales, or improper classification of recurring charges.

249.  The PCT admits this allegation.

250.  The PCT admits that Fleming's Form 10K was false and misleading, but denies that this was the result of any intentional act of Fleming or its Outside Directors.

251.  The PCT admits that the Exchange Offering described in this paragraph occurred, and likewise admits that certain former Fleming officers were motivated to maintain the price of Fleming's existing debt securities even as they plunged the company deeper into insolvency. The PCT denies, however, that either Fleming itself or the Outside Directors harbored any intention to maintain the price of Fleming's debt securities through unlawful means.

252.  The PCT is without information or belief sufficient to enable it to admit or deny this allegation.

253.  The PCT admits that the Registration Statement recited the Fleming financial data described in this paragraph, and admits that the statement of Fleming's net income was false for the reasons stated in response to paragraphs 212, 246 and 249.  The PCT also admits that the Registration Statement incorporated Fleming's Form 10K for 2001.

254.  The PCT admits that the Registration Statement discussed Fleming's price impact retail strategy, but the statements in its speak for themselves and are not fully or accurately characterized in this allegation.

255.  The PCT admits that the Registration Statement incorporated Fleming's Form 10K for 2001, but denies that this allegation accurately characterizes the statements it contained concerning Fleming's retail strategy.

256.  The PCT admits that Fleming announced that its financial statements for the year ended

75

2001 needed to be restated, but denies that this is an admission that Fleming incorporated materially false statements in the Registration Statements. Instead, any false statements in the Registration Statement were included as a result of the wrongful or negligent actions of certain former Fleming officers, certain former Fleming vendors and their duly authorized agents and employees, and Deloitte & Touche. The inclusion of these false statements was not knowingly authorized by Fleming or its Outside Directors.

257. The PCT admits that the March 2002 Registration Statement was false and misleading, but denies that this was the intention of either Fleming or its Outside Directors. The PCT also incorporates in answer to the allegations in this paragraph its answer to the allegations in paragraph 257. The PCT is without information or belief, however, sufficient to admit or deny the allegations that statements in the Registration Statement concerning the price impact stores were materially false and misleading.

258. The PCT admits that the statement quoted in this paragraph is contained in the March 2002 Registration Statement.

259. The PCT admits that the statement quoted in this paragraph is contained in the March 2002 Registration Statement.

260. The PCT admits that the statement quoted in this paragraph is contained in the March 2002 Registration Statement.

261. The PCT admits that the March 2002 Registration Statement was false and misleading, but denies that this was the intention of either Fleming or its Outside Directors. The PCT also incorporates in answer to the allegations in this paragraph its answer to the allegations in paragraph 257. The PCT also admits that Fleming's officers caused Fleming, without its knowledge or

A   117

consent, to take improper vendor deductions and to take inadequate reserves against those deductions; and that its officers, in concert with certain vendors and their agents, were manipulating Fleming's financial statements. The PCT also admits that these practices could and should have been detected and prevented through the performance of a proper audit by Deloitte & Touche. The PCT is without information or belief, however, sufficient to admit or deny the allegations that statements in the Registration Statement were false for the other reasons discussed in this paragraph.

262. The PCT admits this allegation.

263. The PCT admits this allegation.

264. The PCT incorporates as its answer to paragraph 265 its answer to paragraph 262.

265. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

266. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

267. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

268. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

269. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

270. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

271. The PCT admits this allegation.

77

272. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

273. The PCT admits that Fleming's earnings for the first quarter of 2002 were misstated as a result of wrongful, unauthorized actions of certain former Fleming officers, wrongful or negligent actions of certain former Fleming vendors and their duly authorized agents or employees, and wrongful or negligent acts of Deloitte & Touche. The PCT admits that these earnings were misstated as a result of wrongful vendor deductions, unnecessary forward buys of inventory, inadequate reserves for vendor deductions, and manipulative and falsely documented transactions undertaken between certain former Fleming officers and Kraft, Dean Foods, Dexsi and their duly authorized agents and employees. The PCT is without information or belief sufficient permit it to admit or deny the remaining allegations concerning the causes of the overstatement of Fleming's income for the first quarter of 2002.

274. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

275. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

276. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

277. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

278. The PCT admits that Fleming filed its Form 10Q for the first quarter of 2002, but is without information sufficient to confirm the precise date on which it was filed. The PCT admits

78

that, without the knowledge or authorization of Fleming or its Outside Directors, this Form 10Q

materially overstated Fleming's net income for the quarter. The PCT also admits that this Form 10Q

stated that its results were presented in accordance with GAAP, but they were not, in fact, presented

in accordance with GAAP.

279. The PCT admits this allegation.

280. The PCT admits this allegation, but denies that Fleming or its Outside Directors were

motivated to maintain or inflate the price of Fleming's stock through illicit means.

281. The PCT is without information or belief sufficient to permit it to admit or deny this

allegation.

282. The PCT admits this allegation, but denies that it was Fleming's intention to mislead

potential investors.

283. The PCT admits that the June 2002 Registration Statement contained the reported

financial data described in this paragraph, and that Fleming's net income–as reported in the

Registration Statement and incorporated documents–was misstated both for the year 2001 and the

first quarter of 2002. The PCT denies, however, that these misstatements were intentional on the

part of either Fleming or its Outside Directors.

284. The PCT is without information or belief sufficient to admit or deny the allegations in

this paragraph; namely, that the statements concerning Fleming's price impact stores were

misleading.

285. The PCT admits that the June 2002 Registration Statement contained the quoted

information concerning the price impact stores, but is without information or belief sufficient to

permit it to admit or deny the allegation that these statements are false.

79

A    120