286. The PCT admits that Fleming has announced that its 2001 financial results will be restated, but denies that this is an admission that either Fleming or its Outside Directors intended to include false or misleading information in Fleming's Form 10K and Registration Statements.

287. The PCT is without information or belief sufficient to admit or deny the allegations in this paragraph; namely, that the statements in the registration statement concerning Fleming's price impact stores were misleading.

288. The PCT admits that the language quoted in this paragraph appears in Fleming's Registration Statement for June 2002.

289. The PCT admits that the language quoted in this paragraph appears in Fleming's Registration Statement for June 2002.

290. The PCT admits that the language quoted in this paragraph appears in Fleming's Registration Statement for June 2002.

291. The PCT admits that Fleming's earnings for 2001 and the first quarter of 2002, as stated in the June Registration Statement, were misstated as a result of wrongful, unauthorized actions of certain former Fleming officers, wrongful or negligent actions of certain former Fleming vendors and their duly authorized agents or employees, and wrongful or negligent acts of Deloitte & Touche. The PCT admits that these earnings were misstated as a result of wrongful vendor deductions, unnecessary forward buys of inventory, inadequate reserves for vendor deductions, and manipulative and falsely documented transactions undertaken between certain former Fleming officers and Kraft, Dean Foods, Marigold, Frito-Lay, Dexsi, Dole and FMG/Daymon, and their duly authorized agents and employees. The PCT is without information or belief sufficient permit it to admit or deny the remaining allegations concerning the causes of the misstatements in Fleming's June 2002

Registration Statement.

292. The PCT admits that the language quoted in this paragraph appears in Fleming's Registration Statement for June 2002.

293. The PCT admits this allegation.

294. The PCT incorporates as its answer to this allegation, its answer to the allegations in paragraph 292.

295. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

296. The PCT admits this allegation, save for the allegation concerning Fleming's statements about its retail initiative.

298. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

299. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

300. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

301. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

302. The PCT admits that it issued a press release on July 13, 2002 and that the press release contains the quoted information, but denies the remainder of this allegation.

303. The PCT admits this allegation.

304. The PCT is without information or belief sufficient to permit it to admit or deny this

81

allegation.

305. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

306. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

307. The PCT admits that Fleming's wholesale earnings were overstated in part as a result of improper deduction practices undertaken, without the authorization of Fleming or its Outside Directors, by certain former Fleming officers. The PCT is without information or belief sufficient to permit it to admit or deny the remainder of this allegation.

308. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

309. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

310. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

311. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

312. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

313. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

314. The PCT admits that Fleming filed its Form 10Q for the second quarter of 2002, that

82

it contains the language quoted in this paragraph, and that the Form 10Q did not accurately state reflect the true results of Fleming's operations because of the wrongful and negligent actions of certain of Fleming's former officers, certain Fleming vendors and their officers and the wrongful actions of Deloitte.

315. The PCT admits this allegation.

316. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

317. The PCT admits that the article described in this paragraph was published on the Dow Jones Newswire on September 4, 2002–and that it contains the quoted language.

318. The PCT is without information or belief sufficient to permit it to admit or deny this allegation as it pertains to the performance of Fleming's retail division and its price-impact stores, but admits that certain Fleming officers–without the knowledge or Fleming or its Outside Directors–wrongly purchased unnecessary, excess inventory to get cash rebates and falsely inflate Fleming's revenues.

319. The PCT admits that the article discussed in this allegation contained the language quoted in this paragraph.

320. The PCT is without information or belief sufficient to respond to the allegations concerning the closing price of Fleming's stock, but admits that the article described in this allegation appeared in the Wall Street Journal on September 5, 2002.

321. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

322. The PCT is without information or belief sufficient to permit it to respond to the

83

allegations concerning statements that were allegedly made by Hansen and Rider during any analyst conferences. The PCT admits, however, that Fleming's income–without the consent of Fleming or its Outside Directors–was wrongly inflated by improper vendor deductions, improper reserve practices, and fictitious vendor transactions. The PCT, however, is without information or belief sufficient to respond to the allegations concerning Source 3 or his or her statements.

323. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

324. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

325. The PCT is without information or belief sufficient to respond to the allegations concerning the knowledge of the investor community, but admits that neither Fleming itself nor its Outside Directors was aware of the magnitude of the misstatements in Fleming's financial statements as of September 4 and 5, 2002.

326. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

327. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

328. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

329. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

330. The PCT admits that, in 2003, Fleming announced that it would restate its financial

84

results, but denies that unsustainable vendor deductions were the sole cause of that misstatement.

331. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

332. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

333. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

334. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

335. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

336. The PCT admits this allegation.

337. The PCT admits that it filed an amended Form 10Q for the first quarter of 2002, and that this amendment did not correct the misstatements of Fleming's financial results and its first quarter earnings. The PCT admits that Defendants Hansen, Shaprio and Rider made the statements described in this allegation, and that these statements were known by them to be false at the time they made them.

338. The PCT admits that it filed an amended Form 10Q for the first quarter of 2002, and that this amendment did not correct the misstatements of Fleming's financial results and its first quarter earnings. The PCT admits that Defendants Hansen, Shaprio and Rider made the statements described in this allegation, and that these statements were known by them to be false at the time they made them.

339. The PCT admits this allegation, but denies that Fleming or its Outside Directors were a party to any fraud.

340. The PCT admits this allegation, but denies that Fleming or its Outside Directors were a party to any fraud.

341. The PCT admits this allegation.

342. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

343. The PCT admits that Fleming's earnings–without the knowledge or consent of Fleming or its Outside Directors–were misstated as a result of wrongful vendor deductions, improper reserve practices and fictitious vendor transactions–but is without information or belief sufficient to permit it to respond to the remainder of this allegation.

