TAB 5

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 03-10945 (MFW) |
| Fleming Companies, Inc., et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors.[2] | ) | Related to Docket No. 11559 |

**PCT's Objection Deadline: October 4, 2005
at 4:00 p.m. ET
Objection Deadline to Cross-Motion:
October 12, 2005 at 4:00 p.m. ET**

**Hearing Date:  October 19, 2005
at 9:30 a.m. ET**

## AMENDED RESPONSE OF THE POST-CONFIRMATION TRUST TO CLAIM

## OWNERSHIP MOTION OF RECLAMATION CREDITORS TRUST AND

## CROSS-MOTION OF THE POST-CONFIRMATION TRUST

## FOR DECLARATORY RELIEF

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

---

[2] At pertinent places herein, references are made to "Fleming," for Fleming Companies, Inc., public parent company of the Debtors. the Debtors are:  Core-Mark International, Inc.; Fleming Companies, Inc.; ACO Food Group, Inc.; ABCO Markets, Inc.; ABCO Realty Corp.; ASI Office Automation, Inc.; C/M Products, Inc.; Core-Mark Interrelated Companies, Inc.; Core-Mark Mid-Continent, Inc.; Dunigan Fuels, Inc.; Favar Concepts, Ltd.; Fleming Foods Management Col, L.L.C., Fleming Foods of Texas, L.P.; Fleming International, Ltd.; Fleming Supermarkets of Florida, Inc.; Fleming Transportation Service, Inc.; Food 4 Less Beverage Company, Inc.; Fuelserv, Inc.; General Acceptance Corporation; Head Distributing Company; Marquise Ventures Company, Inc.; Minter-Weisman Co.; Piggly Wiggly Company; Progressive Realty, Inc.; Rainbow Food Group, Inc.; Retail Investments, Inc.; Retail Supermarkets, Inc.; RFS Marketing Services, Inc.; and Richmar Foods, Inc.

A

1.    The RCT's motion raises a number of questions of critical importance to Fleming's creditors. The first is: Who owns the valuable claims against individuals who have admitted in SEC Consent Judgments that they knowingly participated in the manipulation of Fleming's financial statements? According to the plain language of the Plan,[3] those claims belong to the PCT. *See* Part II, *infra*.

2.    A second question, not raised but obviously implicated by the RCT's motion, is: Are the RCT's actions consistent with its belated assertion here, months after the PCT filed its lawsuit, that the RCT owns these claims? Equally important is this question: Why has the RCT chosen to interfere with the PCT's claims rather than pursue its own, parallel claims against Reclamation Creditors who have likewise admitted, in SEC Consent Judgments, that each of them also intentionally assisted in the manipulation of Fleming's financial statements?[4] These questions are critical to the recoveries for Fleming's creditors. The conduct described in the SEC Consent Judgments is egregious. The <u>vendors and their employees have admitted in the Consent Judgments</u> that they participated in a scheme with a handful of Fleming officers to falsify Fleming's supply contracts, forge critical audit confirmations, and make false entries in Fleming's financial statements. This scheme, which violated the federal securities laws and involved serious breaches of fiduciary duty, caused the Fleming Companies to incur hundreds of millions of dollars in debt that they would not, and could not, otherwise have incurred. This credit, which was extended by other, innocent creditors and vendors, crippled Fleming and plunged it into insolvency—leaving the unsecured creditors who are the beneficiaries of the PCT with over $2 billion in unsatisfied, unsecured claims. These claims, which were expressly

---

[3] Relevant excerpts of the Confirmed Plan of Reorganization are attached as Exh. "A."

[4] The relevant Consent Judgments are attached as Exhs. "C" and "D," and "E." Exh. "C" contains the Consent Judgment against the Fleming Companies. Exh. "D" contains the conset judgments against the individual vendor officers whom the PcT has sued. Exh. "E" contains the Consent Judgments entered against the Reclamation Creditors whom the RCT has chosen not to sue.

disclosed and retained the Plan, are vital to the creditors' recoveries, and should be maximized in accordance with the Plan. The PCT has discharged its obligations to do so, but the RCT has not. *See* Part III, *infra*.

3.    The third question is: why is the RCT raising this issue now? The PCT filed its suit more than six months ago. Before it filed suit, and in discussions since then, the RCT was well aware that the PCT intended to file--and in fact had filed--the claims now at issue in this motion. The PCT was assured by the RCT and its counsel that the RCT did not intend to, and would not, interfere with the PCT's filing and pursuit of these claims. In reliance on that assurance, the PCT devoted considerable time and expense to an investigation of the facts underlying its claims against these individuals, the preparation of a complaint, litigation of motions to dismiss, retention of consulting expert witnesses, and the pursuit of discovery concerning these very serious, very valuable claims. Yet now, the RCT has reversed field without telling the court why it has done so, and without advising the court what lies behind its change of heart. Also left unaddressed is this, critical fact: If the RCT actually prevails on this motion—despite its own inequitable conduct—then the valuable claims against the individual, wrongdoing officers will be extinguished by the statute of limitations because the RCT took no steps to preserve or file them before limitations ran. In these circumstances, the RCT is equitably estopped from asserting it owns the claims the PCT has filed. *See* Part IV, *infra*.

4.    The RCT's assertion that it owns the claims that the PCT is litigating cannot withstand close scrutiny. The RCT admits that the Plan does not "explicitly" give it ownership of the claims the PCT has filed. RCT Mtn. at 12. The RCT also admits that it does not expect to need any of the claims against the individuals (or against their vendor employers, for that matter)

in order to pay the Reclamation Creditors in full.[5] Left unstated is why the RCT would then choose not to maximize these claims for the benefit of its remaining beneficiary, the PCT to whom the RCT acknowledges it is required to turn over any of its surplus, Status Report at 2, and whose creditors have over $2 billion in unsatisfied claims.

5.    This cannot be a result that any rational fiduciary would desire—particularly one that has a significant, additional beneficiary beyond the Reclamation Creditors in the form of the PCT. The RCT has admitted that the recovery on these claims, if they are maximized, will necessarily go to the PCT and its beneficiaries (because the RCT already has sufficient funds to pay the Reclamation Claims of the Reclamation Creditors in full). *Id.* The RCT's job does not end with the payment in full of the reclamation claims of the Reclamation Creditors' to whom the RCT pledged is fealty. Instead, the RCT's job is to maximize its assets for the benefit of all of its beneficiaries, rather than just for "its own" Reclamation Creditors.    Any other understanding is odds with the Plan provision requiring the RCT to use its "reasonable best efforts to liquidate and resolve Claims, disputes, and maximize the value of the RCT's assets and minimize claims against the RCT," for all of its beneficiaries—including the PCT.

6.    In the end, it appears that extinguishing these claims may be precisely the result the RCT intends. The RCT wants the PCT's litigation stopped so that the RCT can prevent the recovery of even a dime from the vendor officers who inflicted such terrible injuries on the Fleming Creditors. The RCT wants this relief because it told the PCT at the outset that "we are not going to sue our own vendors," apparently no matter how egregious their conduct. If it succeeds, the RCT will therefore ensure that Fleming's creditors will never know the true value

---

[5] *See* RCT Status Report at 2 (reporting that "RCT activities to date (assuming current trends) indicate that *Reclamation Claims should be paid in full.*"). The relevant excerpt from the RCT Status Report is attached as Exh. "B."

of the claims the RCT first ignored, then denied, and finally compromised in order to protect "their own" vendors at the expense of Fleming's other innocent, honest creditors.

7.    For these reasons, and those stated in greater detail below, the RCT's motion should be denied. In order to put an end to this dispute the Court should also enter an Order confirming that the PCT both owns these claims and is free to litigate them without further interference by the RCT. [6] *See infra*, Part VI.

## I.
## The PCT is Not the Debtor

8.    The RCT's motion begins by confusing who and what the PCT is. The PCT is not the Debtor, and it is not the successor to the Debtor, any more than is the RCT. Accordingly, the RCT's assertions concerning the content of the Debtors' Disclosure Statement, or its after the fact characterizations of what the Official Committee of Reclamation Creditors (OCRC) "would have done" in the course of the Plan negotiations, simply are not relevant.

9.    Those issues are not relevant because this question begins and ends with the Plan itself. The PCT is a fiduciary created pursuant to the Fleming Plan. The plan was approved by the required vote of all classes of creditors, including the Reclamation Creditors. The PCT Representative, Castellamare Advisers LLC, and its principal Robert Kors, were appointed by the creditors—not by the Debtor—and each had no prior relationship with the Debtor. Castellamare and Kors are independent fiduciaries, as are the four other, independent board members—also appointed by the creditors—that serve on the PCT Board. The PCT is charged

---

[6] As we explain in the PCT's Cross-Motion for Declaratory Relief, *infra* at Part VI, it appears doubtful that the declaratory relief the RCT seeks can be awarded other than in an adversary proceeding. Should the Court conclude that an adversary proceeding is required, the PCT stands ready to file one promptly, so as to ensure that this issue is decided finally, in a judgment that is not subject to collateral attack.

under the Plan to "act in good faith in carrying out its duties and responsibilities and use its best efforts to liquidate and resolve Claims, disputes and maximize the value of the PCT's assets and minimize claims against the PCT." Plan Art. V(G)(8). Consistent with that obligation, the PCT has been vigorously pursuing the recovery of assets and the repayment of its creditors. The PCT has retained, as its counsel, the firm of Gibbs & Bruns, LLP. This firm, likewise had no previous relationship with the Debtors, and was retained for their nationally-recognized skill in pursuing capital recoveries on behalf of injured creditors and investors.[7]

10.     Over four thousand of the PCT's creditors are honest, legitimate <u>trade creditors</u> who sold goods to Fleming. These vendors played no <u>role at all in and, instead were injured by,</u> the wrongful conduct of a half dozen Reclamation Creditors, and a number of individuals, who admit that they knowingly participated in the manipulation of Fleming's financial statements for their own benefit, and that of a handful of faithless Fleming officers. These innocent creditors have every right to expect that the PCT will use every good faith effort to maximize its recoveries for their benefit—regardless of the litigation target. They have the right to expect the same from the RCT, but this fundamental, and essential point, is what is most obscured in the RCT's motion.

11.     As we demonstrate below, the claims the PCT has filed in Texas against the vendor officers clearly and plainly belong to the PCT under the Plan. The PCT, as it was obliged to do, has vigorously pursued them. The RCT, which owns parallel claims against Reclamation Creditors, has not. Instead, out of a misguided desire not to sue "its own vendors"—apparently no matter what those vendors have done—the RCT first ignored these valuable claims, then

---

[7] Although Gibbs & Bruns, LLP has been retained for less than a year, its efforts for the PCT have already yielded significant fruit. The firm has already closed one very successful—albeit confidential—settlement with a major accounting firm, and is in the process of closing another settlement that will obtain for the PCT a significant recovery against otherwise insolvent former officers of Fleming, despite the assertion of coverage defenses by Fleming's former insurers.

refused to pursue them, and now has begun to settle them outright, all without apparent regard for the existence of these claims, their value, or the RCT's own obligation to "act in good faith ... and to use its reasonable best efforts ... to maximize the value of the RCT 's assets..." Plan Art. V(H)(5).

12.    It is clear that the RCT will neither discharge its own obligations, nor cease interfering in the PCT's discharge of its fiduciary obligations, without the intervention of the Court. Accordingly, although the RCT's motion suffers from procedural defects, *see* Part VI, *infra*, the PCT urges the Court to decide this issue by entering an Order confirming that the PCT, under the Plan, owns the claims it filed.

## II.
### The Plan Establishes that the PCT Owns the Claims Against the Vendor Officers

13.    The RCT's motion proceeds from the mistaken premise that the Plan is silent about which trust owns the claims against the vendor officers. It is not. Under the structure of the Plan, the RCT owns a specific, well-defined set of claims—and the PCT owns everything that is not an RCT Asset. Because these claims were not explicitly allocated to the RCT, as the RCT itself concedes, RCT Mtn. at 12, these claims necessarily belong to the PCT. We explain why, below.

### A.    The Plan is a Contract

14.    A confirmed bankruptcy plan "is a contract," *In re Offshore Diving and Salvaging, Inc.,* 226 B.R. 185, 188 (E.D. La. 1998), and "should be construed basically as a contract." *In re Stratford of Texas, Inc.,* 635 F.2d 365, 368 (5th Cir. 1981). *See also In re Sugarhouse Realty, Inc.,* 192 B.R. 355, 362 (E.D. Penn. 1996) (citing Fifth Circuit's decision in *In re Stratford* to support its conclusion that "confirmed bankruptcy plans of reorganization are binding contracts that must be interpreted in accordance with applicable contract law."); *accord*

*In re Ampace Corp.*, 279 B.R.145, 153 (D. Del. 2002) (citing *In re Sugarhouse* for the proposition that confirmed plans of reorganization are contracts that must be interpreted in accordance with applicable contract law.).

15.    A court should ordinarily construe the Plan without reference to any extrinsic evidence, *id.*, because the interpretation of a plan is a question of law for the court. *In re Stratford*, 635 F.2d at 368. "The starting point of contract construction is to determine whether a provision is ambiguous, i.e. whether it is reasonably subject to more than one interpretation." *Cantera v. Marriott Senior Living Serv., Inc.*, 1999 WL 118823, at *4 (Del. Ch. Feb. 18, 1999); 592 A.2d 473, 478 (Del. 1991).[8] A contract "is not rendered ambiguous simply because the parties in litigation differ concerning its meaning," *City Investing Co. Liquidating Trust v. Continental Cas.* Co., 624 A.2d 1191, 1198 (Del. 1993), or because the parties "do not agree upon its proper construction." *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).    A contract (and thus a bankruptcy plan) is ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc*, 616 A.2d at 1196.[9]

---

[8] The Plan is governed by Delaware law. *See* Plan Art. I(A)(3) ("Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof."). For the convenience of the court, we will cite in the footnotes the analogous provisions of Texas law, which are largely identical to the Delaware law governing the interpretation of contracts.

[9] Texas, the jurisdiction in which the PCT's action is pending, takes the same view. *See, e.g., Natural Gas Clearinghouse v. Midgard Energy Co.*, 113 S.W.3d 400, 407 (Tex. App.-Amarillo 2003, pet. denied) ("In an unambiguous contract, we will not imply language, add language, or interpret it other than pursuant to its plain meaning.").

16.    The RCT and the PCT certainly disagree about what the Plan means, but neither trust contends the Plan itself is ambiguous.[10]  Importantly, ambiguity "does not exist where the court can determine the meaning of a contract 'without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'"  *Id.* *quoting Holland v. Hannan*, 456 A.2d 807, 815 (D.C. App. 1983).  "All written contracts ... are to be read, understood, and interpreted according to the plain meaning and ordinary import of the language employed in them....Words, if of common use, are to be taken in their natural, plain, obvious, and ordinary significance; but, if technical words are used, they are to be taken in a technical sense, unless a contrary intention clearly appears, in either case, from the context."  *Neary v. Philadelphia, W. & B.R. Co.*, 7 Houst. 419, 9 A. 405 (Del. 1887); *accord Northwestern Nat'l. Ins. v. Esmark, Inc.*, 672 A.2d 41, 44 (Del. 1996)(interpreting unambiguous contract terms using dictionary definitions).  Here, the common language of the Fleming Plan–and the defined terms contained within it–establish that the PCT owns the claims against the vendor officers.

