6

institutional investors in the United States, and another Parmalat subsidiary.[14] Administracao booked $130 million of the $300 million as equity. The remaining $170 million was booked as goodwill "and then funneled to Wishaw Trading, a Uruguayan shell entity controlled by the Tanzi family, for the benefit of unknown parties."[15] (Calisto Tanzi was Parmalat's founder and former chief executive officer,[16] and certain members of his family served as officers, directors, or advisors of the Company.[17]) Furthermore, Parmalat never accounted for $150 million repaid to BoA in connection with these transactions.[18]

Luca Sala, a BoA employee, advised Parmalat in December 1999 how to describe the transaction in a press release so that it would appear to be equity rather than debt. The appraisal value of Administracao used in the press release, denominated in dollars, was inappropriately high, in part because the parties used an old report prepared before the Brazilian currency was devalued.[19]

In September 2001, Parmalat gave the SPEs put options that gave them the right to sell the Administracao shares for amounts that would retire the notes.[20] When Parmalat's troubles

---

[14]   Cpt. ¶¶ 142-50.

[15]   *Id.* ¶ 168.

[16]   *See id.* ¶ 204.

[17]   *See* Joint Report 3, 6.

[18]   Cpt. ¶ 169.

[19]   *Id.* ¶¶ 156-64.

[20]   *Id.* ¶¶ 152-54.

came to light, BoA attempted to exercise the SPEs' puts. BoA then forced the SPEs and a Parmalat entity into liquidation proceedings in the Caymans, allegedly to frustrate Bondi's restructuring efforts and an investigation of BoA's officials.[21]

> 5.    *December 2001 Credit and Interest Rate Swap Agreements with Chilean and African Parmalat Subsidiaries*

Under a set of agreements dated December 14, 2001, BoA made a series of loans to Parmalat subsidiaries – $25 million to an entity that the plaintiffs call "Parmalat Chile," $20 million to "Parmalat South Africa," and $15 million to "Parmalat Africa." At the same time, BoA and Parmalat Africa signed what purported to be an interest rate swap agreement, which effectively required that BoA pay $5.2 million each year to a Swiss bank account ostensibly owned by Parmalat Africa. Side letters required Parmalat Chile and Parmalat South Africa to pay BoA additional interest on their loans approximately equal to the BoA's annual $5.2 million payments to Parmalat Africa's ostensible bank account.[22] The account, however, was not Parmalat Africa's. Instead it "has been linked to Bank of America officials."[23] Moreover, the swap agreement was not in actual substance a swap. It specified "no currency or interest rate exchanges and offered the counterparties no ability to hedge."[24] In other words, the agreements were a device for Parmalat to make illicit payments to BoA officials.

---

[21]  *Id.* ¶¶ 176-77.

[22]  *Id.* ¶¶ 180-83.

[23]  *Id.* ¶ 184.

[24]  *Id.*

8

In August 2003, the Bank asked Parmalat to guarantee the $60 million of credit extended under the December 14, 2001 agreements and since then has attempted to foreclose on the loans and threatened to force insolvency proceedings in the relevant countries.[25]

6.    *December 2001 $80 Million Loan Secured by Funds Raised Through BoA's Sale of Notes*[26]

On December 20, 2001, BoA entered into a set of transactions pursuant to which it extended an $80 million loan to Parmalat that was secured by the proceeds of a private placement of notes issued by a Parmalat entity to institutional investors. As with some of the other transactions reviewed above, BoA assumed no risk but received fees and an interest spread and later foreclosed on the $80 million of collateral.[27]

7.    *Private Placements in General*

BoA placed $1.3 billion of debt in the United States on behalf of various Parmalat entities. Parmalat surreptitiously purchased many of its own bonds, a circumstance that was hidden by the use of sham entities that BoA helped Parmalat create and that reduced BoA's exposure.[28]

---

[25]
    *Id.* ¶¶ 185-87.

[26]
    The securities fraud complaint includes a version of these allegations. *See In re Parmalat Sec. Litig.*, 2005 WL 1653638, at *6.

[27]
    *Id.* ¶¶ 188-94.

[28]
    *Id.* ¶¶ 195-96.

B.    *Causes of Action*

        The complaint asserts counts for (1) fraud, (2) aiding and abetting constructive fraud, (3) negligent misrepresentation, (4) aiding and abetting breach of fiduciary duty, (5) diversion of corporate assets, (6) unjust enrichment, (7) violation of North Carolina's Uniform Fraudulent Transfer Act, (8) deepening insolvency, (9) unlawful civil conspiracy, and violations of (10) Section 75-1.1 of the North Carolina General Statutes, which prohibits "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce," (11) the federal Racketeer Influenced and Corrupt Organizations ("RICO") statutes,[29] and (12) the North Carolina RICO Act.[30]

## II.    *The Standard*

        As a general rule, a court deciding a Rule 12(b)(6) motion accepts as true all well-pleaded factual allegations in the complaint and draws all reasonable inferences in the plaintiff's favor.[31] Dismissal is inappropriate "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[32] Where a complaint alleges fraud, however, the plaintiff is held to a more exacting standard. Rule 9(b) requires that the

---

[29]
    18 U.S.C. §§ 1961-68.

[30]
    N.C. GEN STAT. §§ 75D-1 – 75D-14.

[31]
    *E.g., Flores v. Southern Peru Copper Corp.*, 343 F.3d 140, 143 (2d Cir. 2003); *Levy v. Southbrook Int'l Invs., Ltd.*, 263 F.3d 10, 14 (2d Cir. 2001).

[32]
    *Cohen v. Koenig*, 25 F.3d 1168, 1172 (2d Cir. 1994) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (internal quotation marks omitted)).

circumstances constituting fraud be stated with particularity, which means, among other things, that the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[33]

### III.   Threshold Matters

#### A.    Choice of Law

The Judicial Panel on Multidistrict Litigation transferred this action here from the Western District of North Carolina pursuant to Section 1407 of Title 28 of the U.S. Code. In such circumstances, a transferee court in the Second Circuit applies its own interpretation of federal law, not that of the transferor court.[34] To the extent that the action involves issues of state law, this court applies the choice of law rules that would govern in the transferor forum.[35]

#### B.    Bondi Stands in the Shoes of Parmalat

The defendants argue that Bondi lacks standing to bring many of the causes of action because they belong not to the Parmalat Debtors but to their creditors, whom Bondi does not

---

[33]

    *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000) (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994) (internal quotation marks and citation omitted)); *accord In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 69-70 (2d Cir. 2001).

[34]

    *Menowitz v. Brown*, 991 F.2d 36, 40-41 (2d Cir. 1993).

    The Fourth Circuit recognizes the same rule. *See Bradley v. United States*, 161 F.3d 777, 782 n.4 (4th Cir. 1998).

[35]

    *See Van Dusen v. Barrack*, 376 U.S. 612, 638-39 (1964); *Ferens v. John Deere Co.*, 494 U.S. 516 (1990).

11

represent. Although his position is not entirely consistent, Bondi at times contends that his status as

Extraordinary Administrator gives him standing to assert claims on behalf of creditors as well. The

complaint, for example, states that Bondi has the authority to pursue the claims of the Parmalat

Debtors but says nothing about authority to pursue the claims of creditors.[36] In his brief, however,

the plaintiff asserts that he is "empowered to bring this action against third parties on behalf of the

company and its stakeholders . . . that would otherwise be unable to recover for the misdeeds of third

parties," but for this proposition cites only the complaint,[37] which says nothing about authority to

recover on behalf of stakeholders.

   A chapter 11 bankruptcy trustee stands in the shoes of the defunct corporation and

may assert only claims that the debtor could have asserted at the moment before it entered

bankruptcy. The trustee may not assert claims that belong to the creditors.[38] Whether a claim belongs

---

[36]

   The relevant allegations are:

   "In his capacity as Extraordinary Commissioner, Dr. Bondi has the authority and
   duty to sue *on behalf of Parmalat to recover for wrongs done to Parmalat . . . for
   the benefit of the entire Parmalat estate.*

   "Dr. Bondi also has the authority and duty to investigate the Parmalat companies,
   and to take any action he deems necessary *to preserve the estate and causes of
   action owned by the Parmalat companies he is overseeing* as part of his
   extraordinary administration *for the benefit of all their creditors and stakeholders.*

   "This action is being brought by Dr. Bondi on behalf of Parmalat Finanziaria
   S.p.A., Parmalat S.p.A. and their subsidiary and affiliates companies throughout
   the world that are part of Dr. Bondi's Extraordinary Administration." Cpt. ¶¶ 17-19
   (emphases added).

[37]

   Bondi Mem. 7; *see also id.* at 10.

[38]

   *E.g., Wight v. Bankamerica Corp.,* 219 F.3d 79, 86 (2d Cir. 2000); *In re Mediators, Inc.,*
   105 F.3d 822, 825-26 (2d Cir. 1997); *Hirsch v. Arthur Andersen & Co.,* 72 F.3d 1085, 1093
   (2d Cir. 1995).

12

to the debtor or to its creditors is a function of the substantive law governing each claim.[39]

Here, the parties have given the court no reason to believe that Italian law on this point differs from that of the United States. To be sure, the plaintiff's brief asserts that:

> "The 'Extraordinary Administration' constitutes a 'governmental temporary taking' of the distressed corporation, with the purpose of avoiding its liquidation. (Legislative Decree 347/2003.) Under the 2003 rules of 'extraordinary administration,' Dr. Bondi is a private organ of the Ministry of Productive Activities itself. As such, he is not simply representing 'Parmalat,' but 'Parmalat's Extraordinary Administration,' a quasi-public entity."[40]

But the plaintiff has submitted nothing to support these assertions, which in any case do not speak to the issue whether Italian law gives Bondi the right to sue on behalf of creditors of the bankrupt estate.

Where, as here, there is a failure of proof of foreign law, the court may presume that it is the same as local law.[41] Bondi therefore may assert only claims that belonged to the Parmalat Debtors at the moment that they entered Extraordinary Administration. The claims that belong only to creditors, to whatever extent Bondi actually seeks to assert them, are dismissed.

---

[39] creditors as a whole where the claim is asserted generally for the benefit of all creditors as an undifferentiated group." Bondi Mem. 11. The Court rejected this argument in an earlier opinion. See Bondi v. Grant Thornton Int'l (In re Parmalat Sec. Litig.), No. 04 Civ. 9771 (LAK), 2005 WL 1670246, at *19 (S.D.N.Y. July 18, 2005) ("Bondi II").

[40] See, e.g., Wight, 219 F.3d at 86; Mediators, 105 F.3d at 825; St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc., 884 F.2d 688, 700 (2d Cir. 1989).

Id. at 7-8 n.3.

[41] See Fairmont Shipping Corp. v. Chevron Int'l Oil Co., 511 F.2d 1252, 1261 n.16 (2d Cir. 1975); Bartsch v. Metro-Goldwyn-Mayer, Inc., 391 F.2d 150, 155 n.3 (2d Cir. 1968); FED. R. CIV. P. 44.1.

13

C.    *Applicability of the* In Pari Delicto *Defense*

BoA argues that many of the Parmalat Debtors' claims are barred by the doctrine of

*in pari delicto*,[42] which forecloses recovery by a claimant that was a participant in the complained-of

wrong.[43]

1.    Wagoner *Does Not Control*

BoA launches its attack by relying upon the statement in *Shearson Lehman Hutton,*

*Inc. v. Wagoner*[44] that where "a bankrupt corporation has joined with a third party in defrauding its

creditors, the trustee cannot recover against the third party for the damage to the creditors."[45]  While

the Bank perhaps understandably tends to run the point together with the standing argument that the

Court already has disposed of, it appears to contend that *Wagoner* stands also for the proposition that

a third party that is complicit in wrongdoing of the former management of a bankrupt company may

assert the misconduct of the company's former management as a defense to a claim against it by the

bankrupt estate.  But there is a fundamental problem with the Bank's use of *Wagoner*.  The case, to

---

[42]

The phrase is short for *"in pari delicto potior est conditio possidentis [defendentis],"* or "in
a case of equal or mutual fault . . . the condition of the party in possession [or defending] is
the better one." *See Skinner v. E.F. Hutton & Co.*, 333 S.E.2d 236, 239 (N.C. 1985).

[43]

"[A] complaint can be dismissed for failure to state a claim pursuant to a Rule 12(b)(6)
motion raising an affirmative defense 'if the defense appears on the face of the complaint.'"
*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322
F.3d 147, 158 (2d Cir. 2003) (quoting *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67,
74 (2d Cir.1998)) (upholding 12(b) dismissal based on *in pari delicto* defense); *see also
McKenna v. Wright*, 386 F.3d 432, 436 (2d Cir. 2004); *Ghartey v. St. John's Queens Hosp.*,
869 F.2d 160, 162 (2d Cir. 1989).

[44]

944 F.2d 114 (2d Cir. 1991).

[45]

BoA Mem. 5 (quoting *Wagoner*, 944 F.2d at 118).

A    315

14

bankrupt estate. But there is a fundamental problem with the Bank's use of *Wagoner*. The case, to whatever extent it may be relevant to the *in pari delicto* issue, is an application of New York law.[46] The question whether the Parmalat Debtors are chargeable with the fraud allegedly perpetrated by the companies' former management, and thus whether Bondi is subject to a defense of *in pari delicto*, is governed by the law of North Carolina.[47] *Wagoner* simply is not controlling here. At most it is potentially persuasive authority regarding New York's treatment of (a) joint tortfeasors' right to recover from each other, and (b) the imputation of an agent's acts or knowledge to its principal. Because *Wagoner* does not elaborate on these issues, and because the governing law here is that of North Carolina rather than New York, the Court declines to ground its analysis in *Wagoner* and its progeny.

2.    In Pari Delicto *Applies Because the Complaint Alleges that Parmalat Was a Participant in the Complained-of Wrongs*

The complaint alleges that Parmalat engaged in a massive fraud and that BoA assisted in some respects, to wit:

> "Bank of America knew that the result of its 'assistance' was that *Parmalat's* financial statements overstated its publicly reported shareholder's equity and earnings, understated its reported debt, and presented materially false and misleading financial statements to regulators, analysts and investors . . . .

