# TAB 6

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE: | . Chapter 11 |
| | . |
| FLEMING COMPANIES, *et al.*, | . Case No. 03-10945(MFW) |
| | . Jointly Administered |
| Debtors. | . |
| | . Oct. 19, 2005 (9:31 a.m.) |
| | . (Wilmington) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE MARY F. WALRATH
UNITED STATES BANKRUPTCY COURT JUDGE

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1          THE CLERK: All rise.  You may be seated.

2          THE COURT: Good morning.

3          UNIDENTIFIED SPEAKER: Good morning,

4          MR. JONES: Good morning, Your Honor, Your Honor.

5    For the record, Laura Davis Jones, Pachulski, Stang, Ziehl,

6    Young, Jones & Weintraub on behalf of the PCT.  Your Honor,

7    we have one matter that is scheduled for hearing today.

8    There is an amended notice of agenda before the Court, and,

9    Your Honor, before we begin we'd like to just make a few

10   introductions.  On behalf of the PCT I would like to

11   introduce Kathy Patrick from Gibbs & Bruns.  She is trial

12   counsel for the PCT in Texas.  We have moved her admission

13   *pro hac vice*, and Your Honor has signed that order, thank

14   you.

15         THE COURT: All right.

16         MS. PATRICK: Good morning, Your Honor.

17         THE COURT: Good morning.

18         MS. PATRICK: Thank you very much for the privilege

19   of allowing me to appear today.

20         THE COURT: Okay.

21         MS. PATRICK: I also have with me Robert Coors

22   (phonetical) the Trustee of the first confirmation trust whom

23   the Court may have met earlier.

24         THE COURT: All right.

25         MR. COORS: Good morning, Your Honor.

1          THE COURT: Good morning.

2          MS. CALOWAY: Good morning, Your Honor, Mary

3     Caloway, Klett Rooney Lieber & Schorling, on behalf of Kraft

4     Foods Global, Inc.  I'd like to introduce to the Court my co-

5     counsel, Daniel Hildebrand of the Mayer, Brown, Rowe & Maw

6     firm.  Last week I did file a motion for his admission *pro*

7     *hac.*  According to the docket this morning, it's not yet been

8     signed, but we would request that he be permitted to address

9     the Court this morning.

10          THE COURT: Very well, that will be granted.

11          MS. CALOWAY: Thank you, Your Honor.

12          MR. HILDEBRAND: Thank you, Your Honor, and good

13     morning.

14          THE COURT: All right.

15          MR. SCHLERF: Good morning, Your Honor, Jeffrey

16     Schlerf for The Bayard Firm for Dean Foods.  Your Honor, I'd

17     like to reintroduce the Court to Mark Ralston, a partner at

18     the law firm Munsch Hardt, and we will be filing motion

19     papers this morning.  I understand Mr. Ralston is admitted in

20     good standing of various jurisdictions.

21          THE COURT: All right.

22          MR. SCHLERF: Thank you.

23          THE COURT: Will be granted, you're welcome.

24          MR. WAXMAN: Good morning, Your Honor.  Jeff Waxman

25     of Cozen O'Connor on behalf of Food Marketing Group.  Behind

1    me is Mr. Neil Burger of Togu Segal & Segal, and to his right

2    is Terese Pertchard of Bryan Cave.  We have moved their

3    admission *pro hac vice*.  I have not seen orders approving it,

4    but I'd ask that they be permitted to address the Court

5    today.

6              THE COURT: They will be.  It will be granted.

7              MR. WAXMAN: Thank you.

8              THE COURT: You're welcome.  With that done, does

9    the RCT wish to proceed?

10             MR. FRIEDMAN: Thank you, Your Honor.  Good morning,

11    Your Honor.  Mark Friedman, Daniel Carrigan, and Janice

12   Duban from DLA Piper and Steve Kortanek from Klehr Harrison

13   on behalf of the Reclamation Creditors' Trust, the RCT.  Also

14   in attendance today is the chair of the RCT, Cutis Marshall

15   and Gary Grissom, who is a board member of the RCT that I

16   know has testified before this Court.  If I may proceed on

17   the RCT's motion, Your Honor, the narrow issue before this

18   Court is whether the causes of action asserted in the Texas

19   securities litigation by the PCT against current and former

20   employees of five reclamation creditors are PCT assets or are

21   they RCT assets under the plan?  Much of the written

22   presentations to this Court, voluminous papers by the RCT,

23   the PCT, and the four targeted reclamation creditors who have

24   submitted pleadings, elaborate upon the background and

25   context of the dispute and, to some extent, with passionate

 1    intensity.  Certainly from the RCT, we feel the integrity of

 2    the plan mandated RCT process has been challenged, and that

 3    RCT board members, themselves, have been threatened.

 4    However, the two motions, both the RCT's motion and the PCT's

 5    motion that this Court is called upon to decide, revolves

 6    around the narrow issue of competing versions of the plan,

 7    each of which is asserted to be plain and unambiguous.  The

 8    RCT brings its motion with the support of these reclamation

 9    creditors because it believes the claims asserted against the

10    six current and former employees are just conduits by which

11    the PCT seeks recovery from the reclamation creditors

12    themselves.  The PCT pleading in Texas that's been attached

13    as an exhibit to the RCT's motion, Count 6, plainly states

14    that the reclamation creditors themselves are the ultimate

15    liability pocket, and to use the PCT's word, "responsible" to

16    pay for the alleged injuries inflicted upon Fleming by the

17    agents of these reclamation creditors.  The RCT has brought

18    its motion because the RCT believes that it's the right thing

19    to do.  The RCT sees its responsibility to implement the plan

20    mandated process for reclamation creditors and to respond to

21    what it believes to be a PCT intrusion upon that process.

22    This conflict, we submit, Your Honor, needs resolution for

23    all parties, all parties are asking for it.  Seemingly, the

24    Texas Court itself is looking to this Court to resolve that

25    conflict.  And we ask that this Court determine that the

1    claims filed by the PCT in Texas are really claims against

2    these reclamation creditors whether they're characterized as

3    direct, indirect, derivative, or otherwise whether asserted

4    or un-asserted, and whether they change from one form or

5    another depending upon any success the PCT might have derived

6    in the Texas litigation.  They remain as claims against these

7    reclamation creditors and belong to the RCT.  Stated another

8    way, the PCT acknowledges throughout that the RCT owns causes

9    of actions against the reclamation creditors, and that such

10   causes of action are RCT assets governed by the plan

11   treatment.  Thus, the narrow question can be posed another

12   way.  Are these Texas claims, claims against the reclamation

13   creditors within the scope of the plan?  In addressing this

14   narrow question, Your Honor, I think it's important to

15   examine the plan language, the overall fundamental purpose of

16   the plan treatment for reclamation creditors, and which of

17   the competing plan versions of the RCT and the PCT frustrate

18   or achieve the intended plan treatment for reclamation

19   creditors.  The starting point, Your Honor, has to be the

20   focus on the determination of how confirmation of the plan

21   effected either an allocation or distribution of all the

22   claim assertion rights of the estates.   The right to assert

23   claims against reclamation creditors were clearly channeled

24   to the RCT.  All claims against reclamation creditors,

25   including tort claims and including any and all recovery

```
 1   rights that arise therefrom, all injuries and all damages,
 2   and such tort liability, just like any other liability for a
 3   business organization, can only arise through the actions of
 4   its agents, its employees.  The plan should not be viewed as
 5   creating duplicate recovery rights by each trust for the same
 6   injury and for the same damages.  The RCT believes the plan
 7   language prevents this duplicate right and duplicate exposure
 8   upon reclamation creditors having to confront each trust for
 9   resolution of claims against it, and this is accomplished
10   through the expansive net that's been cast by the cause of
11   action definition, that whether or not the claims were
12   identified at the time, or whatever guise they might have
13   been pursued, that creditors were fair in their understanding
14   that they had one exposure, one trust to deal with, and that
15   that's what the plan did provide.  And as will be
16   demonstrated, Your Honor, the RCT's position gives effect to
17   all the plan language.  The PCT's version does not.  The
18   relevant plan provisions, Your Honor, and they're all put
19   together in the PCT's - certainly they're in our motion and
20   in the revised errata filing of the PCT, to look at what's
21   the definition of reclamation creditors?  What's the
22   definition of RCT assets?  What's the definition of PCT
23   assets?  And what's the definition of cause of action?  And
24   to start with an easy one, the definition of reclamation
25   creditors, there appears at least to be total agreement from
```

1    the interested parties here, that reclamation creditors are

2    all those creditors that asserted reclamation claim against

3    Fleming or were otherwise identified on the reclamation claim

4    summary that was compiled by the debtors.  And there's no

5    dispute that the five targeted reclamation creditors, Kraft,

6    Frito-Lay, FMG, Kemps, Marigold, and Dean Foods are

7    reclamation creditors, and that's in the definition, Article

8    1, § (B)148 of the plan.  Now the scope of RCT assets are

9    defined and described several places in the plan.  Article

10   1(b), 145, and Article 5, subsection H, and in every case the

11   description is the same.  It's deductions, over-wires,

12   preference claims, causes of action, a defined term under the

13   plan, and other rights of the debtors against the reclamation

14   creditors.  The critical language, obviously, is cause of

15   action or the rights as against the reclamation creditors and

16   whether these Texas claims are within the scope of that

17   language.  The words "other rights" are general and a

18   catchall, but the words "cause of action" have specific

19   meaning within the plan and a specific definition.  Now, as

20   to PCT assets, as I will describe a little bit later in this

21   statement, Your Honor, but a significant principal of the

22   plan and certainly reclamation creditor treatment was the

23   absolute disengagement of reclamation creditors from these

24   bankruptcy estates for the resolution of every and all claims

25   that remained unresolved at the time of confirmation.  And

1   consistent with that, there was the effort to avoid overlap
2   so you wouldn't have the situation today where there's a
3   contention that there were duplicate claims for the same
4   injury and for the same recovery belonging to both trusts as
5   the PCT has alleged.  Now while the PCT assets are not
6   specifically defined in the plan, they are described and
7   described each time as not including any RCT assets, defined
8   to exclude all RCT assets, that's Article 5 of the plan,
9   subsection (g), both in paragraphs (1), (2), and (3).  So we
10  get to cause of action.  A lengthy definition in the plan
11  intended to have broad scope, and the particular categories
12  listed there are not exclusive but by way of illustration.
13  And cause of action is defined as including but not limited
14  to all the categories of claims, claims itself being a
15  defined term, actions and causes of action, also being a
16  defined term, and by way of illustration, cause of action
17  includes but is not limited to claims, actions, causes of
18  action, but includes due sums of money, controversies,
19  damages of the debtors and the estate against any person
20  based on law or equity, including but not limited to under
21  the Bankruptcy Code.  Now the definition's Article 1,
22  Subsection (B)36.  Again, the language is broad, but the
23  words should be used to have their common meaning except
24  where defined.  Claim is defined as the right to payment
25  whether or not such right is reduced to judgment, liquidated,