344. The PCT admits this allegation, and that the statements made by Defendants Hansen, Rider and Shapiro were false in the manner expressly admitted in this answer–but is without information or belief sufficient to admit the truth of the incorporated allegations except to the extent that they assert Fleming's revenue was overstated as a result of wrongful vendor deductions, wrongful reserve practices and fictitious vendor transactions.

345. The PCT admits this allegation.

346. The PCT admits this allegation.

347. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

348. The PCT admits this allegation.

349. The PCT is without information or belief sufficient to permit it to admit or deny this

allegation.

350. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

351. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

352. The PCT is without information or belief sufficient to permit it to admit or deny this allegation.

353. The PCT admits that certain Fleming officer defendants manipulated Fleming's financial statements as described in the cross-complaint described below and as specifically admitted in this answer, and incorporates in this paragraph its response to the incorporated paragraphs cited in this allegation.

354. The PCT admits that Fleming's contract with Kmart was cancelled in February of 2003, but is without information or belief sufficient to respond to the remainder of the allegations in this paragraph.

355. The PCT admits that Defendant Shapiro was aware of, and participated in, the manipulation of Fleming's financial statements and that Fleming would eventually collapse into bankruptcy as a result of these manipulations.

356. The PCT admits that the SEC's investigation of Fleming's financial reports was upgraded to a formal investigation, but is without information or belief sufficient to permit it to respond to the allegations concerning the effect of this fact on the price of Fleming's securities.

357. The PCT admits this allegation.

358. The PCT admits this allegation.

359. The PCT admits this allegation.

360. The PCT admits this allegation.

361. The PCT admits this allegation.

362. The PCT admits this allegation.

363. The PCT admits this allegation.

364. The PCT admits that the wrongful vendor deductions, improper vendor reserves, fictitious transactions and Deloitte's negligent audit caused the need to restate Fleming's financial results–but denies that this was the result of wrongful conduct by Fleming itself or its Outside Directors. Instead, the need for this restatement was the result of actions that were against Fleming's best interests, were not authorized by it and that caused enormous injury and damage to Fleming.

365. The PCT admits that Fleming's financial statements were misstated as a result of wrongful vendor deductions, improper vendor reserves, fictitious transactions and Deloitte's negligent audit and that its costs were understated and its income overstated as a result. The PCT is without information or belief concerning the remainder of the allegations in this paragraph.

366. The PCT admits this allegation.

367. The PCT admits this allegation.

368. The PCT admits that certain of the Individual Defendants, as described below in the cross-claim, caused Fleming's financial statements to be falsified in the manner described in the cross-claim, but denies these allegations as to the remainder of the Individual Defendants.

Response to Paragraphs 369-70

The PCT admits that Fleming's financials were not presented in conformity with GAAP,

but denies that they were knowingly presented this way by Fleming or its Outside Directors. The PCT refers Lead Plaintiff to the cross-claim for the PCT's allegations concerning the specific ways in which Fleming's financial results were misstated. It is otherwise without information or belief sufficient to admit or deny the truth of the allegations in these paragraphs.

371. The PCT admits this allegation.

372. The PCT denies this allegation, to the extent it asserts that the Audit Committee Defendants had access to information sufficient to have revealed to them the ongoing fraudulent scheme being used to injure Fleming and manipulate its financial statements.

373. The PCT admits that the Proxy Statement describes the function of Fleming's Audit Committee, but that description speaks for itself.

Response to Paragraphs 374-376

The PCT admits that the Audit Committee had a charter that described its functions, but that charter speaks for itself, so no further response is required to these paragraphs.

377. The PCT denies this allegation.

378. The PCT denies this allegation.

379. The PCT denies this allegation.

Response to Paragraphs 380 to 593

Except to the extent that they are expressly admitted in the allegations contained in the PCT's cross-claim, the PCT is without information or belief sufficient to admit or deny the allegations in these paragraphs with one exception: The PCT denies: a) that the Audit Committee Defendants or any of Fleming's Outside Directors were a party to the fraud being perpetrated on Fleming; b) that any of them authorized the manipulation of Fleming's financial statements; and, c)

89

denies that any of them knew about or participated in the misstatement of Fleming's financial information.

## PRAYER FOR RELIEF

The PCT demands trial by jury and, upon trial, the entry of a judgment in its favor awarding it actual damages, exemplary damages, disgorgement of bonuses, fraudulent transfers and preferences, pre- and post-judgment interest and such other relief to which it may show itself to be entitled. The PCT further submits that all claims against the Fleming Companies and Core-Mark should be dismissed, because they are not proper parties to this action, and submits that any damages found by the jury in favor of the securities plaintiffs must be capped and limited in accordance with the provisions of the Confirmed Fleming Plan of Reorganization.

Respectfully submitted,

**GIBBS & BRUNS, LLP**

By: _____
Kathy D. Patrick
Texas State Bar No. 15581400
Scott A. Humphries
Texas State Bar No. 00796800
Jeremy Doyle
Texas State Bar No. 240125523
Brian T. Ross
Texas State Bar No. 24037395
1100 Louisiana, Suite 5300
Houston, Texas 77002
Telephone No.: 713/650-8805
Facsimile No.: 713/750-0903

**Counsel for Defendant and Cross-Claimant the**
**Fleming Post Confirmation Trust and Defendant Core-Mark**
**International, Inc.**

90

A   131

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2005, a true and correct copy of the foregoing instrument was sent to all counsel on the attached service list via electronic filing and/or U.S. Mail.