**B.    Under the Plan, the Claims Against the Vendor Officers Belong to the PCT.**

17.    The Fleming Plan divided all litigation claims belonging to the former Fleming Debtors between two litigation trusts: the PCT and the RCT.  The PCT was vested with the responsibility to liquidate all litigation claims that were not "RCT Assets."  Plan at Art. V(G)(3) (defining the PCT assets to include litigation claims, but stating that "The PCT Assets do not include any RCT Assets.").  The Plan defines RCT Assets as "Reclamation deductions, over-wires, preference claims, Causes of Action and other rights of the Debtors <u>as against the holders of Reclamation Claims</u>, other than post-petition deductions and post-petition over-wires with

---

[10] If, however, this Court concludes the Plan is ambiguous, then it is "both necessary and prudent to allow for the development and presentation of a factual record of the parties' negotiations and dealings." *Paxson Communications v. NBC Universal*, 2005 WL 1038997 (Del. Ch. April 29, 2005).  The need to develop a factual record would therefore preclude the entry of an order enjoining the PCT from pursuing these claims, or awarding them outright to the RCT.

respect to Fleming Convenience which shall be transferred to Core-Mark Newco." Plan at Art. V (H)(2)(a). It similarly defines Reclamation Assets as "deductions, over-wires, preference claims, Causes of Action and other rights of the Debtors as against the Holders of Reclamation Claims, other than the post-petition deductions and post-petition overwires with respect to the Fleming Convenience business which shall be transferred to Core-Mark Newco." Plan at Art. I(B)(145). Critically, each of these grants to the RCT limits the RCT's authority solely to litigation of claims against the "holders of Reclamation Claims." *Id.*

18.    The vendor officers whom the PCT has sued are not Reclamation Creditors, nor are they Holders of Reclamation Claims. This is borne out by the attached register of Reclamation Claims, previously filed with this court. *See* Exh. F, attached. This claims register confirms that the parties the PCT has sued are neither Reclamation Creditors nor holders of Reclamation Claims. *Id.* The unambiguous provisions of the Plan state that the RCT has the power only to litigate claims against Reclamation Creditors or holders of Reclamation Claims. Plan at Art. V(H)(2). The Plan vests in the PCT the ownership of, and the responsibility to litigate, all other litigation claims that previously belonged to the Fleming Debtors. Plan at Art. V(G)(3)(g)(vesting in the PCT "any and all other Claims and Causes of Action of the Debtors, including but not limited to those outlined in section VI hereof..." which are "not RCT Assets").

19.    The claims against the vendor officers, which sound in tort and arise out of the prepetition reporting–and manipulation–of the Fleming Companies' financial information are not only preserved by the Fleming Plan, *see* Plan Art. VI (B),[11] they are vested in the PCT. Plan at

---

[11] Article VI (B) expressly retained and preserved "all actual or potential actions, whether legal, equitable or statutory in nature, against all Persons except the D & O Releases arising out of, or in connection with, any of the Debtors' pre-petition management, operation and/or reporting of financial or other information," Plan at Art. VI(B)(Debtors' Retained Causes of Action), "all actual or potential actions, whether legal, equitable or statutory in nature, against Persons or Entities including vendors with respect to prepetition violations of applicable federal or state securities laws," *id.*, and "all actual or potential tort actions that may exist or may subsequently arise." *Id.*

Art. V (G)(3)(g) (claims vested in PCT) and (H)(2)(limiting RCT's claims solely to those against Reclamation Creditors). Because the vendor officers are not Reclamation Creditors, the claims against them belong to the PCT under the clear, unambiguous language of the Plan.

20.    In the end, the RCT is forced to concede that the Plan does not "explicitly" identify claims against the Vendor Officers as RCT Assets. *See* Mtn. at 12. That these claims are not *explicitly* identified as RCT Assets, however, ends the issue. The PCT owns all assets that are not explicitly designated in the Plan to be transferred to the RCT, Plan Art. V(G)(3), and the RCT concedes there is no explicit designation of these claims as RCT Assets. The question as to which trust owns these claims begins, and *must end*, with the Plan itself. The fact that the RCT's counsel have advised the court that they "would have" made a different deal if they'd thought this through affords no basis upon which the Plan contract can be re-written, now, more than one year after confirmation. The RCT's motion should, be denied.

**C.    The PCT Has Not Asserted Any Claims *Against* Reclamation Creditors**

21.    Without any sound argument based on the plain language of the Plan, the RCT is left to torture its terms—and the PCT's Complaint—in a desperate effort to capture for itself claims that it "would have insisted be identified as RCT Assets," RCT Mtn. at 12, but that are not allocated to it under the Plan. The PCT's claims against the vendor officers are, the RCT asserts, a blatant effort to recover from Reclamation Creditors in contravention of the Plan. RCT Mtn. at 20. This assertion cannot withstand even a cursory reading of the PCT's Texas Complaint. First, and most obviously, the PCT has not sued any Reclamation Creditors; indeed, it specifically alleges that the Reclamation Creditors are not parties to its action. *See, e.g.* Cross Complaint at ¶¶ 33-34 (identifying FMG/Daymon as a "non-party"). Second, the PCT *has sued* individuals (who are not Reclamation Creditors) that are personally liable for their own

wrongdoing. An agent is personally liable for his own torts, regardless of whether he committed them within the scope of his agency for his employer or someone else. "Texas' longstanding rule [is] that a corporate agent is personally liable for his own fraudulent or tortious acts." *Miller v. Keyser*, 90 S.W.3d 712 717 (Tex. 2002). "It is well settled that a corporate agent can be held <u>individually liable</u> for fraudulent statements or knowing misrepresentations even when they are made in the capacity of a corporate representative." *Wright v. Sage Eng'g., Inc.*, 137 S.W.3d 238, 250 (Tex. App.—Houston [1st Dist.] 2004, pet. denied). *See also SITQ E.U., Inc. v. Reata Restaurants, Inc.*, 111 S.W.2d 638, 651 (Tex. App.–Fort Worth 2003, pet. denied)(rejecting the argument that the "fiduciary shield" doctrine immunized an agent from responsibility for torts committed within the jurisdiction); *Kollision King, Inc. v. Calderon*, 968 S.W.2d 20, 25 (Tex.App.–Corpus Christi 1998, no writ) ("Knowing participation in a tortious act will render the corporate agent personally liable. It is not necessary that the "corporate veil" be pierced in order to impose personal liability, as long as it is shown the corporate officer knowingly participated in the wrongdoing.").

22.    Far from seeking a "direct recovery against the Reclamation Creditors," RCT Mtn. at 22, the PCT has in fact sought the entry of judgment *solely* against the individual Defendants whom it has sued. The PCT is not only permitted to do this under applicable law, *see SITQ supra*, the PCT was required to do this in order to discharge its fiduciary obligations to "use its best efforts to liquidate and resolve Claims, disputes and maximize the value of the PCT's assets and minimize the claims against the PCT." Plan Art. V(G)(8).

### 1.    The PCT's Allegations Concerning Indemnification Are Not an Indirect Claim Against Reclamation Creditors

23.    The RCT makes much of allegations in the PCT Complaint asserting that the vendor officers acted within the course of their employment and should, therefore, be

indemnified by their employers. This allegation was intended to forestall any coverage defenses that might exist under applicable policies of insurance. This allegation most certainly is not, however, a claim against the Reclamation Creditors themselves—as any fair reading of the allegations demonstrates.

24.    More to the point, the RCT's assertion about indemnity claims again seeks to usurp for itself claims that do not—and never did—belong to it. The vendor officers' right to indemnification by their employers (if it exists), is their own, individual right. It arises under the charter and by-laws of the companies for which they work. Any such indemnification claims, therefore, were never the property of the Fleming Estates—so they belong to <u>neither</u> the PCT nor the RCT.

25.    Fleming's Plan defines the Causes of Action that were divided between the PCT and the RCT as "all Claims, actions, choses in action, causes of action, suits ... <u>of the Debtors, the Debtors in Possession, and/or the Estates</u>." Plan Art. I(B)(36). The Reclamation Creditors are not Debtors, and the vendor officers' right to indemnity arise–if they exist at all–from the status of each one as an officer of a Reclamation Creditor. Whether an individual officer is entitled to be indemnified is therefore <u>his own</u> cause of action against his own employer. It is not a Fleming cause of action, it is not a "Cause of Action" that belongs to either the RCT or the PCT, and it is not a claim that is being pursued by the PCT in its Texas action.

26.    The RCT's argument concerning indemnification rights is, plainly, a red herring intended to distract attention from this critical point: the Fleming Plan delegated to the PCT the fiduciary responsibility to pursue from the vendor officers, and from all persons other than Reclamation Creditors, the full amount of the damages they caused as a result of their wrongful

manipulation of Fleming's financial statements. The PCT has done so, it has standing to do so, and there is no basis in the plain language of the Plan for any argument to the contrary.

### 2. The PCT Has Not Sought Damages From or a Judgment Against Any Reclamation Creditor.

27.    The RCT next points to the PCT's allegations the vendor officers are "jointly and severally liable for "hundreds of millions of dollars in damages," as evidence that PCT "surely" seeks recovery directly from the Reclamation Creditors themselves. RCT Mtn. at n.21. Nothing in the PCT's complaint seeks (or will entitle it to obtain) a judgment against any Reclamation Creditor, each of which is explicitly alleged to be a "non–party" to the case. *See* Cross Complaint at ¶¶ 33-34. The PCT has asserted no claims against any Reclamation Creditor, it asserts no right to recover against any Reclamation Creditor, and thus will not be entitled to any judgment against any Reclamation Creditor.

28.    To suggest that an allegation that a party acted within the scope of his employment magically becomes a claim for relief against his principal tortures–beyond all recognition–both the PCT's claim and the Fleming Plan itself. "Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty." *Rhone-Poulenc*, 616 A.2d at 1196. The ordinary meaning of the PCT's claims–including its express statement that Dean Foods, for instance, is a "non-party"–makes clear that the PCT has not sought relief against any Reclamation Creditor.

29.    The RCT's point concerning the damages sought by the PCT actually misses one of the most important points about the PCT's lawsuit. When it filed its case, the PCT sought recovery not only from the vendor officers, but from certain former Fleming officers and against Deloitte & Touche LLP, as well. The PCT is investigating and may pursue additional claims against other, highly solvent parties. The PCT's damages from the injuries inflicted on the

Debtors simply are what they are. The PCT has been charged under the Plan with recovering, for the benefit of creditors (including trade creditors who did *not* assist in the manipulation of Fleming's financial statements), more than $2 billion in damages they suffered when Fleming collapsed. No one lawsuit is going to satisfy that entire amount in one fell swoop, but uncertainty as to what might ultimately be recovered from any particular defendant was not a basis upon which the PCT could simply ignore and fail to prosecute the valuable, serious claims against these vendor officers that had been delegated to it under the Plan.

30.    In sum, the PCT's detailed complaint is far from the "sham" the RCT asserts. To the contrary, the PCT's highly specific, concrete allegations establish that each of these vendor officers was pervasively involved in the persistent and deliberate manipulation of the financial statements of Fleming, a large public company. *See* Exhs. "C" and "D" and PCT Complaint at pp. 1-50. This manipulation caused Fleming's multi-billion dollar collapse and left its creditors with massive injuries. With rare exceptions, every Defendant PCT sued has already admitted liability in Consent Judgments they entered into with the Securities and Exchange Commission. *Id.* Any fair reading of the PCT's Complaint confirms that the PCT has a strong case for the recovery of the millions of damages caused by the vendor officers and the others whom the PCT has sued. Put bluntly, the PCT owns the claims it has brought, and it has not asserted a single claim it does not own, so the RCT's motion should be denied.

### III.
### The RCT's Actions Are Not Consistent With its Belated Claim that It Owns the Claims the PCT Has Filed

31.    The RCT's motion next complains, at length, about two contradictory points. First, the RCT complains that it had no idea the claims the PCT has filed existed—until the PCT inquired about them—because "the Debtors at no time advised the OCRC that any EO Claim

was contemplated, or might even exist, against any Reclamation Creditor and/or its employees."
RCT Mtn. at 12. Next, the RCT asserts that the PCT's inquiries concerning what the RCT
planned to do about the valuable claims against six Reclamation Vendors interfered with a
process the RCT had set up to deal with those very claims. RCT Mtn. at 6. Neither premise is
true.

<p style="margin-left:2em;"><strong>A.    The Plan and Disclosure Statement Plainly Notified the OCRC—and All Other Creditors—of the Existence of Potential Tort Claims Against Reclamation Vendors.</strong></p>

32.    The RCT is candid in admitting that it had done nothing to investigate or
maximize the potential tort claims against the dirty half-dozen vendors before the PCT inquired
as to its intentions. Indeed, when the PCT Representative contacted the RCT to inquire about
these claims, the RCT Representative immediately responded "Oh, we're not going to sue <u>our</u>
<u>own</u> vendors!" This statement is astounding, particularly in light of the fact that the Plan imposes
on the RCT an obligation to "act in good faith in carrying out its duties and responsibilities and
[to] use its reasonable best efforts to liquidate and resolve Claims, disputes and maximize the
value of the RCT's assets and minimize claims against the RCT." Plan at Art. V(H). The RCT
now seeks to excuse its inaction, in the face of these valuable claims, by asserting that no one
told them these claims existed or were their responsibility. *See* Mtn. at 11.[12] This excuse —for it
is nothing more than that—is belied by both the Disclosure Statement and the Plan.

<p style="margin-left:2em;"><strong>1.    The Disclosure Statement Discussed the Potential Claims Against Reclamation Creditors in Detail.</strong></p>

33.    What the RCT characterizes in footnote as "one sentence" in the Disclosure
Statement concerning the wrongful conduct of these vendors, RCT Mtn. at n. 17, is actually a

---

[12] This argument is, of course, inconsistent with the RCT's claim that the reconciliation of these tort claims was always intended to be a part of their process—a position the RCT asserts with equal fervor, elsewhere in their motion.

full page discussion of the issue of vendor misconduct and its role in the manipulation of

Fleming's financial statements. In pertinent part, the Disclosure Statement told the OCRC that:

> On November 13, 2002, Fleming announced that the SEC had initiated an informal inquiry related to <u>Fleming's vendor trade practices,</u> the presentation of second quarter 2001 adjusted earnings per share data in Fleming's second quarter 2001 and 2002 earnings press releases, Fleming's accounting for drop-ship sales transactions with an unaffiliated vendor in Fleming's discontinued retail operations, and its calculation of comparable store sales in its discontinued retail operations.
>
> The SEC converted the informal inquiry into a formal investigation on February 13, 2003.  <u>The formal investigation has focused on whether any persons or entities engaged in any acts, transactions, practices or courses of business which operated and would operate as a fraud or a deceit upon purchasers of Fleming securities</u> or upon other persons in violation of the federal securities laws. Fleming has answered questions submitted by the SEC and has produced documents to the SEC.  The SEC has interviewed several current and former employees of Fleming as well as third parties.  Fleming continues to be in discussions with the SEC and intends to fully cooperate with the SEC.  <u>Kraft Foods, Dean Food and Frito-Lay recently announced they have been notified that the SEC is considering filing charges against those companies in connection with their business dealings with Fleming, including whether employees of those companies aided Fleming in accelerating revenue improperly.</u>
>
> After receiving notice of the informal SEC inquiry, <u>Fleming undertook an independent investigation related to the same topics.</u>   The Audit and Compliance Committee of the Board of Directors engaged independent legal counsel and independent consultants to assist in connection with the independent investigation. .... The scope of the independent investigation included the original topics identified by the SEC as well as issues related to <u>the timing of recording revenue, documentation of certain vendor transactions and certain initiatives undertaken for the purpose of increasing reported income.</u>
>
> On April 17, 2003, Fleming issued a press release (the "April 17 Release") announcing that it would have to restate its 2001 annual and quarterly financial statements and 2002 quarterly financial statements .... [that included] <u>adjustments identified in connection with the continuing independent investigation by the Audit Committee into certain accounting and disclosure issues.</u>...The April 17 Release also reported that restatements of the results for the full year 2001 and the first three quarters of 2002 would reduce the pre-tax financial results form continuing operations for such periods by an aggregate amount of not more than $85 million and that <u>the restatements would mainly correct the timing of when certain vendor transactions are recognized</u> and the balance of certain reserve accounts.....Fleming also announced that its fourth quarter 2002 pre-tax loss from

continuing operations would be increased by expenses totaling not more than $80 million as a result of a number of factors, including ... <u>corrections identified as a result of the Audit Committee's independent investigation</u>.

In a Form 12b-25 filed by Fleming with the SEC on June 4, 2003, Fleming announced that its 2000 annual financial statements would require restatement....[that] would principally <u>correct the timing of when certain vendor transactions were recognized and would reflect other adjustments and corrections identified as a result of the Audit Committee's independent investigation</u>.

*See* Disclosure Statement at 30-31, attached as Exh. 1 to RCT Motion.

34.    Contrary to the RCT's assertion, the Disclosure Statement gave the OCRC not a

"one sentence disclosure," but rather a full page disclosure of the following facts:

- The SEC had instituted a formal investigation of whether any persons or entities had engaged in transactions that "operated as a fraud or deceit upon purchasers of Fleming securities."

- The SEC's investigation had progressed far enough that the SEC had formally notified at least three Reclamation Creditors,[13] Kraft Foods, Dean Foods and Frito-Lay, that it was contemplating charging them for their role in "aiding Fleming in accelerating revenue improperly."