---

[46]

*See Wight*, 219 F.3d at 86-87.

[47]

The parties have not asked the Court to apply the law of any foreign jurisdiction. In North Carolina, "[t]he party seeking to have the law of a foreign jurisdiction apply has the burden of bringing such law to the attention of the court. If the foreign jurisdiction has no law, either statutory or decisional, on the question involved, the courts of this state will not speculate what law such jurisdiction might adopt and will apply the law of North Carolina." *Leonard v. Johns-Manville Sales Corp.*, 305 S.E.2d 528, 531 (N.C. 1983); *see also* text accompanying footnote 41 above (same point for issues of federal law).

15

had a dramatic impact on its 'debt-to-equity ratio' .... This was important to the scheme because the better the credit rating, the lower Parmalat's cost of funds.

\* \* \*

"Bank of America's transactions with *Parmalat* were knowingly designed to assist *Parmalat* in perpetrating a broad, continuing series of plainly fraudulent transactions.

\* \* \*

"Bank of America continued to arrange financing for Parmalat, without telling new investors, other existing creditors or Parmalat's shareholders that (a) the transactions were quite different than characterized by Bank of America and *Parmalat* ...."[48]

Moreover, the detailed allegations regarding the challenged transactions make it quite clear that the Parmalat entities were crucial actors in these transactions.

The North Carolina Supreme Court has explained the *in pari delicto* doctrine as follows:

"The law generally forbids redress to one for an injury done him by another, if he himself first be in the wrong about the same matter whereof he complains. . . . No one is permitted to profit by his own fraud, or to take advantage of his own wrong, or to found a claim on his own inequity, or to acquire any rights by his own crime."[49]

This straightforward principle would appear to bar recovery by Bondi from BoA except to the extent that the complaint alleges that BoA aided and abetted a breach of the Parmalat insiders' duties to the Company.

---

[48]  Cpt. ¶¶ 73-74, 197, 201 (emphases added).

[49]  *Byers v. Byers*, 25 S.E.2d 466, 469-70 (N.C. 1943); *see also Skinner v. E.F. Hutton & Co.*, 333 S.E.2d 236, 239 (N.C. 1985); *Bean v. Home Detective Co.*, 173 S.E. 5, 6 (N.C. 1934).

3.   *The Attribution of Wrongdoing to Culpable Insiders Does Not Prevent the Application of* In Pari Delicto

The plaintiff seeks to avoid the *in pari delicto* defense by ignoring the allegations that Parmalat itself perpetrated wrongdoing. Bondi focuses instead on the sections of the complaint that attribute wrongdoing on Parmalat's end to a group of "culpable insiders." But this is of no avail.

The acts performed and knowledge acquired by a corporate officer or agent are imputed to the corporation where the officer or agent was acting within the scope of his or her employment.[50] When the "officer or agent is acting in his own behalf, and does not act in any official or representative capacity for the corporation,"[51] however, the agent's acts and knowledge, under general agency principles applied in the specific context of the corporation, are not imputed. As the North Carolina Supreme Court has explained:

> "[T]here is a well-defined exception to the general rule that knowledge of the agent is imputed to the principal. Where the conduct of the agent is such as to raise a clear presumption that he would not communicate to the principal the facts in controversy, or where the agent, acting nominally as such, is in reality acting in his own business or for his own personal interest and adversely to the principal, or has a motive in concealing the facts from the principal, this rule does not apply. Where the agent is dealing in his own behalf, or has personal interest to serve, the knowledge of [the]

---

[50]     *See, e.g., Whitten v. Bob King's AMC/Jeep, Inc.,* 231 S.E.2d 891, 895 (N.C. 1977); *Sledge Lumber Corp. v. Southern Builders Equip. Co.,* 126 S.E.2d 97, 100 (N.C. 1962); *Le Duc v. Moore,* 15 S.E. 888, 888 (N.C. 1892); *see also* 3 FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 790 ("the general rule is well established that a corporation is charged with constructive knowledge, regardless of its actual knowledge, of all material facts of which its officer or agent receives notice or acquires knowledge while acting in the course of employment within the scope of his or her authority").

[51]     *Brite v. Penny,* 72 S.E. 964, 965 (N.C. 1911); *accord Hice v. Hi-Mil, Inc.,* 273 S.E.2d 268, 272 (N.C. 1981); *Sledge Lumber Corp.,* 126 S.E.2d at 100; *Brinson v. Mill Supply Co.,* 14 S.E.2d 509, 514 (N.C. 1941); *Stansell v. Payne,* 127 S.E. 693, 695 (N.C. 1925).

17

agent is not imputable to the principal."[52]

These principles mean that even where the complaint speaks of Parmalat's insiders rather than Parmalat, the relevant actions and conduct must be imputed to the Company to the extent that the complaint makes it clear that the agents were acting for the Company as well as themselves. The complaint specifically states, for example, that:

"Bank of America assisted certain Parmalat senior managers in structuring and executing a series of complex, mostly off-balance sheet, financial transactions *that were deliberately designed to conceal Parmalat's insolvency.*

\*   \*   \*

"Keeping Parmalat's actual financial condition secret was crucial to the ability of certain Parmalat insiders . . . to maintain an investment grade credit rating for Parmalat. This allowed them to continue to raise additional financing for *(a) their massive acquisition campaign,* (b) their equally massive looting of the company and *(c) their effort to keep the company afloat amid a mounting wave of losses, debts and disappearing funds.*"[53]

Bondi's submissions can be construed as making two major arguments against imputing the corrupt insiders' acts and knowledge to the Company. The first is that the insiders' actions did not benefit the Company. That, however, is immaterial. Agents frequently make decisions that prove to disadvantage their principals. The question is not whether the officers' actions ultimately were good or bad for the corporation, but whether the officers were conducting their own

---

[52]

*Federal Reserve Bank of Richmond v. Duffy,* 188 S.E. 82, 84 (N.C. 1936) (citations omitted); *accord Sparks v. Union Trust Co. of Shelby,* 124 S.E.2d 365, 368 (N.C. 1962); *Wilson Lumber & Milling Co. v. Atkinson,* 78 S.E. 212, 215 (N.C. 1913); *see also* RESTATEMENT (SECOND) OF AGENCY § 282 ("[a] principal is not affected by the knowledge of an agent in a transaction in which the agent *secretly* is acting adversely to the principal and *entirely* for his own or another's purposes . . . ." (emphases added)).

[53]

Cpt. ¶¶ 1, 204 (emphases added).

18

business or the corporation's.[54]

Bondi's other argument is that the complaint contains specific allegations that the agents were acting for themselves rather than for the Company. This is not entirely accurate and, in any case, is not sufficient to save the day.

At oral argument, the Court asked plaintiff's counsel whether and where the complaint alleged that the insiders acted solely for their own benefit. He ultimately responded by pointing only to paragraph 292, which states that "[t]he acts of Parmalat's insiders conferred no benefit on Parmalat. They were all done solely to enrich themselves at the company's expense."[55] This paragraph, however, appears only in Count Eight and therefore at best applies to that count and those that follow, which incorporate by reference all previous allegations.

Bondi's counsel later wrote to invite the Court's attention to paragraph 237, which appears in Count One and states that "[n]one of the conduct, acts and omissions described above benefited [sic] [Parmalat], but was done solely to benefit Bank of America and its officers and employers [sic] and the corrupt Parmalat insiders." That allegation, however, follows a series of allegations about the Bank's activities. The context makes it clear that "the conduct, acts and

---

[54]    Bondi's invocation of the "adverse interest" exception to the *Wagoner* rule would not avail even if *Wagoner* and its Second Circuit progeny were controlling here, which, as explained above, they are not. The Second Circuit repeatedly has emphasized that New York's adverse interest exception "is a narrow one and applies only when the agent has 'totally abandoned' the principal's interests." *Mediators*, 105 F.3d at 827 (citation omitted); *accord In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003); *Wight*, 219 F.3d at 87. As discussed above, the complaint does not indicate that Parmalat's insiders totally abandoned the Company's interests in conducting the great majority of activities in respect to which the complaint seeks to hold BoA liable.

[55]    Tr. 23-24.

A     320

omissions described above" refers in the main to BoA's actions, not actions by the Parmalat insiders.

More generally, the Court is obliged to read the complaint as a whole. The first section is entitled "Nature of this Action" and alleges in substance that the Bank took part in a number of identified financing arrangements through which Parmalat misrepresented its financial health. Subsequent sections entitled "Background – Parmalat's Founding and Ostensible Growth" and "The Vital Role of the Bank of America" are to the same effect. The core of the complaint is a section entitled "Bank of America's Fraudulent and Wrongful Conduct" that presents the details of the financing transactions. The gravamen of this complaint thus is a claim that the Bank is liable for its role in a series of specific transactions. These transactions all were obviously the business of, and intended to benefit, Parmalat and not just its agents. As "[g]eneral, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint,"[56] the insiders' roles in these transactions are imputed to the Parmalat Debtors.

4.     In Pari Delicto *Does Not Apply to the Extent the Complaint Alleges Looting*

In addition to its attack on the specific transactions outlined above, the complaint contains also a number of vague allegations of looting by Parmalat insiders.[57] Giving it a generous

---

[56]     *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).

[57]     The only arguable specification – and it is not one to which the parties have pointed – is paragraph 168, which alleges that $170 million of the $300 million raised through the December 1999 ostensible sale of equity in Administracao was "appropriated by Parmalat Admin's parent . . . and then funneled to Wishaw Trading, a Uruguayan shell entity controlled by the Tanzi family, for the benefit of unknown parties." This allegation, however, does not specify for whose benefit the transfer was made. That is, the transfer may have been part of an effort to benefit Parmalat using off-balance sheet transactions rather than looting.

20

reading, it alleges also that BoA, in addition to designing and entering into the transactions at the core of the complaint, somehow facilitated that looting.[58]

By any standard, theft from a corporation by insiders is self dealing by the insiders and not in any sense in the interest of the entity. The insiders' actions and knowledge in engaging in such conduct therefore cannot be imputed to the company. Accordingly, to the extent that the complaint alleges that BoA assisted the insiders in stealing from Parmalat, *in pari delicto* does not apply.

## IV. Sufficiency of the Claims

### A.    Counts One and Three: Fraud and Negligent Misrepresentation[59]

There are two problems with the claims for fraud and negligent misrepresentation. The first is that recovery is barred by *in pari delicto* because the Company was an active participant in all of the transactions that allegedly operated as a fraud upon it. The second is that fraud and negligent misrepresentation claims require that the plaintiff have relied to its detriment on representations by the defendant. Nothing in the complaint indicates that Parmalat, which is charged with the knowledge of the officials who were responsible for the relevant transactions, relied to its

---

[58]

    *See id.* ¶ 231 ("In active participation and collaboration with certain culpable Parmalat insiders, Bank of America contrived to have Parmalat . . . continue to allow the culpable Parmalat insiders to use shell and sham companies and to engage in fictitious and sham transactions to loot the company and enrich themselves at its expense.").

[59]

    The relevant fraud here is fraud on the Company, not the purchasers of its securities, whom Bondi does not represent. Bondi's many arguments about the damage suffered by purchasers of Parmalat's securities due to alleged misrepresentations of Parmalat and the Bank therefore are irrelevant in this action.

21

detriment on representations by BoA.[60] Counts One and Three therefore dismissed.

### B.    Count Two: Aiding and Abetting Constructive Fraud

Assuming without deciding that North Carolina recognizes a cause of action for aiding and abetting constructive fraud, Count Two is entirely subsumed within the claim for aiding and abetting breach of fiduciary duty. As the North Carolina courts and the plaintiff acknowledge, "[t]he primary difference between pleading a claim for constructive fraud and one for breach of fiduciary duty is the constructive fraud requirement that the defendant benefit himself."[61] Indeed, review of the North Carolina cases reveals that this is the only difference relevant here.[62] It follows that the only difference relevant here between a cause of action for aiding and abetting constructive fraud and one for aiding and abetting breach of fiduciary duty is that the former would contain the additional requirement that the primary violators – in this case, Parmalat's insiders – benefitted themselves. Count Two therefore is entirely redundant of Count Four. It is dismissed.

---

[60]
The fraud claim contains a vague allegation of looting, *see id.* ¶ 231 (quoted above in footnote 58), but it is not pled with particularity and therefore runs afoul of Rule 9(b).

[61]
*White v. Consol. Planning, Inc.*, 603 S.E.2d 147, 156 (N.C. Ct. App. 2004); Bondi Mem. 23.

[62]
*See Barger v. McCoy Hillard & Parks*, 488 S.E.2d 215, 224-25 (N.C. 1997); *Link v. Link*, 179 S.E.2d 697, 704 (N.C. 1971); *White*, 603 S.E.2d at 155-56; *Sterner v. Penn*, 583 S.E.2d 670, 674 (N.C. Ct. App. 2003).

Indeed, some cases appear to hold that not even this distinction separates the two causes of action. *See Compton v. Kirby*, 577 S.E.2d 905, 914-15 (N.C. Ct. App. 2003) ("[A] breach of fiduciary duty amounts to constructive fraud. . . . As we have already determined that plaintiffs established the existence of a fiduciary duty and a breach of that duty, we likewise conclude the issue of constructive fraud was properly submitted to the jury.").

22

### C.    Count Four: Aiding and Abetting Breach of Fiduciary Duty

The North Carolina Court of Appeals has recognized a cause of action for aiding and abetting breach of fiduciary duty.[63] The defendants do not dispute that the complaint sufficiently alleges, at a minimum, that the Parmalat insiders breached fiduciary duties in causing Parmalat to enter into the challenged transactions. Nor does the Bank deny that the complaint sufficiently alleges that it aided and abetted such breaches. Rather, the Bank characterizes the claim as one of aiding and abetting a breach of duty owed to Parmalat's stakeholders and then argues that Parmalat did not owe such a duty.[64]

The Bank's characterization is a straw man, set up to be torn down. It simply ignores the fact that the complaint alleges that the Bank aided insiders in breaching duties the insiders owed to Parmalat.  Insofar as the Bank seeks dismissal of Count Four, its motion is denied.