1   unliquidated, fixed contingent, matured, un-matured,

2   disputed, undisputed, legal, or equitable, and the scope of

3   categories is broad; extending to whom?  The language says

4   against any person whether direct, indirect, derivative, or

5   otherwise, and whether asserted, known, or unknown.  Now the

6   PCT in the brief that was filed Monday night, accuses the RCT

7   of misdirection and claims that the words "indirect and

8   derivative" relate to either the process or the party that

9   brings the claim and not to the target.  But the language

10  itself plainly refers to the claims, whether the claims are

11  direct or indirect, whether they're derivative or whether

12  they are otherwise against the reclamation creditors.  And

13  since raised on Monday, I took a look at Black's Legal

14  Dictionary, and when you look at some of these simple words,

15  like derivative tort defined as tort liability imposed on a

16  principal for actions of the agent; respondeat superior where

17  the master is called to answer; vicarious liability; indirect

18  legal responsibility of an employer for an employee, all

19  words of the plan that should be construed to have meaning, a

20  meaning that provides a workable process for all the parties

21  affected by the plan.  Not to do so through duplicate rights

22  and duplicate recoveries and duplicate exposure, and not to

23  do so by trying to ignore certain of the plan language.  The

24  origin of this plan arose out of acrimonious and litigious

25  disputes between the bankruptcy estates and the reclamation

A   381

1    creditors' over-treatment of reclamation claims, and this

2    Court, in an unusual and perhaps unprecedented step appointed

3    the Official Committee of Reclamation Creditors to allow an

4    opportunity for a negotiated global resolution of the

5    disputes between the bankruptcy estates and reclamation

6    creditors as an alternative to proceeding down the path of

7    the six hundred adversary proceedings which Fleming had filed

8    to deny reclamation claims.  In fact, that process, in a

9    relatively short period of time led to a negotiated

10   resolution between Fleming, the OCUC, the Unsecured Creditors

11   Committee, and the OCRC.  That resolution's set forth in a

12   revised term sheet attached to the disclosure statement, and

13   was itself the object of a settlement referenced in the RCT's

14   motion that was approved by this Court in conjunction with

15   the plan ballot solicitation between the RCT and the debtors.

16   The fundamental plan purpose for treatment of reclamation

17   creditors was a complete separation and disengagement of

18   reclamation creditors from the estates and its post

19   confirmation vehicle, the PCT, for the resolution of all the

20   multitude of unresolved claims of reclamation creditors

21   against the estates and claims of the estates against

22   reclamation creditors.  Similar to a carve-out.  Or simply,

23   the reclamation creditors as a body believed they had

24   achieved their goal, never having again to confront the PCT

25   as Fleming's successor in the resolution of any remaining

1    claims.  Invaluable rights were surrendered in exchange.  The
2    pre-petition trade lien vendors gave up lien status in all
3    the debtor's assets.  The balance of the reclamation
4    creditors gave up claims to lien status or administrative
5    claim status.  And a significant of these surrender, while
6    mitigated to some extent by a deferred Core-Mark guarantee
7    for trade lien vendors and a very limited partial guarantee
8    backstop by Core-Mark for the non-trade lien vendors was
9    still very material, and all done so to totally disengage
10   from Fleming and not have to confront unresolved claims with
11   them.  Now, viewed against that relevant plan language and
12   the plan purpose are the Texas claims, and I submit, Your
13   Honor, the relevant questions: Are they not claims as defined
14   in the plan or causes of action or any of the various
15   categories directly or indirectly against these reclamation
16   creditors?  Looking at the ultimate pocket, who's the PCT
17   looking to pay for any recovery on the claims it pursues?  It
18   makes it clear, it looks to the reclamation creditors to pay.
19   Nothing could be more clear from Count 6 of its Texas
20   complaint wherein it alleges directly that each of the
21   employees was acting within the scope of employment, that the
22   reclamation creditors were responsible to indemnify.  PCT is
23   not pouring its resources in because it wants to recover from
24   the attachable assets of these individual six defendants, and
25   at the same time, they are alleging that when these claims

 1   came out of the shoot, that there were duplicate claims.
 2   They called the word "parallel" but in fact they, as we
 3   mentioned in our brief, that is a misnomer because they all
 4   intersect because they both would be looking to the
 5   reclamation creditors to pay.  The same injury, the same
 6   damages being owned by two different post-confirmation
 7   vehicles.  What is disengagement from the estates and
 8   resolution by the ACT supposed to mean if these reclamation
 9   creditors are left to confront the PCT on these claims or any
10   other?  Clearly, the PCT hopes to make its claims direct, and
11   even now, the word "indirect" can have no meaning if it's not
12   including claims that would exist against these reclamation
13   creditors solely through the actions of their employees.
14   Now, the PCT, through its version of the plan, asks this
15   Court to put on blinders, simply look at the first page of
16   the Texas complaint and when the parties are listed, look to
17   the identified defendants, and since no reclamation creditor
18   is listed to end the inquiry there and say the claims are not
19   being inserted against the reclamation creditors.  That's
20   similar to an emperor-wears-no-clothes fairy tale argument,
21   Your Honor.  It's clear from reading the content of the
22   complaint there is a count listed against the reclamation
23   creditors.  They're alleged to have responsibility to pay,
24   and that is whom the PCT seeks to assert using these claims
25   against the individuals as conduits.  In their response, the

1    PCT is followed with a tortured interpretation of the plan,

2    which the RCT submits frustrates the purpose and creates

3    internal inconsistencies and ignores clear plan language.  As

4    we said before, the PCT argues that these claims are torts,

5    and it may pursue the individuals who allegedly committed

6    these torts, but they are pursuing them for the very same

7    causes of action they acknowledge the RCT owns for the very

8    same injuries and for the very same damages.  Did the plan

9    contemplate such a split in the cause of action, such an

10   imposition of risk of duplicate exposure and duplicate

11   proceedings from these two different trusts?  It's clearly

12   not the separation disengagement from the PCT which the

13   reclamation creditors bargained for and for which they

14   surrendered rights and interests.  The RTC submits it cannot

15   have been the purpose of this Court in approving the plan to

16   impose such uncertainties and risks and inefficiencies upon

17   the post-confirmation process and upon the reclamation

18   creditors.  The Court could not have intended for the RCT and

19   PCT to tussle over claims as now is occurring.  The RCT

20   asserts that the narrow issue before this Court is easily

21   answered by plain reference to the language of the plan.  The

22   claims in Texas are against the employees in name only.  They

23   are claims in reality against the reclamation creditors

24   within the scope of the definition of cause of action.  The

25   conclusion follows directly from the plan language and

15

1    conforms to an orderly process by which reclamation creditors

2    may look only to the RCT for resolution of claims by them or

3    against them in whatever guise.  The PCT version suggests

4    uncertainty and chaos of which multiple parties can proceed

5    in effect against the same ultimate pocket for the same

6    injuries, the same damages, and the same claims.  That's not

7    the plan, the effects of the plan that were negotiated.  It's

8    not the effect of the plan that was voted for overwhelmingly

9    by the reclamation creditors or the process the RCT is

10   obligated to pursue.  For that reason, Your Honor, the RCT

11   requests that the Court enforce the plan by enjoining the PCT

12   from proceeding in the Texas litigation with those claims

13   against these current or former employees and confirming that

14   such claims are RCT assets to be addressed by the RCT in the

15   plan mandated RCT process and not otherwise.  Thank you.

16           THE COURT: Yes.  All right, any response?

17           MS. PATRICK: Your Honor, there are about five or

18   six people that have filed briefs in support of RCT's motion,

19   and it might make sense for me to respond all at once.  If

20   anybody else wants to speak, so we don't do a ping-pong game?

21           THE COURT: All right.  Do any of the reclamation

22   claimants themselves wish to add to –

23           MR. HILDEBRAND: Not at present, Your Honor.  The

24   vendors filed primarily in response to the PCT.  I think

25   we'll sit down for now.

A    386

1           THE COURT: All right, thank you.

2           MR. RALSTON: Your Honor, I don't believe I'm

3     repeating anything that Mr. Friedman has discussed, and it's

4     just to put one point on the brief filed by the PCT Monday.

5     I looked at that to see what the hypothetical they raised

6     that any claim or tort claim essentially could fall under the

7     rubric of a claim against a reclamation creditor, and quite

8     honestly, Your Honor, that just proves too much.  The fact

9     that Deloitte & Touche may have made in settlement

10    negotiations or in pleadings an assertion that there were

11    contribution claims out there does not establish (1) that

12    those claims existed, and certainly, as I understand it,

13    although the settlement is under seal, and we don't know how

14    much they settled for, presumably, Deloitte didn't feel very

15    strongly about its contribution claims at least against

16    reclamation creditors because those claims have been resolved

17    and presumably the PCT has received what it believes to be a

18    reasonable recovery on those claims.  So, we don't think that

19    strawman argument really flies in this case.  I just make

20    that point, Your Honor.