s/ Kathy D. Patrick
Kathy D. Patrick

91

A    132

## SERVICE LIST

| | |
|---|---|
| Sherrie R. Savett<br>Jerome M. Marcus<br>Glen Abramson<br>Casey M. Peterson<br>Jon Lambiras<br>**Berger & Montague, P.C.**<br>1622 Locust Street<br>Philadelphia, PA 19103 | Kenneth S. Marks<br>Johnny Carter<br>Laurie L. Gallum<br>**Susman & Godfrey, LLP**<br>1000 Louisiana, Suite 5100<br>Houston, Texas 77002 |
| Sam Baxter<br>**McKool Smith**<br>505 East Travis Street, Suite 105<br>Marshall, Texas 75670 | William S. Lerach<br>Darren J. Robbins<br>Steven W. Peprich<br>Ryan Llorens<br>**Lerach, Coughlin, Stoia & Robbins, LLP**<br>401 B. Street, Suite 1700<br>San Diego, CA 92101 |
| S. Gene Cauley<br>Curtis L. Bowman<br>J. Allen Carney<br>Marcus Bozman<br>Tiffany Wyatt<br>James Kaufman<br>**Cauley, Bowman Carney & Williams, PPLC**<br>P. O. Box 25438<br>Little Rock, AR 72221-5438 | Terrence Hart<br>**Munsch Hardt Kopf & Harr, P.C.**<br>4000 Fountain Place<br>1445 Ross Avenue<br>Dallas, Texas 75202-2790 |
| Wayne Secore<br>Randall Mark Foret<br>**Secore & Waller, LLP**<br>Three Forest Plaza<br>12221 Merit Drive, Suite 1100<br>Dallas, Texas 75251 | Stephen Cass Weiland<br>**Patton Boggs LLP**<br>2001 Ross Avenue, Suite 3000<br>Dallas, Texas 75201-2774 |

A    133

| | |
|---|---|
| Noel B. Hensley<br>Nicholas Even<br>**Haynes & Boone, LLP**<br>901 Main Street, Suite 3100<br>Dallas, Texas 75202 | Fletcher L. Yarbrough<br>Diane Marie Sumoski<br>**Carrington, Coleman, Sloman &<br>  Blumenthal, LLP**<br>200 Crescent Court, Suite 1500<br>Dallas, Texas 75201 |
| Lisa S. Gallerano<br>**Akin Gump Strauss Hauer & Feld,<br>LLP**<br>1700 Pacific Avenue, Suite 4100<br>Dallas, Texas 75201 | Edwin J. Tomko<br>David Allan Stephan<br>**McManemin & Smith, P.C.**<br>600 N. Pearl Street, Suite 1600<br>Plaza of the Americas, L.B. 175<br>Dallas, Texas 75201 |
| Michael J. Chepiga<br>Kenneth R. David<br>**Simpson Thacher & Bartlett, LLP**<br>425 Lexington Avenue<br>New York, NY 10017-3954 | Thomas E. Bilek<br>**Hoeffner & Bilek**<br>440 Louisiana, Suite 720<br>Houston, Texas 77002 |
| William B. Federman<br>**Federman & Sherwood**<br>120 North Robinson, Suite 2720<br>Oklahoma City, OK 73102 | Jim Flegle<br>**Loewinsohn & Flegle**<br>18383 Preston Road, Suite 100<br>Dallas, Texas 75252 |
| Terence Hart<br>**Munsch Hardt Kopf & Harr, P.C.**<br>4000 Fountain Place<br>1445 Ross Avenue<br>Dallas, Texas 75202-2790 | Joe Kendall<br>**Provost & Umphrey Law Firm,<br>LLP**<br>3232 McKinney Avenue, Suite 700<br>Dallas, Texas 75204 |
| Damian Young<br>**Young, Pickett & Lee**<br>4122 Texas Blvd.<br>P. O. Box 1897<br>Texarkana, TX 75504 | Peter Kazanoff<br>Michael J. Chepiga<br>**Simpson Thacher & Bartlett, LLP**<br>425 Lexington Avenue<br>New York, NY 10017 |

93

| | |
|---|---|
| Dennis Chambers<br>**Atchley Russell Waldrop &**<br>**Hlavinka, LLP**<br>1710 Moores Lane<br>Texarkana, Texas 75503 | |

94

A   135

# EXHIBIT 3

**Revised Term Sheet
To Resolve Objections To Debtors' Chapter 11 Plan
And For Treatment Of Reclamation Claims**

This Revised Term Sheet ("Agreement") is made and entered into this ____ day of May, 2004 by and among the Debtors, the Official Committee of Reclamation Creditors ("OCRC") and the Official Committee of Unsecured Creditors ("OCUC"). This Term Sheet represents an agreement to settle the outstanding issues among the parties with respect to the Debtors' and OCUC's Joint Chapter 11 Plan ("Plan") and the treatment of Reclamation Claims under the Plan (defined herein as TLV Reclamation Claims and Non-TLV Reclamation Claims). This Agreement supercedes and replaces the Term Sheet among the parties dated April 16, 2004 ("Term Sheet"). The general terms and conditions of this Agreement are as follows.

## I. Structure

A.     Establishment of a Reclamation Creditors' Trust ("RCT")

    1.     On the Plan Effective Date[1] and pursuant to the Plan, the Debtors, the OCRC and the OCUC shall establish the RCT and the Debtors, the Reorganized Debtors and Core-Mark Newco, as applicable, shall convey and deliver to the RCT the following.

        a.     All of the Debtors' Reclamation Assets and Reclamation Liabilities.

           Reclamation Assets are defined to include deductions, over-wires, preference claims, Causes of Action and other rights of the Debtors as against the holders of Reclamation Claims (as defined below) (the "Reclamation Creditors"), other than the post-petition deductions and post-petition over-wires with respect to the Fleming Convenience business which shall be transferred to Core-Mark Newco.