- Fleming's Audit Committee had instituted an independent investigation "on the same topics," and had retained independent counsel and an independent accounting firm to assist it.

- The Audit Committee's investigation was finished, and had resulted in a multi-million dollar restatements of Fleming's income for 2000, 2001 and 2002– restatements that would "principally correct the timing of when certain vendor transactions were recognized," and would reflect other adjustments and corrections "identified as a result of the Audit Committee's independent investigation."

The significance of these claims to the recovery for the creditors was obvious, and the

description was more than sufficient to notify the OCRC that the SEC–the body charged with

---

[13] SEC Investigations are non-public, so it is not surprising that this disclosure could do little more than place all creditors on notice of the facts the investigative targets themselves chose to reveal. The Debtors presumably knew about the investigations of Kraft, Dean and Frito-Lay because those companies are, themselves, public companies required to make disclosure of the pending SEC inquiries. The same is not true of other vendors who later entered into consent judgments admitting they too had assisted in manipulating Fleming's financials, such as Kemps/Marigold and Digital Exchange, or of private citizens–such as the employees of various vendors–who likewise have since admitted they had assisted in manipulating Fleming's financials.

enforcing the nation's securities laws–was on the verge of charging at least some vendors with violations of the federal securities laws for having "aided Fleming in accelerating revenue improperly."

### 2. The Plan Expressly Retained Claims Against Vendors (including Reclamation Creditors) and Individuals Who Manipulated Fleming's Financial Statements

35.     The existence of possible claims related to the misconduct of these vendors was not only set out in full in the Disclosure Statement, the right and responsibility to maximize those claims for the benefit of Fleming's creditors was expressly retained in the Plan.  Specifically, Article VI (A) of the Plan provided that the following claims would be preserved "regardless of whether the Causes of Action accrued before or after the Petition Date," including:

- All actual or potential actions, ... against Persons or Entities including vendors with respect to prepetition violations of applicable federal or state securities laws; and,

- All actual or potential actions,... against all Persons except the D & O Releasees arising out of, or in connection with, any of the Debtors' prepetition management, operation and/or reporting of financial or other information.

Plan at Art. VI (B), pp. 31-32.

36.     These Causes of Action, having been retained, were then specifically referred to and addressed in the Revised Term Sheet.  *See* Exh. "3" to RCT Motion.  The Revised Term Sheet states that "Capitalized Terms not otherwise defined shall have the meaning set forth in the Debtors and Official Committee of Unsecured Creditors' Second Amended Joint Plan of Reorganization."  *Id.* at p.1.  "Causes of Action," as defined in the Plan, specifically includes "those actions listed in this Plan," Plan Art. I(36), and thus directly pointed the OCRC—and the RCT after confirmation—to the actions that had been retained in the Plan against vendors for their role in manipulating Fleming's financial reports.  Plan Art. VI (B).

37.    In light of these provisions in the Disclosure Statement, the Revised Term Sheet, and the Plan, the RCT's assertion that it had "no idea" that these claims existed is beyond baffling. These claims were expressly preserved in the Plan–in language that made plain the existence of claims against these vendors that were to be maximized for the benefit of Fleming's creditors. Yet, as we demonstrate below, the RCT had taken no steps even to investigate—much less to maximize—the valuable claims against the Reclamation Creditors until the PCT's legitimate inquiries prompted the RCT to do so.

**B.    The RCT "Process" Ignored These Claims**

38.    The RCT asserts that its "settlement process was disrupted by the PCT's first-time assertion regarding the existence of the EO claims" in December of 2004. RCT Mtn. at 15. In the next breath, however, the RCT is forced to admit that it had no such process as to the EO claims because it never focused on the fact that these claims existed. Either way, the RCT Representative's statement that the RCT was "not going to sue their own vendors," apparently no matter what the vendors had done and regardless of how much damage these vendors had inflicted on other, innocent creditors, is deeply problematic.[14]  Having made the decision that it was not going to sue any Reclamation Creditors, the RCT had every (but no legitimate)reason to turn a blind eye to these claims—because it was only through willful blindness that the RCT would be able to avoid the evidence that these highly meritorious claims, based on admitted SEC Consent Judgments, offered the prospect of substantial recoveries for Fleming's trade and other creditors.

---

[14] The RCT has provided to the court a markedly inaccurate account of what occurred in the discussions between the PCT and the RCT concerning the claims that each trust owned. The RCT did so first in the its purported Status Report; it has done so, again, in its Motion. The RCT's decision to reveal confidential communications between the two trusts—and then to mischaracterize them—has left the PCT with no choice but to correct the record, reluctantly, so that the court is not misled concerning what actually occurred.

39.     The RCT's efforts to avoid investigating these claims are inexcusable.  As fiduciaries charged with the responsibility to liquidate and maximize claims *against Reclamation Creditors*, Plan Art. V(H), one would have expected that the RCT and its counsel would have undertaken to investigate the facts in the Disclosure Statement in order to incorporate the evidence of misconduct of these vendors into the Reclamation Claims by these creditors.  These dishonest creditors had admitted that they (or their employees) willfully manipulated Fleming's financial statements at the expense of 4,000 honest trade creditors, bond holders, and other creditors, who were not parties to the fraud.  How, then, could the RCT possibly determine what *actually was owed* on a Reclamation Claim without at last some understanding of the defenses to it—including defenses based on the admitted fraud of the creditor in question?  Yet, despite its clear fiduciary obligation to do so, the RCT made no effort to investigate these issues until the PCT asked what the RCT intended to do about them.

40.     Had the RCT even attempted to incorporate these facts into its "Reconciliation Process," it would have considered not only what was in the Disclosure Statement, but additional facts that came to light after the Plan was confirmed.  On September 14, 2004, for example, it was publicly reported that Fleming had entered into a Consent Judgment with the SEC in connection with improper "side letters" provided by vendors to certain Fleming officers in order to assist in accelerating, improperly, Fleming's recognition of income.  *See* Exh. "C," attached. The consent judgment specifically named the following Reclamation Vendors as having provided false letters to assist in this fraud:  Kemps LLC, formerly known as Marigold Foods, LLC; Digital Exchange Systems, Inc.; Frito-Lay, Inc.; Kraft Foods, Inc.; and, Dean Foods Company.  *Id.*  The improper payments are clearly set out in the Fleming Consent Judgment, as is the amount of the Fleming income that was overstated as a result.  *Id.*

41.     Simultaneously with the Fleming Consent Judgment, and as disclosed in it, three Reclamation Vendors—Kemps, Dean Foods, and Digital Exchange—and employees of two other Reclamation Vendors, Kraft Foods and Frito-Lay, each entered into separate consent judgments that likewise admit the role these vendors and their officers played in manipulating Fleming's financial statements. *See* Exh. "E." A number of vendor employees likewise admit their crucial roles in falsifying contracts, forging audit confirmations, and improperly accelerating Fleming's recognition of income. *See* Exh. "D."

42.     Three months went by after these Consent Judgments were entered, with the RCT apparently unaware of these crucial developments. In the meantime, the PCT had retained its own litigation counsel to investigate and assess the claims for which the PCT was responsible. Based upon this investigation, the PCT immediately identified claims against the vendor officers as among those the PCT should pursue. Consistent with its desire to cooperate with the RCT, the PCT therefore inquired of the RCT what it intended to do with the claims assigned to the RCT; namely, the parallel tort claims against the handful of wrongdoing Reclamation Creditors who had admitted (or whose employees had admitted) their role in deliberately manipulating Fleming's financial statements.[15]

---

[15] This inquiry was entirely appropriate in light of the PCT's status as a a beneficiary of the RCT and its obligation to maximize its own claims in good faith. First, the PCT is a residual beneficiary of the RCT Assets and has a legitimate interest in ensuring that they are maximized. *See* Revised Term Sheet at Article VII (E), attached as Exhibit 3 to RCT Motion. According to the Term Sheet, "In the event the RCT has or develops proceeds for distribution after satisfaction of all Reclamation Claims, such additional proceeds shall be applied by the RCT in an order of priority as follows:

    A.    To Core-Mark Newco for any advances under the TLV or Non-TLV Guaranty:
    B.    To the Prepetition Non-TLV Reclamation Claim Reduction;
    C.    To Core-Mark Newco for any advances under the Administrative Claim Guaranty;
    D.    Any amount of "Ad Hoc Committee" professional fees which have not been reimbursed by allowance of an Administrative Claim;
    E.    To the PCT."

Second, the unsecured portion of all claims belonging to Reclamation Creditors resides in the PCT. The PCT, and the Reclamation Creditors themselves, each have an interest in ensuring that the RCT's claims are maximized,

43.    There is no question that the RCT—as a fiduciary for all of Fleming's creditors—

was obliged to investigate the facts *they knew* as a result of the Disclosure Statement. There is

little evidence that they did so. Instead, in December of 2004, when the PCT Representative

contacted the RCT Trustee, Bernie Katz, to inquire as to their plans for these claims, Mr. Katz

responded that the RCT simply was not going to sue its own creditors. Consistent with its stated

intention not to "sue its creditors," the RCT  did not obtain copies of the publicly-available

SEC Consent Judgments—which had been entered in September of 2004 --until the PCT

provided them to the RCT on December 4. On December 3, 2004, the PCT also sought to send

the RCT an outline of potential claims that might be asserted against these creditors, but the RCT

refused to accept it.[16]    The RCT also did not obtain a copy of the Fleming International

Investigation report prepared by PriceWaterhouse Coopers (the PWC Report)—again until the

PCT provided it to them at a meeting the RCT grudgingly agreed to attend, after the PCT begged

the RCT to consider the important implications of these claims for the recoveries to be had for

the benefit of Fleming's creditors.

44.    Tellingly, until the PCT raised these issues, the RCT had also instituted no Rule

2004 discovery, had done no research, and had instituted not even an informal process to

determine whether these claims might yield a significant recovery for its "own" beneficiaries—

one of which is the PCT itself. Instead, on December 10, 2004, the RCT sent an email to the

PCT asserting that the reason they had done nothing—in the months since the Plan was

confirmed—was because neither counsel for the Debtors nor Counsel for the Committee of

---

because doing so will result in repayment on unsecured claims and will reduce the PCT's overall unsecured creditor base. Indeed, the RCT's Status Report confirms that, if pursued, the RCT's claims against the six Reclamation creditors will yield recoveries *solely* for the benefit of the PCT and its Creditors. Finally, the PCT Trust Agreement imposes on the PCT an obligation to cooperate with the RCT in maximizing the assets of the former Fleming Debtors.

[16] The PCT stands ready to offer evidence and testimony on these and other facts recited in this response, should the Court conclude evidence is necessary.

A    201

Unsecured Creditors had told them they should do so. Left unexplained was why the RCT, with its own highly skilled and competent counsel, had not been moved by its own fiduciary obligations to consider these issues on its own, and without the need for prompting by the PCT. On December 21, 2004, the RCT followed up with another letter, again blaming others for its failure to discharge its own fiduciary obligations.

45.    On January 7, 2005, the PCT responded to the RCT's excuses by reiterating its view that the claims against the Reclamation Creditors for their overt, and admitted, manipulation of Fleming's financial statements were very valuable and had to be investigated. The PCT told the PCT, as well, that the PCT intended to file the parallel claims it owned against the vendor officers because they were potentially significant to the creditors' recovery. The PCT also offered the RCT the services of its own counsel, at its own expense, to do the legwork on this investigation, so as not to distract the RCT professionals from their Reconciliation Process with other, innocent creditors. The PCT again offered to meet with the RCT—at a time and place of the RCT's choosing—in order to share what it had learned about these manipulative transactions in the course of investigating the PCT's own claims. The Chairman of the PCT Board, Robert Kors, also reached out individually to Curtis Marshall, the Chairman of the RCT Board, to try to determine whether a business solution could be reached that would permit the two trusts to pursue the parallel claims that each owned, in a cooperative manner. Finally, consistent with its own fiduciary obligations, the PCT warned the RCT that its failure event to investigate and assess the RCT's claims against the six Reclamation Creditors could severely impair them, and might subject the RCT and its professionals to claims for a breach of their fiduciary obligations.

46.     Thereafter, the PCT did what the RCT should have done in the exercise of its fiduciary obligations.   First, on January 28, 2005, representatives of the PCT met with representatives of the RCT in Chicago and provided them with still more information concerning the claims against these six vendors.  The PCT also provided to the RCT a copy of the PWC Report.   On February 1, 2005, the PCT identified for the RCT—from the SEC Consent Judgments and the PWC report—a list of vendors that had engaged in questionable transactions. This list was jointly "triaged" by the PCT and the RCT, and priority was given *not* to those vendors whose conduct was particularly grave but, rather, to those creditors with whom the RCT's settlement negotiations were already very advanced.  This, again, was in deference to the RCT's Reconciliation Process and its desire to move forward quickly with its settlements.  The RCT then agreed, reluctantly, to request a limited set of documents, from a handful of vendors, on a voluntary basis.  The RCT did not issue Rule 2004 subpoenas, however, nor did it request voluntary production of all relevant documents, because it didn't want to "disrupt its consensual process."

47.     Thereafter, *at its own expense*, the PCT reviewed Fleming's documents in the storage unit in Relizon to locate the relevant documents concerning these transactions.  These documents were plainly relevant to the PCT's own claims against the vendor officers, but the PCT also voluntarily gave copies of the notebooks it assembled to the RCT, for its review, because the documents were equally relevant to the RCT's claims against the vendors themselves.  The PCT also quickly culled the list of vendors that were in dispute down to seven vendors whose conduct was particularly egregious:   Kraft, Marigold, Dean Foods, Digital Exchange, FMG/Daymon, Dole Food Corporation, and Frito-Lay.[17]   On March 24, 2005,

---

[17] The PCT ultimately filed suit against two of these vendors, and against a number of individuals who were not Reclamation Creditors.  The first vendor the PCT sued was Dole Food Corporation, which was not a Reclamation

representatives of the PCT again met with representatives of the RCT in Chicago, and with the RCT Board, to outline both the claims that could be pursued against the vendors themselves, and the claims the PCT was going to pursue against the vendor officers. This detailed discussion also laid out the very significant damages Fleming's creditors had suffered as a result of these vendors' knowing participation in the scheme to manipulate Fleming's financial statements.

48.    The PCT implored the RCT to take action against these vendors, and even offered to pursue these claims for the benefit of the RCT and all of Fleming's creditors at no cost to the RCT.[18]  The RCT again refused to do so in favor of its "consensual process" with its own vendors—the very process that, months earlier, the RCT asserted dictated that the RCT was "not going to sue its own vendors," no matter what. Even as the statute of limitations loomed, the RCT still did nothing to preserve these claims until prompted to do so by the PCT. The RCT ultimately (at the behest of the PCT) obtained a handful of tolling agreements from the vendor companies, but did <u>nothing at all</u> to preserve claims against the individual, vendor officers who had also admitted their own wrongdoing in the SEC Consent Judgments. Those claims, which the RCT would have allowed to be time-barred, are the very claims the RCT now asserts it owns and that, if so, it had a fiduciary obligation to preserve and protect.

## IV.
### The RCT Equitably is Estopped to Claim it Owns the Claims the PCT is Pursuing

49.    The RCT's inaction concerning the claims the PCT has pursued, and its complete failure to take any steps to preserve or toll the claims against the individuals in particular, are

---

Creditor. The second, Digital Exchange, was a Reclamation Creditor—but the RCT assigned its claims against Digital Exchange to the PCT only days before an agreement tolling limitations on the claims against Digital Exchange against was set to expire.

[18] Counsel for the PCT has been retained on a significantly reduced hourly rate, and a contingent percentage, which the PCT agreed to bear in order to ensure that the RCT would not have to come out of pocket to litigate these claims, if it chose to do so.

inconsistent with the RCT's belated assertion, here, that it believed it owned these claims all along. In fact, although the discussions concerning the Trusts' parallel claims have proceeded more than nine months—including a significant period before and more than six months after the PCT's claims were filed--the RCT never once objected to the PCT's stated intention to pursue its claims against the individual vendor officers. Nor did the RCT object to the PCT's lawsuit after it was filed. Instead, the RCT assured the PCT—before the PCT ever filed its claims—that the RCT did not intend to interfere with the PCT's pursuit of the claims against the individuals.