### D.    Count Five: Diversion of Corporate Assets

The parties tilt at the question of whether North Carolina recognizes an independent claim for diversion of corporate assets. The issue, however, is entirely immaterial, as any diversion of corporate assets, in the context of this case, would be actionable on a theory of aiding and abetting the insiders' breach of fiduciary duty.[65] Count Five therefore is dismissed as redundant.

---

[63]    *Blow v. Shaughnessy*, 364 S.E.2d 444, 447-48 (N.C. Ct. App. 1988).

[64]    *See* BoA Mem. 25-27; BoA Reply Mem. 27-28.

[65]    The presence in the complaint of allegations that Parmalat funds were diverted to BoA officials' pockets does not change this analysis. Any corrupt payments to BoA are imputed to Parmalat, thus triggering *in pari delicto*, unless the Parmalat officials were acting only for themselves in making those payments, a circumstance not alleged in the complaint.

23

## E.    Count Six: Unjust Enrichment

A claim for unjust enrichment is a claim in quasi contract and may be asserted only in the absence of any express agreement between the parties.[66] In this case, all of the disputed transactions were governed by actual contracts.

Bondi responds that (1) the complaint alleges kickbacks to BoA not governed by express contracts, (2) the relevant contracts "were entered into for fraudulent purposes and with bad faith," and (3) Parmalat never received benefits due under the contracts at issue.[67] Argument (1), assuming without deciding that Bondi is correct that the complaint can be read to allege kickbacks not governed by contracts (as opposed to kickbacks governed by contracts that were not written down or disclosed) is barred by *in pari delicto*. Parmalat, through its agents, deliberately paid those kickbacks as part of a corrupt scheme, or so the complaint alleges. Argument (2) also is barred by *in pari delicto* because the Company knew the nature and purpose of its own contracts. Argument (3), even if the complaint could be interpreted to allege that Parmalat never received benefits due under certain contracts – a dubious proposition that the Court nonetheless accepts for the sake of argument – might state a claim for breach of contract (which Bondi has not asserted), but not one in quasi contract.

## F.    Count Seven: Fraudulent Transfer

The North Carolina Uniform Fraudulent Transfer Act makes certain transfers by a

---

[66]
*Whitfield v. Gilchrist*, 497 S.E.2d 412, 414-15 (N.C. 1998); *Booe v. Shadrick*, 369 S.E.2d 554, 555-56 (N.C. 1988).

[67]
Bondi Mem. 48-52.

24

debtor, or obligations incurred by it, fraudulent as to its creditors.[68] The statute, however, assigns the remedies for a fraudulent transfer to creditors, not to the debtor, its estate, or a bankruptcy trustee.[69] Accordingly, Count Seven is dismissed.

G.    *Count Eight: Deepening Insolvency*

"Generally, the deepening insolvency theory of liability holds that there are times when a defendant's conduct, either fraudulently or even negligently, prolongs the life of a corporation, thereby increasing the corporation's debt and exposure to creditors."[70] Here, Count Eight alleges in substance that BoA:

> "aided and assisted Parmalat's culpable insiders in continuing to borrow billions of dollars of money and at the same time willfully and knowingly concealed their wrongful conduct, acts and omissions from these persons and the world at large.
>
> *   *   *
>
> "[A]s a direct result of Bank of America's conduct and acts and omissions described above, Bank of America, acting in concert with Parmalat's insiders, caused Parmalat's state of financial insolvency to deepen to enormous levels as it caused Parmalat to incur billions of dollars of additional debt at a time when Parmalat was already insolvent and that made it impossible for Parmalat to survive without going into bankruptcy."[71]

The parties dispute whether deepening insolvency is a valid cause of action under North Carolina law. The North Carolina courts barely have considered this question. Nor is there any

---

[68]    *See* N.C. GEN. STAT. §§ 39-23.4, 39-23.5 (2005).

[69]    *See id.* § 39-23.7.

[70]    Jo Ann J. Brighton, *Deepening Insolvency*, 23 AM. BANKR. INST. J. 34 (April 2004).

[71]    Cpt. ¶¶ 285, 288.

25

need to do so here.

If officers and directors can be shown to have breached their fiduciary duties by deepening a corporation's insolvency, and the resulting injury to the corporation is cognizable (a point on which courts are split,[72] but that need not be resolved at this stage), that injury is compensable on a claim for breach of fiduciary duty. And because a third party who aids and abets a breach of fiduciary duty is liable under North Carolina law, Count Four would reach any cognizable damage suffered by the Company by reason of deepened insolvency wrought by the company insiders with the Bank's assistance.

Bondi, however, would go further. He asks this Court to recognize an independent cause of action -- that is, a separate tort -- for deepening insolvency based on a duty that a lender, according to the submission of Bondi's counsel at argument, owes "not to intentionally, knowingly prolong the life of a business enterprise that it knows to be insolvent, by designing and implementing transactions which conceal the insolvency."[73] But the cases Bondi cites for the existence of such a duty do not recognize it in any form relevant here.[74]

---

[72]

See, e.g., Kittay v. Atlantic Bank of N.Y. (In re Global Serv. Group LLC), 316 B.R. 451, 457-59 (Bankr. S.D.N.Y. 2004) (collecting cases).

[73]

Tr. 29.

[74]

At oral argument Bondi's counsel cited three decisions: Allard v. Arthur Andersen & Co. (USA), 924 F. Supp. 488 (S.D.N.Y. 1996); Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., 267 F.3d 340 (3d Cir. 2001); and Official Committee of Unsecured Creditors v. Credit Suisse First Boston (In re Exide Techs., Inc.), 299 B.R. 732 (Bankr. D. Del. 2003). Allard merely held that deepening insolvency was a form of injury compensable under other causes of action asserted under New York or Michigan law. There was no discussion of a separate duty or tort. See 924 F. Supp. at 491, 494. Lafferty recognized the possibility of recovery under Pennsylvania law for deepening insolvency without clarifying whether it is a separate cause of action or a theory of damages. See Bondi II, 2005 WL

The Court declines the invitation to recognize a novel tort duty giving rise to a novel cause of action under North Carolina law. North Carolina already imposes on every person a duty not to aid and abet a breach of fiduciary duty by another. On the facts alleged here, if Bondi's proposed duty existed, any breach of it by the Bank would be as well a breach of the duty not to assist Parmalat's insiders in breaching their fiduciary duties to the Company.[75]

Count Eight is dismissed as duplicative.

### H.    Count Nine: Civil Conspiracy

In North Carolina, "[t]he elements of a civil conspiracy are: (1) an agreement between two or more individuals; (2) to do an unlawful act or to do a lawful act in an unlawful way; (3) resulting in injury to plaintiff inflicted by one or more of the conspirators; and (4) pursuant to a common scheme."[76]

To the extent that the civil conspiracy count is based on the Bank's role in the challenged financial transactions, Parmalat was a member of the conspiracies set forth in the complaint. That claim therefore is barred by *in pari delicto*. To the extent that the complaint alleges that the Bank's co-conspirators in planning and executing the challenged transactions were not the

---

1670246, at *18. In any case, *Lafferty* did not hold that a lender owes a separate duty not to deepen insolvency. Finally, *Exide* as relevant here held only that unsecured creditors of a bankrupt corporation could state a claim under Delaware law against a secured lender for deepening the corporation's insolvency. *See* 299 B.R. at 750-52. This motion does not present, and this Court does not decide, the questions whether creditors may assert a claim for deepening insolvency under North Carolina law and what duty, if any, a secured lender owes unsecured creditors in North Carolina.

[75]

*Cf. Bondi II*, 2005 WL 1670246, at *18.

[76]

*Privette v. U. of N.C. at Chapel Hill*, 385 S.E.2d 185, 193 (N.C. Ct. App. 1989); *accord Stetser v. Tap Pharm. Prods., Inc.*, 598 S.E.2d 570, 581 (N.C. Ct. App. 2004).

27

Company and its constituent entities but, rather, the Company insiders, the claim is identical to the

aiding and abetting breach of fiduciary duty claim. To whatever extent, however, that the claim is

based on an allegation that the Bank conspired with insiders somehow to loot the company, the claim

is sufficient, as all of the elements are satisfied on the face of complaint.[77] Count Nine therefore is

dismissed except to the extent that the Bank conspired with insiders to loot the Company.

I.    *Count Ten: North Carolina General Statutes, Section 75-1.1*

As relevant here, Section 75-1.1 prohibits "unfair or deceptive acts or practices in or

affecting commerce."[78] BoA argues that this claim fails because it applies only where the plaintiff

has suffered in-state injuries. No such injuries are alleged here.[79] Bondi responds that the statute

---

[77]    The Court rejects the Bank's argument that the complaint "fails to allege a meeting of the minds between Bank of America and the Parmalat insiders," BoA Mem. 29-30. Here the allegations that BoA "was an active, knowing participant in the conspiracy of" the Parmalat insiders and that BoA "actively and intentionally participated with these corporate insiders in . . . materially assisting in transferring . . . hundreds of millions of dollars to accounts, funds and entities other than the accounts, funds and entities for which they had been raised," Cpt. ¶¶ 295-96, are more than adequate. *See also id.* ¶ 231 (quoted in footnote 58 above). Also without merit is the Bank's argument that the requisite allegations of wrongful underlying conduct are lacking. Looting a corporation is a sufficient predicate activity for a claim of civil conspiracy.

[78]    N.C. GEN. STAT. § 75-1.1(a); *see also HAJMM Co. v. House of Raeford Farms, Inc.*, 403 S.E.2d 483, 492 (N.C. 1991).

[79]    Bondi's argument that the complaint alleges in-state injuries to the plaintiffs fails. The plaintiff here represents the Parmalat entities in Extraordinary Administration in Italy – all of which are foreign corporations – not the United States Parmalat subsidiaries. It is only the latter, however, that are alleged to distribute products in North Carolina. *See id.* ¶ 34. Paragraph 304 of the complaint, which states that "[u]pon information and belief, the defendants' conduct has substantially affected Parmalat's operations in North Carolina, including without limitation its dairy operations and its ability to conduct financial operations in North Carolina," does not compel a contrary conclusion. The complaint does not use the term "Parmalat" to refer only to the entities represented by the plaintiff.

28

affords a remedy for out-of-state injuries caused by in-state conduct.

There is a split of authority regarding the reach of Section 75-1.1. The North Carolina state courts have not passed on this issue, but the overwhelming majority of federal district courts to consider it, most of which are in North Carolina, have limited Section 75-1.1's application to "cases involving substantial effect on a plaintiff's in-state business operation."[80] By contrast, one district court has sustained a Section 75-1.1 counterclaim brought by the out-of-state licensees of a fast food franchise against the in-state licensor.[81]

This Court adopts the majority view. A court sitting outside North Carolina owes some deference to the decisions of North Carolina district court judges regarding matters of North Carolina law. In the absence of a clear indication that the North Carolina legislature intended Section 75-1.1 to reach cases in which the plaintiff alleges no substantial effect on in-state business

---

[80] *The 'In' Porters, S.A. v. Hanes Printables, Inc.*, 663 F. Supp. 494, 502 (M.D.N.C. 1987); accord *Broussard v. Meineke Discount Muffler Shops, Inc.*, 945 F. Supp. 901, 917-18 (W.D.N.C. 1996) (following *Hanes Printables* and denying summary judgment dismissing § 75.1-1 claim where plaintiffs submitted evidence of injurious effects in North Carolina), rev'd on other grounds, 155 F.3d 331 (4th Cir. 1998); *Merck & Co. v. Lyon*, 941 F. Supp. 1443, 1463 (M.D.N.C. 1996) (following *Hanes Printables* to dismiss § 75-1.1 claim where plaintiffs failed to allege "a substantial effect on any in-state business operations"); *Jacobs v. Cent. Transport, Inc.*, 891 F. Supp. 1088, 1112 (E.D.N.C. 1995) (M.J.) ("Section 75-1.1 is available to a foreign plaintiff suing a resident defendant over alleged foreign injuries having a substantial in-state effect on North Carolina trade or commerce"), aff'd in relevant part, rev'd in part, 83 F.3d 415 (4th Cir. 1996); *Dixie Yarns, Inc. v. Plantation Knits, Inc.*, No. 3:93CV301-P, 1994 WL 910955, at *2-3 (W.D.N.C. July 12, 1994) (dismissing § 75-1.1 counterclaim brought by out-of-state plaintiff alleging out-of-state injuries caused by in-state plaintiff); see also *In re Starlink Corn Prods. Liab. Litig.*, 212 F. Supp. 2d 828, 848-51 (N.D. Ill. 2002) (reviewing the North Carolina district court cases and siding with the majority view represented by *Hanes Printables*); *Lithuanian Commerce Corp. v. Sara Lee Hosiery*, 47 F. Supp. 2d 523, 537 (D.N.J. 1999) (applying *Hanes Printables* to dismiss a § 75-1.1 claim).

[81] *Hardee's Food Sys., Inc. v. Beardmore*, No. 5:96-CV-508-BR(2), 1997 U.S. Dist. LEXIS 9671, at *7-8 (E.D.N.C. June 6, 1997).

A    330

29

operations, this Court concludes that the complaint states no claim under the statute.

J.    *Counts Eleven and Twelve: Federal and North Carolina RICO*

   The Court finds it necessary to address only a few of the many arguments the parties make about the RICO claims. The federal RICO claim states that BoA committed mail fraud, wire fraud, bank fraud, and money laundering, engaged in transactions with money derived from unlawful activity, traveled in aid of racketeering enterprises, and transported stolen money.[82] The complaint, however, does not specify any predicate acts except to set forth certain wire transfers out of a BoA account owned by Parmalat,[83] which are said to have constituted wire fraud.