21          THE COURT: All right.

22          MR. RALSTON: Thank you.

23          MS. PATRICK: Your Honor, may I have just a moment.

24    I'm going to hook my computer up, if you don't mind.

25          THE COURT: You may.

1           MS. PATRICK: Good morning, Your Honor.  Again,

2    Kathy Patrick with Gibbs & Bruns in Houston, Texas on behalf

3    of the post-confirmation trust.  We are litigation counsel

4    for the post-confirmation trust in Texas.  We are pursuing

5    toward any professional liability claims that under the plan

6    are allocated to the PCT.  I'd like to begin by bringing the

7    Court up to date on the PCT's activities since confirmation.

8    As the Court knows, the PCT is a post-confirmation trust.

9    Mr. Coors, the chairman of the PCT Board and the PCT

10   representative, was appointed by the creditors.  The PCT also

11   has an independent board, again appointed by the creditors

12   that supervise what I do as their lawyer.  So, the

13   suggestions that were replete in the pleading that somehow

14   the PCT is the debtor are simply misplaced.  It is not the

15   debtor.  Pursuant to our responsibilities under the plan that

16   we have filed a number of lawsuits, we have been, I'm happy

17   to say, quite successful in those.  I'm pleased to report

18   that we do have a settlement with Deloitte & Touche.  It is

19   confidential.  Let me assure the Court that if I were able to

20   disclose it, I would be extremely elated to be able to

21   disclose it, but at Deloitte insistence it was kept

22   confidential.  Similarly, we have just yesterday obtained an

23   order from Judge Ward approving preliminarily a settlement

24   against the non-released officers and directors under the

25   Fleming plan pursuant to which we will get a significant

1    payment of insurance proceeds.  The good thing about that,
2    Your Honor, is, as you know, before they were transferred to
3    Judge Ward there were significant coverage defenses and
4    recession actions pending, and we withstood those and have
5    obtained a settlement that we're quite please with.  As a
6    consequence of that, there are a number of preference actions
7    that have been filed by the PCT against former officers of
8    Fleming that will also be resolved, and we will be bringing
9    you papers to take care of those.  We have pending still in
10   Texas the claims against the vendor officers, and we have a
11   number of other tort claims that have been tolled and are
12   being investigated.  I hope not to bother you too much but
13   you may see me again for Rule 2004 discovery or other things,
14   and I very much appreciate your courtesy in allowing me to
15   appear.  So let's turn now to the vendor officers and the
16   claims that are at issue here.  As the Court will recall from
17   the plan and from the disclosure statement, in the last
18   quarter of 2001 and 2002, a series of false letters were
19   signed and false documents were executed that were used to
20   manipulate and overstate Fleming's income.  In the words of
21   the SEC press release, this happened because it takes two to
22   tango.  Fleming could not have mislead investors as it did
23   without suppliers, _i.e._, vendors providing or agreeing to
24   false transaction documents.

25              THE COURT: I'll assume these are all allegations n

A    389

1    your Texas –

2         MS. PATRICK: They are in fact allegations in the
3    Texas complaint, Your Honor, and we took note of the
4    assertion that the consent judgments themselves are not
5    admissible, which of course, is true, but that does not mean
6    the facts recited in them cannot be proved.  We have the
7    false documents.  We have the false accounting entries, and
8    presumably, that evidence is –

9         THE COURT: I'm not making any findings that there
10   is any fraud or any of this is correct, but I'll accept that
11   these are your allegations.

12        MS. PATRICK: That's right, Your Honor, I
13   understand.  And it is our allegations on which this entire
14   matter turns because the question whether the claims pursued
15   are those that belong to the RCT because they are against
16   reclamation creditors or to the PCT turns on the four corners
17   of the plan and the four corners of the PCT's complaint.  As
18   we allege in the complaint, 65 percent of Fleming's fourth
19   quarter net income was the result of vendor transactions that
20   involved false documentation provided by officers or
21   employees of these four creditors, Dixie, Kraft, Marigold,
22   and Frito-Lay.  An additional 30 percent of the first quarter
23   of 2002 net income was similarly overstated.  As a
24   consequence of the overstatement of that income, Fleming was
25   able under its debt covenants to incur additional debt of

```
 1   $500 million.  We have, Your Honor, in the power point that
 2   we've provided to the representatives of the challenging
 3   creditors and also to the Court, these schedules of the total
 4   debt, and you can see the explosion of debt at Fleming that
 5   corresponds to the manipulation of the income, both in terms
 6   of total debt, in terms of long-term debt in the same time
 7   frame based on year-end financials, and in terms of trade
 8   debt.  Hundreds of millions of dollars of increased trade
 9   debt was incurred immediately after the false financials were
10   published.  This could not have happened under Fleming's debt
11   covenants because there were net income covenants that had to
12   be met before long-term debt was incurred, and Fleming would
13   not have had sufficient income to incur the additional debt
14   but for the manipulation of its financials, and as a result
15   of the transactions, the PCT has alleged were fraudulent,
16   Fleming was effectively insolvent in the last quarter of 2001
17   and for every quarter thereafter, and hundreds of millions of
18   dollars of debt was piled onto this company to the detriment
19   of the creditors themselves.  The potential claims that arise
20   from this manipulation of Fleming's financial statements are
21   plainly set out in the disclosure statement.  There is a
22   detailed discussion of the SEC investigation, including the
23   fact that the Commission was investigating whether any
24   persons had engaged in transactions that had operated as a
25   fraud or deceit.  Specifically disclosed as well was that
```

1   fact that three creditors who ultimately became reclamation

2   creditors, Kraft, Dean Food, and Frito-Lay, had recently

3   announced that they had been notified that the Commission was

4   considering filing charges against those companies in

5   connection with their business dealings with Fleming,

6   including whether their employees, the allegations we have

7   made here in or complaint, whether their employees aided

8   Fleming in accelerating revenue improperly.  So that's what's

9   in the disclosure statement.  The suggestion is made by Kemps

10  and other creditors that nonetheless, these claims were not

11  preserved in the plan.  That simply is not true.  Article

12  6(b) of the plan - and, Your Honor, I apologize in our

13  original brief, I had a moment, I've been through this plan

14  so many times, I kept saying, Article 5 and it's Article 6,

15  and I apologize for those errors in the brief, those are

16  mine.  I assure you that I have got them right in the power

17  point.  Article 6 retained and preserved all actual or

18  potential causes of action against persons or entities

19  including vendors with respect to violations of the federal

20  securities laws and state securities laws, which would

21  include, obviously, the manipulation of income.  It preserved

22  all claims in connection with any of the debtor's pre-

23  petition management, operation, or recording of financial

24  information.  Plainly accelerating revenue improperly and

25  knowingly assisting in that effort, it falls within that

1    ambit.  Similarly, it preserved all claims arising out of or

2    in connection with the debtor's business or operations and

3    contract or tort actions.  Importantly, although Kemps in its

4    second brief relies on Exhibit A and suggests to the Court

5    that because tort claims against reclamation creditors were

6    not listed on Exhibit A, they are not preserved, that too is

7    belied by the plain language of the plan.  In Article 6 it

8    specifically says that the categories I have just described

9    are not limited in any way by reference to Exhibit A.  So the

10   Exhibit A listing of deductions and over-wires and the like,

11   did not somehow take back the broad preservation of claims

12   that existed in Article 6(b)'s categorical listing.  So,

13   Exhibit A and all of the categories in Article 6(b) of the

14   plan are preserved.  There is no serious argument to be made,

15   Your Honor, that these claims are not preserved in the plan,

16   although some have tried.  Our claims against the vendor

17   officers are independent.  It cannot be gainsay that when

18   groups of people and entities combine to cause an injury, it

19   gives rise to more than one claim.  There is no question

20   under Texas law – by that, I mean, Your Honor, more than one

21   claim against the persons responsible, and any trust

22   conspiracy may cause a single injury to the injured,

23   competitor, or consumer, but each competitor is independently

24   liable for their own wrongdoing, and that is true in Texas as

25   well.  The Fleming officers were fiduciaries for the company,

```
 1   and under Texas law it is settled that anyone who knowingly
 2   participates in the breach of duty of a fiduciary, such as a
 3   third party, becomes a joint tortfeasor with the fiduciary,
 4   and here, Your Honor, is the critical point, agents are
 5   personally liable for the damages that they cause,
 6   independently of their principals and employers.  That is the
 7   rule in Texas.  It is a longstanding rule.  We have cited to
 8   the Court the Texas cases.  I have copies of them for the
 9   Court's law clerk which I will hand up at the conclusion of
10   the hearing, and so, when John Kent Adams signs a false
11   letter with the intention that it be used to manipulate
12   Fleming's financial statements, at the behest of Albert Abude
13   (phonetical) a Fleming employee, Mr. Adams may be held
14   personally liable in Texas whether he did that within the
15   scope and course of his employment at Kraft or not.  That is
16   the law.   The focus is on claims not on injury.  The injury
17   issue is addressed, as the Court knows, in the form of
18   judgment.  Credits for settlement are allocated, credits for
19   other recoveries are allocated, but that does not mean the
20   claims are not independent.  And there are independent and
21   parallel claims here that can be asserted.   There's no
22   question, and Mr. Friedman's absolutely right, the claim
23   against Kraft itself, the claim against Kemps belongs to the
24   reclamation creditor's trust.  The claim against Mr. Adams
25   and the other employees, none of whom are reclamation
```

1    creditors, does not belong to the RCT.  It belongs to the

2    PCT.    The other claims that we have asserted, civil

3    conspiracy and negligent misrepresentation are also claims

4    for which the individuals who committed those torts are

5    personally and entirely liable.  Under the plan, which is a

6    contract, the Court looks to the four corners of the plan and

7    determines what it says about the ownership of these claims.

8    Delaware law governs the plan.  It is well-established in

9    Delaware that it is not the proper role of a court to rewrite

10    or supply omitted provisions to a written agreement.  Here,

11    the post-confirmation trust responsibilities under plan

12    Article 5 are to litigate and pursue claims and causes of

13    action other than those which are RCT assets.  So there is a

14    large universe of things which are not RCT assets, all of

15    which belong to the PCT.  Fundamentally, if it is not an RCT

16    asset, it belongs to the PCT, and the plan defines what is an

17    RCT asset.  An RCT asset is defined as deductions, over-

18    wires, causes of action and the like against reclamation

19    creditors.  A reclamation creditor is defined as a claim

20    holder, and those are listed on the reclamation creditor

21    summary.  Importantly, Your Honor, none of the individuals

22    whom the Pct has sued are reclamation creditors.  That is

23    conceded.  They are not, and that ends the inquiry under the

24    plan.  The PCT has expressly alleged that the reclamation

25    creditors are non-parties to this case.  That is not a

1  trivial allegation, Your Honor.  Because they are non-
2  parties, we cannot obtain a judgment against them.  The
3  verdict form at trial is going to say, Did the following
4  parties knowingly participate in the breach of fiduciary duty
5  by Fleming's officers, Peter Frank, John Kent Adams, Bruce
6  Jenson, and the like.  There will not be a blank in the
7  verdict form for Kraft, Frito-Lay, FMG Damon.  Nor, Your
8  Honor, will there be a judgment against Kraft, Frito-Lay, and
9  FMG Damon, because they are not parties to the case.  And I
10  am quite confident that when I recover a judgment in this
11  case, if I were to take it to FMG, which I cannot do, and say
12  I'd like you to pay this judgment, they would say, We're not
13  parties to that case.  That judgment is not enforceable
14  against us.  And they would be right.  They would be right.
15  As a consequence of which, Your Honor, there is no question
16  that these are not RCT assets because the claims are not
17  against reclamation creditors.  Now, the term "indirect",
18  Your Honor, does not change this analysis.  This is, I put
19  before you the entire definition of cause of action, and what
20  you will see is it's very much like a newspaper article.  It
21  has a what, a who, and a how.  And the what is all claims,
22  choices of action, et cetera, et cetera, et cetera, including
23  those listed in the plan, Exhibit A, filed herewith in the
24  disclosure statement by Core-Mark, NewCo, the PCT, et cetera.
25  That's the what.  And then against any person.  That's the