           The Reclamation Liabilities are defined as any and all claims asserted against the Debtors by the Reclamation Creditors, including Administrative Claims, Priority Claims, trade creditor reclamation lien claims (including deficiency claims as outlined in the Final DIP Order) ("TLV Reclamation Claims"), but not including any general unsecured claims held by Reclamation Creditors.

        b.     $3.0 million in cash for administration of the RCT; and

---

[1]  Capitalized terms not otherwise defined shall have the meaning set forth in the Debtors and Official Committee of Unsecured Creditors' Second Amended Joint Plan of Reorganization of Fleming Companies, Inc. and its Filing Subsidiaries under Chapter 11 of the United States Code, as amended.

      c.    Any cash proceeds which are collected by the Debtors from Reclamation Creditors for payment of preference liability, deduction liability and over-wire liability (except for post-petition vendor deductions and post-petition over-wire liability related to the Fleming Convenience business) from and after March 23, 2004 shall be placed into an escrow account pending the Effective Date of the Plan consistent with the terms of this Agreement. Such escrowed funds shall be transferred to the RCT on the Effective Date of the Plan. From and after the date of this Agreement, the Debtors shall be prohibited from soliciting or negotiating any further settlements with reclamation creditors, except with the consent and participation of the OCRC.

B.    The RCT shall be administered by a Trustee selected by the OCRC (the "RCT Trustee"). The RCT Trustee's responsibilities and authority shall include, but not be limited to, facilitating the prosecution and settlement of objections to Reclamation Claims and the general unsecured claims of Reclamation Creditors, liquidating assets, prosecuting litigation establishing appropriate reserves and escrows, and implementing distributions.

C.    In order to facilitate the claims reconciliation process and asset liquidation, the PCT (as defined below) and the RCT shall enter into a transition services agreement whereby the PCT shall provide resources to the RCT related to effecting the claims reconciliation process. Such resources shall include, but not be limited to, access to the professional staff and employees of the PCT, computer systems, data bases and other relevant information. The RCT shall reimburse the PCT for the direct costs (*e.g.*, professional staff and employee expense) and allocation of the indirect costs (*e.g.*, facilities, computers, data storage facilities) with an allocation methodology to be agreed upon. Notwithstanding the foregoing, the RCT shall have no obligation to reimburse the PCT for indirect costs for the first 3 months after the Effective Date, or for (i) direct costs for the first six months after the Effective Date and (ii) indirect costs for months 4-6 after the Effective Date, up to an aggregate cap of $1 million. In addition, at the option of the Debtors and the OCUC, on the Effective Date, either (i) the Debtors shall provide the RCT with an additional $1 million for administrative expenses of the RCT or (ii) the PCT shall provide the RCT with additional resources and services pursuant to the transition services agreement with a value of up to an additional $1 million. However, once the RCT has received aggregate distributions of $10 million from the PCT, inclusive of any amounts paid to the RCT with respect to the Administrative Claims Savings outlined in paragraph II.B. below, the next $1 million in cash to be distributed by the PCT to the RCT shall instead be paid to Core-Mark Newco.

D.    The RCT Trustee shall be advised by an advisory board selected by the OCRC with representation by TLV (but only until TLV Reclamation Claims have been paid in full) and Non-TLV Members. The TLV Reclamation Creditors shall be the primary beneficiaries of the RCT and shall be entitled to be paid in full out of the first distributions to be made by the RCT before the Non-TLV Reclamation Creditors are entitled to any payment by the RCT.

E.    Each of the RCT Trustee and the RCT advisory board shall act in good faith in carrying out their duties and responsibilities and use their reasonable best efforts to liquidate and resolve claims, disputes and maximize the value of the RCT's assets and minimize claims against the RCT.

## II. Establishment of the Post Confirmation Trust ("PCT")

A.    On the Plan Effective Date and as outlined in the Plan, the Debtors and the OCUC shall form the PCT and the Debtors, the Reorganized Debtors and Core-Mark Newco, as applicable, shall transfer the following to the PCT:

1.    All of the PCT assets and liabilities as outlined in the Plan that are not to be transferred to the RCT as outlined herein;

The assets transferred to the PCT shall include, but are not necessarily limited to, cash balances sufficient to pay the estimated Administrative Claims that are the responsibility of the PCT, restricted cash balances (e.g. PACA and FSA but not including the Professional Fee Escrow Account), customer accounts receivable (other than those of the Fleming Convenience business) non-reclamation vendor assets including preference actions, vendor deductions, over-wires (other than the post-petition deductions and post-petition over-wires of the Fleming Convenience business) and other causes of action, but in any event shall not include the Reclamation Assets.

The liabilities transferred to the PCT shall include, but not necessarily be limited to, Priority Tax Claims, Other Priority Non-Tax Claims, Property Tax Claims, Other Secured Claims, PACA/PASA Claims, FSA liability, General Unsecured Claims (solely for purposes of resolution), Convenience Claims and certain Administrative Claims that have not been satisfied on the Effective Date of the Plan, other than the Administrative Claims of the Fleming Convenience business and Professional Fees incurred prior to the Effective Date which are paid by the funds in the Professional Fee Escrow Account (all as defined in the Debtors' Second Amended Plan).

2.    Any assets and/or liabilities of the RCT referred or assigned to the PCT whether vendor deductions, preference claims or otherwise (on terms that have been mutually agreed upon by the RCT and the PCT); and

3.    $3.0 million in cash for administration of the PCT.

B.    As set forth in the estimates included on Exhibit 3 of the Disclosure Statement, the Debtors currently estimate that on the Effective Date administrative claims transferred to the PCT shall total $52 million, consisting of General accounts payable of $3 million, Health and welfare benefits of $5 million, Severance and stay program of $27 million and Other administrative claims of $17 million. In the event that such administrative claims which are ultimately paid by the PCT after the Effective Date, exceed the above referenced estimated amounts by $4 million, such amounts over the $4 million shall be reimbursed by Core-Mark Newco (the "Administrative Claim Guaranty"). In the event