50.    Now, however, for reasons that the RCT has not chosen to share with the Court, the RCT has entirely reversed field. Although the RCT concedes that the Plan does not "explicitly" grant them ownership of the claims the PCT has filed, RCT Mtn. at 12, the RCT nonetheless asserts that the PCT's claims belong to the RCT. In the meantime, nine months have passed since the PCT first contacted the RCT about its own claims, and about the parallel claims that the RCT owned against the Reclamation Creditors themselves.   The PCT invested significant time, scarce resources, and incurred significant expense to prepare and pursue the claims it filed against the individual vendor officers. It has litigated them vigorously and has not left them vulnerable to defenses, such as limitations, as the RCT would have done. The PCT also filed its claims more than six months ago. Since then, the PCT has incurred significant, additional expense in briefing motions to dismiss, taking jurisdictional discovery and amending its pleadings to add additional claims that the RCT assigned to the PCT at the last moment. The RCT knew all of this, just as it knew the PCT was undertaking this effort as a fiduciary for all of the creditors, and on the express assurance by the RCT that it would not interfere with the PCT's efforts to pursue these recoveries.

51.     Under Delaware law, "estoppel may arise when a party by his conduct, intentionally or unintentionally leads another, in reliance upon that conduct, to change his position to his detriment." *Bechtel v. Robinson*, 886 F.2d 644, 650 (3rd Cir. 1989) *quoting Wilson v. American Ins. Co.*, 58 Del. (8 Storey) 394, 398, 209 A.2d 902, 903-04 (1965). As a result, in the words of the Third Circuit, "the person whose conduct has brought the situation about [is] estopped from asserting his legal rights against the party so misled." *Id. quoting Wolf v. Globe Liquor Co.*, 34 Del. Ch. 312, 316, 103 A.2d 774, 776 (1954). This court has described the elements of equitable estoppel in similar terms. *Compare In re Integrated Health Svcs., Inc.*, 304 B.R. 101, 110 (Bankr. Del. 2004).

52.     Even assuming that the Plan itself did not make clear that the PCT owns these claims—as it plainly does—equitable estoppel affords an independent basis upon which the RCT's motion should be denied. Here, the RCT has entirely neglected to protect or investigate the claims that the PCT has filed. Instead, the RCT assured the PCT that it would not interfere with the PCT's efforts to recover on these claims, and the PCT filed its claims in reliance on that assurance. The RCT also knew about—and even obtained the benefit of—the significant expenses the PCT was incurring to develop, file and pursue these claims. As limitations loomed, the RCT made <u>no effort at all</u> to protect the claims it now asserts, vociferously, that it owns. It obtained no tolling agreements from the individual vendor officers, and the tolling agreements it actually obtained do not purport to cover these claims. Accordingly, if the RCT prevails on its motion, these valuable claims will be utterly extinguished. The party that "owned" them—purportedly the RCT—simply did not file them before limitations expired.

53.     In a very real sense, then, the only parties that will benefit from the RCT's motion are the very wrongdoing officers who have admitted to the SEC that they actually and

deliberately manipulated Fleming's financial statements. The RCT won't benefit, because the claims it will recover are now time-barred. The PCT won't benefit because it has expended valuable resources pursuing claims that the RCT now, belatedly, asserts that it owns. Even worse is the fact that the PCT's creditors, who have $2 billion in unsatisfied claims, will also receive nothing from these otherwise valuable assets. The doctrine of equitable estoppel exists to prevent precisely this injustice. If the RCT truly believed it owned these claims, it was required as a fiduciary to do something to preserve them and maximize their value before it was too late. That the RCT, in fact, did nothing at all to protect these claims demonstrates that the RCT never really believed it owned them to begin with. That the RCT also failed to file this motion until after limitations had run, and after the PCT had incurred significant expense and invested significant resources in prosecuting these claims, also establishes that equitable estoppel bars the RCT's request for relief. The RCT's motion should be denied.

## V.
## The Claims At Issue Here are Valuable Claims

54.    There is no question that the claims against the vendors and the vendor officers are extremely valuable.

55.    The tort claims against the vendor officers in the PCT's lawsuit, and that could have been but were not filed by the RCT against the Reclamation Creditors themselves, are: 1) knowing participation in a breach of fiduciary duty (for deliberately participating in the Fleming's officers' breach of their duties of candor and good faith); 2) civil conspiracy (for conspiring with faithless Fleming officers in the manipulation of its financial results); and, 3) negligent misrepresentation (for recklessly providing false documents to Fleming's officers to use for the manipulation of Fleming's financial data).

56.     Texas takes a harsh view of those, such as the vendor officers, who participate in and suborn a fiduciary's breach of his duty.  When "a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tort-feasor and is liable as such." *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 2160 S.W.2d 509, 514 (Tex. 1942).  There is no question that the PCT has stated a claim for relief on these causes of action; indeed, the defendants themselves have admitted that the underlying facts are true in the SEC Consent Judgments.  The only real question, therefore, is what damage Fleming's creditors suffered as a result of this wrongful conduct.

57.     The precise amount of the damages that flowed from the vendor officers' admitted misconduct remains to be determined, but we know this much.  Fleming's unsecured creditors have collectively lost over $2 billion dollars.  We know, as well, that but for the manipulation of its financial statements Fleming might not have incurred as much as a billion dollars or more of that indebtedness.  We also know that—although its corporate collapse was on a different scale than Fleming's--Enron has already recovered *over $700 million* for its creditors by pursuing claims (identical to those filed by the PCT) against those who assisted its faithless employees in manipulating its financial statements.  See Exh. "G"  Finally, just weeks ago, the District Court in the *Parmalat* case recognized that *in pari delicto* does not bar claims against insiders who loot a company, or against those who assist them in doing so.  *In re Parmalat Securities Litig.*, Case No. 05 Civ. 4015 (S.D.N.Y. August 5, 2005,) attached as Exh. "H."

58.     All of this serves only to demonstrate that these are valuable claims, solidly grounded in the law and supported by facts that have already been admitted by the wrongdoers. The RCT's desire to pursue a "consensual process" that protects its own constituency, without regard to its obligation to maximize these claims for the benefit of all creditors, is hardly

A    208

something about which it should boast. The RCT's desire to protect "its" constituency, at the expense of its beneficiary, the PCT, is also no basis upon which the RCT should be permitted to re-trade the Plan, or interfere with the PCT's efforts to pursue claims it has been charged with pursuing under the Plan.[19]

## VI.
### The RCT's Motion Is Procedurally Defective

59.     The RCT's motion suffers from an additional, procedural flaw. Federal Rule of Bankruptcy Procedure 7001 provides that the following proceedings, among others, constitute "adversary proceedings:" (i) a proceeding to determine the validity, priority or extent of . . . interest in property (Rule 7001(1)), (ii) a proceeding to obtain an injunction or other equitable relief (Rule 7001(7)), and (iii) a proceeding to obtain a declaratory judgment relating to any of the foregoing (Rule 7001(9)). Pursuant to Federal Rule of Bankruptcy Procedure 7003, an adversary proceeding "is commenced by filing a complaint with the court." Accordingly, the RCT's Motion, which seeks all three forms of relief, is procedurally improper and must be dismissed.

60.     The RCT concedes that, generally, a party seeking injunctive relief must proceed by an adversary complaint, rather than a motion. See Motion at ¶ 37, fn. 22. However, the RCT claims that the specific relief is properly obtainable by motion. The RCT cites three cases in support of this proposition, but these cases are clearly distinguishable.

61.     The main case on which the RCT relies is *In re Continental Airlines, Inc.*, 236 B.R. 318 (Bankr. D. Del. 1999). The *Continental* court, indeed, allowed the debtors to proceed by motion when they sought to enjoin certain pilots from filing and prosecuting state court actions asserting claims discharged by the confirmation order. The court based its decision on

---

[19] The RCT has one final complaint to make: It is unhappy that it was compelled to retain "conflict" counsel because the RCT's counsel could not investigate Kraft and at least one other vendor. RCT Mtn. at 18. This, too, is an obvious red herring. If the RCT's counsel had a conflict such that it could not investigate Kraft (or any of the other wrongdoing vendors), it had a conflict such that it could not represent the RCT against Kraft in reconciling the underlying reclamation claim. The same is true for any other vendor as to which the RCT was required to retain conflict counsel. That the RCT would invoke its own counsel's conflict as a point in its favor serves only to demonstrate how very badly the RCT has lost sight of where its fiduciary obligations actually lie.

the distinction between situations where a party was *seeking* an injunction (and where an adversary proceeding and a compliant were required) and situations where a party was seeking to *enforce a previously obtained* injunction (and where it was procedurally proper to proceed by motion).    Thus, in <u>Continental</u>, the debtors were seeking to enforce the injunction against instituting and prosecuting discharged claims that was "already in place [by] express terms of the Confirmation Order." <u>Continental</u>, 236 B.R. at 327.[20]

62.    Here, in contrast, the claims at issue were not discharged in the Plan; they were, instead, preserved in the Plan. Plan Art. I (B)(36) (Causes of Action) and Art. VI (B) (Retained Claims).    Nor, as in *Continental*, is there an injunction prohibiting the PCT from prosecuting these claims. To the contrary the Plan specifically requires the PCT to maximize these claims in good faith. Plan Art. V (G)(8) (requiring PCT to maximize all claims that are "not RCT Assets). Accordingly, far from seeking to enforce an existing Plan injunction, as in *Continental*, the RCT seeks an entirely new injunction that would fundamentally re-write the Plan. This cannot be done more than a year after confirmation, and it certainly cannot even be sought by the RCT outside the context of an adversary proceeding—particularly given that the RCT concedes the Plan did not "explicitly" confer the claims at issue on the RCT. *Compare* RCT Mt. at 12.

63.    In order for the RCT to claim that the injunctive relief it is seeking is properly obtainable by motion, it would have to demonstrate that it is seeking to enforce an explicit Plan provision.    The RCT concedes it cannot do this, because no Plan provision "explicitly," RCT Mtn. at 12, confers these claims on the RCT. Accordingly, the RCT can proceed only by an adversary complaint because it seeks a *determination* with respect to an interest in property of the estate. *See* Bankruptcy Rules 7001(1) and (9). *See also In re Taylor*, 77 B.R. 237, 241 (9th Cir. BAP 1987) ("Bankruptcy Rule 7001 specifies that an adversary proceeding is necessary to obtain a declaratory judgment relating to an interest in property."), *reversed in part on other*

---

[20] The other two cases cited by the PCT stand for the same rule. In *In re Petrie Retail, Inc.*, 304 F.3d 223 (2nd Cir. 2002), the movant was seeking to enforce specific explicit provisions of both the sale and the confirmation order enjoining lessors from asserting claims against the purchaser/assignee of the debtor's assets, while in *In re Woods*, 316 B.R. 522, 525 (Bankr. N.D. Ill. 2004), the movant was seeking to compel distribution provided for in the confirmed plan.

*grounds*, 884 F.2d 478 (9ᵗʰ Cir. 1989); *In re Envirodyne Indus., Inc.,* 174 B.R. 955, 960 (Bankr. N.D. Ill. 1994) ("the court cannot issue a binding declaratory judgment with regard to any of the proceedings listed under Rule 7001 without conducting an adversary proceeding"). The RCT has not filed an adversary complaint, so there is no mechanism by which the Court can award injunctive relief.

## VII.
## Cross-Motion for Declaratory Relief

64.    The PCT has established that there are a number of clear Plan provisions that confer these claims on the PCT. *See supra* Part II.  The RCT's actions have interfered and continue to interfere with the PCT's prosecution of its claims—even though the PCT is clearly not merely authorized, but required, to maximize the claims it has filed for the benefit of its creditors.  As a result of the RCT's collateral attack on the PCT's lawsuit, the United States District Judge has stayed all proceedings in the PCT's Complaint pending a ruling by this court. That stay is impairing the PCT's litigation even now, because of fading memories, resignations of employees and the passage of time.  It has already been four years since some of the false transactions at issue in the SEC Consent Judgments, and every moment of delay makes the PCT's task even more difficult.  Accordingly, there is an urgent need for this Court to decide— once and for all—that the PCT may proceed with its litigation.

65.    Although *In re Continental Airlines, supra,* affords no basis for the relief the RCT seeks, under the same case the PCT *is entitled* to entry of an Order declaring that it owns the claims it has filed.  There is an explicit Plan provision conferring these claims on the PCT, these claims were not discharged, and the existing Plan injunction in the Confirmation Order, requires the PCT to maximize these claims for the benefit of its creditors.  Accordingly, the PCT respectfully requests that the Court enter an Order:

1.    Denying the RCT's Motion;

2.    Declaring that the Plan establishes that the PCT owns the claims it has filed in its cross-action; and,

3.    Declaring that the PCT is entitled to pursue its claims, without further interference by the RCT, and further need to prove in this or any other court that the PCT owns the claims it has filed.

### Conclusion

66.    The clear language of the Plan establishes that the PCT owns the claims it has pursued in its Texas lawsuit. The clear language of the PCT's complaint establishes that it has not sought to recover damages (or any other form of relief) from any Reclamation Creditor. Finally, the clear record of inaction by the RCT demonstrates both that it does not genuinely believe it owns these claims—which are not "explicitly" delegated to it under the Plan—and that the RCT should be equitably estopped from asserting it owns these claims in light of its own, inequitable conduct and the severe damages that will ensue when these claims are destroyed as a result.

The RCT's motions should be denied and the court should, instead, enter an Order confirming that these claims are the property of the PCT.

October 13, 2005

> Respectfully submitted.
>
> PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.
>
> *Scotta M Farland*
>
> Laura Davis Jones (Bar No. 2436)
> Scotta E. McFarland (Bar No. 4184)
> 919 North Market Street, 17th Floor
> Post Office Box 8705
> Wilmington, Delaware 19899-8705
> (Courier No. 19801)
> Telephone: (302) 652-4100
> Facsimile: (312) 652-4400

A    212

**OF COUNSEL TO THE PCT:**

**GIBBS & BRUNS LLP**
Kathy Patrick (Texas Bar No. 15581400)
1100 Louisiana Street, Suite 5300
Houston, Texas 77002
Telephone: (713) 650-8805
Facsimile: (713) 750-0903

# Exhibit A

## UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Fleming Companies, Inc., et al.,[1] | ) | Case No. 03-10945 (MFW) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

---

**DEBTORS' AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS' THIRD AMENDED AND REVISED JOINT PLAN OF REORGANIZATION OF FLEMING COMPANIES, INC. AND ITS FILING SUBSIDIARIES UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

---

KIRKLAND & ELLIS LLP
James H. M. Sprayregen, P.C.
Richard L. Wynne
Janet S. Baer
Geoffrey A. Richards
200 East Randolph Drive
Chicago, IL 60601-6436
Telephone: (312) 861-2000
Facsimile: (312) 861-2200

and

PACHULSKI, STANG, ZIEHL, YOUNG,
JONES & WEINTRAUB P.C.
Laura Davis Jones
Ira D. Kharasch
919 North Market Street, Sixteenth Floor, P.O.
Box 8705
Wilmington, Delaware 19899-8705 (Courier No.
19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors in
Possession

MILBANK TWEED HADLEY & MCCLOY LLP
Paul S. Aronzon
Dennis F. Dunne
One Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

and

PEPPER HAMILTON LLP
I. William Cohen
Robert S. Hertzberg
Dennis S. Kayes
100 Renaissance Center
Suite 3600
Detroit, MI 48243-1157
(313) 259-7110

Co-Counsel for the Official Committee of
Unsecured Creditors

Dated: July 20, 2004

---

[1]   The Debtors are the following entities: Core-Mark International, Inc.; Fleming Companies, Inc.; ABCO Food Group, Inc.; ABCO Markets, Inc.; ABCO Realty Corp.; ASI Office Automation, Inc.; C/M Products, Inc.; Core-Mark Interrelated Companies, Inc.; Core-Mark Mid-Continent, Inc.; Dunigan Fuels, Inc.; Favar Concepts, Ltd.; Fleming Foods Management Co., L.L.C., Fleming Foods of Texas, L.P.; Fleming International, Ltd.; Fleming Supermarkets of Florida, Inc.; Fleming Transportation Service, Inc.; Food 4 Less Beverage Company, Inc.; Fuelserv, Inc.; General Acceptance Corporation; Head Distributing Company; Marquise Ventures Company, Inc.; Minter-Weisman Co.; Piggly Wiggly Company; Progressive Realty, Inc.; Fleming Retail Holdings, Inc. f/k/a Rainbow Food Group, Inc.; Retail Investments, Inc.; Retail Supermarkets, Inc.; RFS Marketing Services, Inc.; and Richmar Foods, Inc.