   The complaint fails properly to allege racketeering activity.[84] The wire fraud allegations do not satisfy Rule 9(b). In the RICO context, "[p]laintiffs asserting mail fraud must . . . identify the purpose of the mailing within the defendant's fraudulent scheme."[85] The Court sees no reason why this requirement should not apply also to wire fraud. Bondi has failed to identify the purpose of the wire frauds in the alleged scheme. The allegations other than those pertaining to wire fraud do not specify a single act by BoA. In substance they state only that BoA violated a series of statutes. This is insufficient. "While the pleading standard is a liberal one, bald assertions and

---

[82]
  *See* Cpt. ¶¶ 317, 328-32, 334.

[83]
  *Id.* ¶ 326.

[84]
  *See* 18 U.S.C. § 1961(1) (defining "racketeering activity").

[85]
  *McLaughlin* v. *Anderson*, 962 F.2d 187, 191 (2d Cir. 1992).

conclusions of law will not suffice."[86]

The RICO claim fails for another reason. "[I]n order to prevail in a civil RICO action predicated on any type of fraud" – which is what, on any reasonable view of the complaint, this is – "the plaintiff must establish 'reasonable reliance' on the defendants' purported misrepresentations or omissions."[87] For the reasons discussed above in connection with Counts One and Three, Parmalat cannot establish reasonable reliance.

The North Carolina RICO claim also fails. The North Carolina RICO statute is quite similar to the federal one,[88] but the North Carolina statute allows only an "innocent person" to recover.[89] The Parmalat entities are not innocent persons. A separate problem is that the North Carolina RICO count, the wording of which is nearly identical to that of the federal RICO count, also insufficiently alleges predicate racketeering activity.

Counts Eleven and Twelve are dismissed.

### V. Failure to Join Indispensable Parties

BoA asks the Court to dismiss the action because Bondi acts only for the Parmalat Debtors – that is, the 23 entities in Extraordinary Administration – and not all of the entities in the Parmalat family that were parties to the complained-of transactions. These other Parmalat entities,

---

[86]
    *Leeds v. Meltz*, 85 F.3d 51, 53 (2d Cir. 1996).

[87]
    *Bank of China v. NBM LLC*, 359 F.3d 171, 178 (2d Cir. 2004).

[88]
    *Compare* N.C. GEN. STAT. §§ 75D-1 – 75D-14 (2005) *with* 18 U.S.C. §§ 1961-1968 (2005).

[89]
    N.C. GEN. STAT. § 75D-8(c).

31

argues BoA, are indispensable. The argument is meritless.

Rule 19(a) provides that a person meeting certain criteria – the one relevant here is that the party is "so situated that the disposition of the action in the person's absence may . . . leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest" – shall be joined if feasible. Rule 19(b) provides that if a person coming within subsection (a) of the rule "cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable." It then lists four factors that a court is to take into account in making that determination.

Rule 19 thus requires a three-stage inquiry before dismissal of the action: (1) Is joinder of the party desirable? (2) Is joinder feasible? If not, (3) Is the absent party indispensable such that the action must be dismissed?[90] Here BoA asks only for dismissal, not joinder. The Court therefore assumes that joinder of the relevant absent Parmalat entities is desirable but not feasible and proceeds to consider whether their absence from this action offends "equity and good conscience."

The Court concludes that it does not. One of the Rule 19(b) factors is whether "protective provisions in the judgment" can lessen or avoid the asserted prejudice to the defendants. Any judgment in this action easily could be tailored to permit Bondi to collect only so much as is necessary to compensate the Parmalat Debtors, as opposed to the entire Parmalat family. The other

---

[90] *See, e.g., ConnTech Dev. Co. v. U. Conn. Educ. Properties, Inc.*, 102 F.3d 677, 681-82 (2d Cir. 1996).

32

Rule 19(b) factors do not point in a different direction.[91] "[T]he fact that the defendants may be required to defend more than one action arising from the same tort" does not necessarily render the absent parties indispensable.[92] The members of the Parmalat family not in Extraordinary Administration are not indispensable to this action.

## VI. Subject Matter Jurisdiction

Although no party has raised the issue, the dismissal of the RICO claim eliminates the court's jurisdiction under Section 1331 (the remaining claims arise under state law) as well as under Section 1332 (there are foreign parties on both sides of this suit). Continuing jurisdiction under Section 1367 is doubtful at best.[93] None of this, however, mandates dismissal of the action. Section 1334 confers on the federal district courts jurisdiction over any action "related to" a bankruptcy case. Like Bondi's action against Parmalat's auditors and their affiliates, and for the same reasons,[94] this action is related to a bankruptcy case.

---

[91]
    The Court is mindful that one of several interests protected by Rule 19(b) is a joined party's "wish to avoid multiple litigation, or inconsistent relief, or sole responsibility for a liability he shares with another." *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 109-110 (1968). Inconsistent relief and sole responsibility for a liability shared with another are not serious concerns here. To the extent, however, that BoA faces the theoretical potential for multiple litigation – and BoA has given the Court no reason to believe that other Parmalat entities are likely to bring claims like those advanced here – that concern is outweighed by the other Rule 19(b) considerations.

[92]
    *See Arkwright-Boston Mfrs. Mut. Ins. Co. v. City of New York*, 762 F.2d 205, 209 (2d Cir. 1985); *see also United States v. Aetna Cas. & Surety Co.*, 338 U.S. 366, 382 (1949).

[93]
    *See, e.g.*, *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966) (observing in the context of pendent jurisdiction that "if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

[94]
    *See Bondi I*, 322 B.R. at 47-49.

33

### VII.   Conclusion

BoA's motion to dismiss is granted to the extent that Counts One, Two, Three, Five, Six, Seven, Eight, Ten, Eleven and Twelve, Count Nine except insofar as it rests on allegations that Parmalat insiders looted the Parmalat Debtors, and so much of Counts Four and Nine as assert claims or seek recovery on behalf of Parmalat's creditors, are dismissed. The motion is otherwise denied. The plaintiff may file an amended complaint repleading only Counts Eleven and Twelve on or before August 22, 2005. If he does amend, he shall serve and furnish to chambers a red- or black-lined version that highlights the amendments.

SO ORDERED.

Dated: August 5, 2005

Lewis A. Kaplan
United States District Judge

A    335

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 03-10945 (MFW) |
| Fleming Companies, Inc., et al., | ) | (Jointly Administered) |
| | ) | |
| Debtors.[2] | ) | Related to Docket No. 11559 |

**PCT'sObjection Deadline: October 4, 2005
at 4:00 p.m. ET
Objection Deadline to Cross-Motion:
October 12, 2005 at 4:00 p.m. ET**

**Hearing Date: October 19, 2005
at 9:30 a.m. ET**

## [AMENDED ]RESPONSE OF THE POST-CONFIRMATION TRUST TO CLAIM OWNERSHIP MOTION OF RECLAMATION CREDITORS TRUST AND CROSS-MOTION OF THE POST-CONFIRMATION TRUST FOR DECLARATORY RELIEF

TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:

1.     The RCT's motion raises a number of questions of critical importance to

Fleming's creditors. The first is: Who owns the valuable claims against individuals who have

admitted in SEC Consent Judgments that they knowingly participated in the manipulation of

---

[1] At pertinent places herein, references are made to "Fleming," for Fleming Companies, Inc., public parent company of the Debtors. the Debtors are:  Core-Mark International, Inc.; Fleming Companies, Inc.; ACO Food Group, Inc.; ABCO Markets, Inc.; ABCO Realty Corp.; ASI Office Automation, Inc.; C/M Products, Inc.; Core-Mark Interrelated Companies, Inc.; Core-Mark Mid-Continent, Inc.; Dunigan Fuels, Inc.; Favar Concepts, Ltd.; Fleming Foods Management Col, L.L.C., Fleming Foods of Texas, L.P.; Fleming International, Ltd.; Fleming Supermarkets of Florida, Inc.; Fleming Transportation Service, Inc.; Food 4 Less Beverage Company, Inc.; Fuelserv, Inc.; General Acceptance Corporation; Head Distributing Company; Marquise Ventures Company, Inc.; Minter-Weisman Co.; Piggly Wiggly Company; Progressive Realty, Inc.; Rainbow Food Group, Inc.; Retail Investments, Inc.; Retail Supermarkets, Inc.; RFS Marketing Services, Inc.; and Richmar Foods, Inc.

Fleming's financial statements?  According to the plain language of the Plan,[2] those claims

belong to the PCT. *See* Part II, *infra.*

2.    A second question, not raised but obviously implicated by the RCT's motion, is:

Are the RCT's actions consistent with its belated assertion here, months after the PCT filed its

lawsuit, that the RCT owns these claims?  Equally important is this question:  Why has the RCT

chosen to interfere with the PCT's claims rather than pursue its own, parallel claims against

Reclamation Creditors who have likewise admitted, in SEC Consent Judgments, that each of

them also intentionally assisted in the manipulation of Fleming's financial statements?[3]  These

questions are critical to the recoveries for Fleming's creditors.  The conduct described in the SEC

Consent Judgments is egregious.  The <u>vendors and their employees have admitted in the Consent</u>

<u>Judgments</u> that they participated in a scheme with a handful of Fleming officers to falsify

Fleming's supply contracts, forge critical audit confirmations, and make false entries in

Fleming's financial statements.  This scheme, which violated the federal securities laws and

involved serious breaches of fiduciary duty, caused the Fleming Companies to incur hundreds of

millions of dollars in debt that they would not, and could not, otherwise have incurred.  This

credit, which was extended by other, innocent creditors and vendors, crippled Fleming and

plunged it into insolvency—leaving the unsecured creditors who are the beneficiaries of the PCT

with over $2 billion in unsatisfied, unsecured claims.  These claims, which were expressly

disclosed and retained the Plan, are vital to the creditors' recoveries, and should be maximized in

accordance with the Plan.  The PCT has discharged its obligations to do so, but the RCT has not.

*See* Part III, *infra.*

---

[2] Relevant excerpts of the Confirmed Plan of Reorganization are attached as Exh. "A."

[3] The relevant Consent Judgments are attached as Exhs. "C" and "D," and "E."  Exh. "C" contains the Consent Judgment against the Fleming Companies.  Exh. "D" contains the conset judgments against the individual vendor officers whom the PcT has sued.  Exh. "E" contains the Consent Judgments entered against the Reclamation Creditors whom the RCT has chosen not to sue.

A    337

3.    The third question is: why is the RCT raising this issue now? The PCT filed its suit more than six months ago. Before it filed suit, and in discussions since then, the RCT was well aware that the PCT intended to file--and in fact had filed--the claims now at issue in this motion. The PCT was assured by the RCT and its counsel that the RCT did not intend to, and would not, interfere with the PCT's filing and pursuit of these claims. In reliance on that assurance, the PCT devoted considerable time and expense to an investigation of the facts underlying its claims against these individuals, the preparation of a complaint, litigation of motions to dismiss, retention of consulting expert witnesses, and the pursuit of discovery concerning these very serious, very valuable claims. Yet now, the RCT has reversed field without telling the court why it has done so, and without advising the court what lies behind its change of heart. Also left unaddressed is this, critical fact: If the RCT actually prevails on this motion—despite its own inequitable conduct—then the valuable claims against the individual, wrongdoing officers will be extinguished by the statute of limitations because the RCT took no steps to preserve or file them before limitations ran. In these circumstances, the RCT is equitably estopped from asserting it owns the claims the PCT has filed. *See* Part IV, *infra*.

4.    The RCT's assertion that it owns the claims that the PCT is litigating cannot withstand close scrutiny. The RCT admits that the Plan does not "explicitly" give it ownership of the claims the PCT has filed. RCT Mtn. at 12. The RCT also admits that it does not expect to need any of the claims against the individuals (or against their vendor employers, for that matter) in order to pay the Reclamation Creditors in full.[4] Left unstated is why the RCT would then choose not to maximize these claims for the benefit of its remaining beneficiary, the PCT to

---

[4] *See* RCT Status Report at 2 (reporting that "RCT activities to date (assuming current trends) indicate that *Reclamation Claims should be paid in full*."). The relevant excerpt from the RCT Status Report is attached as Exh. "{A}[B]."

whom the RCT acknowledges it is required to turn over any of its surplus, Status Report at 2, and whose creditors have over $2 billion in unsatisfied claims.

5.       This cannot be a result that any rational fiduciary would desire—particularly one that has a significant, additional beneficiary beyond the Reclamation Creditors in the form of the PCT. The RCT has admitted that the recovery on these claims, if they are maximized, will necessarily go to the PCT and its beneficiaries (because the RCT already has sufficient funds to pay the Reclamation Claims of the Reclamation Creditors in full). *Id.* The RCT's job does not end with the payment in full of the reclamation claims of the Reclamation Creditors' to whom the RCT pledged is fealty. Instead, the RCT's job is to <u>maximize its assets</u> for the benefit of <u>all</u> of its beneficiaries, rather than just for "its own" Reclamation Creditors.    Any other understanding is odds with the Plan provision requiring the RCT to use its "reasonable best efforts to liquidate and resolve Claims, disputes, and <u>maximize the value of the RCT's</u> assets and minimize claims against the RCT," for all of its beneficiaries—including the PCT.

6.       In the end, it appears that extinguishing these claims may be precisely the result the RCT intends. The RCT wants the PCT's litigation stopped so that the RCT can prevent the recovery of even a <u>dime</u> from the vendor officers who inflicted such terrible injuries on the Fleming Creditors. The RCT wants this relief because it told the PCT at the outset that <u>"we are not going to sue our own vendors</u>," apparently no matter how egregious their conduct.    If it succeeds, the RCT will therefore ensure that Fleming's creditors will never know the true value of the claims the RCT first ignored, then denied, and finally compromised in order to protect "their own" vendors at the expense of Fleming's other innocent, honest creditors.

7.       For these reasons, and those stated in greater detail below, the RCT's motion should be denied. In order to put an end to this dispute the Court should also enter an Order

confirming that the PCT both owns these claims and is free to litigate them without further interference by the RCT.[5]

*See infra*, Part VI.