26

1    who.  And finally, you have the how, under the Bankruptcy

2    Code whether direct or indirect, law or in equity.  So, what

3    you have in this language indirect is a discussion of

4    procedure, but claim identification, Your Honor, turns on the

5    who.  Claim identification turns on the who.  Now, the RCT's

6    assertion is that any claim that even exposes a reclamation

7    creditor to litigation risk in the form of a contribution or

8    indemnity claim is an indirect claim against a reclamation

9    creditor.  That is their position because they have said,

10   since we have sued officers, and officers might or might not

11   have indemnity claims and might or might not ultimately

12   assert their own indemnity claims against their employers,

13   that creates a risk to a reclamation creditor, and therefore,

14   it's an RCT asset.  There are two problems with that, Your

15   Honor.  First, Mr. Frank's indemnity claim is Mr. Frank's.

16   It is not a property of the debtor.  It never was and never

17   could be.  As a consequence of which it is not allocated in

18   the plan either to the PCT or to the RCT.  It is Mr. Frank's

19   claim.  So, the argument that an indemnity claim by a third

20   party determines the identity of the assets simply ignores

21   what the plan did.  The plan did and did only what it could

22   do.  It divided the debtor's causes of action.  The PCT's

23   claims, they say, are RCT assets because they create a risk

24   of an indemnity claim by a third party but that argument, to

25   use the phrase earlier, does prove too much.  This is what

1    Deloitte said in answer to the securities plaintiffs'

2    lawsuit.  Fleming personnel entered into extensive collusion

3    with various third-party vendors for the very reason that

4    they needed to mislead Deloitte & Touche during its audit

5    procedures.  The allegations in the Securities & Exchange

6    Commission's consent judgments are well known.  They were

7    written up in the Wall Street Journal when they were entered.

8    And all of the PCT's tort claims present a risk of

9    contribution or indemnity against a reclamation creditor.

10    They do.  They may not like it, but they do.  Under Texas

11    law, Chapter 33 of the Civil Practice and Remedies Code,

12    affords a right of contribution against persons found jointly

13    and severally liable for damages against other responsible

14    third parties.  The claims that we have asserted are joint

15    and several liability claims.  They present a risk of that

16    exposure.  Kensbach (phonetical), the knowing participation

17    claim, the conspiracy claim, those are joint liability

18    claims, and under Texas law, the defendants whom we have sued

19    have a right to turn around and say, Well, you guys

20    contributed to cause this injury.  It was a scheme to

21    manipulate Fleming's financials, and you had an important

22    part in it.  I'm filing a contribution claim against you.

23    And as the RCT would have it, the minute that occurs, the PCT

24    which owned claims against professionals, which owned claims

25    against individuals, which owned claims against consultants

1   is suddenly divested of the ownership of claims directly
2   allocated to it under the plan.  Nothing in the plan supports
3   that view.  Nothing.  The ownership of claims does not turn
4   and cannot turn on how third-party litigation targets respond
5   to them.  They turn on the identity of the defendant itself.
6   That's what the plan says.  The plan says, The RCT owns
7   claims against reclamation creditors, and these claims by the
8   PCT are not.

9        THE COURT: Well, doesn't the definition of cause of
10  action which includes direct, indirect, derivative, or
11  otherwise suggest that it's not simply the identity of the
12  defendant that's at issue?

13       MS. PATRICK: Partly, Your Honor.  Cause of action -
14       THE COURT: I mean, what would that mean if I were
15  only to look at the identity of the defendant?

16       MS. PATRICK: I'll tell you exactly what it would
17  mean.  There are indirect claims that could be asserted
18  against a reclamation creditor as follows: If you look at the
19  context of the description, it talks about against any person
20  and then whether direct, indirect, or derivative.  That's the
21  how asserted.  Suppose, for example, a creditor of Fleming in
22  its own lawsuit were to turn around and bring a suit against
23  Kemps for the injury done to Fleming, that would be an
24  indirect claim.  They would be claiming through Fleming
25  against a reclamation creditor.

1          THE COURT: Well, that would be derivative, perhaps.

2          MS. PATRICK: Well, it's also indirect because it's

3     not derivative - you have to bring it derivatively on behalf

4     of Fleming, but there are injuries against creditors

5     themselves; right?  When a company is in the vicinity of

6     insolvency?  The Court knows this law better than I do.  But

7     the point is, if the claim is a credit lyonaise (phonetical)

8     type claim on behalf of a creditor against Kemps, it's an RCT

9     asset, the RCT has to deal with it.  This claim is not.  This

10    claim is against Peter Frank, Bruce Jenson, John Kent Adams,

11    and others.  The fact that they worked for anybody is

12    irrelevant.  They committed torts, and they are liable for

13    them, and they are not reclamation creditors.  They aren't.

14    And so the term "indirect" refers to the how asserted, but it

15    does not refer to the who.  And more important, my who is not

16    against a reclamation creditor in any event.

17         THE COURT: Well, if at the end, how do we know it's

18    only related to the how not the who?

19         MS. PATRICK: Because derivative claim tells you

20    that.  That's a how.  Direct tells you that.  That's a how.

21    Indirect tells you that.  That's a how.  That doesn't have

22    anything to do with who.  Any person is the subject.

23         THE COURT: Well, indirect and derivative implicate

24    someone other than the person.

25         MS. PATRICK: Right, they implicate the procedure.

1          THE COURT: Well –

2          MS. PATRICK: I mean, a derivative claim is a

3     procedural process; right?  It's a claim that somebody brings

4     on behalf of somebody else against who.  Against any person.

5     And so here, the person, the identity of the person sued

6     controls.  Claim allocation turns on the identity of the

7     named defendant.  If it is a reclamation creditor, it's an

8     RCT asset.  That's why if you go back to the definition of

9     cause of action, it's – Let me go back there and just – Okay.

10    If you start, it says, All claims and actions and so forth.

11    That's what.  And then it's against any person is the who.

12         THE COURT: Yeah, I know.

13         MS. PATRICK: And then based on law or equity

14    including but not limited to, et cetera, that's the process.

15    That doesn't tell you who the target of the litigation is.

16    That tells you the process by which the claim is being

17    litigated.  As a consequence of which, claim ownership under

18    the plan by every definition here in the plan, including the

19    definition of RCT assets, requires that that person in the

20    cause of action be a reclamation creditor.  Otherwise, it's a

21    PCT asset.  That's what the plan says.

22         THE COURT: All right, I understand your argument.

23         MS. PATRICK: Okay.  And, Your Honor, that brings us

24    to the point of why in order for the RCT to prevail, you'd

25    have to effectively rewrite the plan.  The only way their

1    argument makes sense is as follows: When the RCT asset was

2    defined, what they say is reclamation creditor meant

3    reclamation creditor or their officers, directors, employees,

4    or agents.  But that's not what it says.  That's just not

5    what it says.  And it's important, Your Honor, that when the

6    plan meant to use that term, "officers, directors, employees,

7    or agents", it did so.  This plan was heavily negotiated.

8    You know that much better than I do.  I have the privilege,

9    thank you very much, of not being here for the negotiation of

10   the plan.  I'm just looking at what it says, and it says what

11   it says, and it does not say, reclamation creditor means the

12   holder of a claim and any other officers, employees, or

13   agents.  It does not say that.  And to get that out of a

14   single word "indirect" when the plan elsewhere uses that term

15   when it means to, is to torture the plan and to supply a term

16   that is not there.  You can't do that.  Delaware doesn't

17   permit that.  And the plan has been substantially consummated

18   here, no question about that.  Assets have been distributed.

19   Claims have been asserted.  People have been buying and

20   selling claims based on the fact that the PCT has these

21   claims out there, and they are believed to be valuable, and

22   it would be a material adverse change at this point to strip

23   them away.  Now, the argument is also made under the plan

24   that, well, if the plan did that, you know, to quote the

25   fellow from Dickens, The plan is a silly thing.  The plan did

1    that.  The plan can split claims.  Now these claims, Your

2    Honor, are not split, and that's important to remember.  The

3    individuals are liable for their own torts, and those claims

4    existed, and they had to go somewhere, and the plan

5    specifically contemplated claims against individuals.  We've

6    shown you the language.  So, those claims against individuals

7    had to go somewhere, and the individuals aren't reclamation

8    creditors, so they went to the PCT.  The suggestion –

9           THE COURT: But how could – You say they're not

10   split, but how could there be a claim against the reclamation

11   creditors other than because of the actions of their

12   employees?  It's –

13          MS. PATRICK: Your Honor, that's fine.  There are

14   claims against the reclamation creditors because of the

15   actions of their employees, and the RCT is going to do with

16   those what they do.

17          THE COURT: It's the same claim –

18          MS. PATRICK: No.

19          THE COURT: It's the same claim, they're simply two

20   different responsible persons.

21          MS. PATRICK: It's, well, let me phrase it slightly

22   differently to get to the point.  It's two claims arising

23   from a single injury for which both defendants are

24   responsible.

25          THE COURT: Not a single injury, a single act.

33

1   Because the act of the employee is what caused the injury.

2   We're not - It's a single act.  It's a single claim, same

3   injury, same action.

4        MS. PATRICK: It is not a single claim under Texas

5   law, Your Honor.  I cannot emphasize the point more

6   vigorously than I have.  Under Texas law -

7        THE COURT: You can bring a cause of action against

8   the employee.  You can bring a cause of action against the

9   company.

10        MS. PATRICK: That's right.

11        THE COURT: It's the same claim though.

12        MS. PATRICK: Well -

13        THE COURT: You can name two different defendants.

14        MS. PATRICK: That's right.  You name two different

15   defendants, and each of them may be held jointly and

16   severedly liable for the injury.