3

such administrative claims against the Debtors currently anticipated to be satisfied post-Effective Date through the PCT, are instead settled through entry of an Order of the Bankruptcy Court approving such settlement pre-Effective Date at a level lower than currently budgeted in the PCT projections then, in such event, 50% of the net savings from any such Court approved settlement below current budgeted levels (after reasonable deduction for legal fees and other resolution costs) shall be paid to the RCT on the Effective Date (the "Administrative Claims Savings"). Once the aggregate distributions from the PCT to the RCT (inclusive of any Administrative Savings paid to the RCT), have reached $10 million then, in such event, any additional distributions to the RCT shall effect a reduction of the maximum amount of the Non-TLV Guaranty by an amount equal to 50% of any such aggregate additional distributions. Notwithstanding the forgoing, the parties recognize that the Bankruptcy Court could ultimately determine that certain of the administrative claims which are subject to the Administrative Claim Guaranty may be reclassified by the Court as priority claims and correspondingly, certain priority claims may be reclassified as administrative claims. Irrespective of such reclassification by the Bankruptcy Court, for purposes of calculating the amount which may be owed, if any, on the Administrative Claim Guaranty, the classification assigned to those claims as outlined in Exhibit 3 of the Disclosure Statement shall govern.

C.     From and after April 1, 2004, all proceeds of settlements for customer accounts receivables, vendor deductions, over-wires and preferences (exclusive of those related to either the Fleming Convenience business or the Reclamation Assets) in excess of $9 million shall be placed into an escrow account pending the Effective Date of the Plan and shall be transferred to the PCT on the Effective Date of the Plan.

D.     The PCT shall be administered by the Post Confirmation Representative who shall be mutually agreed upon by the Debtors and the OCUC.

E.     The PCT Representative shall be advised by the PCT Advisory Board which shall include: (i) the PCT Representative; (ii) two members designated by Core-Mark Newco; (iii) one member designated by the OCUC, other than trade members and the PBGC, who shall be an Old Noteholder that holds in excess of 3.5% or greater of the total outstanding equity securities of Core-Mark Newco received as a result of distribution of such equity to Holders of Class 6 Claims under the Plan; and (iv) one member to be designated mutually by the trade members of the OCUC and the OCRC.

F.     The beneficiaries of the PCT, after satisfaction of all liabilities to be satisfied by the PCT as outlined in the Plan including Administrative Claims, Priority Tax Claims, Other Priority Non-Tax Claims, Property Tax Claims, PACA/PASA Claims, FSA liabilities, Convenience Claims and all PCT expenses, shall be (i) Core-Mark Newco, in the amount necessary to reimburse Core-Mark Newco for any payments made on the TLV or Non-TLV Guaranty as outlined herein; (ii) the RCT, in the event all Reclamation Claims and interest thereon as applicable together with the Prepetition Non-TLV Reclamation Claim Reduction as defined herein, have not been paid in full by the RCT, (iii) Core-Mark Newco in the amount necessary to reimburse Core-Mark Newco for any payments made on the Administrative Claim Guaranty, in the event the Reclamation Claims and the Prepetition Non-TLV Reclamation Claim Reduction have been paid in full by the RCT

4

and (iv) thereafter the Class 6 General Unsecured Creditors (as defined in the Debtors' Second Amended Plan) at which time the RCT should terminate with any remaining assets delivered to the PCT.

G.    Each of the PCT Representative and the PCT Advisory Board shall act in good faith in carrying out their duties and responsibilities and use their best efforts to liquidate and resolve claims, disputes and maximize the value of the PCT's assets and minimize claims against the PCT.

### III.  Claims Treatment for Reclamation Creditors

Reclamation Claims under the Plan and this Agreement shall be defined as TLV Reclamation Claims, and Non-TLV Reclamation Claims.  The total amount of Reclamation Claims to be satisfied by the RCT shall be reconciled pursuant to the methodology described in Exhibit A attached hereto, but in any event shall not exceed $150 million prior to the application of any setoff including the Prepetition Non-TLV Reclamation Claim Reduction (as defined herein).  In the event Reclamation Claims exceed $150 million, the Non-TLV Reclamation Claims shall be reduced pro rata.  The pursuit and collection of any and all Causes of Action with respect to Reclamation Claims and the reconciliation and payment of all Reclamation Claims shall be solely the responsibility of the RCT and shall generally be pursuant to the following terms and conditions.

### IV.  TLV Reclamation Claims

A.    Allowance shall be determined solely by the RCT and the affected creditor without standing of any other party to object (unless resolution is referred to the PCT on such terms as the RCT and the PCT shall determine),

B.    Reconciliation of the TLV Reclamation Claims shall consist of application of all postpetition vendor deductions, over-wires and preferences and pre-petition setoffs to the extent that general unsecured claims have first been fully setoff through application of pre-petition deductions.  The reconciliation shall recognize the effect of the Trade Credit Program and the critical vendor program.

C.    Allowed TLV Reclamation Claims shall earn interest which shall begin to accrue sixty (60) days after the Effective Date at the Wall Street Journal listed prime rate.

D.    Allowed TLV Reclamation Claims shall be paid (i) first from the RCT; (ii) second from the PCT and (iii) third from the Core-Mark TLV Guaranty (as described below).

### V.  Non-TLV Reclamation Claims

A.    Allowance shall be determined solely by RCT and affected creditor without standing of any other party to object (unless resolution is referred to the PCT on such terms as the PCT and RCT shall determine).

Page 374

B.    Non-TLV Reclamation Claims are defined as reclamation claims held by Reclamation Creditors who did not participate in the Trade Credit Program. In reconciling the Non-TLV Reclamation Claims, all post-petition vendor deductions, over-wires, preferences, and pre-petition setoffs to the extent that general unsecured claims have been fully set off, shall be applied. In addition, the total amount of Allowed Non-TLV Reclamation Claims shall be reduced by a discount of $13 million (the "Prepetition Non-TLV Reclamation Claim Reduction") to calculate the net Allowed amount of pre-petition Non-TLV Reclamation Claims ("Net Non-TLV Reclamation Claims").