C:\Dox\Fleming\PLAN\Plan\Plan 7-20.doc



EXHIBIT

A

A   215

# TABLE OF CONTENTS

Page

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW,
     RESERVATION OF RIGHTS AND DEFINED TERMS................................................................1
     A.     Rules of Interpretation, Computation of Time and Governing Law ...............................1
     B.     Defined Terms ............................................................................................................1

ARTICLE II. UNCLASSIFIED CLAIMS ..............................................................................................13
     A.     Administrative Claims ..............................................................................................13
     B.     Priority Tax Claims....................................................................................................15
     C.     DIP Claims................................................................................................................15

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY
     INTERESTS..................................................................................................................15
     A.     Summary....................................................................................................................15
     B.     Classification and Treatment.....................................................................................16
     C.     Additional Provisions Governing Reclamation Claims .............................................21
     D.     Special Provision Governing Unimpaired Claims .....................................................21

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN .........................................................22
     A.     Voting Classes...........................................................................................................22
     B.     Acceptance by Impaired Classes................................................................................22
     C.     Presumed Acceptance of Plan....................................................................................22
     D.     Presumed Rejection of Plan .......................................................................................22
     E.     Non-Consensual Confirmation...................................................................................22

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ......................................................22
     A.     Substantive Consolidation..........................................................................................22
     B.     Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors ........23
     C.     Cancellation of Old Notes, Old Stock and Other Equity Interests ............................23
     D.     Issuance of New Securities; Execution of Related Documents...................................23
     E.     Restructuring Transactions.........................................................................................23
     F.     Corporate Governance, Directors and Officers, and Corporate Action ......................24
     G.     PCT............................................................................................................................25
     H.     RCT............................................................................................................................28
     I.     Creation of Professional Fee Escrow Account............................................................29

ARTICLE VI. DEBTORS' RETAINED CAUSES OF ACTION............................................................29
     A.     Maintenance of Causes of Action ..............................................................................29
     B.     Preservation of Causes of Action ..............................................................................30
     C.     Preservation of All Causes of Action Not Expressly Settled or Released....................32

ARTICLE VII. FUNDING OF THE PLAN............................................................................................33
     A.     Exit Financing Facility, Obtaining Cash for Plan Distributions and Transfers of Funds
            Among the Debtors and the Reorganized Debtors.......................................................33
     B.     Tranche B Loan..........................................................................................................33
     C.     Sale of Assets.............................................................................................................33

ARTICLE VIII. TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND
     INSURED CLAIMS........................................................................................................34
     A.     Assumption/Rejection of Executory Contracts and Unexpired Leases........................34
     B.     Claims Based on Rejection of Executory Contracts or Unexpired Leases...................34
     C.     Cure of Defaults for Executory Contracts and Unexpired Leases Assumed.................34
     D.     Indemnification of Directors, Officers and Employees...............................................34

ii

**DEBTORS' AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS' THIRD AMENDED AND REVISED JOINT PLAN OF REORGANIZATION OF FLEMING COMPANIES, INC. AND ITS FILING SUBSIDIARIES UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

Pursuant to Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, Fleming Companies, Inc. and its Filing Subsidiaries, debtors and debtors-in-possession in the above-captioned and numbered case, and their Official Committee of Unsecured Creditors hereby respectfully propose the following Third Amended and Revised Joint Plan of Reorganization of Fleming Companies, Inc. and its Filing Subsidiaries Under Chapter 11 of the United States Bankruptcy Code:

## ARTICLE I.

### RULES OF INTERPRETATION,
### COMPUTATION OF TIME, GOVERNING LAW, RESERVATION OF RIGHTS AND DEFINED TERMS

A.    *Rules of Interpretation, Computation of Time and Governing Law*

1.    For purposes herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented; (d) unless otherwise specified, all references herein to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits hereof or hereto; (e) the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.    In computing any period of time prescribed or allowed hereby, the provisions of Bankruptcy Rule 9006(a) shall apply.

3.    Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

B.    *Defined Terms*

Unless the context requires otherwise, the following terms shall have the following meanings when used in capitalized form herein:

1.    "5¼% Convertible Senior Subordinated Notes" means the 5¼% Convertible Senior Subordinated Notes, CUSIP numbers 339130AQ9 and 339130AR7, due 2009 issued by Fleming pursuant to the 5¼% Convertible Senior Subordinated Notes Indenture in the original principal amount of $150 million and guaranteed by all of the Filing Subsidiaries.

2.    "5¼% Convertible Senior Subordinated Notes Indenture" means that certain indenture dated March 15, 2001, between Bank One, N.A. and any predecessor or successor in interest, as indenture trustee, and Fleming, as amended or supplemented.

3. "9¼% Senior Notes" means the 9¼% Senior Notes, CUSIP number 339130AX4, due 2010 issued by Fleming pursuant to the 9¼ Senior Notes Indenture in the original principal amount of $200 million and guaranteed by all of the Filing Subsidiaries.

4. "9¼% Senior Notes Indenture" mean that certain indenture dated June 18, 2002, between The Bank of New York, as successor trustee to Manufacturers and Traders Trust Company, and Fleming, as amended or supplemented.

5. "9⅝% Senior Subordinated Notes" means the 9⅝% Senior Subordinated Notes, CUSIP number 339130AW6, due 2012 issued by Fleming pursuant to the 9⅝% Senior Notes Indenture in the original principal amount of $260 million and guaranteed by all of the Filing Subsidiaries.

6. "9⅝% Senior Subordinated Notes Indenture" means that certain indenture dated April 15, 2002, between Bank One, N.A. and any predecessor or successor in interest, as indenture trustee, and Fleming, as amended or supplemented.

7. "10⅛% Senior Notes" means the 10⅛% Senior Notes, CUSIP number 339130AP1, due 2008 issued by Fleming pursuant to the 10⅛% Senior Notes Indenture in the original principal amount of $355 million and guaranteed by all of the Filing Subsidiaries.

8. "10⅛% Senior Notes Indenture" means that certain indenture dated March 15, 2001, between The Bank of New York, as successor indenture trustee to Bankers Trust Company, and Fleming, as amended or supplemented.

9. "10⅝% Senior Subordinated Notes" means the Series B and D 10⅝% Senior Subordinated Notes, CUSIP numbers 339130AL0 and 339130AT3, due in 2007 issued by Fleming pursuant to the 10⅝% Senior Subordinated Notes Indenture in the original principal amount of $400 million and guaranteed by all of the Filing Subsidiaries.

10. "10⅝% Senior Subordinated Notes Indenture" means that certain indenture dated July 25, 1997, between Bank One, N.A. and any predecessor or successor in interest as indenture trustee, and Fleming as amended or supplemented.

11. "Additional Carve-Out" means that additional carve-out provided for Professional Fees and expenses of $6.0 million, which are entitled to payout prior to the payment of Administrative Claims to Allowed Approved Trade Creditor Lien Claim Holders, as outlined in the Final DIP Order.

12. "Administrative Claim" means a Claim for costs and expenses of administration under section 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (including Approved Trade Creditor Lien Claims as well as wages, salaries or commissions for services and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise; and (c) all fees and charges assessed against the Estates under chapter 123 of Title 28 United States Code, 28 U.S.C. §§ 1911-1930.

13. "Administrative Claims Guarantee" has the meaning ascribed to it in the Revised Term Sheet.

14. "Agents" mean Deutsche Bank Trust Company Americas, acting in its capacity as administrative agent for the Post-Petition Lenders, and JPMorgan Chase Bank, acting in its capacity as collateral agent for the Post-Petition Lenders.

15. "Aggregate Limit" means the aggregate or per-occurrence maximum amount of insurance for a particular insurance policy (or policies, as the case may be) owned by the Debtors.

16. "Allowed" means, with respect to any Claim except as otherwise provided herein: (a) a Claim that has been scheduled by a Debtor in its schedule of liabilities as other than disputed, contingent or unliquidated and as to which the Debtors or any other party in interest has not Filed an objection by the Objection Deadline; (b) a Claim

that either is not a Disputed Claim or has been allowed by a Final Order; (c) a Claim that is determined by the Debtors, the PCT or the RCT as applicable, to be allowed; (d) a Claim that is allowed: (i) in any stipulation of amount and nature of Claim executed prior to the Effective Date; (ii) in any stipulation with the PCT or RCT of amount and nature of Claim executed on or after the Effective Date; or (iii) in or pursuant to any contract, instrument, indenture or other agreement entered into or assumed in connection herewith; (e) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a proof of Claim has been Filed by the Claims Bar Date or has otherwise been deemed timely Filed under applicable law; or (f) a Claim as to which a proof of Claim has been timely filed and as to which the Debtors, the PCT, the RCT or any party in interest has not filed an objection by the Objection Deadline; and with respect to all Claims only after reduction for unpaid pre-petition and post-petition deductions, preference payments and other applicable setoff rights, subject to, and as consistent with, the treatment provided in Class 3(B) and Class 5 for the Holders of Reclamation Claims.

17.    "Allowed Claim" means an Allowed Claim in the particular Class described.

18.    "Allowed Defense Costs" means certain costs incurred by an Insurer in the defense and/or liquidation of an Insured Claim, for which the Debtors are obligated to reimburse the respective Insurers.

19.    "Approved Trade Creditor" means a trade creditor who elected to participate in the Trade Credit Program established under the Final DIP Order and provided post-petition trade credit thereunder.

20.    "Approved Trade Creditor Lien" means the junior lien of an Approved Trade Creditor in the amount of actual trade credit provided pursuant to the agreement with the Debtors and as outlined in the Trade Credit Program.

21.    "Approved Trade Creditor Lien Claim" means the Claim of an Approved Trade Creditor in the amount of actual unpaid trade credit provided pursuant to the agreement with the Debtors and as outlined in the Trade Credit Program.

22.    "Assumption Schedule" means the schedule to be filed 15 days prior to the Voting Deadline, of executory contracts and unexpired leases that are to be assumed by the Reorganized Debtors on the Effective Date.

23.    "Avoidance Actions" means those avoidance actions available pursuant to Chapter 5 of the Bankruptcy Code.

24.    "Ballots" means the ballots accompanying the Disclosure Statement upon which Holders of Impaired Claims entitled to vote shall indicate their acceptance or rejection of the Plan in accordance with the Plan and the Voting Instructions.

25.    "Bank Guarantees" means those guarantees issued by the Filing Subsidiaries in favor of the Pre-Petition Lenders, guaranteeing the obligations of Fleming on the Pre-Petition Credit Agreement.

26.    "Bankruptcy Code" means Title 11 of the United States Code, and applicable portions of Titles 18 and 28 of the United States Code.

27.    "Bankruptcy Court" means the United States District Court having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made pursuant to section 157 of Title 28 of the United States Code and/or the General Order of such District Court pursuant to section 151 of Title 28 of the United States Code, the bankruptcy unit of such District Court.

28.    "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075 and the General; Local and Chambers Rules of the Bankruptcy Court.

29.    "Beneficial Holder" means the Person or Entity holding the beneficial interest in a Claim or Equity Interest.

30.    "Bondholders" mean the Beneficial Holders of the Old Notes.

CADesiFlemingPLANPlanPlan 7-24.doc

31.    "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)) in Wilmington, Delaware.

32.    "Canadian CCAA Court" means the Supreme Court of British Columbia or such other court in Canada having jurisdiction over Core-Mark International Inc.'s proceedings under the CCAA from time to time.

33.    "Carve-Out" means the carve-out provided for in the Final DIP Order or any Court Order or credit agreement executed with respect to a refinancing of the DIP Credit Facility or Pre-Petition Credit Agreement which includes but is not necessarily limited to (i) in the event of the occurrence and during the continuation of a Termination Event (as defined in the Final DIP Order), the payment of allowed and unpaid professional fees and disbursements incurred by the Debtors, the Committee or the OCRC in an aggregate amount not in excess of $4.0 million (plus all unpaid professional fees and disbursements incurred prior to the occurrence of such Termination Event strictly in accordance with the budget described in the Final DIP Order and to the extent allowed by the Bankruptcy Court), and (ii) the payment of all fees required to be paid pursuant to 28 U.S.C. § 1930(c)(6) and all unpaid fees payable to the Clerk of this Court or the United States Trustee.

34.    "Cash" means cash and cash equivalents.

35.    "Casualty Insurance Program" means the certain insurance policies maintained by the Debtors pursuant to the Insurance Program, including, but not limited to: automobile liability, general liability, property damage and other, similar types of insurance coverage.

36.    "Cause of Action" means, including but is not limited to, all Claims, actions, choses in action, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims and cross claims (including, but not limited to, all claims in any avoidance, recovery, subordination or other actions against Insiders and/or any other Persons under the Bankruptcy Code, including sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553) of the Debtors, the Debtors in Possession and/or the Estates (including, but not limited to, those actions listed in this Plan, Exhibit A filed herewith and the Disclosure Statement that are or may be pending on the Effective Date or instituted by Core-Mark Newco, the Reorganized Debtors, the PCT or the RCT as applicable, after the Effective Date against any Person based on law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, known or unknown.

37.    "CCAA" means the Companies' Creditors Arrangement Act (Canada).

38.    "Chapter 11 Cases" means the chapter 11 bankruptcy cases filed by the Debtors on April 1, 2003, in the Bankruptcy Court.

39.    "Claim" means (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, as defined in section 101(5) of the Bankruptcy Code.

40.    "Claim Holder" means the Holder of a Claim.

41.    "Claims Bar Date" means September 15, 2003.

42.    "Class" means a category of Claims or Equity Interests as set forth in Article III herein.

43.    "Class 3B Preferred Interests" means those certain secured preferred interests to be issued by the RCT in favor of the Holders of Allowed Class 3B Claims pursuant to the terms of the Revised Term Sheet.

44.    "Class 5 Preferred Interests" means those certain junior secured preferred interests to be issued by the RCT in favor of the Holders of Allowed Class 5 Claims pursuant to the terms of the Revised Term Sheet.

A    220

services rendered prior to the Effective Date pursuant to sections 327, 328, 329, 330 and 331 or 363 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

139.    "Professional Fee Escrow Account" means the account established by the Reorganized Debtors on the Effective Date, solely for the purpose of paying all accrued and anticipated Professional Fees through the Effective Date.

140.    "Professional Fees" means all fees and expenses (including, but not limited to, success fees, if any) for services rendered by all Professionals in the Chapter 11 Cases through the Effective Date that the Bankruptcy Court has not denied by Final Order, regardless of whether a fee application has been filed for such fees.

141.    "PMSI" means a purchase money security interest as defined in Section 9-312 of the Uniform Commercial Code.

142.    "Ratable Proportion" means the ratio (expressed as a percentage) of the amount of an Allowed Claim in a Class to the aggregate amount of all Allowed Claims in the Class.

143.    "RCT" means that trust that shall be created pursuant to the Plan and the RCT Agreement for the purposes of carrying out certain provisions of the Plan.

144.    "RCT Agreement" means that agreement, a draft of which is attached to the Disclosure Statement as Exhibit 12, that shall be entered into by the Debtors, the OCRC and the RCT Representative on or before the Effective Date and which shall govern the RCT.

145.    "RCT Assets" means deductions, over-wires, preference claims, Causes of Action and other rights of the Debtors as against the Reclamation Creditors, other than the post-petition deductions and post-petition overwires with respect to the Fleming Convenience business which shall be transferred to Core-Mark Newco.

146.    "RCT Representative" means the representative selected to administer the RCT.

147.    "Reclamation Claims" means TLV Reclamation Claims and Non-TLV Reclamation Claims.

148.    "Reclamation Creditor" means any Claim Holder that asserts that all, or any portion, of its Claim is entitled to be granted priority and/or to be secured by a lien in accordance with 546(c)(2) of the Bankruptcy Code and also those identified on the Reclamation Claim Summary by Claimant of the Debtors dated November 21, 2003.

149.    "Reclamation Liabilities" means any and all claims asserted against the Debtors by the Reclamation Creditors, including Administrative Claims (other than Administrative Claims against Fleming Convenience), Priority Claims, TLV Reclamation Claims and Non-TLV Reclamation Claims, but not including any PACA/PASA Claims, DSD Trust Claims or General Unsecured Claims held by Reclamation Creditors.

150.    "Record Date" means May 25, 2004.