# I.
## The PCT is Not the Debtor

8.    The RCT's motion begins by confusing who and what the PCT is. The PCT is <u>not</u> the Debtor, and it is not the successor to the Debtor, any more than is the RCT. Accordingly, the RCT's assertions concerning the content of the Debtors' Disclosure Statement, or its after the fact characterizations of what the Official Committee of Reclamation Creditors (OCRC) "would have done" in the course of the Plan negotiations, simply are not relevant.

9.    Those issues are not relevant because this question begins and ends with the Plan itself. The PCT is a fiduciary created pursuant to the Fleming Plan. The plan was approved by the required vote of all classes of creditors, including the Reclamation Creditors. The PCT Representative, Castellamare Advisers LLC, and its principal Robert Kors, were appointed by the creditors—not by the Debtor—and each had no prior relationship with the Debtor. Castellamare and Kors are independent fiduciaries, as are the four other, independent board members—also appointed by the creditors—that serve on the PCT Board. The PCT is charged under the Plan to "act in good faith in carrying out its duties and responsibilities and use its best efforts to liquidate and resolve Claims, disputes and maximize the value of the PCT's assets and minimize claims against the PCT." Plan Art. {IV}[V](G)(8). Consistent with that obligation, the PCT has been

---

[5] As we explain in the PCT's Cross-Motion for Declaratory Relief, *infra* at Part VI, it appears doubtful that the declaratory relief the RCT seeks can be awarded other than in an adversary proceeding. Should the Court conclude that an adversary proceeding is required, the PCT stands ready to file one promptly, so as to ensure that this issue is decided finally, in a judgment that is not subject to collateral attack.

vigorously pursuing the recovery of assets and the repayment of its creditors. The PCT has retained, as its counsel, the firm of Gibbs & Bruns, LLP. This firm, likewise had no previous relationship with the Debtors, and was retained for their nationally-recognized skill in pursuing capital recoveries on behalf of injured creditors and investors.[6]

10.    Over four thousand of the PCT's creditors are honest, legitimate <u>trade creditors</u> who sold goods to Fleming. These vendors played no <u>role at all in and, instead were injured by,</u> the wrongful conduct of a half dozen Reclamation Creditors, and a number of individuals, who admit that they knowingly participated in the manipulation of Fleming's financial statements for their own benefit, and that of a handful of faithless Fleming officers. These innocent creditors have every right to expect that the PCT will use every good faith effort to maximize its recoveries for their benefit—regardless of the litigation target. They have the right to expect the same from the RCT, but this fundamental, and essential point, is what is most obscured in the RCT's motion.

11.    As we demonstrate below, the claims the PCT has filed in Texas against the vendor officers clearly and plainly belong to the PCT under the Plan. The PCT, as it was obliged to do, has vigorously pursued them. The RCT, which owns parallel claims against Reclamation Creditors, has not. Instead, out of a misguided desire not to sue "its own vendors"—apparently no matter what those vendors have done—the RCT first ignored these valuable claims, then refused to pursue them, and now has begun to settle them outright, all without apparent regard for the existence of these claims, their value, or the RCT's own obligation to "act in good faith

---

[6] Although Gibbs & Bruns, LLP has been retained for less than a year, its efforts for the PCT have already yielded significant fruit. The firm has already closed one very successful—albeit confidential—settlement with a major accounting firm, and is in the process of closing another settlement that will obtain for the PCT a significant recovery against otherwise insolvent former officers of Fleming, despite the assertion of coverage defenses by Fleming's former insurers.

... and to use its reasonable best efforts ... to maximize the value of the RCT 's assets..." Plan Art. {IV}[V](H)(5).

12.    It is clear that the RCT will neither discharge its own obligations, nor cease interfering in the PCT's discharge of its fiduciary obligations, without the intervention of the Court. Accordingly, although the RCT's motion suffers from procedural defects, *see* Part VI, *infra*, the PCT urges the Court to decide this issue by entering an Order confirming that the PCT, under the Plan, owns the claims it filed.

## II.
### The Plan Establishes that the PCT Owns the Claims Against the Vendor Officers

13.    The RCT's motion proceeds from the mistaken premise that the Plan is silent about which trust owns the claims against the vendor officers. It is not. Under the structure of the Plan, the RCT owns a specific, well-defined set of claims—and the PCT owns everything that is not an RCT Asset. Because these claims were not explicitly allocated to the RCT, as the RCT itself concedes, RCT Mtn. at 12, these claims necessarily belong to the PCT. We explain why, below.

### A.    The Plan is a Contract

14.    A confirmed bankruptcy plan "is a contract," *In re Offshore Diving and Salvaging, Inc.,* 226 B.R. 185, 188 (E.D. La. 1998), and "should be construed basically as a contract." *In re Stratford of Texas, Inc.*, 635 F.2d 365, 368 (5th Cir. 1981). *See also In re Sugarhouse Realty, Inc.*, 192 B.R. 355, 362 (E.D. Penn. 1996) (citing Fifth Circuit's decision in *In re Stratford* to support its conclusion that "confirmed bankruptcy plans of reorganization are binding contracts that must be interpreted in accordance with applicable contract law."); *accord In re Ampace Corp.*, 279 B.R.145, 153 (D. Del. 2002) (citing *In re Sugarhouse* for the

A    342

proposition that confirmed plans of reorganization are contracts that must be interpreted in accordance with applicable contract law.).

15.    A court should ordinarily construe the Plan without reference to any extrinsic evidence, *id.*, because the interpretation of a plan is a question of law for the court. *In re Stratford*, 635 F.2d at 368. "The starting point of contract construction is to determine whether a provision is ambiguous, i.e. whether it is reasonably subject to more than one interpretation." *Cantera v. Marriott Senior Living Serv., Inc.*, 1999 WL 118823, at *4 (Del. Ch. Feb.    18,    1999);    592    A.2d    473,    478    (Del. 1991).[7]

A contract "is not rendered ambiguous simply because the parties in litigation differ concerning its meaning," *City Investing Co. Liquidating Trust v. Continental Cas.* Co., 624 A.2d 1191, 1998 (Del. 1993), or because the parties "do not agree upon its proper construction." *Rhone-Poulenc Basic Chemicals Co. v. American Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992).    A contract (and thus a bankruptcy plan) is ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc*, 616 A.2d at 1196.[8]

---

[7] The Plan is governed by Delaware law. *See* Plan Art. I(A)(3) ("Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof."). For the convenience of the court, we will cite in the footnotes the analogous provisions of Texas law, which are largely identical to the Delaware law governing the interpretation of contracts.

[8] Texas, the jurisdiction in which the PCT's action is pending, takes the same view. *See, e.g., Natural Gas Clearinghouse v. Midgard Energy Co.*, 113 S.W.3d 400, 407 (Tex. App.-Amarillo 2003, pet. denied) ("In an unambiguous contract, we will not imply language, add language, or interpret it other than pursuant to its plain meaning.").

16.     The RCT and the PCT certainly disagree about what the Plan means, but neither trust contends the Plan itself is ambiguous.[9]  Importantly, ambiguity "does not exist where the court can determine the meaning of a contract 'without any guide other than a knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'"  *Id.* quoting *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. App. 1983).  "All written contracts ... are to be read, understood, and interpreted according to the plain meaning and ordinary import of the language employed in them....Words, if of common use, are to be taken in their natural, plain, obvious, and ordinary significance; but, if technical words are used, they are to be taken in a technical sense, unless a contrary intention clearly appears, in either case, from the context."  *Neary v. Philadelphia, W. & B.R. Co.*, 7 Houst. 419, 9 A. 405 (Del. 1887); *accord Northwestern Nat'l. Ins. v. Esmark, Inc.*, 672 A.2d 41, 44 (Del. 1996)(interpreting unambiguous contract terms using dictionary definitions).  Here, the common language of the Fleming Plan–and the defined terms contained within it–establish that the PCT owns the claims against the vendor officers.

**B.     Under the Plan, the Claims Against the Vendor Officers Belong to the PCT.**

17.     The Fleming Plan divided all litigation claims belonging to the former Fleming Debtors between two litigation trusts: the PCT and the RCT.  The PCT was vested with the responsibility to liquidate all litigation claims that were not "RCT Assets."  Plan at Art. {IV}[V](G)(3) (defining the PCT assets to include litigation claims, but stating that "The PCT Assets do not include any RCT Assets.").  The Plan defines RCT Assets as "Reclamation deductions, over-wires, preference claims, Causes of Action and other rights of the Debtors <u>as against the holders of Reclamation Claims</u>, other than post-petition deductions and post-petition

---

[9] If, however, this Court concludes the Plan is ambiguous, then it is "both necessary and prudent to allow for the development and presentation of a factual record of the parties' negotiations and dealings." *Paxson Communications v. NBC Universal*, 2005 WL 1038997 (Del. Ch. April 29, 2005). The need to develop a factual record would therefore preclude the entry of an order enjoining the PCT from pursuing these claims, or awarding them outright to the RCT.

A    344

over-wires with respect to Fleming Convenience which shall be transferred to Core-Mark Newco." Plan at Art. {IV}[V] (H)(2)(a). It similarly defines Reclamation Assets as "deductions, over-wires, preference claims, Causes of Action and other rights of the Debtors as against the Holders of Reclamation Claims, other than the post-petition deductions and post-petition overwires with respect to the Fleming Convenience business which shall be transferred to Core-Mark Newco." Plan at Art. I(B)(145). Critically, each of these grants to the RCT limits the RCT's authority solely to litigation of claims against the "holders of Reclamation Claims." Id.

18.    The vendor officers whom the PCT has sued are not Reclamation Creditors, nor are they Holders of Reclamation Claims. This is borne out by the attached register of Reclamation Claims, previously filed with this court. See Exh. F, attached. This claims register confirms that the parties the PCT has sued are neither Reclamation Creditors nor holders of Reclamation Claims. Id. The unambiguous provisions of the Plan state that the RCT has the power only to litigate claims against Reclamation Creditors or holders of Reclamation Claims. Plan at Art. {IV}[V](H)(2). The Plan vests in the PCT the ownership of, and the responsibility to litigate, all other litigation claims that previously belonged to the Fleming Debtors. Plan at Art. {IV}[V](G)(3)(g)(vesting in the PCT "any and all other Claims and Causes of Action of the Debtors, including but not limited to those outlined in section VI hereof..." which are "not RCT Assets").

19.    The claims against the vendor officers, which sound in tort and arise out of the prepetition reporting–and manipulation–of the Fleming Companies' financial information are not

only    preserved    by    the    Fleming    Plan,    *see*    Plan    Art.    VI (B),[10]

they are vested in the PCT.  Plan at Art. {IV}[V] (G)(3)(g) (claims vested in PCT) and

(H)(2)(limiting RCT's claims solely to those against Reclamation Creditors).  Because the

vendor officers are not Reclamation Creditors, the claims against them belong to the PCT under

the clear, unambiguous language of the Plan.

20.    In the end, the RCT is forced to concede that the Plan does not "explicitly"

identify claims against the Vendor Officers as RCT Assets.  *See* Mtn. at 12.  That these claims

are not *explicitly* identified as RCT Assets, however, ends the issue.  The PCT owns all assets

that are not explicitly designated in the Plan to be transferred to the RCT, Plan Art.

{IV}[V](G)(3), and the RCT concedes there is no explicit designation of these claims as RCT

Assets.  The question as to which trust owns these claims begins, and *must end*, with the Plan

itself.  The fact that the RCT's counsel have advised the court that they "would have" made a

different deal if they'd thought this through affords no basis upon which the Plan contract can be

re-written, now, more than one year after confirmation.  The RCT's motion should, be denied.

C.    **The PCT Has Not Asserted Any Claims *Against* Reclamation Creditors**

21.    Without any sound argument based on the plain language of the Plan, the RCT is

left to torture its terms—and the PCT's Complaint—in a desperate effort to capture for itself

claims that it "would have insisted be identified as RCT Assets," RCT Mtn. at 12, but that are

not allocated to it under the Plan.  The PCT's claims against the vendor officers are, the RCT

asserts, a blatant effort to recover from Reclamation Creditors in contravention of the Plan.  RCT

---

[10] Article VI (B) expressly retained and preserved "all actual or potential actions, whether legal, equitable or statutory in nature, against all Persons except the D & O Releases arising out of, or in connection with, any of the Debtors' pre-petition management, operation and/or reporting of financial or other information," Plan at Art. VI(B)(Debtors' Retained Causes of Action), "all actual or potential actions, whether legal, equitable or statutory in nature, against Persons or Entities <u>including vendors</u> with respect to prepetition violations of applicable federal or state securities laws," *id.*, and "all actual or potential tort actions that may exist or may subsequently arise." *Id.*

Mtn. at 20.   This assertion cannot withstand even a cursory reading of the PCT's Texas Complaint.  First, and most obviously, the PCT has not sued any Reclamation Creditors; indeed, it specifically alleges that the Reclamation Creditors are <u>not</u> parties to its action. *See, e.g.* Cross Complaint at ¶¶ 33-34 (identifying FMG/Daymon as a "non-party").  Second, the PCT *has sued* individuals (who are not Reclamation Creditors) that are personally liable for their own wrongdoing.  An agent is personally liable for his own torts, regardless of whether he committed them within the scope of his agency for his employer or someone else. "Texas' longstanding rule [is] that a corporate agent is personally liable for his own fraudulent or tortious acts." *Miller v. Keyser*, 90 S.W.3d 712 717 (Tex. 2002).  "It is well settled that a corporate agent can be held <u>individually liable</u> for fraudulent statements or knowing misrepresentations even when they are made in the capacity of a corporate representative." *Wright v. Sage Eng'g., Inc.*, 137 S.W.3d 238, 250 (Tex. App.—Houston [1st Dist.] 2004, pet. denied). *See also SITQ E.U., Inc. v. Reata Restaurants, Inc.*, 111 S.W.2d 638, 651 (Tex. App.–Fort Worth 2003, pet. denied)(rejecting the argument that the "fiduciary shield" doctrine immunized an agent from responsibility for torts committed within the jurisdiction); *Kollision King, Inc. v. Calderon*, 968 S.W.2d 20, 25 (Tex.App.–Corpus Christi 1998, no writ) ("Knowing participation in a tortious act will render the corporate agent personally liable.  It is not necessary that the "corporate veil" be pierced in order to impose personal liability, as long as it is shown the corporate officer knowingly participated in the wrongdoing.").