17        THE COURT: Of course.

18        MS. PATRICK: Okay?  And the question is, when you

19   can bring a claim arising out of a common course of conduct

20   against two people, where did those claims go?  If one of

21   them is not a reclamation creditor, it went to the PCT.

22   That's just what the plan says.  That's what the plan says,

23   and the argument that the plan couldn't do that or wouldn't

24   have done that is barred at this point because under *res*

25   *judicata* the plan says what it says.  The claims went where

1   they went.  And the fact that the reclamation creditors wish

2   they would have thought of this, although it was in the plan,

3   or would have done something differently, although it was in

4   the plan, doesn't matter now.  What matters is under the

5   plan, where did they go?  And under the plan, they went to

6   the RCT.  Now, again, the argument about claim splitting is

7   just irrelevant.  Under the plan itself, under the

8   restatement of judgments, when a claim is preserved and sent

9   somewhere in a bankruptcy plan, it's preserved and sent

10  somewhere in a bankruptcy plan.  All of these creditors voted

11  for the plan, and the plan is binding, and the plan

12  specifically says that *res judicata* does not bar the claims.

13  And claim splitting is *res judicata*.  So this argument that

14  the plan couldn't have split this single injury, if that's

15  what it was, and I don't believe it was, Your Honor, these

16  are two separate claims.  They go to two different places.

17  The argument that the plan can't divide the claims in this

18  fashion is irrelevant.  It did.  And once it did, the only

19  question is, who owns them?  And because these individuals

20  are not reclamation creditors and because the judgment can't

21  be entered against a reclamation creditor, that ends it.

22  Now, the other point, Your Honor, is this, and it's a point

23  that clearly got misconstrued in our opening papers, so let

24  me be clear about why we made it.  The point we made about

25  the failure to toll limitations or otherwise preserve the

1    claims against the individuals was meant to demonstrate that

2    at the time the PCT was filing its lawsuit, the RCT was not

3    acting like a group of people that believed the claims

4    belonged to them because they took no steps to preserve or

5    protect them.  It was not a secret to them that this lawsuit

6    was being filed.  We were actively in discussions with them.

7    We met with them to talk to them about what we were going to

8    do in the litigation, and they knew these claims were going

9    to be filed by the PCT, and they did not independently toll

10   or preserve them.  They are prudent people.  They are good

11   lawyers.  They are fiduciaries.  If they genuinely believed

12   these claims belonged to them, they would have done something

13   to preserve them, and they did not.  And that in itself is

14   extremely telling.  It's also very important because at this

15   juncture, the only party that has filed the claims against

16   the officers is the PCT.  If the Pct is found by this Court

17   to lack standing to pursue those claims, they will disappear

18   and evaporate.  And that is important for two reasons.

19   First, the only insurance coverage that may be available to

20   satisfy the liability for these claims may be coverage that

21   covers officers and director but not companies.  And second,

22   Kraft at least has suggested in its pleading that its

23   employee, Mr. Adams, acted outside the course and scope of

24   his authority.  So the only recovery may be against Mr.

25   Adams.  And while Mr. Friedman jocularly notes that the PCT

1    presumably isn't expecting to recover hundreds of millions or

2    billions of dollars in damages from individuals, there is a

3    two billion dollar hole in the PCT.  And every little bit

4    helps the creditors and some of the people, who the PCT has

5    sued, are very substantial individuals.  They are chief

6    financial officers of public companies, and they do have

7    means, and they may have insurance that covers them.  We

8    don't know the answers to any of those questions, Your Honor,

9    we just know the claims exist, and for the benefit of the

10   creditors who are beneficiaries of the Pct, we had to do

11   something with them and bring them, and the RCT did not

12   protect them.  If you rule for the RCT now, however, the

13   claims will be destroyed.  There are a handful of other

14   catchall arguments that are made by a variety of creditors.

15   The allegations about insurance coverage, Your Honor, are a

16   red herring.  The insurance coverage, if it exists, you know

17   the law from bankruptcy jurisprudence very well, the proceeds

18   of the policy belong to the insureds and the liability if

19   it's paid is going to be paid by the insurance company not by

20   the reclamation creditors.  That doesn't advance the ball at

21   all.  Insurance is paid by insurance companies, it's not a

22   claim against a reclamation creditor, and that's the basis on

23   which the allegations were included in the complaint.  They

24   were included to preclude coverage defenses because coverage,

25   as you know, turns on the four corners of the complaint and

1    the four corners of the policy, and had we not alleged that

2    these individuals has acted in the course and scope of their

3    authority, it would have given the carriers a coverage

4    defense, and we didn't want to do that.  So that's the reason

5    it's in there, and it is what it is.  Although they don't

6    like the consent judgments on the one hand, many of the

7    creditors argue, well the SEC didn't charge us with federal

8    securities violations.  That really doesn't matter.  We will

9    prove our claims in a Texas court, and Texas law is what

10   governs here, and the absence of a federal securities

11   violation, while they may make points about that, is

12   irrelevant.  They also argue, although it is not – they do

13   this having observed that this is not a motion to dismiss the

14   PCT's claim, argue vociferously that the PCT's claims are

15   barred by the doctrine of *in pari delicto*.  That is for Judge

16   Ward to decide, and in any event, Your Honor, on the four

17   corners of the plaintiff's complaint here, it can't be true.

18   Texas is a pure comparative fault state.  Whether fault is

19   equal or *in pari*, to use the Latin term, is for the jury to

20   decide.  And even the cases they cite, <u>Wagoner</u> and <u>Wexler</u> and

21   the other cases recognize that where all relevant decision

22   makers are involved *in pari delicto* applies, but where they

23   are not, it does not, and absent a finding that all relevant

24   decision makers were involved in the fraud, *in pari delicto*

25   doesn't apply.  And here, the outside directors are not

38

1    alleged to be involved in the fraud.  Indeed, the PCT alleges

2    expressly in its complaint that these manipulations were done

3    precisely in order to mislead the Audit Committee in

4    authorizing the issuance of the financial statement.  So,

5    those allegations are in the complaint and on the complaint

6    itself.  The Wagoner rule doesn't apply.  We talked about

7    Exhibit A - Oh, Kemps suggests that it was incumbent upon us

8    to seek an advisory opinion from the Court about whether we

9    owned these claims before we filed suit.  Your Honor, we

10   didn't think it was unclear.  The plan says what it says, and

11   at the point in time when we did this, we filed the lawsuits

12   on the eve of the statute of limitations expiring and filed

13   them because we believed they owned them.  Obviously, people

14   can raise as defenses in the underlying lawsuit whether we

15   have standing to sue.  Mr. Frank has done that in front of

16   Judge Ward.  But nothing requires us to go ask the Court

17   before we file whether we own claims that the plan clearly

18   says we own, and finally, there is a suggestion, perhaps

19   because I'm from Texas, that I sort of shoot first, ask

20   questions later or as phrased colorfully in the pleading, sue

21   first, investigate later.  Let me say, I've been accused of

22   many things in my life but not being thorough in the

23   investigation of claims I file is a first.  We went through a

24   massive review of documents at Fleming.  The RCT knows that.

25   We gave them the documents we reviewed for them to give them

1    the information that they needed.  The RCT knows that we

2    reviewed the consent judgments in detail.  That we reviewed

3    the applicable law.  We didn't sue first and ask questions

4    later.  We read the plan.  Figured out what we owned, and

5    then investigated to determine what claims we had, and we

6    filed them.  And it should be no surprise to anybody,

7    including the reclamation creditors that the PCT is

8    litigating, it's created as a litigating trust among other

9    things.  It is specifically instructed to pursue and collect

10   litigation claims.  Your Honor, with that, I think that I

11   have - Let me just check.  Oh, the last argument that is made

12   was made by Mr. Friedman, is that *respondeat superior* and

13   vicarious liability are theories alleged against reclamation

14   creditors in the PCT's complaint?  They're not.  They're not.

15   Course and scope is alleged, but there is no cause of action,

16   no prayerful relief against any defendant on a theory of

17   *respondeat superior* or vicarious liability.  It is only

18   against the individuals, and with that, Your Honor, unless

19   the Court has other questions, I think I'm finished.

20            THE COURT: Thank you.

21            MS. PATRICK: Thank you, Your Honor.  Let me hand

22   the cases from Texas to the Court's law clerk, so that I

23   don't forget.

24            THE COURT: Thank you.  Who wishes to respond?

25            MR. FRIEDMAN: Just a few brief points, Your Honor.

40

1    I'm sure the reclamation creditors can go tit for tat with

2    Ms. Patrick on, you know, the allegations and the facts, and

3    I think as the Court correctly pointed out, these are

4    allegations, and the only reason we challenged in our brief

5    on the SEC consent decree is that the papers from the PCT

6    were rife with claims that these were admissions.

7              THE COURT: Right.

8              MR. FRIEDMAN: And the PCT has now, I think,

9    modified that they, in fact, are not admissions.  It is clear

10   that I think what compels the PCT to do this, as was

11   expressed in their argument here on reciting all of these

12   allegations, is that they don't like the approach that the

13   RCT may be taking, but that's not how the plan is to be

14   reviewed from hindsight or from looking at the PCT and the

15   RCT as two different entities.  It has to be looked at from

16   the time of plan confirmation with a single collective group

17   of estates allocating its claims to either one trust or the

18   other.  And, the plan simply does not work.  The language

19   does not work.  The definition of cause of action does not

20   work if you look at the recovery right for the alleged

21   participation in the accounting fraud and say, well, the

22   right for that injury against the reclamation creditor goes

23   to the RCT and the right for that injury against the

24   individual employee goes to the PCT.

25             THE COURT: Why doesn't it work?

A    411

1        MR. FRIEDMAN: Because you're then exposing the

2    reclamation creditor to duplicate recoveries.  You're

3    creating -

4        THE COURT: Why am I exposing - isn't that simply

5    the fact that there's joint and several liability and that

6    there is a separate cause of action under state law against

7    the employees as well as the employer?

8        MR. FRIEDMAN: I don't think - one thing, I don't

9    there's anything unique about Texas in that.

10       THE COURT: I don't either.

11       MR. FRIEDMAN: I think I'm not aware of any state

12   that says the person - an agent that commits an intentional

13   tort is - has some kind of insulation because it does so at

14   the behest of principal.