C.    Allowed Non-TLV Reclamation Claims shall be paid only after satisfaction of all Allowed TLV Reclamation Claims (i) first from the RCT, (ii) second from the PCT and (iii) third from the Core-Mark Non-TLV Guaranty (as described below). The timing of such distribution shall be in the discretion of the RCT.

## VI. General Unsecured Claims of Reclamation Creditors

A.    Allowance of general unsecured claims held by Reclamation Creditors shall be determined by the RCT pursuant to procedures established by the Court. Such procedures shall include a mechanism for approval by the PCT Board of settlements which represent an increase of at least 20% from the general unsecured claims scheduled by the Debtors or the proofs of claim, whichever is less.

B.    The prosecution of any objections with respect to the general unsecured claims held by Reclamation Creditors and the reconciliation of general unsecured claims shall be conducted by the RCT, at its expense and will be subject to setoff against any pre-petition claims of the Debtors against the vendors, including pre-petition vendor deductions if not previously applied as outlined in Section V(B) above.

C.    Allowed general unsecured claims of Reclamation Creditors shall be entitled to the same treatment under the Plan as the Allowed general unsecured claims of non-reclamation creditors and shall receive distributions pursuant to the Plan upon Allowance.

## VII. Surplus Contingency from RCT

In the event the RCT has or develops proceeds for distribution after satisfaction of all Reclamation Claims, such additional proceeds shall be applied by the RCT in an order of priority as follows:

A.    To Core-Mark Newco for any advances under the TLV or Non-TLV Guaranty;

B.    To the Prepetition Non-TLV Reclamation Claim Reduction;

C.    To Core-Mark Newco for any advances under the Administrative Claim Guaranty;

D.    Any amount of "Ad Hoc Committee" professional fees which have not been reimbursed by allowance of an Administrative Claim;

E.    To the PCT.

## VIII.  Core-Mark Guaranty to TLV Reclamation Creditors And Core-Mark Guaranty to Non-TLV Reclamation Creditors

A.    Core-Mark TLV Guaranty

1.    The TLV Reclamation Claims shall be secured by a junior security interest and lien in Core-Mark Newco subordinate to the Exit Financing Facility (and any replacement facility) and any Tranche B Loan (as described in the Plan)(the "TLV Guaranty"). The rights provided under the TLV Guaranty will include customary inter-creditor rights (to be defined).

2.    The maximum amount of the TLV Guaranty shall be the total Allowed TLV Reclamation Claims inclusive of unpaid interest. Interest will be calculated from the Effective Date of the Plan at Prime plus 1%.

3.    Pursuant to the TLV Guaranty, payment shall be made by January 30, 2006 to all holders of Allowed but unpaid TLV Reclamation Claims and unpaid interest thereon as of December 31, 2005 so long as the Tranche B Loan is paid in full. In the event, the Tranche B Loan is not paid in full by December 31, 2005, the payment due on January 30, 2006 shall be reduced by the outstanding principal amount of the Tranche B Loan with the balance of any payment on the TLV Guaranty due to be paid 30 days after the Tranche B Loan has been repaid in full (to holders of unpaid TLV Reclamation Claims as of such date), but in no event later than on January 30, 2007 to all holders of Allowed but unpaid TLV Reclamation Claims as of December 31, 2006. For purposes of calculating the amount of TLV Guaranty payment, the amount shall be reduced by any escrowed funds of the RCT in excess of reasonable expenses projected to be incurred in the administration of the RCT. Upon a payment on the TLV Guaranty, Core-Mark Newco shall be subrogated to the rights of the TLV Reclamation Creditors in the RCT. In the event the payments by Core-Mark Newco on the TLV Guaranty shall be in excess of $5 million, Core-Mark Newco shall be entitled to board representation on the RCT advisory board equal to at least 20%. In the event aggregate payments by Core-Mark Newco under the TLV Guaranty equal or exceed $10 million, Core-Mark Newco shall be entitled to representation on the RCT advisory board of at least 40%.

B.    Core-Mark Non-TLV Guaranty

1.    The Net Non-TLV Reclamation Claims shall be secured by a junior security interest and lien in Core-Mark Newco subordinate to the Exit Financing Facility (and any replacement facility) any Tranche B Loan (as described in the Plan and the TLV Guaranty)( the "Non-TLV Guaranty"). The rights provided under the Non-TLV Guaranty will include customary intercreditor rights (to be defined).

2.    The maximum amount of the Non-TLV Guaranty shall be $15 million.

7

3.      Pursuant to the Non-TLV Guaranty, payment shall be made by January 1, 2007 to all holders of Allowed but unpaid Net Non-TLV Reclamation Claims as of December 31, 2006 so long as the Tranche B Loan is paid in full. In the event the Tranche B Loan is not paid in full, the payment due on January 30, 2007 shall be reduced by the outstanding principal amount of the Tranche B Loan plus amounts paid under the TLV Guaranty and not yet reimbursed by the PCT or RCT to Core-Mark Newco with the balance of any payment on the Non-TLV Guaranty due to be paid to the RCT (for pro rata payment on account of unpaid Net Non-TLV Reclamation Claims) 30 days after the Tranche B Loan has been repaid in full but in no event later than January 1, 2008 to all holders of Allowed but unpaid Net Non-TLV Reclamation Claims as of December 31, 2007. The amount of Non-TLV Guaranty payment, subject to the maximum amount described above, shall be reduced by any escrowed funds of the RCT in excess of reasonable expenses projected to be incurred in the administration of the RCT. In the event of a payment on the Non-TLV Guaranty, Core-Mark Newco shall be subrogated to the rights of the Non-TLV Reclamation Creditors in the RCT. In the event the payments by Core-Mark Newco on the Non-TLV Guaranty shall be in excess of $5 million, Core-Mark Newco shall be entitled to board representation on the RCT advisory board equal to 20%. In the event aggregate payments under the Non-TLV Guaranty equal to or exceed $10 million, Core-Mark Newco shall be entitled to representation on the RCT advisory board of at least 40%.