151.    "Releasees" means each of the Debtors, the Reorganized Debtors, Core-Mark Newco, each of the Pre-Petition Lenders, the Agents, the Pre-Petition Agents, the Old Notes Trustees, the Post-Petition Lenders, the Tranche B Lenders, the Committee, the OCRC, each member of the Committee and the OCRC, the PCT, the PCT Representative, the PCT Advisory Board, the RCT, the RCT Representative and the RCT Advisory Board, and the affiliates, agents and professionals of each of the foregoing, including, without limitation, professionals acting as officers of the Debtors, each in their capacity as such; provided however that Excluded Releasees shall not be Releasees.

152.    "Remaining Pension Plans" means, collectively, the Pension Plan of S.M. Flickinger Co., Inc., the Godfrey Company subsidiaries Pension Plan, the ABCormarkets, Inc. Retirement Plan for Arizona Warehouse and Distribution Employees and Core-Mark International, Inc. Non-Bargaining Employees Pension Plan.

153.    "Reorganized Debtors" means collectively, Core-Mark International, Inc., Core-Mark Mid-Continent, Inc., General Acceptance Inc., C/M Products, Inc., ASI Office Automation, Inc., E.A. Morris

11

## ARTICLE IV.

### ACCEPTANCE OR REJECTION OF THE PLAN

A.    *Voting Classes*

Each Holder of an Allowed Claim in Classes 1(B), 3(B), 3(C), 5, 6(A), 6(B) and 7 shall be entitled to vote to accept or reject the Plan.

B.    *Acceptance by Impaired Classes*

An Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

C.    *Presumed Acceptance of Plan*

Classes 1(A), 2, 3(A) and 4 are unimpaired under the Plan and, therefore, are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

D.    *Presumed Rejection of Plan*

Classes 8, 9 and 10 are impaired and shall receive no distributions and, therefore, are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

E.    *Non-Consensual Confirmation*

The Debtors and the Committee will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable based on the deemed rejection by Classes 8, 9 and 10 and if any Voting Class fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code. The Debtors and the Committee reserve the right (a) to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code and/or (b) to modify the Plan in accordance with section XIV.D. hereof.

### ARTICLE V.

### MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Substantive Consolidation*

This Plan is premised upon the limited substantive consolidation of the Debtors solely for purposes of actions associated with the Confirmation of this Plan and occurrence of the Effective Date, including, but not limited to, voting, confirmation and distribution. As a result of this limited substantive consolidation, a Holder of Claims against one or more of the Debtors arising from or relating to the same underlying debt that would otherwise constitute Allowed Claims against two or more Debtors, including, without limitation, Claims based on joint and several liability, contribution, indemnity, subrogation, reimbursement, surety, guaranty, co-maker and similar concepts, shall have only one Allowed Claim on account of such Claims. This Plan does not contemplate the merger or dissolution of any Debtor which is currently operating or which currently owns operating assets or the transfer or further commingling of any asset of any Debtor, except that the assets of Fleming and certain Filing Subsidiaries already being used by Fleming Convenience in its operations shall be formally vested in Core-Mark Newco, or one of the Reorganized Debtors and except to accomplish the distributions under this Plan. Such limited substantive consolidation shall not affect (other than for Plan voting, treatment, and/or distribution purposes) (i) the legal and corporate structures of the Reorganized Debtors or (ii) Equity Interests in the Filing Subsidiaries.

This Plan shall serve as a motion seeking entry of an order substantively consolidating the Chapter 11 Cases, as described herein. Unless an objection to substantive consolidation is made in writing by any creditor affected by this Plan as herein provided on or before 10 days prior to the date that is fixed by the Bankruptcy Court

A    222

Committee. To the extent any such Person is an "insider" under the Bankruptcy Code, the nature of any compensation for such Person will also be disclosed. Each such director and officer shall serve from and after the Effective Date pursuant to the terms of such Reorganized Debtor's certificate of incorporation and other constituent documents.

### 3. Corporate Action

After the Effective Date, the adoption and filing, if necessary, of any of the Reorganized Debtors' Restated Certificates of Incorporation, the approval of their Restated By-laws, the appointment of directors and officers for Core-Mark Newco, the adoption of the Management Incentive Plan, and all other actions contemplated hereby with respect to each of the Reorganized Debtors shall be authorized and approved in all respects (subject to the provisions hereof). All matters provided for herein involving the corporate structure of any Debtor or any Reorganized Debtor, and any corporate action required by any Debtor or any Reorganized Debtor in connection with the Plan, shall be deemed to have occurred and shall be in effect, without any requirement of further action by the security holders or directors of such Debtor or Reorganized Debtor. On the Effective Date, the appropriate officers of each Reorganized Debtor and members of the board of directors of each Reorganized Debtor are authorized and directed to issue, execute and deliver the agreements, documents, securities and instruments contemplated by the Plan in the name of and on behalf of such Reorganized Debtor.

### G. PCT

#### 1. Formation/Purpose

On the Effective Date or as soon as practicable thereafter, the Debtors and the Committee will form the PCT to administer certain post-confirmation responsibilities under the Plan, including, but not necessarily limited to, those responsibilities associated with the pursuit and collection of the Litigation Claims and Causes of Action other than those which are RCT Assets and the reconciliation and payment of Claims, other than Reclamation Claims (except that reconciliation of Class 6(A) Claims of Reclamation Creditors, but not the payment of such Claims, shall be the responsibility of the RCT).

#### 2. Powers

The powers, authority, responsibilities and duties of the PCT and the allocation of such powers, authority, responsibilities and duties between Core-Mark Newco and the PCT, shall be set forth and governed by the PCT Agreement to be mutually agreed upon by the Debtors and the Committee. A copy of the draft PCT Agreement is attached to the Disclosure Statement as Exhibit 9. The Debtors and the Committee shall also mutually agree upon appointment of the PCT Representative who shall have the power to administer the PCT and shall be advised by the PCT Advisory Board as specified in the PCT Agreement. The PCT Advisory Board shall consist of four members plus the PCT Representative, two members designated by Core-Mark Newco, one member designated by the Committee other than trade members and the PBGC, who shall be an Old Note Holder that holds in excess of 3.5% or greater of the total outstanding equity securities of Core-Mark Newco received as a result of the distribution of such equity to Holders of Class 6(A) Claims under the Plan and one member to be designated mutually by the trade members of the Committee and the OCRC, which member shall be a Holder of a Class 6(A) Claim, other than with respect to the Old Notes, against which there is not pending (or against which the Debtors or the PCT do not reasonably contemplate bringing) a Cause of Action other than a Cause of Action which is an RCT Asset.

Pursuant to section 1129(a)(5) of the Bankruptcy Code, the Debtors will disclose, on or prior to the Confirmation Date, the identity and any affiliations of any Person proposed to serve on the initial PCT Advisory Board as well as the identity and affiliations of the PCT Representative. To the extent any such Person is an "insider" under the Bankruptcy Code, the nature of any compensation for such Person will also be disclosed.

#### 3. Assets of the PCT

On the Effective Date or as soon as practicable thereafter, the Debtors, the Reorganized Debtors and Core-Mark Newco, as applicable, shall transfer, assign and deliver to the PCT, the PCT Assets (the "PCT Assets") as outlined in the PCT Agreement. The PCT Assets do not include any RCT Assets. Subject to the preceding exclusion of all RCT Assets, the PCT Assets shall consist of all of the following assets of the Debtors:

(a)    cash balances sufficient to pay the estimated Administrative Claims that are the responsibility of the PCT;

(b)    non-reclamation trade accounts receivable including credits for post-petition deductions, other than the pre-petition and post petition trade accounts receivable and post-petition deductions of the continuing Fleming Convenience business;

(c)    royalty payments owing to the Debtors related to the sale of the Fleming wholesale operations;

(d)    Litigation Claims which consist primarily of vendor-related receivables, primarily for uncollected promotional allowances (e.g. rebates, discounts, price reductions), unreimbursed funds related to military receivables and funds wired in advance for inventory for which invoices were not processed and inventory not shipped, but not including vendor deductions incurred in the ordinary course of business of the Fleming Convenience business which shall remain with Core-Mark Newco;

(e)    Avoidance Actions, especially preference actions as outlined in section 547 of the Bankruptcy Code;

(f)    restricted cash, including the PACA account, the FSA Reserve (subject to all Allowed Claims of FSA Participants and the applicable restrictions and requirements relating to distribution of the FSA Reserve pursuant to the terms of the Orders governing the FSA Reserve (Docket Nos. 3142 & 5224), which were binding on the Debtors prior to transfer of the FSA Reserve to the PCT) and the Professional Fee Escrow Account;

(g)    any and all other Claims and Causes of Action of the Debtors, including but not limited to those outlined in section VI hereof, Exhibit A hereto and section VII of the Disclosure Statement, other than Causes of Action related to the fire loss at the Denver warehouse occurring in December, 2002 and Causes of Action against Ace related to Insurance Security and Ace's draw of letters of credit related thereto which shall be transferred to Core-Mark Newco, and other than claims and Causes of Action waived, exculpated or released in accordance with the provisions of the Plan;

(h)    any assets of the RCT referred or assigned to the PCT whether vendor deductions, preference claims or otherwise (on terms that have been mutually agreed upon by the RCT and the PCT);

(i)    any cash proceeds of settlements for customer accounts receivables, vendor deductions, over-wires and preferences (exclusive of those related to either Fleming Convenience or the RCT Assets) in excess of $9 million collected by the Debtors from April 1, 2004 to the Effective Date which are being held in an escrow account;

(j)    $3.0 million in cash for administration of the PCT; and

(k)    all of the remaining assets of the Debtors, other than the assets of the Reorganized Debtors and the assets of Fleming Convenience which will have been transferred to Core-Mark Newco and the Reorganized Debtors.

The PCT Assets do not include: (1) any of the RCT Assets; (2) any of the assets of the continuing Fleming Convenience businesses which are to be transferred to Core-Mark Newco and the Reorganized Debtors; and (3) the stock of Core-Mark Newco and the stock of the Reorganized Debtors.

The PCT Assets shall be held by the PCT for the beneficiaries of the PCT subject to the terms and conditions of the Plan and the PCT Agreement. The PCT shall administer the directors and officers insurance policies maintained pursuant to section XII.D. and all proceeds of such policies shall benefit the D&O Releasees and the prepetition directors and officers of the Debtors who are covered by the directors and officers insurance policies as well as the PCT to the extent the PCT or other Party has a valid Claim against a D&O Releasee or a prepetition director or officer of the Debtors who is covered by the director and officer insurance policies.

4.    Liabilities of the PCT

The liabilities transferred to the PCT shall include, but not necessarily be limited to, Priority Tax Claims, Other Priority Non-Tax Claims, Property Tax Claims, Other Secured Claims, PACA/PASA Claims, FSA liability, General Unsecured Claims (solely for purposes of resolution), Convenience Claims and certain Administrative Claims that have not been satisfied on the Effective Date of the Plan, other than the Administrative Claims of Fleming Convenience.

5.    Funding

On the Effective Date, or as soon as practicable thereafter, the Debtors, the Reorganized Debtors and Core-Mark Newco will transfer to the PCT certain cash on hand and/or certain proceeds from the Exit Financing Facility and the Tranche B Loan necessary for the PCT to make the payments required on Allowed Claims pursuant to the Plan and the PCT Agreement. In addition, the PCT shall have available the proceeds from the prosecution of Causes of Action. Core-Mark Newco and the Reorganized Debtors shall retain the remainder of the cash and/or proceeds from the Exit Financing Facility and the Tranche B Loan to operate their businesses. The capital structure of Core-Mark Newco, the Reorganized Debtors and the PCT on the Effective Date are outlined on Exhibit 3 to the Disclosure Statement.

6.    Administrative Claims Guaranty

As set forth in the estimates included on Exhibit 3 of the Disclosure Statement, the Debtors currently estimate that, on the Effective Date, administrative claims (other than Professional Fees) transferred to the PCT will total $52 million, consisting of General accounts payable of $3 million, Health and welfare benefits of $5 million, Severance and stay program of $27 million and Other administrative claims of $17 million (collectively, the "relevant administrative claims"). In the event that the relevant administrative claims that are ultimately paid by the PCT after the Effective Date exceed the above referenced estimated amounts by more than $4 million, such amounts over the $4 million shall be reimbursed by Core-Mark Newco. In the event any of the relevant administrative claims against the Debtors currently anticipated to be satisfied post-Effective Date through the PCT are, instead, settled through entry of an Order of the Bankruptcy Court approving such settlement pre-Effective Date at a level lower than currently budgeted in the PCT projections then, in such event, 50% of the net savings from any such Court approved settlement below current budgeted levels (after reasonable deduction for legal fees and other resolution costs) shall be paid to the RCT on the Effective Date (the "Administrative Claims Savings"). Once the aggregate distributions from the PCT to the RCT (inclusive of any Administrative Claims Savings paid to the RCT), have reached $10 million then, in such event, any additional distributions to the RCT shall effect a reduction of the maximum amount of the Non-TLV Guaranty by an amount equal to 50% of any such aggregate additional distributions. Notwithstanding the forgoing, the parties recognize that the Bankruptcy Court could ultimately determine that certain of the relevant administrative claims which are subject to the Administrative Claim Guaranty may be reclassified by the Court as priority claims and correspondingly, certain priority claims may be reclassified as relevant administrative claims. Irrespective of such reclassification by the Bankruptcy Court, for purposes of calculating the amount which may be owed, if any, on the Administrative Claim Guaranty, the classification assigned to those claims as outlined in Exhibit 3 of the Disclosure Statement shall govern.

7.    PCT Beneficiaries and Creditors

The beneficiaries of the PCT shall be the Holders of Allowed Class 6(A) and Class 6(B) Claims. The PCT will also make payments to Holders of Allowed Administrative Claims, Priority Tax Claims, Other Priority Non-Tax Claims, Priority Property Tax Claims, Other Secured Claims, PACA/PASA Claims, and Convenience Claims solely in satisfaction of liabilities assumed by the PCT and such Claim Holders shall not be treated as beneficiaries of the PCT for any purpose. After satisfaction of all such liabilities, the PCT will also make payments to (i) Core-Mark Newco, in the amount necessary to reimburse Core-Mark Newco for any payments made on the TLV Guaranty or Non-TLV Guaranty as outlined herein; (ii) the RCT, in the event all Reclamation Claims and interest thereon as applicable together with the Prepetition Non-TLV Reclamation Claim Reduction, have not been paid in

full by the RCT,[7] (iii) Core-Mark Newco in the amount necessary to reimburse Core-Mark Newco for any payments made on the Administrative Claims Guaranty in the event the Reclamation Claims and the Prepetition Non-TLV Reclamation Claim Reduction have been paid in full by the RCT and (iv) thereafter the Class 6(A) and 6(B) General Unsecured Creditors, pro rata.

### 8. Good Faith

Each of the PCT Representative and the PCT Advisory Board shall act in good faith in carrying out its duties and responsibilities and use its best efforts to liquidate and resolve Claims, disputes and maximize the value of the PCT's assets and minimize claims against the PCT.

## H. RCT

### 1. Formation/Purpose

On the Plan Effective Date or as soon as practicable thereafter, the Debtors, the OCRC and the Committee will form the RCT to administer certain post-confirmation responsibilities under the Plan, including but not necessarily limited to those responsibilities associated with the pursuit and collection of the RCT Assets and payment of Reclamation Claims.

### 2. Assets of the RCT

On the Effective Date or as soon as practicable thereafter, the Debtors, the Reorganized Debtors and Core-Mark Newco, as applicable, shall transfer, assign and deliver to the RCT the RCT Assets as outlined in the RCT Agreement or the Revised Term Sheet. The RCT Assets shall include assets of the Debtors (more specifically set forth in the Revised Term Sheet) as follows:

(a) Vendor Deductions, over-wires, preference claims, Causes of Action and other rights of the Debtors as against Reclamation Creditors, other than the post-petition deductions and post-petition over-wires with respect to Fleming Convenience which shall be transferred to Core-Mark Newco;

(b) $3.0 million in cash for administration of the RCT; and

(c) Any cash proceeds which are collected by the Debtors from Reclamation Creditors for payment of preference liability, deduction liability and over-wire liability (except for post-petition vendor deductions and post-petition over-wire liability related to Fleming Convenience) from and after March 23, 2004 to the Effective Date which are being held in an escrow account.

### 3. Liabilities of the RCT

The Reclamation Liabilities transferred to the RCT shall include any and all claims asserted against the Debtors by the Reclamation Creditors, including Administrative Claims (other than Administrative Claims against Fleming Convenience), Priority Claims, TLV Reclamation Claims and Non-TLV Reclamation Claims, but not including any DSD Trust Claims, PACA/PASA Claims[8] or General Unsecured Claims held by Reclamation Creditors.