22.    Far from seeking a "direct recovery against the Reclamation Creditors," RCT Mtn. at 22, the PCT has in fact sought the entry of judgment *solely* against the individual Defendants whom it has sued.  The PCT is not only permitted to do this under applicable law, *see SITQ supra*, the PCT was required to do this in order to discharge its fiduciary obligations to

"use its best efforts to liquidate and resolve Claims, disputes and maximize the value of the PCT's assets and minimize the claims against the PCT." Plan Art. {IV}[V](G)(8).

## 1. The PCT's Allegations Concerning Indemnification Are Not an Indirect Claim Against Reclamation Creditors

23.    The RCT makes much of allegations in the PCT Complaint asserting that the vendor officers acted within the course of their employment and should, therefore, be indemnified by their employers. This allegation was intended to forestall any coverage defenses that might exist under applicable policies of insurance. This allegation most certainly is not, however, a claim against the Reclamation Creditors themselves—as any fair reading of the allegations demonstrates.

24.    More to the point, the RCT's assertion about indemnity claims again seeks to usurp for itself claims that do not—and never did—belong to it. The vendor officers' right to indemnification by their employers (if it exists), is their own, individual right. It arises under the charter and by-laws of the companies for which they work. Any such indemnification claims, therefore, were never the property of the Fleming Estates—so they belong to <u>neither</u> the PCT nor the RCT.

25.    Fleming's Plan defines the Causes of Action that were divided between the PCT and the RCT as "all Claims, actions, choses in action, causes of action, suits ... <u>of the Debtors, the Debtors in Possession, and/or the Estates.</u>" Plan Art. I(B)(36). The Reclamation Creditors are not Debtors, and the vendor officers' right to indemnity arise–if they exist at all–from the status of each one as an officer of a Reclamation Creditor. Whether an individual officer is entitled to be indemnified is therefore <u>his own</u> cause of action against his own employer. It is not

a Fleming cause of action, it is not a "Cause of Action" that belongs to either the RCT or the PCT, and it is not a claim that is being pursued by the PCT in its Texas action.

26.    The RCT's argument concerning indemnification rights is, plainly, a red herring intended to distract attention from this critical point: the Fleming Plan delegated to the PCT the fiduciary responsibility to pursue from the vendor officers, and from all persons other than Reclamation Creditors, the full amount of the damages they caused as a result of their wrongful manipulation of Fleming's financial statements. The PCT has done so, it has standing to do so, and there is no basis in the plain language of the Plan for any argument to the contrary.

### 2.    The PCT Has Not Sought Damages From or a Judgment Against Any Reclamation Creditor.

27.    The RCT next points to the PCT's allegations the vendor officers are "jointly and severally liable for "hundreds of millions of dollars in damages," as evidence that PCT "surely" seeks recovery directly from the Reclamation Creditors themselves. RCT Mtn. at n.21. Nothing in the PCT's complaint seeks (or will entitle it to obtain) a judgment against any Reclamation Creditor, each of which is explicitly alleged to be a "non–party" to the case. *See* Cross Complaint at ¶¶ 33-34. The PCT has asserted no claims against any Reclamation Creditor, it asserts no right to recover against any Reclamation Creditor, and thus will not be entitled to any judgment against any Reclamation Creditor.

28.    To suggest that an allegation that a party acted within the scope of his employment magically becomes a claim for relief against his principal tortures–beyond all recognition–both the PCT's claim and the Fleming Plan itself. "Courts will not torture contractual terms to impart ambiguity where ordinary meaning leaves no room for uncertainty." *Rhone-Poulenc*, 616 A.2d at 1196. The ordinary meaning of the PCT's claims–including its

express statement that Dean Foods, for instance, is a "non-party"–makes clear that the PCT has not sought relief against any Reclamation Creditor.

29.    The RCT's point concerning the damages sought by the PCT actually misses one of the most important points about the PCT's lawsuit. When it filed its case, the PCT sought recovery not only from the vendor officers, but from certain former Fleming officers and against Deloitte & Touche LLP, as well. The PCT is investigating and may pursue additional claims against other, highly solvent parties. The PCT's damages from the injuries inflicted on the Debtors simply are what they are. The PCT has been charged under the Plan with recovering, for the benefit of creditors (including trade creditors who did *not* assist in the manipulation of Fleming's financial statements), more than $2 billion in damages they suffered when Fleming collapsed. No one lawsuit is going to satisfy that entire amount in one fell swoop, but uncertainty as to what might ultimately be recovered from any particular defendant was not a basis upon which the PCT could simply ignore and fail to prosecute the valuable, serious claims against these vendor officers that had been delegated to it under the Plan.

30.    In sum, the PCT's detailed complaint is far from the "sham" the RCT asserts. To the contrary, the PCT's highly specific, concrete allegations establish that each of these vendor officers was pervasively involved in the persistent and deliberate manipulation of the financial statements of Fleming, a large public company. *See* Exhs. "C" and "D" and PCT Complaint at pp. 1-50. This manipulation caused Fleming's multi-billion dollar collapse and left its creditors with massive injuries. With rare exceptions, every Defendant PCT sued has already admitted liability in Consent Judgments they entered into with the Securities and Exchange Commission. *Id.* Any fair reading of the PCT's Complaint confirms that the PCT has a strong case for the recovery of the millions of damages caused by the vendor officers and the others whom the PCT

has sued. Put bluntly, the PCT owns the claims it has brought, and it has not asserted a single claim it does not own, so the RCT's motion should be denied.

### III.
### The RCT's Actions Are Not Consistent With its Belated Claim that It Owns the Claims the PCT Has Filed

31.    The RCT's motion next complains, at length, about two contradictory points. First, the RCT complains that it had no idea the claims the PCT has filed existed—until the PCT inquired about them—because "the Debtors at no time advised the OCRC that any EO Claim was contemplated, or might even exist, against any Reclamation Creditor and/or its employees." RCT Mtn. at 12. Next, the RCT asserts that the PCT's inquiries concerning what the RCT planned to do about the valuable claims against six Reclamation Vendors interfered with a process the RCT had set up to deal with those very claims. RCT Mtn. at 6. Neither premise is true.

A.    **The Plan and Disclosure Statement Plainly Notified the OCRC—and All Other Creditors—of the Existence of Potential Tort Claims Against Reclamation Vendors.**

32.    The RCT is candid in admitting that it had done nothing to investigate or maximize the potential tort claims against the dirty half-dozen vendors before the PCT inquired as to its intentions.  Indeed, when the PCT Representative contacted the RCT to inquire about these claims, the RCT Representative immediately responded "Oh, we're not going to sue our own vendors!" This statement is astounding, particularly in light of the fact that the Plan imposes on the RCT an obligation to "act in good faith in carrying out its duties and responsibilities and [to] use its reasonable best efforts to liquidate and resolve Claims, disputes and maximize the value of the RCT's assets and minimize claims against the RCT." Plan at Art. V(H). The RCT now seeks to excuse its inaction, in the face of these valuable claims, by asserting that no one told them these claims existed or were their responsibility. *See* Mtn. at {━━}[11.][11] This excuse —for it is nothing more than that—is belied by both the Disclosure Statement and the Plan.

1.    **The Disclosure Statement Discussed the Potential Claims Against Reclamation Creditors in Detail.**

33.    What the RCT characterizes in footnote as "one sentence" in the Disclosure Statement concerning the wrongful conduct of these vendors, RCT Mtn. at n. 17, is actually a full page discussion of the issue of vendor misconduct and its role in the manipulation of Fleming's financial statements.  In pertinent part, the Disclosure Statement told the OCRC that:

> On November 13, 2002, Fleming announced that the SEC had initiated an informal inquiry related to Fleming's vendor trade practices, the presentation of second quarter 2001 adjusted earnings per share data in Fleming's second quarter 2001 and 2002 earnings press releases, Fleming's accounting for drop-ship sales transactions with an unaffiliated vendor in Fleming's discontinued retail operations, and its calculation of comparable store sales in its discontinued retail operations.

[11] This argument is, of course, inconsistent with the RCT's claim that the reconciliation of these tort claims was always intended to be a part of their process—a position the RCT asserts with equal fervor, elsewhere in their motion.

The SEC converted the informal inquiry into a formal investigation on February 13, 2003. The formal investigation has focused on whether any persons or entities engaged in any acts, transactions, practices or courses of business which operated and would operate as a fraud or a deceit upon purchasers of Fleming securities or upon other persons in violation of the federal securities laws. Fleming has answered questions submitted by the SEC and has produced documents to the SEC. The SEC has interviewed several current and former employees of Fleming as well as third parties. Fleming continues to be in discussions with the SEC and intends to fully cooperate with the SEC. Kraft Foods, Dean Food and Frito-Lay recently announced they have been notified that the SEC is considering filing charges against those companies in connection with their business dealings with Fleming, including whether employees of those companies aided Fleming in accelerating revenue improperly.

After receiving notice of the informal SEC inquiry, Fleming undertook an independent investigation related to the same topics.   The Audit and Compliance Committee of the Board of Directors engaged independent legal counsel and independent consultants to assist in connection with the independent investigation. .... The scope of the independent investigation included the original topics identified by the SEC as well as issues related to the timing of recording revenue, documentation of certain vendor transactions and certain initiatives undertaken for the purpose of increasing reported income.

On April 17, 2003, Fleming issued a press release (the "April 17 Release") announcing that it would have to restate its 2001 annual and quarterly financial statements and 2002 quarterly financial statements .... [that included] adjustments identified in connection with the continuing independent investigation by the Audit Committee into certain accounting and disclosure issues....The April 17 Release also reported that restatements of the results for the full year 2001 and the first three quarters of 2002 would reduce the pre-tax financial results form continuing operations for such periods by an aggregate amount of not more than $85 million and that the restatements would mainly correct the timing of when certain vendor transactions are recognized and the balance of certain reserve accounts.....Fleming also announced that its fourth quarter 2002 pre-tax loss from continuing operations would be increased by expenses totaling not more than $80 million as a result of a number of factors, including ... corrections identified as a result of the Audit Committee's independent investigation.

In a Form 12b-25 filed by Fleming with the SEC on June 4, 2003, Fleming announced that its 2000 annual financial statements would require restatement....[that] would principally correct the timing of when certain vendor transactions were recognized and would reflect other adjustments and corrections identified as a result of the Audit Committee's independent investigation.

*See* Disclosure Statement at 30-31, attached as Exh. 1 to RCT Motion.

34.  Contrary to the RCT's assertion, the Disclosure Statement gave the OCRC not a "one sentence disclosure," but rather a full page disclosure of the following facts:

> The SEC had instituted a formal investigation of whether any persons or entities had engaged in transactions that "operated as a fraud or deceit upon purchasers of Fleming securities."

> The SEC's investigation had progressed far enough that the SEC had formally notified at least three Reclamation Creditors,[12] Kraft Foods, Dean Foods and Frito-Lay, that it was contemplating charging them for their role in "aiding Fleming in accelerating revenue improperly."

> Fleming's Audit Committee had instituted an independent investigation "on the same topics," and had retained independent counsel and an independent accounting firm to assist it.

> The Audit Committee's investigation was finished, and had resulted in a multi-million dollar restatements of Fleming's income for 2000, 2001 and 2002–restatements that would "principally correct the timing of when certain vendor transactions were recognized," and would reflect other adjustments and corrections "identified as a result of the Audit Committee's independent investigation."

The significance of these claims to the recovery for the creditors was obvious, and the description was more than sufficient to notify the OCRC that the SEC–the body charged with enforcing the nation's securities laws–was on the verge of charging at least some vendors with violations of the federal securities laws for having "aided Fleming in accelerating revenue improperly."

### 2.  The Plan Expressly Retained Claims Against Vendors (including Reclamation Creditors) and Individuals Who Manipulated Fleming's Financial Statements

---

[12] SEC Investigations are non-public, so it is not surprising that this disclosure could do little more than place all creditors on notice of the facts the investigative targets themselves chose to reveal. The Debtors presumably knew about the investigations of Kraft, Dean and Frito-Lay because those companies are, themselves, public companies required to make disclosure of the pending SEC inquiries. The same is not true of other vendors who later entered into consent judgments admitting they too had assisted in manipulating Fleming's financials, such as Kemps/Marigold and Digital Exchange, or of private citizens–such as the employees of various vendors–who likewise have since admitted they had assisted in manipulating Fleming's financials.

35.     The existence of possible claims related to the misconduct of these vendors was not only set out in full in the Disclosure Statement, the right and responsibility to maximize those claims for the benefit of Fleming's creditors was expressly retained in the Plan. Specifically, Article VI (A) of the Plan provided that the following claims would be preserved "regardless of whether the Causes of Action accrued before or after the Petition Date," including:

> All actual or potential actions, ... against Persons or Entities including vendors with respect to prepetition violations of applicable federal or state securities laws; and,

> All actual or potential actions,... against all Persons except the D & O Releasees arising out of, or in connection with, any of the Debtors' prepetition management, operation and/or reporting of financial or other information.

Plan at Art. {IV}[VI] (B), pp. 31-32.

36.     These Causes of Action, having been retained, were then specifically referred to and addressed in the Revised Term Sheet. *See* Exh. "3" to RCT Motion. The Revised Term Sheet states that "Capitalized Terms not otherwise defined shall have the meaning set forth in the Debtors and Official Committee of Unsecured Creditors' Second Amended Joint Plan of Reorganization." *Id.* at p.1. "Causes of Action," as defined in the Plan, specifically includes "those actions listed in this Plan," Plan Art. I(36), and thus directly pointed the OCRC—and the RCT after confirmation—to the actions that had been retained in the Plan against vendors for their role in manipulating Fleming's financial reports. Plan Art. {IV}[VI] (B).