15       THE COURT: Right.

16       MR. FRIEDMAN: I think, Your Honor, that it's

17   certainly nothing unusual about two separate parties having

18   rights against for the injury done to itself.  Here you have

19   one party, essentially the bankruptcy estates, now taking its

20   claim and the issue is can it somehow say, all right, the

21   right to recover for this injury against the reclamation

22   creditor goes one place, and the right to recover against the

23   employee goes another place.  I mean -

24       THE COURT: Why can't it say that?

25       MR. FRIEDMAN: Conceivably, I think it could.  Now,

1    the question is –

2           THE COURT: Did it?

3           MR. FRIEDMAN:  – did it, and when you look at cause

4    of action and you look at that definition and try to

5    understand what does that mean, I think, I submit, Your

6    Honor, the PCT's explanation is sort of groundless.  It

7    argues that this definition was necessary in order to tell

8    third parties they couldn't bring claims that belong to the

9    estate.  That definition wasn't inserted in there to tell

10   third parties they couldn't create claims.  It was created in

11   there to define who got what?

12          THE COURT: Right, but you only got claims and

13   causes of action against reclamation creditors.

14          MR. FRIEDMAN: Claims, and here again, the

15   definition of this who, what, and how, all those words give

16   meaning to the term claims.  They're all there to talk about

17   what kind of claims.

18          THE COURT: All right.

19          MR. FRIEDMAN: And their claims against these

20   persons, here the person deemed –

21          THE COURT: It's the reclamation creditor.

22          MR. FRIEDMAN:  – the reclamation creditor, and it's

23   the claim against the reclamation creditor, whether it's

24   direct against them, indirect against them, derivative

25   against them, or otherwise, and the purpose being to avoid

1    the situation where you have the conflict now of the

2    reclamation creditor having to confront two separate

3    situations, and whether you –

4         THE COURT: Well, I'm not sure that's the intent.  I

5    think the intent, rather, is to assure that you got every

6    possible claim you could have against a reclamation creditor

7    but not against anybody else.  To be sure that you had every

8    possible claim, whether it was derivative, whether it was an

9    indirect claim, or a direct claim against a reclamation

10   creditor, so that you could use it in your reconciliation

11   process, but I'm not sure it was intended to give you claims

12   against others that somehow might implicate – indirect claim

13   is not a direct claim against another that might implicate a

14   reclamation creditor.  I mean that would go too far; wouldn't

15   it?

16        MR. FRIEDMAN: Well, correct, Your Honor.  We're not

17   – I mean, I think the PCT set up a strawman and said, Well,

18   there might be an impact from Deloitte or there might be –

19        THE COURT: Right.

20        MR. FRIEDMAN:  – an impact of all these things. I

21   think that totally misses the point because the issue is not,

22   does it have an impact?  The issue is, looking at the claim –

23        THE COURT: Yes.

24        MR. FRIEDMAN:  – of the estate and where did it go?

25   If Deloitte were to bring a third-party claim against the

44

1    reclamation creditors or anybody else was, it's all
2    hypothetical because none of it happened, but I don't believe
3    that the plan would suggest or that the RCT would take the
4    position, or could effectively take the position that somehow
5    that meant the Deloitte claim became property of the RCT or
6    that somehow the PCT couldn't pursue Deloitte because
7    Deloitte might claim it had some contribution right.  I don't
8    think that's anything like what the language is talking about
9    here.  It's talking about a cause of action of the estate.
10   The cause of action of the estate was theoretically a claim
11   against the reclamation creditor who through –

12        THE COURT: But the claim against Deloitte is a
13   claim against the reclamation creditors too, because they
14   were a participant in the fraud according to their
15   allegations.

16        MR. FRIEDMAN: But the claim against Deloitte is a
17   claim against – it's not a claim against a reclamation
18   creditor.  We say that a claim –

19        THE COURT: Nor is the claim against Mr. Frank, for
20   example.

21        MR. FRIEDMAN: Well, if – when the PCT alleges that
22   Mr. Frank, acting within – I mean, we step back for a minute.
23   When you read the complaint, it's sort of rife with
24   allegations against the reclamation creditors themselves,
25   acting within the scope, they're responsible, and that

A    415

45

 1    clearly shows what the purpose and intent is, but let's

 2    forget the complaint and just look about the claim itself and

 3    say, Does a claim exist against Mr. Frank that was allocated

 4    by the plan differently than the claim against FMG who was

 5    liable - who would be liable by virtue of Mr. Frank's

 6    conduct?  And so that is the issue.  And so, does the plan

 7    permit a process by which each trust could have a claim for

 8    the same injury?

 9              THE COURT: Well, why not?

10              MR. FRIEDMAN: Well -

11              THE COURT: Why not?  Because the injury, the claim

12    against Deloitte is for the same injury.

13              MR. FRIEDMAN: Correct, Your Honor, but it's not the

14    claim - Well, whether it - I'm not sure it is the same

15    injury.

16              THE COURT: Sure it is.

17              MR. FRIEDMAN: Well, it may -

18              THE COURT: It's the 2 billion that they allege is

19    lost, the 500 million in the excess -

20              MR. FRIEDMAN: It may be the same damage, that's

21    possible, but it may not be either.  Remember, what is the

22    claim against Deloitte?  The claim against Deloitte is a

23    claim that Fleming's auditors engaged in some kind of

24    professional misconduct; all right?  And it has nothing -

25    that claim has nothing to do with any reclamation creditor.

A    416

1    Now –

2           THE COURT: Well, let's talk about then the claim

3    against the Fleming officers and directors who participated

4    in this fraud.

5           MR. FRIEDMAN: Okay.

6           THE COURT: It's the same injury –

7           MR. FRIEDMAN: It may be or it may not be, but even

8    assuming that it is, it's not the same cause of action.

9    Nothing that the –

10          THE COURT: Okay, you've acknowledged it's not the

11   same cause of action then why is the action against Mr. Frank

12   the same cause of action as the action against the

13   reclamation creditor?

14          MR. FRIEDMAN: Because the claim against the

15   reclamation creditor can only arise through the claim against

16   the employee, through the agent.

17          THE COURT: No, no.  The claim can only arise

18   through the action of the employee, but it does not mean that

19   they're the same claim.

20          MR. FRIEDMAN: Well, I don't know how you

21   differentiate other than to say that –

22          THE COURT: They're similar, they're different

23   defendants.

24          MR. FRIEDMAN: The defendants are different,

25   clearly the damage has to be the same, the injury has to be

47

 1   the same, the recovery has to be the same, and both are
 2   liable, so then if the construction of the plan is then that
 3   we have a plan here where the two trusts can both go for the
 4   same recovery and compete with each other for it, I mean -
 5           THE COURT: Yeah.
 6           MR. FRIEDMAN:  - that may be a construction.  I
 7   submit, Your Honor, that that's not what the plan provided.
 8   The intent was not to create that kind of dissonance where
 9   you then have this paralysis - potential paralysis where the
10   ability to go ahead and resolve things are chilled because it
11   doesn't involve simply a creditor dealing with one trust.  It
12   calls for dealing with both trusts.  So how do you give
13   meaning to the language of the cause of action.  We suggest
14   the meaning -
15           THE COURT: Well, the reclamation creditor, quite
16   frankly, does not have to deal with the claim of its
17   employee.  I mean it resolves its claim.  There are two
18   separate claims.  I know that practically speaking, because
19   of contractual relationships it may have with the employee,
20   it may feel obligated to, but I'm not sure that the plan
21   takes that into consideration.  Why is this not the same as
22   if a reclamation creditor had a contractual relationship with
23   another trade creditor whereby it guaranteed its obligations?
24   You wouldn't suggest that simply by that contractual
25   relationship an action by the PCT against that other trade

1   creditor would somehow become a reclamation claim.

2          MR. FRIEDMAN: No, but what I do look at is, I look

3   at - when I take the language and I look at the

4   interpretation that we're suggesting be placed upon it, and

5   then I look at, okay, what are the implications of that

6   interpretation as against the implications of the PCT's

7   interpretation, and I try to come up with what is a workable

8   format presuming that that's what was intended by the plan.

9   I mean, we have a situation where there's no practical way

10  that a reclamation creditor cannot get involved in the

11  litigation because you've got issues whether they're acting

12  within the scope or not acting within the scope of the

13  employment -

14         THE COURT: Well, what do they care?  It's not a

15  claim against the reclamation creditor, so legally, why do

16  they care?

17         MR. FRIEDMAN: Well, if there is - I mean, they care

18  because the PCT came right out in its complaint and alleged

19  that they were responsible.

20         THE COURT: But they're not being sued, so, okay,

21  there are a lot of things said in the press and lawsuits that

22  implicate you, but if you're not a defendant, why do you

23  care?  There's no effect on you if you're not a defendant; is

24  there?

25         MR. FRIEDMAN: Well, I think there is an effect

49

1   because you then have - Were they to stand back and not get

2   involved, and let's say you then have these individuals left

3   to their own devices to deal with the fire power of the PCT,

4   and then you've got this judgment that may come about, and

5   then you've got to deal with all kinds of estoppel issues,

6   and you've got to deal with issues of the employee now coming

7   and asserting either indemnification or contractual coverage,

8   insurance coverage, or whatever it might be, and the

9   practical expectation, Your Honor, that the PCT will, in

10  effect, take an assignment of all those rights.

11          THE COURT: Well, now you're getting back to the

12  connection between the two claims is the contractual

13  relationship between the employee and the reclamation

14  creditors, and that's why I'm saying, why is this any

15  different from any other contractual relationship which would

16  not extend the definition of reclamation claimant to that

17  other party.

18          MR. FRIEDMAN: Well, that's not precisely what I'm

19  saying, Your Honor.  What I'm trying to say is that it is

20  because of that - it's because of the - that is a consequence

21  of the employer/employee relationship, and it's because of

22  that that when you look at the definition of cause of action,

23  it is appropriate and makes sense that the meaning for that

24  is that the claims that arise against the reclamation

25  creditor by virtue of the conduct of its employees, and

50

1   therefore, the conduct of the employees acting within the
2   scope of their employment, as the PCT alleges, are in fact
3   causes of action that belong to the RCT because they fit
4   within that definition.
5           THE COURT: Well, except, you'd then be expanding
6   the definition of person to include any person including
7   anyone who has contractual rights of indemnification or
8   contribution or guarantee or otherwise.
9           MR. FRIEDMAN: No, I don't think so, Your Honor,
10  because it's not –
11          THE COURT: The employee is not the reclamation
12  creditor.
13          MR. FRIEDMAN: But the reclamation creditor has the
14  exposure only through the employee.
15          THE COURT: For its claim, but you've resolved its
16  claim.  So it has no claim.  There is no claim against it.
17  The RCT has resolved the direct claims of the estate against
18  the reclamation creditors.
19          MR. FRIEDMAN: Well, that's not entirely true –
20          THE COURT: For some of them but it has the claims.
21          MR. FRIEDMAN: But, Your Honor, I don't think this
22  can be looked at now here and look at what happened to each
23  of the reclamation creditors and say, well, have you
24  resolved, haven't you resolved, and what the treatment given
25  somehow determines whether the PCT has a claim or doesn't

51

1   have a claim.