C.      In the event of an 80% change in ownership of Core-Mark Newco (excluding shareholders who are shareholders on the Effective Date) whereby the Core-Mark Newco shareholders are paid cash for their shares, the Core-Mark Newco Guaranties outlined above shall be immediately triggered and the obligations under the Guaranties shall be immediately due and payable.

## IX. Coordination Pending Confirmation

Upon execution of this Agreement, the parties shall do the following:

1.      Agree to a continuance of the May 4, 2004 Disclosure Statement hearing, the related Exclusivity Motion, and related contested motions in the Reclamation Adversary Proceedings ("Reclamation Motions") to the May 18, 2004 Omnibus hearing.

2.      Agree to an extension of the date to file a responsive pleading to the Reclamation Count of the Reclamation Adversary Proceedings to June 1, 2004.

3.      File with the Court no later than May ___, 2004 an amended Disclosure Statement and Plan, Settlement Agreement, Motion for Approval of Settlement Agreement and related documents consistent with the terms of this Agreement ("Agreement Documents"). The Plan shall provide that the Reclamation Claims shall be satisfied as outlined in this Agreement and the RCT, as provided herein, shall be the sole source of payment for Allowed Reclamation Claims.

4.      Seek a stay of the Reclamation Adversary Proceedings, and proceed towards facilitating a consensual confirmation of the Plan of Reorganization, subject to the approval of the Bankruptcy Court

By execution of this Agreement, the OCRC specifically waives the Due Diligence Contingency contained in the Term Sheet of April 16, 2004.

Page 378

The Official Committee of
Reclamation Creditors

By: _S. Curtis Marshall_
      S. Curtis Marshall
      Chairperson

The Official Committee of
Unsecured Creditors

By: _____
      Paul S. Aronzon, Esq.
      Co-Counsel

Fleming Companies, Inc., et al.
Debtors and Debtors in Possession

By: _____
      Edward Stenger
      Chief Restructuring Officer

10

The Official Committee of
Reclamation Creditors

By: _____
S. Curtis Marshall
Chairperson

The Official Committee of
Unsecured Creditors

By: _____
Paul S. Aronzon, Esq.
Co-Counsel

Fleming Companies, Inc., et al.
Debtors and Debtors in Possession

By: _____
Edward Stenger
Chief Restructuring Officer

10

Page 380

The Official Committee of
Reclamation Creditors

By: _____
S. Curtis Marshall
Chairperson

The Official Committee of
Unsecured Creditors

By: _____
Paul S. Aronzon, Esq.
Co-Counsel

Fleming Companies, Inc., et al.
Debtors and Debtors in Possession

By: _____
Edward Stenger
Chief Restructuring Officer

10

## Exhibit A

### Methodology for Allowance of Reclamation Claims

1.  The methodology for applying the valid reclamation window shall be consistent with the attached chart.

2.  Those reclamation claims whose date of delivery has been marked "P.O. not identified" by the Debtors will be reconciled.

3.  Consumption will be treated as follows:

    (a)    Allowed reclamation claims for product shipped to Fleming-owned stores during the valid reclamation period shall be allowed at 100% less 50% for presumed consumption of goods;

    (b)    For all valid reclamation claims (exclusive of Fleming convenience) a reduction to the valid claims shall be made in the amount equal to, allowed Fleming reclamation claims less 17% of such claim for presumed consumption of goods;

    (c)    Consumption of reclamation goods for the Fleming Convenience business and Dunigan business shall be calculated using the methodology utilized by the Debtors in the November 21, 2003 reclamation report.

Page 382

**Fleming
Reclamation
Methodology
Adjusted Assertion
Date Chart**

| Assertion Date | Receiving Window | | |
|---|---|---|---|
| 3/20/2003 | 3/10/03 | through | 3/20/03 |
| 3/21/2003 | 3/11/03 | through | 3/21/03 |
| 3/22/2003 | 3/12/03 | through | 3/22/03 |
| 3/23/2003 | 3/13/03 | through | 3/23/03 |
| 3/24/2003 | 3/14/03 | through | 3/24/03 |
| 3/25/2003 | 3/15/03 | through | 3/25/03 |
| 3/26/2003 | 3/16/03 | through | 3/26/03 |
| 3/27/2003 | 3/17/03 | through | 3/27/03 |
| 3/28/2003 | 3/18/03 | through | 3/28/03 |
| 3/29/2003 | 3/19/03 | through | 3/29/03 |
| 3/30/2003 | 3/20/03 | through | 3/30/03 |
| 3/31/2003 | 3/21/03 | through | 3/31/03 |
| 4/1/2003 | 3/22/03 | through | 3/31/03 |
| 4/2/2003 | 3/22/03 | through | 3/31/03 |
| 4/3/2003 | 3/22/03 | through | 3/31/03 |
| 4/4/2003 | 3/22/03 | through | 3/31/03 |
| 4/5/2003 | 3/22/03 | through | 3/31/03 |
| 4/6/2003 | 3/22/03 | through | 3/31/03 |
| 4/7/2003 | 3/22/03 | through | 3/31/03 |
| 4/8/2003 | 3/22/03 | through | 3/31/03 |
| 4/9/2003 | 3/22/03 | through | 3/31/03 |
| 4/10/2003 | 3/22/03 | through | 3/31/03 |
| 4/11/2003 | 3/23/03 | through | 3/31/03 |
| 4/12/2003 | 3/24/03 | through | 3/31/03 |
| 4/13/2003 | 3/25/03 | through | 3/31/03 |
| 4/14/2003 | 3/26/03 | through | 3/31/03 |
| 4/15/2003 | 3/27/03 | through | 3/31/03 |
| 4/16/2003 | 3/28/03 | through | 3/31/03 |
| 4/17/2003 | 3/29/03 | through | 3/31/03 |
| 4/18/2003 | 3/30/03 | through | 3/31/03 |
| 4/19/2003 | 3/31/03 | through | 3/31/03 |
| All other dates | N/A | | |