---

[7] Holders of Class 5 Claims shall not be entitled to a double distribution on account of any Non-TLV Reclamation Claims Reduction related payments and the PCT shall establish its holdbacks or the RCT shall otherwise adjust its distributions accordingly.

[8] The liability for DSD Trust Claims held by Reclamation Creditors shall remain with the DSD Trust and such claims shall be reconciled and paid, if Allowed, by the DSD Trust. The liability for PACA/PASA Claims held by Reclamation Creditors shall remain with the PCT and such claims shall be reconciled and paid, if Allowed, by the PCT.

C:\Data\Fleming\PLAN\Plan\Plan 7-26.doc

A    226

4.     Powers

The Powers, authority, responsibilities and duties of the RCT and the allocation of such powers, authority, responsibilities and duties shall be set forth and governed by the Revised Term Sheet and set forth more fully in the RCT Agreement which shall be consistent with the Revised Term Sheet. A copy of the draft RCT Agreement is attached to the Disclosure Statement as Exhibit 12. The RCT shall be administered by the RCT Representative, to be selected by the OCRC.

In order to facilitate the claims reconciliation process and asset liquidation, the PCT and the RCT shall enter into a transition services agreement whereby the PCT shall provide resources to the RCT related to effecting the Claims reconciliation process. Such resources shall include, but not be limited to, access to the professional staff and employees of the PCT, computer systems, data bases and other relevant information. The RCT shall reimburse the PCT for the direct costs (e.g., professional staff and employee expense) and allocation of the indirect costs (e.g., facilities, computers, data storage facilities) with an allocation methodology to be agreed upon. Notwithstanding the foregoing, the RCT shall have no obligation to reimburse the PCT for indirect costs for the first 3 months after the Effective Date, or for (i) direct costs for the first six months after the Effective Date and (ii) indirect costs for months 4-6 after the Effective Date, up to an aggregate cap of $1 million. On the Effective Date, the Debtors and the Committee shall, at their option, either (i) have the Debtors provide an additional $1 million to the RCT for administrative expenses of the RCT or (ii) have the PCT provide the RCT with additional resources and services pursuant to the transition services agreement with a value of up to an additional $1 million. However, once the RCT has received aggregate distributions of $10 million from the PCT, inclusive of any amounts paid to the RCT with respect to the Administrative Claims Savings outlined in paragraph V.G.6. herein, the next $1 million in Cash otherwise to be distributed by the PCT to the RCT shall, instead, be paid to Core-Mark Newco.

The RCT Representative shall be advised by an advisory board selected by the OCRC with representation by Holders of TLV Reclamation Claims (but only until TLV Reclamation Claims have been paid in full) and Holders of Non-TLV Reclamation Claims. The TLV Reclamation Creditors shall be the primary beneficiaries of the RCT and shall be entitled to be paid in full out of the first distributions to be made by the RCT before the Non-TLV Reclamation Creditors are entitled to any payment by the RCT.

5.     Good Faith

Each of the RCT Representative and the RCT Advisory Board shall act in good faith in carrying out its duties and responsibilities and use its reasonable best efforts to liquidate and resolve Claims, disputes and maximize the value of the RCT's assets and minimize claims against the RCT.

I.·     *Creation of Professional Fee Escrow Account*

On or before the Effective Date, the Debtors shall establish the Professional Fee Escrow Account and fund such Professional Fee Escrow at an appropriate level based upon the most current information available on the date the account is established. The Professional Fee Escrow Account will include a Cash reserve of $1.1 million for the projected fees of the ad hoc reclamation committee, as well as sufficient funds to cover any professional fee claims that may be asserted based on substantial contribution, provided, however, the Debtors' reservation of such amounts shall in no way constitute an admission of liability for, or the validity of, any such fees.

## ARTICLE VI.

### DEBTORS' RETAINED CAUSES OF ACTION

A.     *Maintenance of Causes of Action*

Except as otherwise provided in the Plan, Core-Mark Newco, the Reorganized Debtors, the PCT, and the RCT, as applicable, shall retain all rights on behalf of the Debtors, Core-Mark Newco and the Reorganized Debtors to commence and pursue, as appropriate, in any court or other tribunal including, without limitation, in an adversary proceeding filed in one or more of the Debtors' Chapter 11 Cases, any and all Causes of Action, whether such

Causes of Action accrued before or after the Petition Date, including, but not limited to, the actions specified in section VI.B. herein as well as those Causes of Action listed on Exhibit A filed herewith.

Except as otherwise provided in the Plan, in accordance with section 1123(b)(3) of the Bankruptcy Code, any Claims, rights, and Causes of Action that the respective Debtors, Core-Mark Newco and the Reorganized Debtors may hold against any Person shall vest in Core-Mark Newco, the PCT, or the RCT, as applicable and such vesting shall be consistent with the Revised Term Sheet. Core-Mark Newco, the PCT, or the RCT, as applicable, shall retain and may exclusively enforce any and all such Claims, rights or Causes of Action, and commence, pursue and settle the Causes of Action in accordance with the Plan, provided the PCT may commence, pursue and settle non-RCT Causes of Action, as outlined more fully in the PCT Agreement and the RCT may commence, pursue and settle the RCT Causes of Action as outlined more fully in the RCT Agreement and the Revised Term Sheet. Core-Mark Newco, the PCT and the RCT, as applicable, shall have the exclusive right, authority, and discretion to institute, prosecute, abandon, settle, or compromise any and all such claims, rights, and Causes of Action without the consent or approval of any third party and without any further order of court. Notwithstanding any of the preceding, the retention and vesting of Causes of Action shall conform to the specifications set forth in the Revised Term Sheet.

B.    *Preservation of Causes of Action*

The Debtors are currently investigating whether to pursue potential Causes of Action against any Creditors, Entities, or other Persons, but not as against the Releasees. The investigation has not been completed to date, and under the Plan, Core-Mark Newco, the PCT, and the RCT, as applicable, retain the right on behalf of the Debtors and Reorganized Debtors to commence and pursue any and all Causes of Action. Potential Causes of Action currently being investigated by the Debtors, which may, but need not, be pursued by the Debtors before the Effective Date or by Core-Mark Newco, the PCT, or the RCT, as applicable, after the Effective Date include, without limitation, the following Causes of Action:

- All actual or potential avoidance actions pursuant to any applicable section of the Bankruptcy Code including, without limitation, sections 544, 545, 547, 548, 549, 550, 551, 553(b) and/or 724(a) of the Bankruptcy Code, arising from any transaction involving or concerning the Debtors, and among others, without limitation, those entities listed on Exhibit A-3 and A-7;

- All actual or potential actions, whether legal, equitable or statutory in nature, for, or in any way involving, the collection of accounts receivable or general ledger items that are due and owing to Fleming or its subsidiaries, including without limitation trade receivables, rent and other lease and sublease charges, franchise and/or license fees, payments due under equipment leases and licenses, other miscellaneous charges, and principal and interest on promissory notes by any Person or Entity (collectively, the "Accounts Receivable"), including, but not limited to, the Accounts Receivable owed by those customers listed on Exhibit A-1 and A-2 hereto;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against customers, including, but not limited to, those customers listed in Exhibit A-1 and A-2, for Accounts Receivable, improper setoff, overpayment, claims under the facility standby agreement, or any other claim arising out of the customer relationship;

- All actual actions or potential actions, whether legal, equitable or statutory in nature, against vendors, including, but not limited to, those vendors listed on Exhibit A-4 hereto, for overpayment, improper setoff, warranty, indemnity, retention of double payments, retention of mis-directed wires, deductions owing or improper deductions taken, claims for damages arising out of a military distribution relationship, claims for overpayment of drop-ship-delivery amounts, or any other claim arising out of the vendor relationship;

- All actual actions or potential actions against vendors for violation of the Trade Credit Program or the Trade Credit Program Letter Agreement as set forth in the Final Order Authorizing (I) Post- Petition Financing Pursuant To 11 U.S.C. § 364 And Bankruptcy Rule 4001(c); (II) Use Of Cash Collateral Pursuant To 11 U.S.C. § 363 And Bankruptcy Rules 4001(b) And (d); (III) Grant Of Adequate Protection Pursuant To 11 U.S.C. §§ 361 And 363; And (IV) Approving Secured Inventory Trade

C:\Data\Fleming\PLAN\Plan\Plan 7-24.doc

Credit Program And Granting Of Subordinate Liens, Pursuant To 11 U.S.C. §§105 And 364(c)(3) And Rule 4001(c) entered on May 7, 2003 and the Order Granting Motion for Order Authorizing the Payment of Critical Trade Vendors in Exchange for Continuing Relationship Pursuant to Customary Trade Terms, entered on May 6, 2003. The Debtors are still investigating which vendors they have actions against. A list of the vendors participating in the Critical Trade Lien Program is attached hereto as Exhibit A-7;

- All actual or potential actions, whether legal, equitable or statutory in nature, against Persons or Entities including vendors with respect to prepetition violations of applicable federal or state securities laws;

- All actual or potential breach of contract actions against any customers, vendors or Entities who improperly exited the Debtors' system or who violated the automatic stay after the Petition Date, including, but not limited to, those customers or vendors listed on Exhibit A-1, A-2, and A-3;

- All actual or potential actions, whether legal, equitable or statutory in nature, against landlords, lessees, sublessees, or assignees arising from various leases, subleases and assignment agreements relating thereto, including, without limitation, actions for unpaid rent, overcharges relating to taxes, common area maintenance and other similar charges, including, but not limited to, those claims identified on Exhibit A-10. In addition, two landlords, Massilon Food Company LLC and Tulsa Food Company, LLC, drew down on standby letters of credit under their respective leases shortly after the Debtors filed for bankruptcy. The Debtors are investigating whether these draw-downs were proper and reserve all rights to bring actions against these landlords;

- All actual or potential actions, whether legal, equitable or statutory in nature, against the Debtors' current or former insurance carriers to recover unpaid reimbursements and claims, overpayment of premiums and fees, claims for breach of contract, indemnity obligations or coverage, return of the proceeds of Insurance Security or release of Insurance Security or similar Causes of Action, including, but not limited to, those insurers listed on Exhibit A-12;

- All actual or potential Causes of Actions, whether legal, equitable or statutory in nature, against purchasers of assets from the Debtors relating to breach of the purchase agreement or unpaid compensation thereunder, including, but not limited to, those purchasers listed on Exhibit A-9;

- Any and all rights to payment against any taxing authority listed on Exhibit A-11 for any tax refunds, credits, overpayments or offsets that may be due and owing to the Debtors for taxes that the Debtors may have paid to any such taxing authority;

- All actions or potential actions, whether legal, equitable or statutory in nature, relating to deposits or other amounts owed by any creditor, lessor utility, supplier, vendor, landlord, sub-lessee, assignee or other Person or Entity;

- All actions or potential actions, whether legal, equitable or statutory in nature, relating to environmental and product liability matters;

- All actions or potential actions, whether legal, equitable or statutory in nature, arising out of, or relating to, the Debtors' intellectual property rights;

- Any litigation or lawsuit initiated by any of the Debtors that is currently pending, whether in the Bankruptcy Court, before the American Arbitration Association, or any other court or tribunal or initiated against the Debtors after the Petition Date for which the Debtors may have counterclaims or other rights, including, but, not limited to, those actions listed on Exhibit A-4 hereto;

- Potential actions against any of the prepetition directors, officers, employees, attorneys, financial advisors, accountants, investment bankers, agents and representatives of each Debtor and their

31

respective subsidiaries, including, but not limited to those employees on Exhibit A-5 hereto, except the D&O Releases, for breaches of fiduciary duty, negligent mismanagement, wasting of corporate assets, and diversion of corporate opportunity;

- All actual or potential actions, whether legal, equitable or statutory in nature, against all Persons except the D&O Releases arising out of, or in connection with, any of the Debtors' prepetition management, operation and/or reporting of financial or other information;

- All actions or potential actions, whether legal, equitable or statutory in nature, against any of the Debtors' current or former professionals, except the Releases, for breach of fiduciary duty, breach of contract, negligence or professional misconduct or malpractice, or other tortuous conduct, including, but not limited to, those former professionals listed on Exhibit A-8 hereto;

- All rights against any shareholders or others for subordination of their Claims pursuant to section 510(b) of the Bankruptcy Code or against any Person that has agreed to subordination of their claim pursuant to section 510(a) of the Bankruptcy Code;

- All actions or potential actions against the prepetition members of the Debtors' board of directors and/or officers except the D&O Releases, including, without limitation, the right to equitably subordinate claims held by such directors and officers pursuant to section 510(c) of the Bankruptcy Code;

- All actual or potential actions, whether legal, equitable or statutory in nature, to recover amounts improperly awarded to employees except the D&O Releases under the terms of any prepetition employment or change-in-control agreement or bonus arrangement;

- All actual or potential contract and tort actions that may exist or may subsequently arise; and

- All actual or potential actions whether legal, equitable or statutory in nature, arising out of, or in connection with the Debtors' business or operations, except actions against the Releasees or D&O Releasees to the extent they are released by the Plan.

The above categories of preservation of causes of action shall not be limited in any way by reference to Exhibit A nor are the categories intended to be mutually exclusive.

In addition, there may be numerous other Causes of Action which currently exist or may subsequently arise that are not set forth herein, because the facts upon which such Causes of Action are based are not fully or currently known by the Debtors and, as a result, cannot be specifically referred to herein (collectively, the "Unknown Causes of Action"). The failure to list any such Unknown Causes of Action herein, or on Exhibit A filed herewith (except as to Releasees or D&O Releasees), is not intended to limit the rights of Core-Mark Newco, the PCT, or the RCT, as applicable, to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtors.

C.     *Preservation of All Causes of Action Not Expressly Settled or Released*

Unless a Claim or Cause of Action against a Creditor or other Person is expressly waived, relinquished, released, compromised or settled in the Plan or any Final Order, the Debtors expressly reserve such Claim or Cause of Action for later adjudication by Core-Mark Newco, the PCT, or the RCT, as applicable (including, without limitation, Unknown Causes of Action), and, therefore, no preclusion doctrine, including, without limitation, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise) or laches shall apply to such Claims or Causes of Action upon or after the Confirmation or Effective Date of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order, except where such Claims or Causes of Action have been released in the Plan or other Final Order. In addition, the Debtors, Core-Mark Newco, the Reorganized Debtors, the PCT, the RCT and the successor entities under the Plan expressly reserve the right to pursue or adopt any Claim alleged in any lawsuit in which the Debtors are defendants or an interested party, against any Person or Entity, including, without limitation, the plaintiffs or co-defendants such lawsuits.

32

# Exhibit B

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

In re:                                  )
                                        )   Chapter 11
Fleming Companies, Inc., et al.,        )   Case No. 03-10945 (MFW)
                                        )   (Jointly Administered)
                        Debtors.        )
                                        )

### FIRST RCT STATUS REPORT AND NOTICE OF
### PAYMENT OF CLASS 3(B) TLV RECLAMATION CLAIMS

The Reclamation Creditors' Trust (the "RCT"), created pursuant to the Debtors' and Official Committee of Unsecured Creditors' Third Amended and Revised Joint Plan of Reorganization of Fleming Companies, Inc. and its Filing Subsidiaries Under Chapter 11 of the United States Bankruptcy Code (the "Plan"),[1] confirmed by Order of this Court entered July 27, 2004 (the "Confirmation Order," Dkt. No. 9045), submits this status report (the "Report") in conjunction with its filing of the "Office of the United States Trustee – Region 3 Post-Confirmation Quarterly Summary Report" for the calendar quarter ending June 30, 2005 (attached as Exhibit 1).

#### Overview

Since it was created on the Plan Effective Date (August 23, 2004), the RCT has made remarkable progress and achieved significant interim success in liquidating and recovering its assets and reconciling and satisfying its liabilities.

---

[1]  All capitalized terms not otherwise defined herein shall have the respective meanings ascribed to them in the Plan.