37.     In light of these provisions in the Disclosure Statement, the Revised Term Sheet, and the Plan, the RCT's assertion that it had "no idea" that these claims existed is beyond baffling. These claims were expressly preserved in the Plan–in language that made plain the existence of claims against these vendors that were to be maximized for the benefit of Fleming's creditors. Yet, as we demonstrate below, the RCT had taken no steps even to investigate—much

less to maximize—the valuable claims against the Reclamation Creditors until the PCT's legitimate inquiries prompted the RCT to do so.

### B.    The RCT "Process" Ignored These Claims

38.    The RCT asserts that its "settlement process was disrupted by the PCT's first-time assertion regarding the existence of the EO claims" in December of 2004. RCT Mtn. at 15. In the next breath, however, the RCT is forced to admit that it <u>had</u> no such process as to the EO claims because it never focused on the fact that these claims existed. Either way, the RCT Representative's statement that the RCT was "not going to sue <u>their own</u> vendors," apparently no matter what the vendors had done and regardless of how much damage these vendors had inflicted     on     other,     innocent     creditors,     is     deeply     problematic.[13] Having made the decision that it was not going to sue any Reclamation Creditors, the RCT had every (but no legitimate)reason to turn a blind eye to these claims—because it was only through willful blindness that the RCT would be able to avoid the evidence that these highly meritorious claims, based on admitted SEC Consent Judgments, offered the prospect of substantial recoveries for Fleming's trade and other creditors.

39.    The RCT's efforts to avoid investigating these claims are inexcusable. As fiduciaries charged with the responsibility to liquidate and maximize claims *against Reclamation Creditors*, Plan Art. {IV}[V](H), one would have expected that the RCT and its counsel would have undertaken to investigate the facts in the Disclosure Statement in order to incorporate the evidence of misconduct of these vendors into the Reclamation Claims by these creditors. These dishonest creditors had admitted that they (or their employees) willfully manipulated Fleming's

---

[13] The RCT has provided to the court a markedly <u>inaccurate</u> account of what occurred in the discussions between the PCT and the RCT concerning the claims that each trust owned. The RCT did so first in the its purported Status Report; it has done so, again, in its Motion. The RCT's decision to reveal confidential communications between the two trusts—and then to mischaracterize them—has left the PCT with no choice but to correct the record, reluctantly, so that the court is not misled concerning what actually occurred.

financial statements at the expense of 4,000 honest trade creditors, bond holders, and other creditors, who were not parties to the fraud. How, then, could the RCT possibly determine what *actually was owed* on a Reclamation Claim without at last some understanding of the defenses to it—including defenses based on the admitted fraud of the creditor in question? Yet, despite its clear fiduciary obligation to do so, the RCT made no effort to investigate these issues until the PCT asked what the RCT intended to do about them.

40.    Had the RCT even attempted to incorporate these facts into its "Reconciliation Process," it would have considered not only what was in the Disclosure Statement, but additional facts that came to light after the Plan was confirmed. On September 14, 2004, for example, it was publicly reported that Fleming had entered into a Consent Judgment with the SEC in connection with improper "side letters" provided by vendors to certain Fleming officers in order to assist in accelerating, improperly, Fleming's recognition of income. *See* Exh. "C," attached. The consent judgment specifically named the following Reclamation Vendors as having provided false letters to assist in this fraud:  Kemps LLC, formerly known as Marigold Foods, LLC; Digital Exchange Systems, Inc.; Frito-Lay, Inc.; Kraft Foods, Inc.; and, Dean Foods Company. *Id.* The improper payments are clearly set out in the Fleming Consent Judgment, as is the amount of the Fleming income that was overstated as a result. *Id.*

41.    Simultaneously with the Fleming Consent Judgment, and as disclosed in it, three Reclamation Vendors—Kemps, Dean Foods, and Digital Exchange—and employees of two other Reclamation Vendors, Kraft Foods and Frito-Lay, each entered into separate consent judgments that likewise admit the role these vendors and their officers played in manipulating Fleming's financial statements. *See* Exh. "E." A number of vendor employees likewise admit their crucial

A    357

roles in falsifying contracts, forging audit confirmations, and improperly accelerating Fleming's

recognition of income. *See* Exh. "D."

42.    Three months went by after these Consent Judgments were entered, with the RCT

apparently unaware of these crucial developments.  In the meantime, the PCT had retained its

own litigation counsel to investigate and assess the claims for which the PCT was responsible.

Based upon this investigation, the PCT immediately identified claims against the vendor officers

as among those the PCT should pursue.  Consistent with its desire to cooperate with the RCT, the

PCT therefore inquired of the RCT what it intended to do with the claims assigned to the RCT;

namely, the parallel tort claims against the handful of wrongdoing Reclamation Creditors who

had admitted (or whose employees had admitted) their role in deliberately manipulating

Fleming's                                                                    financial statements.[14]


43.    There is no question that the RCT—as a fiduciary for all of Fleming's

creditors—was obliged to investigate the facts *they knew* as a result of the Disclosure Statement.

---

[14] This inquiry was entirely appropriate in light of the PCT's status as a a beneficiary of the RCT and its obligation
to maximize its own claims in good faith. First, the PCT is a residual beneficiary of the RCT Assets and has a
legitimate interest in ensuring that they are maximized. *See* Revised Term Sheet at Article VII (E)[, **attached as
Exhibit 3 to RCT Motion]**. According to the Term Sheet, "In the event the RCT has or develops proceeds for
distribution after satisfaction of all Reclamation Claims, such additional proceeds shall be applied by the RCT in
an order of priority as follows:

To Core-Mark Newco for any advances under the TLV or Non-TLV Guaranty:
To the Prepetition Non-TLV Reclamation Claim Reduction;
To Core-Mark Newco for any advances under the Administrative Claim Guaranty;
Any amount of "Ad Hoc Committee" professional fees which have not been reimbursed by allowance of an
Administrative Claim;
To the PCT."

Second, the unsecured portion of all claims belonging to Reclamation Creditors resides in the PCT. The PCT,
and the Reclamation Creditors themselves, each have an interest in ensuring that the RCT's claims are
maximized, because doing so will result in repayment on unsecured claims and will reduce the PCT's overall
unsecured creditor base.  Indeed, the RCT's Status Report confirms that, if pursued, the RCT's claims against the
six Reclamation creditors will yield recoveries *solely* for the benefit of the PCT and its Creditors. Finally, the
PCT Trust Agreement imposes on the PCT an obligation to cooperate with the RCT in maximizing the assets of
the former Fleming Debtors.

A    358

There is little evidence that they did so.  Instead, in December of 2004, when the PCT Representative contacted the RCT Trustee, Bernie Katz, to inquire as to their plans for these claims, Mr. Katz responded that the RCT simply was not going to sue its own creditors. Consistent with its stated intention not to "sue its own creditors," the RCT did not obtain copies of the publicly-available SEC Consent Judgments—which had been entered in September of 2004 --until the PCT provided them to the RCT on December 4.  On December 3, 2004, the PCT also sought to send the RCT an outline of potential claims that might be asserted against these creditors, but the RCT refused to accept it.[15]    The RCT also did not obtain a copy of the Fleming International Investigation report prepared by PriceWaterhouse Coopers (the PWC Report)—again until the PCT provided it to them at a meeting the RCT grudgingly agreed to attend, after the PCT begged the RCT to consider the important implications of these claims for the recoveries to be had for the benefit of Fleming's creditors.

44.    Tellingly, until the PCT raised these issues, the RCT had also instituted no Rule 2004 discovery, had done no research, and had instituted not even an informal process to determine whether these claims might yield a significant recovery for its "own" beneficiaries—one of which is the PCT itself.  Instead, on December 10, 2004, the RCT sent an email to the PCT asserting that the reason they had done nothing—in the months since the Plan was confirmed—was because neither counsel for the Debtors nor Counsel for the Committee of Unsecured Creditors had told them they should do so.  Left unexplained was why the RCT, with its own highly skilled and competent counsel, had not been moved by its own fiduciary obligations to consider these issues on its own, and without the need for prompting by the PCT.

---

[15] The PCT stands ready to offer evidence and testimony on these and other facts recited in this response, should the Court conclude evidence is necessary.

On December 21, 2004, the RCT followed up with another letter, again blaming others for its failure to discharge its own fiduciary obligations.

45.     On January 7,[ 2005,] the PCT responded to the RCT's excuses by reiterating its view that the claims against the Reclamation Creditors for their overt, and admitted, manipulation of Fleming's financial statements were very valuable and had to be investigated. The PCT told the PCT, as well, that the PCT intended to file the parallel claims it owned against the vendor officers because they were potentially significant to the creditors' recovery. The PCT also offered the RCT the services of its own counsel, at its own expense, to do the legwork on this investigation, so as not to distract the RCT professionals from their Reconciliation Process with other, innocent creditors. The PCT again offered to meet with the RCT—at a time and place of the RCT's choosing—in order to share what it had learned about these manipulative transactions in the course of investigating the PCT's own claims. The Chairman of the PCT Board, Robert Kors, also reached out individually to Curtis Marshall, the Chairman of the RCT Board, to try to determine whether a business solution could be reached that would permit the two trusts to pursue the parallel claims that each owned, in a cooperative manner. Finally, consistent with its own fiduciary obligations, the PCT warned the RCT that its failure event to investigate and assess the RCT's claims against the six Reclamation Creditors could severely impair them, and might subject the RCT and its professionals to claims for a breach of their fiduciary obligations.

46.     Thereafter, the PCT did what the RCT should have done in the exercise of its fiduciary obligations. First, on January 28,[ 2005,] representatives of the PCT met with representatives of the RCT in Chicago and provided them with still more information concerning the claims against these six vendors. The PCT also provided to the RCT a copy of the PWC

Report.  On February 1, 2005, the PCT identified for the RCT—from the SEC Consent Judgments and the PWC report—a list of vendors that had engaged in questionable transactions. This list was jointly "triaged" by the PCT and the RCT, and priority was given *not* to those vendors whose conduct was particularly grave but, rather, to those creditors with whom the RCT's settlement negotiations were already very advanced.  This, again, was in deference to the RCT's Reconciliation Process and its desire to move forward quickly with its settlements.  The RCT then agreed, reluctantly, to request a limited set of documents, from a handful of vendors, on a voluntary basis.  The RCT did not issue Rule 2004 subpoenas, however, nor did it request voluntary production of all relevant documents, because it didn't want to "disrupt its consensual process."

47.    Thereafter, *at its own expense*, the PCT reviewed Fleming's documents in the storage unit in Relizon to locate the relevant documents concerning these transactions.  These documents were plainly relevant to the PCT's own claims against the vendor officers, but the PCT also voluntarily gave copies of the notebooks it assembled to the RCT, for its review, because the documents were equally relevant to the RCT's claims against the vendors themselves.  The PCT also quickly culled the list of vendors that were in dispute down to seven vendors whose conduct was particularly egregious:   Kraft, Marigold, Dean Foods, Digital Exchange, FMG/Daymon, Dole Food Corporation, and Frito-Lay.[16]

On March 24, 2005, representatives of the PCT again met with representatives of the RCT in Chicago, and with the RCT Board, to outline both the claims that could be pursued against the

---

[16] The PCT ultimately filed suit against two of these vendors, and against a number of individuals who were not Reclamation Creditors.  The first vendor the PCT sued was Dole Food Corporation, which was not a Reclamation Creditor.  The second, Digital Exchange, was a Reclamation Creditor—but the RCT assigned its claims against Digital Exchange to the PCT only days before an agreement tolling limitations on the claims against Digital Exchange against was set to expire.

vendors themselves, and the claims the PCT was going to pursue against the vendor officers. This detailed discussion also laid out the very significant damages Fleming's creditors had suffered as a result of these vendors' knowing participation in the scheme to manipulate Fleming's financial statements.

48.    The PCT implored the RCT to take action against these vendors, and even offered to pursue these claims for the benefit of the RCT and all of Fleming's creditors at no cost to the RCT.[17]

The RCT again refused to do so in favor of its "consensual process" with its own vendors—the very process that, months earlier, the RCT asserted dictated that the RCT was "not going to sue its own vendors," no matter what. Even as the statute of limitations loomed, the RCT still did nothing to preserve these claims until prompted to do so by the PCT. The RCT ultimately (at the behest of the PCT) obtained a handful of tolling agreements from the vendor companies, but did nothing at all to preserve claims against the individual, vendor officers who had also admitted their own wrongdoing in the SEC Consent Judgments. Those claims, which the RCT {wold}[would] have allowed to be time-barred, are the very claims the RCT now asserts it owns and that, if so, it had a fiduciary obligation to preserve and protect.

## IV.
### The RCT Equitably is Estopped to Claim it Owns the Claims the PCT is Pursuing

49.    The RCT's inaction concerning the claims the PCT has pursued, and its complete failure to take any steps to preserve or toll the claims against the individuals in particular, are inconsistent with the RCT's belated assertion, here, that it believed it owned these claims all along. In fact, although the discussions concerning the Trusts' parallel claims have proceeded

---

[17] Counsel for the PCT has been retained on a significantly reduced hourly rate, and a contingent percentage, which the PCT agreed to bear in order to ensure that the RCT would not have to come out of pocket to litigate these claims, if it chose to do so.

A    362

more than nine months—including a significant period before and more than six months after the PCT's claims were filed--the RCT never once objected to the PCT's stated intention to pursue its claims against the individual vendor officers. Nor did the RCT object to the PCT's lawsuit after it was filed. Instead, the RCT assured the PCT—before the PCT ever filed its claims—that the RCT did not intend to interfere with the PCT's pursuit of the claims against the individuals.