2           THE COURT: No, I'm suggesting some of them have

3   been settled, and that's what some of the responses say.

4   Others have not, and you own them, but, you know, that's the

5   direct claim.

6           MR. FRIEDMAN: But the - When you look at what is

7   being settled, when somebody gets a release from the RCT,

8   let's say, or what they had a reasonable right to expect

9   would come within that settlement, or when you approach

10  somebody and seek to resolve a claim, by whatever means,

11  litigation, settlement, by whatever means, and you look at,

12  okay, what were the RCT assets, if you're resolving them, I

13  submit, Your Honor, that the RCT assets have to have included

14  claims of employees for acting within the scope because you

15  then in effect no matter how you get there, whether it's

16  through the insurance coverage or through the indemnification

17  or through the contractual right, you end up with the

18  ultimate pocket being again the reclamation creditor, and if

19  that was the understanding of the plan, there would have been

20  an inability for us to resolve exposure of reclamation

21  creditors for that kind of a claim just like there would be

22  for anything else.  If parties, if creditors had to sit there

23  and look at this plan as creating what in effect was now two

24  different vehicles with which they had to resolve their

25  exposure, the RCT and the PCT, it wasn't a workable system

1    and it's not what the plan contemplated.

2         THE COURT: But again, I think you're definition of

3    claims for which they may be liable is a little bit too

4    expansive.  I think what the RCT could settle would be only

5    the claims that the RCT had against them.  So we have to go

6    back to what was given to the RCT because everything else was

7    left behind.

8         MR. FRIEDMAN: Correct.

9         THE COURT: So –

10        MR. FRIEDMAN: What was given to the RCT –

11        THE COURT: Were claims against the persons, the

12   reclamation creditors.

13        MR. FRIEDMAN: Correct.  However, they potentially –

14        THE COURT: You may have them.

15        MR. FRIEDMAN: However they could – and we're all

16   trying to get meaning into the words direct, indirect,

17   derivative, or otherwise.  That's really what the key is or

18   the definition of claim, and I'm submitting, Your Honor, that

19   in order to give effect to those words, one has to look at

20   the right of recovery that the estate had when it started,

21   when these claims were channeled out and that it couldn't

22   have been split saying that both the PCT and the RCT had a

23   right to recover for that same claim.

24        THE COURT: Of course it was split.  I mean, you've

25   acknowledged that the claim against Deloitte was split.  The

1   claim against the debtor's directors and officers, that's the
2   same claim.
3           MR. FRIEDMAN: No, we don't say that was split.  We
4   say all of that went to the PCT.
5           THE COURT: Okay.
6           MR. FRIEDMAN: We don't say -
7           THE COURT: And the claims against the individuals
8   went to the PCT too then.
9           MR. FRIEDMAN: No, we don't concede that, Your
10  Honor, because -
11          THE COURT: It's not the - I mean, you're saying
12  it's the same claim. They're really -
13          MR. FRIEDMAN: It's the same claim because it's the
14  same - wherever you say it's the same claim or it's the same
15  recovery or it's the same injury, it's the same damage, it's
16  leaving the situation where the estate has now in effect
17  conferred the same recovery right on two different entities.
18          THE COURT: Right.
19          MR. FRIEDMAN: And that's what we say the plan does
20  not do.
21          THE COURT: That doesn't disturb me.  It doesn't
22  disturb me because even if we call it one claim, it's against
23  20 defendants, and what was given to the RCT was a claim
24  against one defendant, the reclamation creditors.
25          MR. FRIEDMAN: If the claim against that one

1  defendant can really be separated from the party by whom that

2  claim arose - by whose actions that claim arose in the first

3  place.

4       THE COURT: But of course it can, and I'll posit

5  this, there are many situations where actions are brought

6  against the corporation and its actors, the officers,

7  employees who committed the act.  I mean, it's -

8       MR. FRIEDMAN: Correct, and the question is, we say

9  that's what the RCT had the right to do -

10      THE COURT: Yeah, but - Well, I'm not sure you were

11  given the right to sue the individuals.  You were given the

12  right to sue the company, but take my example where the

13  company and the individuals are sued.  The company files

14  bankruptcy.  It does not mean that the claims against the

15  individuals don't proceed.  There are many cases where I have

16  companies in bankruptcy and the lawsuits continue against the

17  former directors and officers, even current directors and

18  officers.

19      MR. FRIEDMAN: Which are not always the same claim,

20  but they can be the same claim.

21      THE COURT: It's the exact same claim because the

22  debtor can't act except through its agents.

23      MR. FRIEDMAN: All right, they can be the same

24  claim.

25      THE COURT: So, I mean, even calling it the same

1   claim doesn't answer the question, I think.

2        MR. FRIEDMAN: Well, Your Honor, what we think

3   answers the question is that the intent of the plan was the

4   disengagement of reclamation creditors which was to be

5   accomplished through this language, and what we have clearly

6   seen through the PCT's assertions in the complaint, because

7   it says so directly, and what we've seen by the position of

8   these reclamation creditors is that purpose is not

9   accomplished if in fact the PCT is construed to own the

10  claims against these individuals.

11       THE COURT: I don't know why it isn't because the

12  claims against the reclamation creditors are yours and you

13  deal with them as you see fit.  The fact that they may have

14  some exposure because of a contractual obligation, I think is

15  not relevant.  And even if it's not a contractual obligation

16  but an obligation arising under state law, Deloitte has had

17  the right to cross claim against or do third party in the

18  reclamation creditors.  That wasn't precluded by the plan;

19  was it?

20       MR. FRIEDMAN: No, but that's not the estate's

21  claim.  If Deloitte has a contribution claim –

22       THE COURT: No, but if – it's an indirect claim

23  against the reclamation creditors that the PCT is pursuing by

24  suing Deloitte.

25       MR. FRIEDMAN: Correct, but it's not – Well –

1          THE COURT: Under your description.

2          MR. FRIEDMAN: No, no, I don't think so, Your Honor,

3    because the claim against Deloitte is the claim of the

4    estate.

5          THE COURT: Yes, you admit that.

6          MR. FRIEDMAN: If Deloitte has a contribution right,

7    if it should have that –

8          THE COURT: Yes.

9          MR. FRIEDMAN: That contribution right is not a

10   claim of the estate –

11         THE COURT: Exactly.

12         MR. FRIEDMAN: It's not a claim directly or

13   indirectly.

14         THE COURT: Exactly, then why isn't the claim

15   against Mr. Frank a claim the estate has and any claim Mr.

16   Frank may have against any of the reclamation creditors, not

17   implicated.  It's not a claim of the estate, and it's not a

18   claim of the RCT.

19         MR. FRIEDMAN: But the plan was not intended, in our

20   view, Your Honor, to take the estate's direct claims for a

21   single injury and split them apart.

22         THE COURT: I don't think it is.  I think there's a

23   separate claim against the individual just as there's a

24   separate claim against Deloitte and a separate claim against

25   the debtor's directors and officers.

1        MR. FRIEDMAN: I understand, Your Honor, but we see

2    the distinction between the two and the practical

3    implications demonstrate that.

4        THE COURT: All right.  Somebody else wishes to be

5    heard, I think.

6        MR. HILDEBRAND: Good morning, Your Honor.  Dan

7    Hildebrand for Kraft Foods.  I think many of the questions

8    Your Honor has been posing to the RCT implicate the

9    reasonable expectations of the vendors under the plan as

10   well, and so, I'd like to try to answer some of those

11   questions from the vendors' point of view.  I think by

12   focusing on the fact that there is a separate action in Texas

13   against the vendor individuals, we lose sight of the plain

14   meaning and intent of the plan, so I'd like to go back to

15   that from the vendors' point of view in terms of what we

16   sought to achieve.  When we agreed to the plan, and also what

17   some of our setoff rights would have been as against the

18   debtors for an injury to the debtors allegedly caused by

19   Kraft and its employee.  You asked a question earlier in the

20   proceedings when you pointed out that there's a single act

21   here at issue - a handful of acts, I should say, by Kraft's

22   employee, Mr. Ken Adams.  Obviously, we contest the PCT's

23   assertions of the values of those claims, including the

24   culpability of Mr. Adams and the company.  We believe that *in*

25   *pari delicto* would fully bar any recovery by the PCT, but

1    that's not really before the Court.  But when you go to what

2    we bargained for when we agreed to the reclamation plan, Your

3    Honor, to me the simple phrase "as against reclamation

4    creditors" has to embrace the actions by our employees within

5    the course of their employment.  There's no other way we can

6    act other than through our employees.  So, when the RCT gets

7    causes of action against reclamation creditors, that

8    includes, it must include the acts of our employees within

9    the scope of their employment.

10          THE COURT: No, it includes the claims against you

11   for the acts of your employees while working within the scope

12   of their employment.  Why would it include any claims against

13   anyone else as a result of those actions?

14          MR. HILDEBRAND: Because - Well, a couple of

15   reasons, Your Honor, the primary thing we bargained for in

16   agreeing to the RCT process was, basically having a single

17   Trustee to deal with and an understanding of what that

18   process would be, and we have significant setoff rights as

19   against the debtors if we are in a litigation position

20   against them about these issues.  Our position is that the

21   post-confirmation trust, whoever we're dealing with, stands

22   in the shoes of the prior company, and we had a $19 million

23   reclamation claim, Your Honor, that we can use as offset

24   against the liabilities created by ourselves as a corporation

25   and the actions of our employees.  So the understanding is,

1   we're buying into a single process whereby we can receive

2   closure.  Now, as long as –

3            THE COURT: But I can't give you closure on all of

4   your contractual relationships with third parties.  Did you

5   really expect that I was giving you closure with respect to

6   any obligation that you may have with respect to somebody

7   else somehow related to this?

8            MR. HILDEBRAND: I expect that the RCT owns in a

9   category of RCT assets, claims against our employees within

10  the scope.  That's what I expect.