# EXHIBIT 4



Home | Previous Page

U.S. Securities and Exchange Commission

# Grocery Wholesaler Fleming Companies Settles Fraud Charges with SEC

## FOR IMMEDIATE RELEASE
## 2004-129

## Several Fleming Suppliers and Their Employees Also Settle Charges of Causing Fleming's Violations and Will Pay Civil Penalties
## Commission's Investigation Continues

*Washington, D.C., Sept. 14, 2004 —* The Securities and Exchange Commission today announced settlement of enforcement proceedings against grocery wholesaler Fleming Companies, Inc., of Lewisville, Texas, for securities fraud and other violations arising from material earnings overstatements during late 2001 and the first half of 2002. The Commission also announced settled enforcement proceedings against three Fleming suppliers and their employees, and against former employees of two other Fleming suppliers, for causing certain of Fleming's violations.

To settle these charges, Fleming, the suppliers and the supplier employees each consented to Commission orders to cease and desist from such violations. The suppliers and supplier employees also agreed to pay civil penalties — ranging from $100,000 to $400,000 for the suppliers and from $25,000 to $75,000 for the supplier employees — that the Commission will obtain through related civil actions it filed today in U.S. District Court in Sherman, Texas. The Commission is not seeking civil penalties against Fleming, which recently emerged from bankruptcy protection. All parties settled without admitting or denying the Commission's non-jurisdictional findings.

Commenting on the enforcement actions, Harold F. Degenhardt, Administrator of the Commission's Fort Worth office, said, "Fleming's repeated wrongdoing masked the reality of an increasingly earnings-challenged company and prevented investors from discovering just how

Press Release: Grocery Wholesaler Fleming Companies Settles Fraud Charges with SEC; ...    Page 2 of 3

poorly the business actually was performing. Today's action represents an important step in holding those who contributed to Fleming's misstatements responsible for their actions. As our investigation continues, we will focus on others who may have culpability for Fleming's misconduct."

The Commission's administrative orders find that over several quarters in late 2001 and into 2002, Fleming improperly accounted for a number of transactions — described internally as "initiatives" — to sustain an illusion of growth and financial strength when, in fact, its earnings were under tremendous pressure from a series of business reversals, including the failure of Kmart Corporation, its largest customer. Over this span, Fleming became increasingly reliant on these initiatives to "bridge the gap" between Wall Street expectations and disappointing actual operating results.

As the Commission's orders outline, Fleming employed a variety of improper initiatives during this period. For example, Fleming obtained misleading side letters from suppliers to justify improperly accelerating accounting recognition of up-front payments the suppliers made to secure forward-looking contracts. The Commission's orders implicate the following suppliers and their employees in these types of improper transactions (the numbers in parentheses are the penalties each agreed to pay in the related civil actions):

- Dean Foods Company ($400,000), a publicly traded dairy product supplier based in Dallas, and John D. Robinson ($50,000), a senior executive in its dairy division;

- Kemps LLC, f/k/a Marigold Foods LLC ($150,000), a privately held dairy product supplier headquartered in Minneapolis, and its CEO, James Green ($50,000), and vice president of financial services, Christopher Thorpe ($50,000);

- Digital Exchange Systems, Inc. ($100,000), a privately held company based in Tampa, and its president, Steven Schmidt ($75,000), and principal owner, Rosario Coniglio ($75,000);

- Bruce Keith Jensen ($25,000), a director of national accounts for Frito Lay, Inc. in Plano, Texas, during the relevant periods; and

- John K. Adams ($25,000), a region manager for Kraft Foods, Inc. in Dallas during the relevant periods.

Spencer C. Barasch, Associate Administrator of the Fort Worth office, added, "Put simply, Fleming manufactured earnings to meet Wall Street expectations. But it takes two to tango. Without suppliers providing or agreeing to false transaction documents, Fleming could not have misled investors as it did. Our actions today reinforce the Commission's commitment to impose liability on those third parties who help others mislead investors."

Fleming also improperly inflated earnings by buying excessive inventory quantities — including perishable and outdated products — near quarter ends solely to generate cash and volume discounts, which Fleming recorded immediately. Fleming also released sizable accounting reserves, without

justification or disclosure, to increase reported earnings. Moreover, Fleming failed to establish reserves against known losses, including likely repayment of supplier deductions, even as Fleming's disputed deduction balance ballooned. These improper transactions materially overstated Fleming's earnings for these periods. For example, had Fleming properly accounted for these transactions, its pre-tax earnings for 2001 would have declined almost 40%.

The Commission's orders also find that Fleming's retail group reported false same-store sales, an important metric in the grocery industry. Fleming repeatedly changed how it calculated same-store sales, without disclosing to investors that it was making these changes. Fleming compounded these undisclosed changes by including in its calculations several financing transactions disguised as sales. As a result of this misconduct, Fleming was able to report apparent same-store sales growth in its retail division when, in fact, same-store sales were declining.

In determining to accept Fleming's offer, the Commission took into account the remedial acts Fleming promptly undertook and its cooperation with the Commission's staff.

The Commission's investigation continues.

For further information contact:

Harold F. Degenhardt 817/978-6469
Spencer C. Barasch 817/978-6425
David L. Peavler 817/978-1417
James E. Etri 817/978-1406

**Additional materials:**
☐ Administrative Proceeding Release No. 33-8382
☐ Administrative Proceeding Release No. 33-8383
☐ Administrative Proceeding Release No. 33-8384
☐ Administrative Proceeding Release No. 33-8385
☐ Administrative Proceeding Release No. 33-8386
☐ Administrative Proceeding Release No. 33-8387
☐ Litigation Release No. 18884

*http://www.sec.gov/news/press/2004-129.htm*

Home | Previous Page                         Modified: 09/14/2004