EXHIBIT

B

A   232

Even though the reconciliation work of the RCT confirms that the Debtors' Disclosure Statement[2] significantly understated total net Reclamation Claims (as demonstrated below), the RCT's asset recovery efforts are likely to yield collections that significantly exceed those projected by the Debtors in the same Disclosure Statement. Thus, despite (a) approximately $16 million more in net Reclamation Claims and (b) Disclosure Statement projections that RCT Assets would be insufficient to pay net Reclamation Claims (by approximately $1 million, even without the $16 million increased Reclamation Liabilities), RCT activities to date (assuming current trends) indicate that Reclamation Claims should be paid in full. That means the RCT not only has overcome a projected RCT Asset shortfall of $17 million, but the RCT also may ultimately turn over a surplus to the Post Confirmation Trust (the "PCT").[3] In addition, assuming no unanticipated delay, the RCT will complete its process and pay all Reclamation Creditors significantly ahead of the Debtors' projected timetable.

As set forth below in greater detail, as of June 30, 2005, the RCT has made a 100% cash distribution on its total net liability for Reclamation Liabilities to all TLV Reclamation Creditors[4] who have fully settled with the RCT. The RCT also has reserved cash sufficient to satisfy its

---

[2]   Reference is to the Disclosure Statement approved by the Court in conjunction with the Plan (the "Disclosure Statement," Dkt. No. 8224).

[3]   The PCT, the counterpart Trust to the RCT, was also created on the Effective Date pursuant to the Plan and the PCT Agreement for the purposes, among other things, of administering liabilities of the bankruptcy estates which are not Reclamation Liabilities and collecting assets of the bankruptcy estates which are not RCT Assets. Plan, Art. V.G. Once such liabilities of the PCT have been satisfied, or adequate reserves for them have been established, the PCT is obligated to turn over all cash to the RCT to enable the RCT to satisfy the Reclamation Liabilities.

[4]   The Plan provides for 2 classes of Reclamation Claims. TLV Reclamation Claims are held by Reclamation Creditors who (i) participated in the Trade Credit Program, and (ii) asserted that all, or any portion, of their claim is entitled to priority and/or a lien in accordance with Section 546(c)(2) of the Bankruptcy Code. Plan, Art. I.B.166. Non-TLV Reclamation Claims are held by Reclamation Creditors who (i) did not participate in the Trade Credit Program, and (ii) asserted that all, or any portion, of their claim is entitled to priority and/or a lien in accordance with Section 546(c)(2) of the Bankruptcy Code. Plan, Art. I.B.105. The Plan requires the RCT to satisfy its obligations on TLV Reclamation Claims prior to any satisfaction of its obligations on Non-TLV Reclamation Claims. Plan, Art. III.B.5.

2

# Exhibit C

UNITED STATES OF AMERICA
Before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 8482 / September 14, 2004

SECURITIES EXCHANGE ACT OF 1934
Release No. 50365 / September 14, 2004

ACCOUNTING AND AUDITING ENFORCEMENT
Release No. 2097 / September 14, 2004

ADMINISTRATIVE PROCEEDING
File No. 3-11653

|  |  |
|---|---|
| In the Matter of<br><br>Fleming Companies, Inc.<br><br>Respondent. | ORDER INSTITUTING PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS AND IMPOSING A CEASE-AND-DESIST ORDER |

I.

The Securities and Exchange Commission ("Commission") deems it appropriate to institute cease-and-desist proceedings pursuant to Section 8A of the Securities Act of 1933 (the "Securities Act") and Section 21C of the Securities Exchange Act of 1934 (the "Exchange Act") against Fleming Companies, Inc. ("Fleming" or "Respondent").

II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement ("Offer") that the Commission has determined to accept. Solely for the purpose of these proceedings or any other proceeding brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings contained herein, except that Respondent admits the Commission's jurisdiction over it and over the subject matter of these proceedings, Respondent consents to the entry of this Order Instituting Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings and Imposing a Cease-and-Desist Order.



EXHIBIT

C

## III.

On the basis of this Order and Respondent's Offer, the Commission finds that:[1]

### A.    Respondent

Fleming is an Oklahoma corporation headquartered in Lewisville, Texas, which currently is in Chapter 11 bankruptcy. Before its April 2003 bankruptcy filing, Fleming's stock traded on the New York Stock Exchange. At one time, Fleming was the nation's largest supplier of consumer packaged goods to retailers, including supermarkets, convenience stores and supercenters, with approximately 50 major distribution centers ("DCs") across the country, and a sizable retail grocery operator as well, with more than 100 stores throughout the Midwest and West. Fleming's 2001 and 2002 reported revenues were approximately $15.6 billion and $15.5 billion, respectively.[2] But its earnings were relatively much smaller, with only a $23.3 million profit and an $84 million loss, respectively, in those years. Fleming recently announced its intent to emerge from bankruptcy reorganized around its subsidiary Coremark International, Inc., a convenience store distributor it acquired in June 2002.

### B.    Background

In late 2001 and the first half of 2002, Fleming improperly recorded numerous transactions to address anticipated earnings shortfalls stemming from a variety of business and financial challenges. Chief among these challenges was its February 2001 agreement to be Kmart Corporation's sole supplier. Fleming initially announced this arrangement as a major victory and substantially expanded its facilities (and debt load) to handle the new business. Fleming hoped that this agreement and concomitant expansion would provide economies of scale and greater purchasing power, which would result in greater returns for its overall wholesale business. The Kmart arrangement, however, failed to yield the efficiencies Fleming had expected, and, when Kmart filed bankruptcy in January 2002, Fleming's future viability came under scrutiny.

Simultaneously, Fleming's primary wholesale customer base, the small to medium-sized independent grocer, faced adversity on a number of fronts, including a depressed national economy and heightened competition from low-cost supercenter chains encroaching into the rural and suburban areas the independents had long dominated. As these and other pressures drove these grocers out of business or into mergers with larger, self-supplying grocery chains, Fleming found it harder to generate its historical returns from this business.

---

[1] The findings herein are made pursuant to Respondent's Offer and are not binding on any other person or entity in these or any other proceedings.

[2] The 2001 reported revenues were for Fleming's wholesale and retail operations. The 2002 reported revenues were for Fleming's continuing wholesale operations only, in accordance with Statement of Financial Accounting Standards No. 144, Accounting for the Impairment or Disposal of Long-Lived Assets. The Fleming financial information specified in this document does not incorporate the proposed restatements and revisions publicly announced by Fleming in its April and June 2003 press releases.

Fleming experienced other earnings pressures as well. In early 2000, Fleming began centralizing many of its business functions, including its procurement department. Traditionally, Fleming's DCs handled most of their own procurement, which provided a substantial part of each DCs' internal margin. By centralizing this function and purchasing on a national rather than local or regional scale, Fleming hoped to obtain better prices from vendors and thereby improve its overall margins. These anticipated benefits did not materialize, and, instead, Fleming was increasingly at odds with the vendor community.

Fleming's retail operations, known internally as Fleming Retail Group or "FRG," also pressured Fleming's bottom line. Securities analysts referred to FRG as a "growth vehicle" for the future, based largely on the strong same store sales figures Fleming reported during 2001. As discussed below, however, these same store sales figures were misleading, as FRG's real same store sales performance began to decline in the third quarter of 2001.

C.    **Fleming implements "initiatives" improperly to address anticipated earnings shortfalls**

1.    **Fourth Quarter 2001**

When earnings pressures increased in the fourth quarter of 2001, Fleming implemented a series of transactions and programs, described internally as "initiatives," designed to increase earnings to help "fill the gap" between actual and projected results. These initiatives ordinarily were itemized on initiative lists circulated among senior Fleming management and sometimes within Fleming's procurement department. Although the initiatives, in and of themselves, were not improper, Fleming executed some of the initiatives improperly to boost Fleming's bottom line.

One way Fleming improperly executed initiatives was to obtain misleading side letters from certain vendors to justify accelerating earnings. Grocery industry vendors routinely pay wholesalers and retailers up-front monies to secure such advantages as favorable product positioning or exclusive supplier status. To the extent these are future advantages, generally accepted accounting principles ("GAAP") required the wholesaler or retailer to recognize the payments over time either as revenue or as cost-of-goods-sold offsets, rather than up-front.[3]

Four vendors[4] were asked to provide side letters in December 2001 that were used to accelerate Fleming's earnings under contemporaneous forward-looking agreements with those

---

[3] *See* Statement of Financial Accounting Concepts No. 5, ¶¶83-84; Staff Accounting Bulletin No. 101, *Revenue Recognition in Financial Statements*, Question 5. Under Emerging Issues Task Force Abstract ("EITF") 02-16, *Accounting by a Customer (Including a Reseller) for Certain Consideration Received from a Vendor*, Fleming is now required to recognize these up-front payments as offsets to cost of goods sold ratably over the term of the concomitant forward-looking agreements. However, this EITF was not effective when Fleming entered into these transactions.

[4] Certain vendors and vendor personnel have settled Commission charges arising from these and later vendor transactions. *See* In re Kemps LLC f/k/a Marigold Foods, LLC, James Green and Christopher Thorpe, Exch. Act

3

same vendors, in violation of GAAP. Each of these letters characterized up-front payments as rebates or other compensation for alleged past performance. The payments, however, actually induced some future performance by Fleming or secured some future right for the vendor.

### a.    Kemps LLC, f/k/a Marigold Foods, LLC ("Marigold")

Marigold, a privately held dairy supplier, provided Fleming with such a side letter in connection with an agreement to supply ice cream to Fleming's wholesale business for three years beginning March 2002 (the "Marigold Supply Agreement"). Fleming was willing to grant this agreement to Marigold only in return for an up-front payment of $2 million. Though extremely reluctant to make this payment, Marigold eventually viewed it as the "ante" to retaining and expanding the Fleming business.

At the 11th hour of negotiations, Fleming demanded a side letter – the terms of which Fleming dictated – describing the payment as a "non-refundable" "rebate" for "2001 purchases." Fleming knew the rebate had not been earned and that the $2 million was specifically linked to the Marigold Supply Agreement. Marigold ultimately agreed to this arrangement but required a penalty provision in the Marigold Supply Agreement obligating Fleming to repay the $2 million on a pro rata basis if Fleming failed to buy a certain volume of Marigold product during the agreement's term.

Using the side letter as justification, Fleming recorded the entire $2 million as an offset to expenses, which increased earnings in the fourth quarter of 2001 in violation of GAAP.

### b.    Digital Exchange Systems, Inc. ("Dexsi")

Dexsi is a privately held diverting services supplier.[5] In late 2001, Fleming hired Dexsi to handle part of its diverting business. Fleming was by far Dexsi's biggest customer. Accordingly, Dexsi expended significant capital ramping up to handle the Fleming business, such as by purchasing equipment and hiring employees to work on-site at Fleming's headquarters.

Fleming demanded that Dexsi pay $2 million and provide a side letter attributing the payment to past performance. Simultaneously, Fleming agreed to allow Dexsi to recoup the $2 million by charging Fleming a higher-than-normal price on diverting purchases.[6] In short, the $2

---

Rel. No. 34-50369; In re Digital Exchange Systems, Inc., Rosario Coniglio and Steven Schmidt, Exch. Act Rel. No. 34-50366; In re Bruce Keith Jensen, Exch. Act Rel. No. 34-50370; In re John K. Adams, Exch. Act Rel. No. 34-50367; and In re Dean Foods Company and John D. Robinson, Exch. Act Rel. No. 34-50368.

[5] "Diverting" occurs when a wholesaler overbuys from a vendor at a special discount, and then sells the excess product to buyers at a higher price.

[6] To illustrate, if Fleming wanted to purchase a product with a list cost of $1 per unit, Dexsi normally would sell that product to Fleming for, hypothetically, $.90. Under their agreement, however, Fleming allowed Dexsi to charge $1 for that product, with the additional $.10 per unit credited against the $2 million. This mechanism remained in place until Dexsi recovered the entire $2 million.

million was an advance on future diverting savings Fleming otherwise would not have received until later, when it actually purchased goods through Dexsi. Fleming insinuated that it would terminate the relationship if Dexsi refused. Dexsi agreed to Fleming's demand and the parties kept a running tab of Dexsi's recovery of the $2 million, which Dexsi did not fully recoup until the first quarter of 2002.

Although Fleming had not earned the entire payment during the fourth quarter of 2001, Fleming nonetheless recorded the entire $2 million as an offset to expenses, which increased its earnings in violation of GAAP.

### c.    Frito-Lay, Inc.

Frito-Lay, a subsidiary of PepsiCo Inc., is a leading snack manufacturer. In December 2001, Fleming and Frito-Lay negotiated an agreement that would pay Fleming for achieving certain sales targets during 2002. The agreement included a $400,000 incentive for Fleming to set up certain new product store displays by February 2002. Wanting to recognize the $400,000 immediately, Fleming asked its Frito-Lay contact to execute a side letter characterizing the $400,000 payment as "non-refundable" compensation. The Frito-Lay employee provided the requested letter.

Fleming knew it had not earned the $400,000 during 2001 but nevertheless recorded the full amount as an offset to expenses, which improperly increased its earnings in the fourth quarter of 2001 in violation of GAAP.

### d.    Kraft Foods Inc.

Kraft is the largest U.S. branded foods and drink manufacturer. During 2001, Fleming and Kraft executed two agreements pertinent to this matter. First, in April 2001, the parties entered into a no-divert agreement, under which Kraft was to pay $7.5 million for Fleming's promise to waive certain promotional fees and to refrain from diverting Kraft products. Then, in June 2001, the parties agreed to a one-year preferred vendor agreement (the "Kraft PVA"), under which Kraft was to pay $10.7 million in exchange for Fleming's commitment to eliminate several prior practices and fees and to cooperate in the resolution of certain disputed deductions made by Fleming. Although these disputed deductions generally declined following this agreement, they nonetheless continued and, by early 2002, had amounted to at least $4 million.

In December 2001, Fleming approached Kraft about accelerating $1.65 million payable under the no-divert agreement. These funds were subject to certain criteria, such as that they would "pass through" to Fleming's retail customers to help promote Kraft products. At Fleming's request, the Kraft employee responsible for the Fleming account signed a letter representing that the $1.65 million was an "offset to administrative costs" under the no-divert agreement. However, as Fleming knew, there were no administrative costs to offset. Instead, Fleming requested the letter solely to justify recording the $1.65 million as an offset to expenses, which improperly increased its earnings in the fourth quarter in violation of GAAP.

### e.    Reduction of reserve balances

Fleming also released portions of previously established bad debt and other reserve balances while closing its fourth quarter 2001 books. These reserve reductions totaled approximately $12.7 million, the vast majority of which pertained to bad debts owed by Fleming's wholesale division customers. Of these reductions, $7.8 million was to increase earnings, not because of new information, greater experience or change in circumstance that would justify a lesser reserve balance. *See* Accounting Principles Board Opinion No. 20, *Accounting Changes* ("APB 20"). Fleming never disclosed to investors that it was reducing these reserves. *See* APB 20, ¶ 33 (recommending disclosure if a change in estimate is material).

Fleming also released portions of previously established reserves relating to its exposure to vendors for disputed deductions. Historically, Fleming had relied on vendor deductions to contribute to profit margins. In some cases, after negotiating with a particular vendor, Fleming paid back some or all of the deductions attributable to that vendor. Thus, some level of vendor paybacks was probable and, based on Fleming's experience, reasonably estimable. Fleming therefore was obligated to reserve for these paybacks. *See* Statement of Financial Accounting Standards ("SFAS") No. 5, *Accounting for Contingencies*.

By November 2001, Fleming's disputed deduction balance had grown beyond $60 million and Fleming procurement personnel recognized that as much as $20 million of this amount likely would have to be repaid. Fleming's reserve for these paybacks, however, was only $8.8 million, which was insufficient. Yet, rather than increase the reserve to meet its anticipated payback obligations, Fleming reduced the rate at which it reserved against such anticipated paybacks.

### f.    Fleming's misstated annual and quarterly financial results

Together, these improperly recorded transactions totaled $25.05 million. Fleming reported fourth quarter 2001 pre-tax earnings of approximately $26.9 million, and net earnings of $5.7 million. Had Fleming properly accounted for these transactions, it would have reported materially reduced earnings for the fourth quarter of 2001.

Fleming's 2001 annual results likewise would have been materially different. Fleming reported pre-tax annual earnings of $62.8 million and net earnings of $23.3 million. Had Fleming properly accounted for these transactions, its annual pre-tax earnings would have declined almost 40%.

### 2.    First Quarter 2002

Fleming's earnings pressures did not relent in 2002. To the contrary, Kmart's January 2002 bankruptcy increased the pressure on Fleming to perform well, as analysts and investors scrutinized how the company responded to the Kmart situation. As it approached the end of the first quarter 2002, however, Fleming again was falling short of analysts' expected earnings and therefore improperly recorded several transactions to address the anticipated earnings shortfall.