50.    Now, however, for reasons that the RCT has not chosen to share with the Court, the RCT has entirely reversed field. Although the RCT concedes that the Plan does not "explicitly" grant them ownership of the claims the PCT has filed, RCT Mtn. at 12, the RCT nonetheless asserts that the PCT's claims belong to the RCT. In the meantime, nine months have passed since the PCT first contacted the RCT about its own claims, and about the parallel claims that the RCT owned against the Reclamation Creditors themselves. The PCT invested significant time, scarce resources, and incurred significant expense to prepare and pursue the claims it filed against the individual vendor officers. It has litigated them vigorously and has not left them vulnerable to defenses, such as limitations, as the RCT would have done. The PCT also filed its claims more than six months ago. Since then, the PCT has incurred significant, additional expense in briefing motions to dismiss, taking jurisdictional discovery and amending its pleadings to add additional claims that the RCT assigned to the PCT at the last moment. The RCT knew all of this, just as it knew the PCT was undertaking this effort as a fiduciary for all of the creditors, and on the express assurance by the RCT that it would not interfere with the PCT's efforts to pursue these recoveries.

51.    Under Delaware law, "estoppel may arise when a party by his conduct, intentionally or unintentionally leads another, in reliance upon that conduct, to change his position to his detriment." *Bechtel v. Robinson*, 886 F.2d 644, 650 (3rd Cir. 1989) *quoting Wilson*

A    363

*v. American Ins. Co.*, 58 Del. (8 Storey) 394, 398, 209 A.2d 902, 903-04 (1965). As a result, in the words of the Third Circuit, "the person whose conduct has brought the situation about [is] estopped from asserting his legal rights against the party so misled." *Id. quoting Wolf v. Globe Liquor Co.*, 34 Del. Ch. 312, 316, 103 A.2d 774, 776 (1954). This court has described the elements of equitable estoppel in similar terms. *Compare In re Integrated Health Svcs., Inc.*, 304 B.R. 101, 110 (Bankr. Del. 2004).

52.     Even assuming that the Plan itself did not make clear that the PCT owns these claims—as it plainly does—equitable estoppel affords an independent basis upon which the RCT's motion should be denied. Here, the RCT has entirely neglected to protect or investigate the claims that the PCT has filed. Instead, the RCT assured the PCT that it would not interfere with the PCT's efforts to recover on these claims, and the PCT filed its claims in reliance on that assurance. The RCT also knew about—and even obtained the benefit of—the significant expenses the PCT was incurring to develop, file and pursue these claims. As limitations loomed, the RCT made no effort at all to protect the claims it now asserts, vociferously, that it owns. It obtained no tolling agreements from the individual vendor officers, and the tolling agreements it actually obtained do not purport to cover these claims. Accordingly, if the RCT prevails on its motion, these valuable claims will be utterly extinguished. The party that "owned" them—purportedly the RCT—simply did not file them before limitations expired.

53.     In a very real sense, then, the only parties that will benefit from the RCT's motion are the very wrongdoing officers who have admitted to the SEC that they actually and deliberately manipulated Fleming's financial statements. The RCT won't benefit, because the claims it will recover are now time-barred. The PCT won't benefit because it has expended valuable resources pursuing claims that the RCT now, belatedly, asserts that it owns. Even

worse is the fact that the PCT's creditors, who have $2 billion in unsatisfied claims, will also receive nothing from these otherwise valuable assets. The doctrine of equitable estoppel exists to prevent precisely this injustice. If the RCT truly believed it owned these claims, it was required as a fiduciary to do something to preserve them and maximize their value before it was too late. That the RCT, in fact, did nothing at all to protect these claims demonstrates that the RCT never really believed it owned them to begin with. That the RCT also failed to file this motion until after limitations had run, and after the PCT had incurred significant expense and invested significant resources in prosecuting these claims, also establishes that equitable estoppel bars the RCT's request for relief. The RCT's motion should be denied.

## V.
## The Claims At Issue Here are Valuable Claims

54.    There is no question that the claims against the vendors and the vendor officers are extremely valuable.

55.    The tort claims against the vendor officers in the PCT's lawsuit, and that could have been but were not filed by the RCT against the Reclamation Creditors themselves, are:  1) knowing participation in a breach of fiduciary duty (for deliberately participating in the Fleming's officers' breach of their duties of candor and good faith); 2) civil conspiracy (for conspiring with faithless Fleming officers in the manipulation of its financial results); and, 3) negligent misrepresentation (for recklessly providing false documents to Fleming's officers to use for the manipulation of Fleming's financial data).

56.    Texas takes a harsh view of those, such as the vendor officers, who participate in and suborn a fiduciary's breach of his duty. When "a third party knowingly participates in the breach of duty of a fiduciary, such third party becomes a joint tort-feasor and is liable as such."

*Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 2160 S.W.2d 509, 514 (Tex. 1942). There is no question that the PCT has stated a claim for relief on these causes of action; indeed, the defendants themselves have admitted that the underlying facts are true in the SEC Consent Judgments. The only real question, therefore, is what damage Fleming's creditors suffered as a result of this wrongful conduct.

57.    The precise amount of the damages that flowed from the vendor officers' admitted misconduct remains to be determined, but we know this much. Fleming's unsecured creditors have collectively lost over $2 billion dollars. We know, as well, that but for the manipulation of its financial statements Fleming might not have incurred as much as a billion dollars or more of that indebtedness. We also know that—although its corporate collapse was on a different scale than Fleming's--Enron has already recovered *over $700 million* for its creditors by pursuing claims (identical to those filed by the PCT) against those who assisted its faithless employees in manipulating its financial statements. See Exh. "G" Finally, just weeks ago, the District Court in the *Parmalat* case recognized that *in pari delicto* does not bar claims against insiders who loot a company, or against those who assist them in doing so. *In re Parmalat Securities Litig.*, Case No. 05 Civ. 4015 (S.D.N.Y. August 5, 2005,) attached as Exh. "H."

58.    All of this serves only to demonstrate that these are valuable claims, solidly grounded in the law and supported by facts that have already been admitted by the wrongdoers. The RCT's desire to pursue a "consensual process" that protects its own constituency, without regard to its obligation to maximize these claims for the benefit of all creditors, is hardly something about which it should boast. The RCT's desire to protect "its" constituency, at the expense of its beneficiary, the PCT, is also no basis upon which the RCT should be permitted to re-trade the Plan, or interfere with the PCT's efforts to pursue claims it has been charged with

31

pursuing                              under                                    the Plan.[18]

## VI.
### The RCT's Motion Is Procedurally Defective

59.    The RCT's motion suffers from an additional, procedural flaw.  Federal Rule of Bankruptcy Procedure 7001 provides that the following proceedings, among others, constitute "adversary proceedings:" (i) a proceeding to determine the validity, priority or extent of . . . interest in property (Rule 7001(1)), (ii) a proceeding to obtain an injunction or other equitable relief (Rule 7001(7)), and (iii) a proceeding to obtain a declaratory judgment relating to any of the foregoing (Rule 7001(9)).  Pursuant to Federal Rule of Bankruptcy Procedure 7003, an adversary proceeding "is commenced by filing a complaint with the court."  Accordingly, the RCT's Motion, which seeks all three forms of relief, is procedurally improper and must be dismissed.

60.    The RCT concedes that, generally, a party seeking injunctive relief must proceed by an adversary complaint, rather than a motion.  See Motion at ¶ 37, fn. 22.  However, the RCT claims that the specific relief is properly obtainable by motion.  The RCT cites three cases in support of this proposition, but these cases are clearly distinguishable.

61.    The main case on which the RCT relies is *In re Continental Airlines, Inc.*, 236 B.R. 318 (Bankr. D. Del. 1999).  The *Continental* court, indeed, allowed the debtors to proceed by motion when they sought to enjoin certain pilots from filing and prosecuting state court actions asserting claims discharged by the confirmation order.  The court based its decision on the distinction between situations where a party was *seeking* an injunction (and where an adversary proceeding and a compliant were required) and situations where a party was seeking to

---

[18] The RCT has one final complaint to make:  It is unhappy that it was compelled to retain "conflict" counsel because the RCT's counsel could not investigate Kraft and at least one other vendor.  RCT Mtn. at 18.  This, too, is an obvious red herring.  If the RCT's counsel had a conflict such that it could not investigate Kraft (or any of the other wrongdoing vendors), it had a conflict such that it could not represent the RCT against Kraft in reconciling the underlying reclamation claim.  The same is true for any other vendor as to which the RCT was required to retain conflict counsel.  That the RCT would invoke its own counsel's conflict as a point in its favor serves only to demonstrate how very badly the RCT has lost sight of where its fiduciary obligations actually lie.

*enforce a previously obtained* injunction (and where it was procedurally proper to proceed by motion). Thus, in <u>Continental</u>, the debtors were seeking to enforce the injunction against instituting and prosecuting discharged claims that was "already in place [by] express terms of the Confirmation Order." <u>Continental</u>, 236 B.R. at 327.[19]

62.    Here, in contrast, the claims at issue were not discharged in the Plan; they were, instead, preserved in the Plan. Plan Art. I (B)(36) (Causes of Action) and Art. VI (B) (Retained Claims). Nor, as in *Continental*, is there an injunction prohibiting the PCT from prosecuting these claims. To the contrary the Plan specifically requires the PCT to maximize these claims in good faith. Plan Art. {IV}[V] (G)(8) (requiring PCT to maximize all claims that are "not RCT Assets). Accordingly, far from seeking to enforce an existing Plan injunction, as in *Continental*, the RCT seeks an entirely new injunction that would fundamentally re-write the Plan. This cannot be done more than a year after confirmation, and it certainly cannot even be sought by the RCT outside the context of an adversary proceeding—particularly given that the RCT concedes the Plan did not "explicitly" confer the claims at issue on the RCT. *Compare* RCT Mt. at 12.

63.    In order for the RCT to claim that the injunctive relief it is seeking is properly obtainable by motion, it would have to demonstrate that it is seeking to enforce an explicit Plan provision. The RCT concedes it cannot do this, because no Plan provision "explicitly," RCT Mtn. at 12, confers these claims on the RCT. Accordingly, the RCT can proceed only by an adversary complaint because it seeks a *determination* with respect to an interest in property of the estate. *See* Bankruptcy Rules 7001(1) and (9). *See also In re Taylor*, 77 B.R. 237, 241 (9th Cir. BAP 1987) ("Bankruptcy Rule 7001 specifies that an adversary proceeding is necessary to obtain a declaratory judgment relating to an interest in property."), *reversed in part on other grounds*, 884 F.2d 478 (9th Cir. 1989); *In re Envirodyne Indus., Inc.*, 174 B.R. 955, 960 (Bankr. N.D. Ill. 1994) ("the court cannot issue a binding declaratory judgment with regard to any of the

---

[19] The other two cases cited by the PCT stand for the same rule. In *In re Petrie Retail, Inc.*, 304 F.3d 223 (2nd Cir. 2002), the movant was seeking to enforce specific explicit provisions of both the sale and the confirmation order enjoining lessors from asserting claims against the purchaser/assignee of the debtor's assets, while in *In re Woods*, 316 B.R. 522, 525 (Bankr. N.D. Ill. 2004), the movant was seeking to compel distribution provided for in the confirmed plan.

proceedings listed under Rule 7001 without conducting an adversary proceeding"). The RCT has not filed an adversary complaint, so there is no mechanism by which the Court can award injunctive relief.

## VII.
## Cross-Motion for Declaratory Relief

64.     The PCT has established that there are a number of clear Plan provisions that confer these claims on the PCT. *See supra* Part II. The RCT's actions have interfered and continue to interfere with the PCT's prosecution of its claims—even though the PCT is clearly not merely authorized, but required, to maximize the claims it has filed for the benefit of its creditors. As a result of the RCT's collateral attack on the PCT's lawsuit, the United States District Judge has stayed all proceedings in the PCT's Complaint pending a ruling by this court. That stay is impairing the PCT's litigation even now, because of fading memories, resignations of employees and the passage of time. It has already been four years since some of the false transactions at issue in the SEC Consent Judgments, and every moment of delay makes the PCT's task even more difficult. Accordingly, there is an urgent need for this Court to decide—once and for all—that the PCT may proceed with its litigation.

65.     Although *In re Continental Airlines*, *supra*, affords no basis for the relief the RCT seeks, under the same case the PCT *is entitled* to entry of an Order declaring that it owns the claims it has filed. There is an explicit Plan provision conferring these claims on the PCT, these claims were not discharged, and the existing Plan injunction in the Confirmation Order, requires the PCT to maximize these claims for the benefit of its creditors. Accordingly, the PCT respectfully requests that the Court enter an Order:

1.     Denying the RCT's Motion;

2.    Declaring that the Plan establishes that the PCT owns the claims it has filed in its cross-action; and,

3.    Declaring that the PCT is entitled to pursue its claims, without further interference by the RCT, and further need to prove in this or any other court that the PCT owns the claims it has filed.

### Conclusion

66.    The clear language of the Plan establishes that the PCT owns the claims it has pursued in its Texas lawsuit. The clear language of the PCT's complaint establishes that it has not sought to recover damages (or any other form of relief) from any Reclamation Creditor. Finally, the clear record of inaction by the RCT demonstrates both that it does not genuinely believe it owns these claims—which are not "explicitly" delegated to it under the Plan—and that the RCT should be equitably estopped from asserting it owns these claims in light of its own, inequitable conduct and the severe damages that will ensue when these claims are destroyed as a result.

The RCT's motions should be denied and the court should, instead, enter an Order confirming that these claims are the property of the PCT.

October {4,} [13,] 2005

Respectfully submitted.

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB P.C.

[_____]
Laura Davis Jones (Bar No. 2436)
Scotta E. McFarland (Bar No. 4184)
919 North Market Street, 17th Floor
Post Office Box 8705
Wilmington, Delaware 19899-8705
(Courier No. 19801)
Telephone: (302) 652-4100
Facsimile: (312) 652-4400

A    370

**OF COUNSEL TO THE PCT:**

**GIBBS & BRUNS LLP**
Kathy Patrick{*} (Texas Bar No. {————}[15581400)]
1100 Louisiana Street, Suite 5300
Houston, Texas  77002
Telephone:  (713) 650-8805
Facsimile:  (713) 750-0903
(~~"Application for Admission Pro Hac Vice Filed"~~)