11           THE COURT: Did you – but persons doesn't include

12  your employees.  It includes reclamation creditors.

13           MR. HILDEBRAND: Well, Your Honor, I think that

14  proves a little too much because if the vendor employees need

15  to be separately disclosed, then I have a serious question

16  about whether these claims against the vendor employees are

17  even preserved under the listing in the plan of potential

18  issues concerning the vendors which are being preserved.  So,

19  you know –

20           THE COURT: Well, the disclosure statement does make

21  it clear that the vendor employees committed certain actions.

22  It didn't simply identify vendors.  It said through the

23  actions of their employees.

24           MR. HILDEBRAND: You know that is –

25           THE COURT: Isn't that sufficient?

1      MR. HILDEBRAND: That is precisely why the

2  reasonable expectation of Kraft was that that category of

3  issues belong to the RCT.  The way I think this needs to be

4  looked at, Your Honor, is, it's a total split between the RCT

5  and the PCT, and what the reclamation creditors bargained for

6  was the right to deal with the RCT alone.

7      THE COURT: Did you think that it precluded Deloitte

8  from bringing Kraft and its employees into the lawsuit?

9      MR. HILDEBRAND: Certainly not, Your Honor.  That

10 argument is - I just think that argument is a total strawman.

11     THE COURT: Why?

12     MR. HILDEBRAND: Because Deloitte isn't our

13 employee.  It's not acting on our behalf.

14     THE COURT: No, but they could sue you.

15     MR. HILDEBRAND: But the injuries caused by Deloitte

16 arise from a different set of actions.  They arise from the

17 actions of Deloitte's accountants.  Yet, Deloitte belongs to

18 the PCT, but the reclamation creditors -

19     THE COURT: And Deloitte's claim against you would

20 be, Hey, I was mislead, because your employee sent me a

21 letter confirming this, you know, fraudulent scheme that the

22 debtor had concocted.  So it's the same claim; isn't it?

23     MR. HILDEBRAND: Your Honor, we could not defend

24 against a contribution action by Deloitte by pointing to a

25 release -

1          THE COURT: Right.

2          MR. HILDEBRAND:  - from the RCT.

3          THE COURT: Right.

4          MR. HILDEBRAND: We can -

5          THE COURT: Or the estate.

6          MR. HILDEBRAND: That's correct, but that's

7    irrelevant.  The question is, was it our intention under the

8    plan to sunder ourselves from our employees and be exposed to

9    two different sets of litigation proceedings.  The cost in

10   this, Your Honor, just a moment, the costs of defending the

11   employees are not irrelevant.  It's a lengthy expensive

12   process.

13         THE COURT: I agree, but it's a contractual

14   obligation you have that really has nothing to do with what's

15   before me, and just as the plan could not eliminate your

16   exposure to Deloitte, how can it eliminate your exposure to

17   your employee?

18         MR. HILDEBRAND: Your Honor, excuse me, I'm not

19   arguing about the exposure.  I'm arguing about who owns the

20   claim against the employee.

21         THE COURT: Why do you think -

22         MR. HILDEBRAND: I think the claim against the

23   employee is owned by the RCT as an RCT asset.

24         THE COURT: Why?

25         MR. HILDEBRAND: Because claims as against

1   reclamation creditors, as defined in the plan, must include

2   claims against our employees that arise within the scope.

3         THE COURT: No, it includes claims against you for

4   actions of your employee within the scope, but why does it

5   include claims against the employee himself?

6         MR. HILDEBRAND: Because we cannot act except

7   through our employees, and we would have essentially gained,

8   you know, we gain nothing under the plan by agreeing to this

9   consensual process and giving up our, you know, giving up our

10  rights of, you know, setoff and so on.  It just doesn't make

11  sense to read the plan to divorce us from the actions of our

12  employee.  Now, you've got the word "indirect" and you've got

13  the word "as against the reclamation creditors".  The plan

14  doesn't expressly assign claims against the employees to

15  anybody.  So the question is, do they belong in the RCT

16  basket or the PCT basket.  Conceptually they belong in the

17  RCT basket.

18        THE COURT: No, conceptually the plan said all

19  assets go to the PCT except what is given to the RCT.  So

20  they get whatever's left over.

21        MR. HILDEBRAND: I think, Your Honor, it's a little

22  bit different than that.  I think it's the RCT, the

23  reclamation creditors in total are in the RCT basked, and

24  anything related to the reclamation creditors.  Now, a

25  contribution claim against Deloitte is completely different

1    from a claim against one of our employees for actions within
2    the scope where one of the counts in the complaint is a count
3    for indemnity.  I don't know why they plead it as a count if
4    they're not going to seek findings of fact that he was acting
5    within the scope, and they plan to collect against us.

6           THE COURT: Well, they don't plan to collect against
7    you.

8           MR. HILDEBRAND: Well, of course –

9           THE COURT: The employee may be able to collect
10   against you or your insurance, but –

11          MR. HILDEBRAND: Of course, they do.  If this plan
12   is interpreted to allow classes of action against our
13   employees, acting within the scope to reside with the PCT,
14   the next thing that's going to happen is they're going to
15   come knock on our door and say, How much do you want to pay
16   us to get rid of this?  That is the next thing that is going
17   to happen.

18          THE COURT: But that's a result of your contractual
19   relationship with your employees.  Your claim is against the
20   employees.  If you don't have any contractual obligation to
21   defend your employees or choose to ignore that, your
22   employees with be responsible.

23          MR. HILDEBRAND: I guess I'm talking about what I
24   think will happen in practice and why this is an RCT asset.
25   To me, if you step back and look at what the plan intended,

1    the plan is clearly intended to give the reclamation

2    creditors a right to negotiate and settle these global issues

3    as concerned their rights and liabilities against the

4    debtors, not against the RCT but against the debtors with the

5    RCT.  Those are the ones we should have to deal with, and now

6    suddenly, we're caught up having to deal with another basket

7    of the debtors over here on the other side of the courtroom.

8    That's not what we intended.  That's not what we signed up

9    for.

10           THE COURT: Well, but I'm not sure that's what the

11   plan said.  The plan did not say you're scot-free, you never

12   have to deal with the PCT.  You admit you'd have to deal with

13   the PCT if Deloitte filed a contribution claim against you?

14           MR. HILDEBRAND: I think we'd have to deal with

15   Deloitte.  That's fine.  I don't mind dealing with Deloitte.

16           THE COURT: Well, you can't - I see no difference.

17   I really see no difference.

18           MR. HILDEBRAND: Just to make my record, Your Honor,

19   we think the language in the plan as against reclamation

20   creditors must be read to include actions by our employees

21   acting within the scope.  The plan was not intended to sever

22   us from our employees so that they'd be exposed to the PCT,

23   and I would respectfully request that you not adopt such a

24   formalistic reading of the plan, as argued by the PCT.

25           THE COURT: You may be heard.

1          MS. PERTCHARD: Your Honor, Terese Pertchard on

2    behalf of FMG.  I am not a bankruptcy lawyer but a securities

3    lawyer, so I will take maybe 30 seconds of your time to say –

4          THE COURT: All right.

5          MS. PERTCHARD:  – looking at it in its plain

6    language, it seems to me the PCT has asserted a claim, maybe

7    not a claim, but has certainly made its intentions clear in

8    the Texas litigation when it has said that the reclamation

9    creditors are responsible to indemnify their officers and

10   employees.  And it does seem to me that that turns their

11   direct claim against Mr. Frank into an indirect claim against

12   the reclamation creditors, and I, not a bankruptcy lawyer,

13   don't understand what that word "indirect" would mean but for

14   this type of a claim in which they have made their intentions

15   very clear to look to the deep pocket which is FMG.

16         THE COURT: But they have not named any of the

17   reclamation creditors.

18         MS. PERTCHARD:  They have not put that name in the

19   complaint, that's correct, but they have put a count in the

20   complaint that says Mr. Frank was acting within the scope of

21   his employment –

22         THE COURT: Okay.

23         MS. PERTCHARD:  – and therefore, the reclamation

24   creditor is responsible for the damage he caused.

25         THE COURT: But they can't collect from you.  Even

1   if the Texas Court finds that, they have no claim against

2   you.

3           MS. PERTCHARD: Well, legally, and perhaps

4   contractually, FMG will be responsible to indemnify for the

5   damages caused by the employee acting within the scope of his

6   authority.

7           THE COURT: You're required to indemnify the

8   employee.  You're not required to pay the PCT a dime.

9           MS. PERTCHARD: Isn't that an indirect claim against

10  FMG?  I don't know what that word would mean but for this

11  kind of a circumstance.

12          THE COURT: Well, it would mean a creditor in my

13  group has a direct claim against FMG for injuries caused by

14  its actions with the entire debtor.

15          MS. PERTCHARD: That would be a direct claim.

16          THE COURT: An individual creditor.  But, I, on

17  behalf of the estate can bring that claim.  Fraudulent

18  conveyance actions, individual creditors have fraudulent

19  conveyance actions.  They're derivative claims.  They're

20  indirect claims that really belong to the estate.

21          MS. PERTCHARD: Well, as I, a non-bankruptcy lawyer

22  read those words, my interpretation was/is that those words

23  "indirect claim" would encompass a claim against an employee

24  of mine who has an indemnification claim against me.

25          THE COURT: Well, would it extend to anybody who has

1    a contribution claim against you like Deloitte may have?

2              MS. PERTCHARD: No.

3              THE COURT: Why?

4              MS. PERTCHARD: Because Deloitte is not acting

5    within the scope of its employment.

6              THE COURT: But it's part of - according to the

7    allegations, it's part of the entire conspiracy.

8              MS. PERTCHARD: I just don't - I don't read it to go

9    that far.

10             THE COURT: But see, I have to decide how far it

11   could go logically if I agree with your definition.

12             THE COURT: Well, I think that's right.  That's why

13   you're there and I'm here, I guess, but thank you, Your

14   Honor.

15             THE COURT: Thank you.

16             MR. MILLER: Good morning, Your Honor.  Stephen

17   Miller on behalf of Kemps LLC, formerly known as Marigold.

18   Your Honor, first of all, I want to adopt all of the

19   arguments that have been made by my brethren on behalf of the

20   RCT and the other vendors.  So that I don't have to repeat

21   everything and take up more of Your Honor's time, I think

22   that the issues have been laid out pretty well.  I think it

23   is important to kind of step back.  There's been a lot of

24   papers that have been filed on this issue, and a lot of the

25   comments that have been made really, I don't think, are