IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| Fleming Companies, Inc. et al. [1], | ) | Case No. 03-10945 (MFW) |
| | ) | |

| | | |
|---|---|---|
| | ) | |
| Dean Foods Company, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | Civil Action No. 05-835 (SLR) |
| v. | ) | |
| | ) | Appeal No. 05-79 |
| Post Confirmation Trust, | ) | |
| | ) | |
| Appellee. | ) | |

## ANSWERING BRIEF OF APPELLEE POST CONFIRMATION TRUST

**PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP**
Laura Davis Jones (Bar No. 2436)
Scotta E. McFarland (Bar No. 4184)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 17th Floor
Post Office Box 8705
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile: (312) 652-4400

And

**GIBBS & BRUNS, L.L.P.**
Kathy D. Patrick
Texas Bar No.15581400
1100 Louisiana, Suite 5300
Houston, TX 77002
Telephone: (713) 650-8805
Facsimile: (713) 750-0903

Co- Counsel for Appellee, Post Confirmation Trust

Date: October 10, 2006

---

[1] At pertinent places herein, references are made to "Fleming" for Fleming Companies, Inc., public parent company of the following Debtors whose cases remain open: Core-Mark International, Inc.; Fleming Companies, Inc.; ASI Office Automation, Inc.; C/M Products, Inc.; Core-Mark Interrelated Companies, Inc.; Core-Mark Mid-Continent, Inc.; General Acceptance Corporation; Head Distributing Company; Marquise Ventures Company, Inc.; and Minter-Weisman Co.

**TABLE OF CONTENTS**

I.      STATEMENT OF THE CASE.................................................................... 1

II.     QUESTION PRESENTED........................................................................ 2

III.    STANDARD OF REVIEW ....................................................................... 2

IV.     STATEMENT OF FACTS ........................................................................ 4

        A.      The Bankruptcy Plan.................................................................... 5

        B.      The PCT's Lawsuit ....................................................................... 6

        C.      The RCT's Motion........................................................................ 7

        D.      The RCT's Settlement With Dean and the Denial of Dean's Motion to
                Dismiss in the Texas Suit............................................................ 8

V.      SUMMARY OF THE ARGUMENT ......................................................... 9

VI.     ARGUMENT............................................................................................ 10

        A.      The Bankruptcy Court Did Not Abuse Its Discretion In Ruling That
                Under The Plan, Claims Asserted Against Vendor Officers Belong To
                The PCT..................................................................................... 11

                1.      The Plan is an Unambiguous Contract.................................... 12

                2.      Under the Unambiguous Terms of the Plan, Claims Against
                        Vendor Officers Such as Robinson Belong to the PCT........... 13

                3.      The PCT Has Not Asserted Any Claims Against Reclamation
                        Creditors................................................................................ 15

        B.      Dean's Proposed Interpretation Defies All Logic And Is Supported By
                Neither Caselaw Nor The Unambiguous Terms Of The Plan. ............... 16

                1.      The Terms of the Plan Contract, Not the Response of Litigation
                        Targets, Defines Which Trust Owns a Claim. .......................... 17

                        (a)     Dean Misconstrues the Plan's Use of "Indirect" and
                                Ignores Its Use of "Against." ..................................... 17

                        (b)     The Plan's Omission of the Phrase "And Their Officers,
                                Employees, and Directors" In Reference to "Claims
                                Against Reclamation Creditors" is Also Highly
                                Significant. ............................................................... 20

        (c)     Dean's Erroneously Relies on the Legal Concept of Indemnification in Interpreting the Plan. ...................................... 21

    2.    Dean's Interpretation Strips the PCT of Claims Expressly Assigned to it Under the Terms of the Plan, Leading to Ludicrous Results. .................................................................................................... 23

        (a)     "Claims That Might Result in Reclamation Creditor Liability" .................................................................................... 24

        (b)     "Claims That Have Actually Resulted in Contribution or Indemnification Claims Against Reclamation Creditors" ............ 25

    3.    Dean's Citations to Caselaw Are Misguided. ........................................... 27

C.    Dean Misconstrues The Nature Of The Plan's Contemplated Independence Of The Vendor And Officer Claims. .............................................. 29

    1.    The Bankruptcy Court's Interpretation of the Plan Will Not Result in Double Recovery. ..................................................................... 30

    2.    The Unlikely Chance of Inconsistent Judgments Does Not Call For Reversal of the Bankruptcy Court's Order. ......................................... 32

VII.    CONCLUSION. .............................................................................................................. 32

## TABLE OF AUTHORITIES

### Cases

*Anderson v. Bessemer City,*
  470 U.S. 564, 573 (1985)................................................................................................ 4

*Annan v. Wilmington Trust Co. Trustee,*
  559 A.2d 1289, 1292 (Del. 2000) ............................................................................... 12

*Cantera v. Marriott Senior Living Servs., Inc.,*
  C.A. No. 16498, 1999 WL 118823, at *4 (Del. Ch. Feb. 18, 1999)........................... 12

*Cincinnati SMSA Ltd. Partnership v. Cincinnati Bell Cellular Systems Co.,*
  708 A.2d 989 (Del. Supr. 1998)................................................................................... 19

*City Investing Co. Liquidating Trust v. Continental Cas. Co.,*
  624 A.2d 1191, 1998 (Del. 1993) ................................................................................ 12

*First Western SBLC, Inc. v. Mac-Tav, Inc.,* 231 B.R. 878, 883-884 (D.N.J. 1999), *aff'd* 213
  F.3d 628 (3d Cir. 2000) ............................................................................................ 3, 4

*Gertrude L.Q. v. Stephen P.Q.,*
  466 A.2d 1213 (Del. 1983) .......................................................................................... 19

*Hammerly Oaks, Inc. v. Edwards,*
  958 S.W.2d 387, 391-92 (Tex. 1997) .......................................................................... 31

*Holland v. Hannan,*
  456 A.2d 807, 815 (D.C. App. 1983) .......................................................................... 13

*In re Ampace Corp.,*
  279 B.R. 145, 153 (Bankr. D. Del. 2002) ................................................................... 12

*In re Dow Corning Corp.,*
  456 F3d 668, (6th Cir. 2006) ......................................................................................... 3

*In re Eagle Enters., Inc.,*
  223 B.R. 290, 292 (Bankr. E.D. Pa. 1998) ................................................................. 12

*In re Klesalek,*
  307 B.R. 648, 651 (B.A.P. 8th Cir. 2004) .................................................................... 3

*In re New Valley Corp.,*
  89 F.3d 143, 149 (3d Cir. 1996) .................................................................................. 18

*In re O'Connor*,
   258 F.3d 392, 401 (5th Cir. 2001) ....................................................................... 3

*In re Optical Techs., Inc.*,
   425 F.3d 1294, 1300 (11th Cir. 2005) ................................................................. 3

*In re Ranch House of Orange Brevard, Inc.*,
   773 F.2d 1166, 1168 (11th Cir. 1985) ................................................................. 3

*In re Smouha*,
   136 B.R. 921, 925 (S.D.N.Y.
   1992) ..................................................................................................................... 3

*In re Stratford of Tex., Inc.*,
   635 F.2d 365, 368 (5th Cir. 1981) ................................................................. 12, 13

*In re Sugarhouse Realty*,
   192 B.R. 355, 362 (E.D. Pa. 1996) ..................................................................... 12

*In re Terex Corp.*,
   984 F.2d 170, 172 (6th Cir. 1993) ....................................................................... 3

*In re Weber*,
   25 F.3d 413, 416 (7th Cir. 1994) ......................................................................... 3

*Kollision King v. Calderon*,
   968 S.W.2d 20, 25 (Tex. App. -- Corpus Christi 1998, no pet)............................ 30

*Leitch v. Hornsby*,
   935 S.W.2d 114, 117 (Tex. 1996)........................................................................ 31

*Miller v. Keyser*,
   90 S.W.3d 712, 717 (Tex. 2002).......................................................................... 16

*Monarch Life Ins. Co. v. Ropes & Gray*
   65 F.3d 973, 975-75 (1st Cir. 1995) ............................................................... 27, 28

*Morrow v. Wyeth*,
   Civil Action B-05-209, 2005 U.S. Dist. LEXIS 43194, *13 (S.D. Tex. Oct. 13, 2005) .......... 31

*Natural Gas Clearinghouse v. Midgard Energy Co.*,
   113 S.W.3d 400, 407 (Tex. App. – Amarillo 2003, pet. denied)............................ 13

*Neary v. Philadelphia, W. & B.R. Co.*,
   7 Houst. 419, 9 A. 405 (Del. 1887)...................................................................... 13

*Northwestern Nat'l. Ins. v. Esmark, Inc.*,
   672 A.2d 41, 44 (Del. 1996) ................................................................................ 13

*Overthrust Constructors, Inc. v. Home Ins. Co.,*
   676 F. Supp. 1086, 1089-90 (D. Utah 1987) ............................................................ 28

*Pellaton v. Bank of New York,*
   592 A.2d 473, 478 (Del. 1991) ................................................................................ 13

*Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,*
   616 A.2d 1192, 1196 (Del. 1992) ...................................................................... 12, 13

*United States v. Monsanto,*
   182 F.2d 385, 393 (D.N.J. 2000) ............................................................................ 28

*United States v. White Farm Equip. Co.,*
   157 B.R. 117, 119 (N.D. Ill. 1993) ............................................................................ 3

*Wright v. Sage Eng'g., Inc.,*
   137 S.W.3d 238, 250 (Tex. App.  -- Houston [1st Dist.] 2004, pet. denied)............................ 16

**Rules**

TEX. CIV. PRAC. & REM. CODE § 33.004(a) ............................................................... 24

TEX. CIV. PRAC. & REM. CODE § 33.012 (b)............................................................... 31

## I.    STATEMENT OF THE CASE

This appeal arises from the Bankruptcy Court's ruling that the Confirmed Plan of Liquidation of the Fleming Companies, Inc. ("Plan") vested ownership of certain litigation claims in the Post Confirmation Trust ("PCT or "Appellee") rather than in the separate Reclamation Creditors Trust ("RCT"). *See* R. App. at 1.[1]  Both the PCT and the RCT were created, under the terms of the Plan, to pursue distinct categories of recovery for the benefit of Fleming's creditors.

Fleming was previously the nation's largest grocery wholesaler. *Id.* at 236.  It was pushed into insolvency in 2002 as a result of a scheme of financial statement manipulation that was carried out by certain Fleming's officers, with the active assistance of a handful of former Fleming vendors and their employees.  As a result of this scheme, Fleming collapsed, leaving its creditors with unsatisfied debts totaling more than $3 billion.  The U.S. Securities and Exchange Commission ("SEC") later charged a number of individuals and companies -- including Appellant Dean Food Company ("Appellant" or "Dean") and one of its officers, John Robinson ("Robinson") -- with intentionally assisting in the manipulation of Fleming's financial statements in violation of federal securities laws. *See id.* at 254-57.

Fleming's Plan was confirmed on July 27, 2004.  On March 31, 2005, the PCT filed suit against a number of parties, including Robinson, seeking recovery of the damages caused to Fleming and its creditors by the knowing participation of Robinson (and other defendants) in the deliberate breach of fiduciary duties Fleming's officers owed to Fleming. *See id.* at 37-135.

---

[1]  References to the Record on Appeal (the appendix to Dean Food Company's Opening Brief) will be designated as "R. App. at ___." References to the Supplemental Record on Appeal (the appendix attached hereto by the PCT) will be designated as "Supp. R. App. at ___."  The complete Plan may be found at Supp. R. App. at 1-58.

Five months after the PCT filed its suit, the RCT asked the Bankruptcy Court to enjoin the PCT from asserting its claims against the vendors' officers. *See id.* at 3-31. The RCT asserted, *for the first time,* that the claims pursued by the PCT actually belonged to the RCT under the Plan. The only creditors who intervened to support the RCT's argument were a handful of Reclamation Creditors whose employees were named in the PCT's action. *See id.* at 155-63; Supp. R. App. at 59-101. No other creditor asserted that the PCT's effort to recover damages for Fleming's creditors violated the Plan terms. R. App. at *passim.*

After significant briefing and an extensive oral hearing on the matter, The Honorable Mary F. Walrath of the Bankruptcy Court issued an opinion and order denying the RCT's motion and rejecting Dean's arguments. *See id.* at 1, 372-484. The Opinion concluded that under the plain terms of the Plan, the claims being pursued by the PCT were indeed the property of the PCT. *See id.* Dean then appealed to this Court.

## II.    QUESTION PRESENTED

Did Bankruptcy Judge Walrath abuse her discretion in ruling that the PCT owns the litigation claims it filed, when the Plan states that the RCT owns *only* claims against Reclamation Creditors, and when the vendor employees whom the PCT sued are not holders of Reclamation Claims and thus not Reclamation Creditors?

## III.    STANDARD OF REVIEW

Dean errs when it asserts that the Bankruptcy Court's decision is subject to *de novo* review by this Court. Where the matter on appeal from a bankruptcy court "concerns the interpretation of [a] Confirmation Plan," the district court "review[s] the bankruptcy court's interpretation of the Confirmation Plan under the abuse of discretion standard." *First Western SBLC, Inc. v. Mac-Tav, Inc.*, 231 B.R. 878, 883-884 (D.N.J. 1999), *aff'd* 213 F.3d 628 (3d Cir.

2000) (citing *In re Weber*, 25 F.3d 413, 416 (7th Cir. 1994)) (rejecting argument that confirmation plan is essentially a contract, the bankruptcy court's interpretation of which should therefore be subject to *de novo* review; holding instead that bankruptcy court's interpretation of a confirmed plan should receive deferential review); *In re Terex Corp.*, 984 F.2d 170, 172 (6th Cir. 1993) (bankruptcy court's interpretation of confirmed plan should be accorded full deference); *In re Ranch House of Orange Brevard, Inc.*, 773 F.2d 1166, 1168 (11th Cir. 1985) (expressing reluctance to disturb a bankruptcy court's judgment interpreting a confirmation order); *United States v. White Farm Equip. Co.*, 157 B.R. 117, 119 (N.D. Ill. 1993) (bankruptcy court's interpretation of confirmed plan should be accorded full deference); *In re Smouha*, 136 B.R. 921, 925 (S.D.N.Y. 1992) (clearly erroneous standard applies where bankruptcy court has construed its own prior order)).

Unlike interpretations of other contracts, which are, as questions of law, subject to *de novo* review, a bankruptcy court's interpretation of a confirmed bankruptcy plan is awarded the "same deference that is otherwise paid to a court's interpretation of its own order." *In re O'Connor*, 258 F.3d 392, 401 (5th Cir. 2001); *see also In re Dow Corning Corp.*, 456 F3d 668, (6th Cir. 2006) (abuse of discretion standard appropriate where bankruptcy court's interpretation of confirmed plan does not require interpretation of Bankruptcy Code); *In re Optical Techs., Inc.*, 425 F.3d 1294, 1300 (11th Cir. 2005) (while generally bankruptcy court's legal conclusions are reviewed *de novo,* interpretations of effects of their own orders should not be disturbed absent abuse of discretion); *In re Klesalek*, 307 B.R. 648, 651 (B.A.P. 8th Cir. 2004) (bankruptcy court's interpretation of confirmed plan is reviewed for abuse of discretion); *In re Weber*, 25 F.3d at 416. In short, because the decision below involved *solely* the Bankruptcy Court's construction of its own Plan, that decision may be overturned only upon a showing that the

3

Bankruptcy Court abused its discretion. *See Mac-Tav*, 231 B.R. at 884 (affirming bankruptcy court's ruling on plan interpretation where court was not "left with the definite and firm conviction that a mistake ha[d] been committed") (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573 (1985)). The Order of the Bankruptcy Court should be affirmed. [2]

## IV.    STATEMENT OF FACTS

Before its collapse, Fleming was the nation's leading wholesale grocery distributor. R. App. at 236. Beginning in the latter half of 2001 and continuing through 2002, certain Fleming officers embarked upon a scheme to accelerate the company's recognition of revenue and income in order to inflate Fleming's financial results and generate large performance bonuses for themselves.[3] *Id.* at 237-38. Aiding that scheme were certain individuals working for a handful of Fleming vendors.[4] *Id.* at 237-41. These individuals falsified supply agreements, payment records, and sometimes audit confirmations, in order to actively assist in the misstatement of Fleming's financial statements. *Id.* Following Fleming's collapse, the SEC instituted an investigation of Fleming's financial reporting. On September 14, 2004, the SEC announced that a number of former Fleming vendors and/or their employees had entered into Consent Judgments acknowledging their role in the deliberate manipulation of Fleming's financial reports. *Id.* at 254-66.

---

[2]   Even if this Court were to review the Bankruptcy Court's decision *de novo*, however, the result would be the same: the Bankruptcy Court's decision was plainly a correct reading of the Plan terms.

[3]   The SEC Consent Judgment against Fleming specifies that one of the ways in which the company improperly accelerated earnings was by obtaining "misleading side letters from certain vendors" to support immediate recognition of revenue for past services, while the money was in fact for future services and should therefore have been accounted for over a period of time. *See* R. App. at 237.

[4]   The same Consent Judgment specifies five vendors (and their officers) who were asked to -- and did --provide fraudulent side letters to Fleming in December 2001 and in the first quarter of 2002, including Dean (ands its officer Robinson). *See id.* at 237-39. Each of these vendors entered into consent judgments that detail the conduct of the vendor officers who agreed to make misleading representations to aid Fleming's officers in manipulating the company's financial results. *See id.* at 246-253; 254-57; 258-62, and 263-66.

The PCT has alleged in its lawsuit that, as a result of these artificially inflated income numbers, Fleming's directors and creditors approved, and Fleming incurred, over $500 million in public, trade, and bank debt. *See id.* at 48. Fleming thereafter plunged into bankruptcy and was dismembered, leaving its creditors with unpaid and unsecured debts exceeding $3 billion. *Id.*

## A.    The Bankruptcy Plan

Fleming filed for bankruptcy protection on April 1, 2003. On May 28, 2004, Fleming and the Official Committee of Unsecured Creditors ("OCUC") filed the Third Amended and Revised Joint Plan of Reorganization, *see* Supp. R. App. at 1-58, which was confirmed by the Bankruptcy Court on July 27, 2004. The Plan created two liquidating Delaware trusts – the PCT and the RCT – to administer and resolve Fleming's assets and liabilities.

The RCT was created to administer Fleming's claims against its Reclamation Creditors ("RCT Assets") and Fleming's liabilities to the same Reclamation Creditors ("Reclamation Claims"). *See id.* at 28 (charging the RCT with responsibility for "the pursuit and collection of the RCT Assets and payment of Reclamation Claims"). The RCT Assets were defined as to include:

> Vendor deductions, over-wires, preference claims, Causes of Action and other rights of the Debtors as against Reclamation Creditors, other than the post-petition deductions and post-petition overwires with respect to the Fleming Convenience business which shall be transferred to Core-Mark Newco.

*Id.* at 11.[5] Reclamation Creditors were further defined in the Plan as holders of Reclamation Claims. *Id.* at 11.[6] As explained in Part V.A, below, it is undisputed that *none* of the parties the

---

[5]  The Revised Term Sheet agreed upon by the Official Committee of Reclamation Creditors ("OCRC") and the OCUC also defined "Reclamation Assets" to include "deductions, over-wires, preference claims, Causes of Action and other rights of the Debtors as against the holders of Reclamation Claims . . . (the "Reclamation Creditors") . . . ." *See id.* at 137.

[6]  The Plan defines "Reclamation Creditor" as "any Claim Holder that asserts that all, or any portion, of its Claim is entitled to be granted priority and/or to be secured by a lien in accordance with 546(c)(2) of the Bankruptcy Code

PCT sued was the holder of a Reclamation Claim and that, therefore, *none* was a Reclamation Creditor.

The PCT was created to administer *all other* post-confirmation responsibilities of the former Fleming debtors, including, but not limited to, those "associated with the pursuit and collection of the Litigation Claims and Causes of Action other than those which are RCT Assets and the reconciliation and payment of Claims, other than Reclamation Claims . . . ." *Id.* at 25. The Plan states that "[t]he PCT Assets do not include any RCT Assets." *Id.* In other words, all claims and liabilities involving anyone who is *not* a Reclamation Creditor belong to the PCT under the plain terms of the Plan.

### B.    The PCT's Lawsuit

On March 31, 2005, after both an internal investigation conducted by Fleming's Audit Committee and the entry of the SEC's Consent Judgments, the PCT filed suit against a number of parties in the U. S. District Court for the Eastern District of Texas ("Texas suit"). To recover from the defendants the damage that had been caused to Fleming (and its creditors) as a result of the scheme to inflate and manipulate Fleming's financial results, the PCT alleged, *inter alia*, breach of fiduciary duty, conspiracy, negligent misrepresentation, and breach of professional obligations against various former officers of Fleming, Fleming's auditors (Deloitte & Touche LLP ("Deloitte")), and various officers of Fleming's vendors who aided the Fleming officers' scheme to artificially inflate revenue ("Vendor Officers"). *See* R. App. at 37-136. The PCT sued John Robinson, an employee of Dean, as well as other Vendor Officers, including persons affiliated with Marigold, Kraft, Digital Exchange, Frito-Lay, Dean Foods, FMG, and Dole Fresh

---

and also those identified on the Reclamation Claim Summary by Claimant of the Debtors dated November 21, 2003." Supp. R. App. at 11.

Fruit Company ("Dole").[7]  With the exception of Defendant Michael Cavallero,[8] all of the Vendor Officers sued by the PCT were (or had been) employees of Reclamation Creditors. *See id.* at 44-46. They were not, however, themselves Reclamation Creditors.

### C.    The RCT's Motion

On August 25, 2005, almost five months after the PCT filed the Texas lawsuit, the RCT filed a motion in the Bankruptcy Court seeking to enjoin the PCT from pursuing its claims against employees of Reclamation Creditors ("Motion"). See *id.* at 3-36. The RCT argued that such claims were included in the assets of the RCT. *See id.*  Dean joined the RCT's motion, *id.* at 155-63, as did the three other Reclamation Creditors whose officers had been named in the Texas lawsuit, Supp. R. App. at 59-101. No other creditors, however, joined the RCT's motion. R. App. at *passim.*

After extensive briefing and a lengthy hearing, the Bankruptcy Court rejected the RCT's arguments and the arguments of all of the wrongdoing Reclamation Creditors who had joined the RCT's motion. The court concluded that

> the plain language of the plan provides that only causes of action or claims against reclamation creditors were transferred to the RCT, and I view a claim against the vendors, the reclamation creditors, as separate from the claims against the employees albeit they arise from the same actions and result in the same injuries. They are separate claims, and ***there was no assignment to the RCT of any claims which the estate may have against employees of the vendors.*** . . . [T]here is some concept that would preclude a double recovery on a claim to the extent there's joint and several liability that does not mean the plaintiff may recover a hundred percent from each of the defendants. I recognize that it might be difficult to parse out what percentage of that claim has already been paid by any reclamation creditors who have settled with the RCT . . . but I leave that for another court, another forum to decide. . . *[T]he plan . . . did retain with the PCT*

---

[7]  Subsequent to the filing of the Texas lawsuit, the PCT entered into settlement agreements with the officers of - Kraft, Dexsi, and FMG. The PCT also settled with Deloitte and Fleming's former officers who were named as defendants.

[8]  Cavallero was employed by Dole, which was not a Reclamation Creditor.

*the causes of action which the estate may have against the employees of the reclamation vendors*.

R. App. at 466-67 (emphasis added).    The court then entered an order the same day denying the

RCT's Motion and declaring that "[u]nder Fleming's Plan of Reorganization, any claims which

were preserved by the Plan against the Vendor Officers, who are not Reclamation Creditors, are

the property of the PCT." *Id.* at 1.

**D.      The RCT's Settlement With Dean and the Denial of Dean's Motion to Dismiss in the Texas Suit**

After the PCT filed its lawsuit, the RCT began to settle the Reclamation Claims of

various Reclamation Creditors, including the claims of Appellant Dean.    In its settlement with

the RCT, Dean received a release of claims "to the full extent of RCT Assets, *but not further*, . . .

of any and all claims, obligations, demands, actions, causes of action of whatever kind and

nature . . ." against Dean and its current or former employees. *Id.* at 169-70 (emphasis added).[9]

Although the terms of the Dean Settlement Agreement release claims against Dean as a

Reclamation Creditor, and against Dean's officers and employees, they do so *only to the extent*

that such claims belong to the RCT.

Disappointed by the Bankruptcy Court's ruling, several of the Vendor Officers filed

Motions to Dismiss in the PCT's Texas suit.    In those motions, certain Vendor Officers argued --

as their employers had in the Bankruptcy Court -- that the claims the PCT was pursuing were

---

[9]  The settlement agreement provides, in relevant part, that

> the RCT, to the full extent of RCT Assets, but not further, . . . hereby waives, releases and forever discharges the Dean Foods Reclamation Creditors and all of their current, former and future directors, partners, members, officers, agents, employees, assigns, attorneys, predecessors and successors . . . from any and all claims, obligations, demands, actions, causes of action and liabilities of whatever kind and nature, character and description whether known or unknown, fixed or contingent, concealed or hidden, anticipated or unanticipated which the RCT ever had, now has or may in the future have against the Reclamation Creditor Released Parties.

R. App. at 169-70.

actually the property of the RCT. Although Judge Ward, who is presiding over the Texas action, did not opine on the claim ownership issue, he recently issued an order denying all pending motions to dismiss. The case is now set for trial in March of 2007.

Having been rebuffed by both the Bankruptcy Court and the District Court presiding over the PCT's lawsuit, Dean now asks this Court for a third bite at the apple. It argues, again, that the Bankruptcy Court erred in finding that claims against Vendor Officers (*e.g.*, Robinson) are the property of the PCT because they are not claims against Reclamation Creditors (*e.g.*, Dean) and, therefore, are *not* RCT assets. If Dean is successful, its settlement with the RCT will preclude any effort to hold Robinson responsible for the damages he caused to Fleming and its creditors.

## V.    SUMMARY OF THE ARGUMENT

The unambiguous terms of the Plan assign to the RCT "claims . . . against Reclamation Creditors." Supp. R. App. at 11, 28. "Reclamation Creditor" is defined as a person or entity that holds a "Reclamation Claim." *Id.* at 11. It is undisputed that the Vendor Officers whom the PCT has sued are not the holders of Reclamation Claims and, therefore, are not Reclamation Creditors.

The unambiguous terms of the Plan also assign to the PCT *all other claims. See id.* at 25-26. The PCT's claims against the individual officers who aided in the manipulation of Fleming's financial statements are, simply and plainly, not claims "against Reclamation Creditors." As a result, they are not RCT Assets and are not the property of the RCT. Instead, as the Bankruptcy Court correctly determined, *"there was no assignment to the RCT of any claims which the estate may have against employees of the vendors . . . ,"* R. App. 466-67, so those claims remained the property of the PCT.

Appellant Dean argues that the PCT's claims against the Vendor Officers are "indirect" claims "against Reclamation Creditors" because the employees may later have claims for contribution or indemnification against Reclamation Creditors. This argument is wrong in two respects. First, the Plan determines which trust owns claims that formerly belonged to Fleming. Contribution claims by vendor employees are the property *of the employees*; they were never the property of the Fleming Bankruptcy Estate. Contribution rights of third parties (that may or may not exist) are irrelevant to determining which claims -- that formerly belonged to Fleming -- were conveyed to the PCT *under the Plan*.    *See* Part VI.B.1(c), *infra*. Second, if Dean were correct, the PCT would not even own claims that have been explicitly and unarguably granted to it under the Plan -- including claims against professionals and former Fleming officers -- because of the possibility that those parties might seek contribution from a Reclamation Creditor. *See* Part VI.B.2, *infra*. Such a ludicrous interpretation of the Plan is unsupported by any fair reading of the Plan terms. As a matter of law, and in the exercise of its discretion to construe its own Bankruptcy Plan, the Bankruptcy Court correctly determined that the PCT owned the claims it had filed. This Court should therefore affirm the Bankruptcy Court's ruling.

## VI.    ARGUMENT

Dean brings this appeal for two obvious reasons: (a) a reversal of the Bankruptcy Court's decision would strip the PCT of standing to assert its claims against Vendor Officers in the Texas litigation, and (b) the PCT's claims would then be extinguished. If Dean succeeds in this effort, its employee Robinson will never have to answer for the catastrophic damage his fraudulent conduct caused Fleming and its innocent creditors on whose behalf the PCT is seeking to recover damages.

The result Dean advocates is not merely antithetical to the purpose for which the PCT was created; it is utterly at odds with the plain language of the Plan. This Court should therefore defer to the Bankruptcy Court's considered interpretation of its confirmed Plan and deny Dean's appeal.

The PCT has diligently exercised its duties under the Plan. The PCT has invested significant time and scarce resources, and incurred significant expense, to prepare and pursue the claims it filed against the individual Vendor Officers. The PCT's claims are not thin or contrived; instead, they are based on undisputed facts set out in Consent Judgments entered into by most of the major defendants, including Appellant Dean's employee, Robinson. The PCT is pursuing hundreds of millions of dollars in damages from individuals who knowingly falsified documents, defrauded Fleming and its auditors, and manipulated Fleming's income to such an extent that the company collapsed -- leaving *innocent* creditors, who had no part in the scheme, to bear the $3 billion brunt of the loss. The Texas District Court has already declined to dismiss the PCT's claims. It has denied a request for a trial continuance, as well. Fleming's creditors are on the verge of having their day in court against those who injured them so badly. Given that the plain language of the Plan establishes that the claims the PCT is pursuing are its own, the PCT should be permitted to continue to pursue them for the benefit of Fleming's creditors.

A.    **The Bankruptcy Court Did Not Abuse Its Discretion In Ruling That Under The Plan, Claims Asserted Against Vendor Officers Belong To The PCT.**

Under the structure of the Plan, the RCT owns a specific, well-defined and limited set of claims defined as RCT Assets -- and the PCT owns everything that is *not* an RCT Asset.

Because the claims against the individuals sued in the Texas action were not explicitly allocated to the RCT, these claims necessarily belong to the PCT.[10]

### 1.    The Plan is an Unambiguous Contract.

"Confirmed bankruptcy plans of reorganization are binding contracts that must be interpreted in accordance with applicable contract law." *In re Sugarhouse Realty*, 192 B.R. 355, 362 (E.D. Pa. 1996) (citing *In re Stratford of Tex., Inc.*, 635 F.2d 365, 368 (5th Cir. 1981); *see also In re Ampace Corp.*, 279 B.R. 145, 153 (Bankr. D. Del. 2002) (citing *In re Sugarhouse*). "The starting point of contract construction is to determine whether a provision is ambiguous, *i.e.* whether it is reasonably subject to more than one interpretation." *Cantera v. Marriott Senior Living Servs., Inc.*, C.A. No. 16498, 1999 WL 118823, at *4 (Del. Ch. Feb. 18, 1999).

A contract "is not rendered ambiguous simply because the parties in litigation differ concerning its meaning," *City Investing Co. Liquidating Trust v. Continental Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993), or because the parties "do not agree upon its proper construction," *Rhone-Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1196 (Del. 1992). A contract (and thus a bankruptcy plan) is ambiguous "only when the provisions in controversy are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone-Poulenc*, 616 A.2d at 1196. If the terms of the plan are *not* ambiguous, a

---

[10]  The Plan contains a choice-of-law provision choosing Delaware law. *See* Supp. R. App. at 1 ("Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof."). "In most instances bankruptcy courts rely on the rule observed by federal district courts hearing diversity cases and use the choice of law rules of the forum state." *In re Eagle Enters.*, Inc., 223 B.R. 290, 292 (Bankr. E.D. Pa. 1998) (citations omitted). Under Delaware law, a choice of law provision in a contract will generally be upheld, "as long as the jurisdiction selected bears some material relationship to the transaction." *Organ v. Byron*, 435 F. Supp. 2d 388, 390 (D. Del. 2006) (quoting *Annan v. Wilmington Trust Co. Trustee*, 559 A.2d 1289, 1292 (Del. 2000)). Because Fleming was incorporated in Delaware and filed its petition for bankruptcy there, the choice of law provision is enforceable. Thus, to the extent that any state's law applies to interpretation of the Plan, Delaware's is the relevant law. However, for the convenience of the court, where applicable, the PCT will also cite analogous provisions of Texas law, which are largely identical to those of Delaware.

court should glean its meaning without reference to any extrinsic evidence, and such interpretation is a question of law for the court. *In re Stratford*, 635 F.2d at 368; *Pellaton v. Bank of New York*, 592 A.2d 473, 478 (Del. 1991).[11]

Although the PCT and Dean disagree about what the Plan means, neither party contends the Plan itself is ambiguous.    Importantly, ambiguity "does not exist where the court can determine the meaning of a contract 'without any guide other than knowledge of the simple facts on which, from the nature of language in general, its meaning depends.'" *Rhone-Poulenc*, 616 A.2d at 1196 (quoting *Holland v. Hannan*, 456 A.2d 807, 815 (D.C. App. 1983)).  Further,

> All written contracts . . . are to be read, understood, and interpreted according to the plain meaning and ordinary import of the language employed in them. . . . Words, if of common use, are to be taken in their natural, plain, obvious, and ordinary significance; but, if technical words are used, they are to be taken in a technical sense, unless a contrary intention clearly appears, in either case, from the context.

*Neary v. Philadelphia, W. & B.R. Co.*, 7 Houst. 419, 9 A. 405 (Del. 1887); *accord Northwestern Nat'l. Ins. v. Esmark, Inc.*, 672 A.2d 41, 44 (Del. 1996) (interpreting unambiguous contract terms using dictionary definitions).  In the case at bar, the common language of the Fleming Plan, the defined terms contained therein, and even basic grammar all establish that the PCT owns the claims against the Vendor Officers.

### 2.    Under the Unambiguous Terms of the Plan, Claims Against Vendor Officers Such as Robinson Belong to the PCT.

As explained above in Section IV. the Plan divided all litigation claims belonging to the former Fleming Debtors between the PCT and the RCT.  The PCT was vested with the responsibility to liquidate all litigation claims that were not "RCT Assets."  Supp. R. App. at 25.

---

[11]  Similarly, under Texas law, courts will "not imply language, add language, or interpret it other than pursuant to its plain meaning" when interpreting an unambiguous contract. *Natural Gas Clearinghouse v. Midgard Energy Co.*, 113 S.W.3d 400, 407 (Tex. App. – Amarillo 2003, pet. denied).

The Plan defines "RCT Assets" to include "Vendor deductions, over-wires, preference claims, Causes of Action and other rights of the Debtors *as against Reclamation Creditors*, other than the post-petition deductions and post-petition over-wires with respect to Fleming Convenience which shall be transferred to Core-Mark Newco." *Id.* at 28 (emphasis added). Critically, this definition, repeated in substance in the "Defined Terms" section of the Plan under the definition of "RCT Assets," *see id.* at 11, limits the RCT's authority *solely* to litigation of claims against Reclamation Creditors.

The term "Reclamation Creditor," in turn, is defined as "any Claim Holder that asserts that all, or any portion, of its Claim is entitled to be granted priority and/or to be secured by a lien in accordance with 546(2) of the Bankruptcy Code and also those identified on the Reclamation Claim Summary . . . ." *Id.* Dean does not seriously dispute that the Vendor Officers whom the PCT has sued, including Robinson, are not Reclamation Creditors. Robinson, for example, is not the holder of a Reclamation Claim and his name does not appear anywhere on the Reclamation Claim summary. *See id.* at 102-123.

The Plan vests in the PCT ownership of, and the responsibility to litigate, *all other litigation claims* that previously belonged to the Fleming Debtors. *See id.* at 26 (vesting in the PCT "*any and all other Claims and Causes of Action* of the Debtors, including but not limited to those outlined in section VI hereof . . . which are not RCT Assets") (emphasis added). The claims against the Vendor Officers, which sound in tort and arise out of the pre-petition manipulation of the Fleming Companies' financial information, are thus not merely preserved by the Fleming Plan, *see id.* at 30-31, they are also vested in the PCT, *see id.* at 26 (claims vest in PCT) and 28 (limiting RCT's claims to solely those against Reclamation Creditors). Because the

14

Vendor Officers are not Reclamation Creditors, the claims against them belong to the PCT under the clear and unambiguous terms of the Plan.

Dean's tortured interpretation of the Plan, discussed in depth *infra*, effectively concedes this point. Dean must twist and turn precisely because the Plan *does not define* claims against the Vendor Officers as RCT Assets. That these claims are not explicitly identified as RCT Assets ends the issue. The PCT owns all assets that are not explicitly designated in the Plan to be transferred to the RCT, and these are not RCT Assets. Dean's attempt to radically expand the phrase "Causes of Action as against Reclamation Creditors" to include all conceivable claims that might result in a contribution claim by a third party against a Reclamation Creditor finds no support in the Plan terms. The question as to which trust owns these claims begins and *must end* with the Plan itself. The Bankruptcy Court not only properly exercised its discretion to construe the Plan as it did -- its construction of the Plan is absolutely correct. The claims against the Vendor Officers are not claims "against Reclamation Creditors." They are not, therefore, RCT Assets, so they belong to the PCT.

### 3.    The PCT Has Not Asserted Any Claims Against Reclamation Creditors.

The Bankruptcy Court's interpretation of the Plan must be upheld for another reason: even a cursory review of the Texas complaint establishes that the PCT has not brought any claims *against Reclamation Creditors.* First, and most obviously, the PCT has specifically alleged in its complaint that Dean and other Reclamation creditors are *not* parties to its action. *See* R. App. 45-47.

Second, the PCT has sued individuals who are personally liable for their own wrongdoing. An agent is personally liable for his own torts, regardless of whether he committed them within the scope of his agency for his employer (or other principal). "Texas' long-standing

15

rule [is] that a corporate agent is personally liable for his own fraudulent or tortious acts." *Miller v. Keyser*, 90 S.W.3d 712, 717 (Tex. 2002). "It is well settled that a corporate agent can be held *individually liable* for fraudulent statements or knowing misrepresentations even when they are made in the capacity of a corporate representative." *Wright v. Sage Eng'g., Inc.*, 137 S.W.3d 238, 250 (Tex. App. -- Houston [1st Dist.] 2004, pet. denied) (emphasis added).

Far from filing an "indirect claim" against the Reclamation Creditors, the PCT has sought damages and the entry of judgment *solely* against the individual Defendants whom it has sued. Nothing in the complaint seeks (or will entitle the PCT to obtain) a judgment against any Reclamation Creditor, each of which is explicitly alleged to be a "non-party" to the case. *See* R. App. at 42-47 (¶¶ 20, 23, 25, 29, 31, 33, 34, and 37). The PCT is not only *permitted* to pursue these claims by law, it is required to pursue them to discharge its fiduciary obligations to "use its best efforts to liquidate and resolve Claims, disputes and maximize the value of the PCT's assets and minimize the claims against the PCT." Supp. R. App. at 28.[12]

### B.    Dean's Proposed Interpretation Defies All Logic And Is Supported By Neither Caselaw Nor The Unambiguous Terms Of The Plan.

The PCT has sued solely the Vendor *Officers*—not the Reclamation Vendors—for their role in Fleming's demise. Dean's tortured interpretation of the Plan – based on one word, "indirect" -- seeks to:

(1) fundamentally change and expand the Plan's definition of RCT Assets from "Cause of Action against Reclamation Creditors" to include "all claims against Reclamation Creditors,

---

[12] Notably, when the PCT filed its Texas suit, it sought recovery not only from the Vendor Officers, but also from certain former Fleming officers and from Deloitte. The PCT has been charged under the Plan with recovering for the benefit of creditors (including trade creditors who did not assist in the manipulation of Fleming's financial statements) more than $2 billion in damages they suffered when the company collapsed. No one lawsuit will satisfy that entire amount in one fell swoop, but uncertainty as to what might ultimately be recovered from one particular defendant was not, and is not, a basis upon which the PCT could simply ignore and fail to prosecute the serious claims against the Vendor Officers that were assigned to it for prosecution under the plain terms of the Plan.

and their officers, directors, employees and agents." This re-write is contrary to the explicit terms of the Plan;

(2) exclude from the PCT's assets claims against officers, directors, and employees of all Reclamation Creditors, and by implication, claims against *any other defendant who might possess a claim of indemnity or contribution against any of the Reclamation Creditors*; and

(3) extinguish very valuable claims by transferring them, post hoc and contrary to the Plan terms, from the PCT to the RCT -- where they will be forever barred by the RCT's precipitous settlement with Dean.[13]  This court should reject Dean's attempt to immunize Robinson, after the fact, from claims that the Plan plainly preserved, meant to be pursued, and assigned to the PCT for that express purpose.

### 1.    The Terms of the Plan Contract, Not the Response of Litigation Targets, Defines Which Trust Owns a Claim.

#### (a)    Dean Misconstrues the Plan's Use of "Indirect" and Ignores Its Use of "Against."

Dean admittedly rests its entire argument on appeal on a single word: "indirect." It argues that because the Plan's definition of Cause of Action includes "all Claims ... against any Person based on law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative or otherwise and whether asserted or not asserted, known or unknown," the RCT thus owns every claim that presents even a remote chance that a Reclamation Creditor may be affected by the result of a lawsuit. As the Bankruptcy Court recognized, this is not the manner in which the Plan uses the term "indirect," and the other terms of the plan, such as "against," cannot be ignored. "A court cannot interpret words in a vacuum,

---

[13]  The RCT settled with Dean while the PCT's lawsuit was pending, but before the District Court had considered -- and denied -- both Robinson's motion to dismiss and the subsequent request for a continuance of the trial date for the PCT's claims.

but rather must carefully consider the parties' context and the other provisions in the [bankruptcy] plan." *In re New Valley Corp.*, 89 F.3d 143, 149 (3d Cir. 1996). Most obviously, the Plan defines RCT Assets as a cause of action "against a Reclamation Creditor." Supp. R. App. at 11, 28. These claims, against persons who are not Reclamation Creditors, are not RCT Assets.

The use of the phrase "direct, indirect, or derivative" in the definition of Cause of Action does not alter the relevant analysis -- no matter how desperately Dean tries to pluck "indirect" out of context and place it a different provision of the Plan. As Judge Walrath understood and explained in her ruling, the Plan's use of the words "direct, indirect or derivative" does not refer to the ultimate target of the claims (*i.e.*, the identity of the defendant, whether a Reclamation Creditor or someone else); rather, that phrase refers to the source of the right being pursued and the procedure through which it is asserted. Take, for instance, the securities fraud perpetrated at Fleming. That wrongful conduct gave rise to a number of claims, including a direct securities fraud action by Fleming's shareholders and a series of indirect, derivative actions on behalf of Fleming against those who injured the company. The targets of those claims, in each case, were certain former directors and officers of Fleming. The derivative action was an "indirect" claim -- in the sense that it was asserted *indirectly on behalf of Fleming*. It was not "indirect" as to the target of the litigation: the action itself named as defendants the officers who were its targets. The same is true of the PCT's action: it names as targets only the parties against whom the PCT filed suit -- namely, a handful of Vendor Officers who are not Reclamation Creditors. This is a direct action by the PCT against these wrongdoers; it is not an indirect action against anyone, much less "against a Reclamation Creditor."

Essentially, Dean's interpretation would replace the defining phrase "against a Reclamation Creditor" with "indirectly against a Reclamation Creditor." While Dean might desire that result, that simply is not what the Plan says, nor is it how the Plan uses the term "indirect." "Delaware observes the well-established general principle that . . . it is not the proper role of a court to rewrite or supply omitted provisions to a written agreement." *Cincinnati SMSA Ltd. P'ship v. Cincinnati Bell Cellular Sys. Co.*, 708 A.2d 989 (Del. Supr. 1998); *accord Gertrude L.Q. v. Stephen P.Q.*, 466 A.2d 1213, 1217 (Del. 1983) ("Delaware follows the well-established principle that in construing a contract a court cannot in effect rewrite it or supply omitted provisions."). The Plan's use of the term "indirect" as modifying "Cause of Action" means, simply and solely, that if a claim had been brought – indirectly -- by a group of creditors, *against a Reclamation Creditor*, that claim would belong to the RCT. The RCT would then have to decide what to do with that claim, just as the PCT did when it assumed and re-opened a handful of indirect, derivative claims that had been filed against Fleming's officers and directors. "Indirect" does *not* mean that the PCT is barred from asserting its own claims merely because those claims might have some collateral impact on a Reclamation Creditor.

The RCT owns, and it owns only, claims *against Reclamation Creditors*. *See* Supp. R. App. at 11 (RCT Assets means ... "Causes of Action ... as against the Reclamation Creditors."). Claims against anyone who is *not* a Reclamation Creditor belong to the PCT. *Id.* at 25. The claims belonging to the PCT therefore include claims against vendor officers, other creditors, professionals, agents, and consultants; indeed, the PCT owns the entire universe of claims against Persons and Entities who share one thing in common: *they are not Reclamation Creditors*. Those whom the PCT has sued are, we repeat, not Reclamation Creditors, and no one

claims that they are -- so the claims against them belong to the PCT under the plain terms of the Plan, and the Bankruptcy Court did not abuse its discretion in so holding.

> **(b)    The Plan's Omission of the Phrase "And Their Officers, Employees, and Directors" In Reference to "Claims Against Reclamation Creditors" is Also Highly Significant.**

In addition to twisting the English language by highlighting one word – "indirect" – at the expense of the remaining terms of the Plan, Dean also ignores the fact that where the Plan *intended* to refer to officers or directors, it did so expressly. *See id.* at 31-32 (retaining claims against "any of the prepetition directors, officers, employees, attorneys, financial advisors, accountants, investment bankers, agents and representatives of each Debtor..." and against "the prepetition members of the Debtors' board of directors and/or officers except the D & O Releasees"). The term "Reclamation Creditor" does not include the additional phrase "officers, directors and employees," *id.* at 11, nor does the definition of "Reclamation Creditor" *need* the insertion of the phrase "officers, directors, employees and agents" in order to make the Plan work. On the contrary, the Plan contract can be (and has been) enforced without adding to the contract's definition of Reclamation Creditor a new phrase -- "officers, directors, and employees" -- that was not included when the Plan was confirmed.[14]

The Bankruptcy Court cannot be said to have abused its discretion by refusing to "rewrite" the definition of Reclamation Creditor, *see Gertrude L.Q.*, 466 A.2d at 1217, when the language is clear and unambiguous as it stands. The fact that the term "directors, officers, employees" was used elsewhere in the Plan but was not included in the definition of

---

[14]  Indeed, the Settlement Agreement between the RCT and Dean further supports that the terms "officers, directors, and employees" are explicitly stated when the parties mean to refer to them. *See* R. App. at 170-71("the RCT, to the fullest extent of the RCT Assets, but not further . . . hereby waives, releases and forever discharges the Dean Foods Reclamation Creditors *and all of their current, former and future directors, partners, members, officers, agents, employees, assigns, attorneys, predecessors and successors* . . . from any and all claims. . . .").

"Reclamation Creditor" confirms that when the parties meant to use this term, they did. To add the term "officers, directors, employees and agents" to the definition of Reclamation Creditor, after Confirmation, would be to rewrite the contract in a very real and meaningful way. Delaware law does not permit such a result, so this Court should reject the RCT's invitation to re-write this critical Plan term.

> **(c)    Dean's Erroneously Relies on the Legal Concept of Indemnification in Interpreting the Plan.**

Ownership of claims allocated in the Plan simply does not turn on how third party litigation targets respond to them. Instead, ownership is determined by how the Plan expressly allocated the claims that belonged *to the Debtor* between the RCT and the PCT.

Dean relies heavily on the purported contribution rights of its employee, Robinson, to argue that the PCT's lawsuit is an indirect claim against Dean. See Appellant's Opening Brief at 9-13. This argument ignores the basic principle that a party's right to indemnity or contribution belongs to *that party only.* The Vendor Officers' right to indemnification by their employers (to the extent it exists), is their own, individual right arising from under the charter and by-laws of the companies for which they work. *Any such indemnification claims, therefore, were never the property of the Fleming Estates and belong to the individual Vendor Officers.* Fleming's Plan defines Causes of Action that were divided between the PCT and the RCT as "all Claims, actions, choses in action, causes of action, suits . . . of the Debtors, the Debtors in Possession, and/or the Estates." Supp. R. App. at 4. Because the individual officers' rights to indemnification by their employers were never a part of the bankruptcy estate, such claims belong neither to the PCT nor the RCT and instead belong to the individual officers. They are not allocated in the Plan at all and thus do not aid Dean in its argument that "indemnification"

claims against Reclamation Creditors somehow belong not to the employees who assert them, but rather to the RCT.

Dean nevertheless argues that the PCT's suit against Robinson is an effort by the PCT to "sidestep" the Plan's division of assets in order to reach Dean itself. For this point, it cites allegations in the PCT's Complaint asserting that Robinson was acting in the scope of his corporate duties. This argument is flawed for two reasons. First, in addition to being true, the PCT's allegation was intended to forestall any course and scope defenses that might negate coverage under applicable insurance policies. Second, and equally obviously, this argument ignores the other express allegation by the PCT asserting that Dean itself *was not* a party to its action. R. App. at 46 ("Non-Party Dean Foods Company . . ."). The PCT's allegation that an officer was acting within the scope of his employment most certainly does *not* transform the claim against the officer into a claim "against the Reclamation Creditor" that employed him. [15]

In the end, that Dean resorts to quibbling about the "true intent" of the PCT's lawsuit *highlights* the fact that no express provision of the Plan supports Dean's argument that these claims belong to the RCT, rather than to the PCT. No matter how Dean chooses to (mis)characterize it, what remains true is that the Plan gave the PCT authority to pursue all claims that were "not RCT Assets" and these Vendor Officer claims, emphatically, are not. Dean's emphasis on the Vendor Officers' ability to claim indemnification by their employers, who are also Reclamation Creditors, is a gambit intended to distract the Court's attention from

---

[15] Dean suggests that the PCT's argument in the Bankruptcy Court "back[ed] off its position that the Reclamation Creditors involved indirectly in the PCT's Texas Action owe a duty to indemnify their officers of employees," a point Dean seems to think supports its argument that the RCT owns the claims against the Vendor Officers. Appellant's Opening Brief at 13 n.29. Although Dean's argument on this point is well-nigh incomprehensible, the PCT's position is and always has been the same: the allegations that the vendor officers were acting with the course and scope of their authority (or were entitled to be indemnified), *see* R. Supp. at 42 (each . . . was an officer of the former Fleming vendors . . . , and each . . . – while acting within the course and scope of their authority – assisted" the Fleming officers), were included in the PCT's complaint in order to remove potential obstacles to D&O insurance coverage. These "coverage" allegations simply are not claims "against Reclamation Creditors," nor do they seek entry of a judgment requiring any Reclamation Creditor to indemnify any of its employees.

this critical point: the Plan delegated to the PCT the fiduciary responsibility to pursue from the Vendor Officers, and from all persons other than Reclamation Creditors, the full amount of the damages they caused as a result of their wrongful manipulation of Fleming's financial statements.

### 2. Dean's Interpretation Strips the PCT of Claims Expressly Assigned to it Under the Terms of the Plan, Leading to Ludicrous Results.

Dean's interpretation of the Plan to include in the RCT's Assets all claims "indirectly asserted" against Reclamation Creditors (including claims which might result in claims for contribution or indemnification against the Reclamation Creditors) suffers from an additional, obvious, and important logical fallacy: it would leave the PCT with literally *no* claims that could not be *converted into RCT claims* either (a) at their inception, or (b) once the litigation target reacted by asserting an indemnification or contribution claim against a Reclamation Creditor. This is a ludicrous result. Other than calling this argument a "straw man," Dean has offered neither this Court (nor the Bankruptcy Court) any limiting principle by which Dean's position could be accepted without simultaneously threatening to strip the PCT of literally every litigation claim expressly delegated to it under the Plan.

As we demonstrate below, the Bankruptcy Court correctly concluded that to accept Dean's argument on this point would have been to fundamentally re-write the bargain struck at the time the Plan was approved. The Bankruptcy Court was right to reject an argument that would yield such absurd results, and it certainly did not abuse its discretion in declining to construe the Plan in a manner that eviscerated the PCT's rights and tortured the Plan's terms beyond recognition.

(a)     "**Claims That Might Result in Reclamation Creditor Liability**"

Dean argues that even though the Vendor Officers have *yet to actually assert* indemnification claims against their respective employers, the claims against the Vendor Officers belong to the RCT, simply because of the possibility that the officers *might someday receive* contribution or indemnity payments from their respective employers. Carried to its next logical step, Dean's argument is that any claim expressly vested in the PCT by the Plan would be divested, and transferred to the RCT, if there was even a remote possibility that the PCT's lawsuit might stir up a claim -- by a third party -- for contribution or indemnity against a Reclamation Creditor.

The Plan plainly contemplates that the PCT would litigate claims against *any* individuals who were involved in the wrongdoing related to Fleming's demise. Among the claims the PCT is responsible to pursue are claims against "any of the prepetition . . . financial advisors, accountants, investment bankers, agents and representatives of each Debtors," Supp. R. App. at 31, and "all actions against any of the Debtors' current or former professionals, . . . for breach of fiduciary duty, breach of contract, negligence or professional misconduct or malpractice," *id.* at 32. *See also id.* at 26 (PCT's Assets include all claims and Causes of Action of Debtor including those outlined in Art. VI of Plan). At the time of the Plan's confirmation, it was entirely foreseeable that the PCT would file lawsuits against professionals and consultants whose actions injured Fleming and its creditors; indeed, the Plan required the PCT to do so.

Under Texas law, however, the professionals and consultants whom the PCT was entitled to sue (and has sued) possess the right to join as contribution defendants any "potentially responsible person" whom they believe also contributed to cause the damages the PCT seeks to recover. TEX. CIV. PRAC. & REM. CODE § 33.004(a) (providing for designation of responsible

24

third parties) and (b) (permitting joinder of responsible third parties by defendants asserting contribution and indemnity claims). The PCT is powerless to prevent that joinder under the statute; the right to join responsible parties is a unilateral right Texas law confers on any defendant whom the PCT sues. All of the defendants the PCT has sued could have asserted (and still could assert) contribution claims against vendors who happen to be Reclamation Creditors.[16] It does not stretch the imagination to observe that Dole (which is not a Reclamation Creditor) might well conclude it is in Dole's best interest to seek contribution from Dean --particularly when Dole faces the prospect of hundreds of millions of dollars in damages liability to the PCT.

In this (and literally every other) scenario, Dean would have this Court hold that *the mere prospect* of a contribution claim, against a Reclamation Creditor, by a third party, is enough to *automatically* divest the PCT *ab initio* of its right to pursue an express cause of action assigned to the PCT under the Plan terms. Thus, under Dean's interpretation of the Plan, upon the Plan's confirmation the PCT was meant to (and did) possess *none* of the claims *specifically enumerated* to belong to the PCT (*e.g.,* claims against professionals, Fleming's former officers, and third parties such as the Vendor Officers) because those litigation targets each hypothetically held a claim for indemnification or contribution against one or more Reclamation Creditors. Such an interpretation not only defies common sense, it guts the Plan and denies the creditors the recoveries for which they bargained when they voted to approve it.

(b)    **"Claims That Have Actually Resulted in Contribution or Indemnification Claims Against Reclamation Creditors"**

A second farcical aspect of Dean's interpretation of the Plan is that even claims expressly allocated to the PCT, such as the claims against the Vendor Officers or those against professional firms, can be *converted* into RCT Assets -- even years after Confirmation -- the

---

[16] In fact, one of the defendants in the Texas suit -- Deloitte -- expressed its intention to do precisely that, before it settled with the PCT.

moment a claim for contribution or indemnity is *actually* asserted against a Reclamation Creditor. Dean thus asserts that any lawsuit allocated by the Plan to the PCT could be stripped away from the PCT -- and its creditor beneficiaries -- by the later actions of a wrongdoer who asserts a contribution claim against a Reclamation Creditor in order to limit its own liability. That is not what the Plan says, and to accept this argument would be to destroy the Plan entirely. Quite simply, if a third party's post-confirmation claim for contribution or indemnity changes the ownership of Plan assets, then the PCT -- which has filed literally hundreds of cases -- will never know whether any particular claim it has filed might be seized after the fact by the RCT. The RCT's incentive to cherry pick, collude and manipulate is obvious, and the risk of manipulation here is far from trivial.

Dean's interpretation also fails to account for what happens if a contribution claim or indemnity -- once asserted -- were rejected by a court. Dean argues that the *assertion* of a contribution claim divests the PCT of its ownership of a claim, but such claims can (and often do) fail. Dean's interpretation -- which the Bankruptcy Court rightly rejected -- envisions the Plan as a sort of a carnival game of chance, in which ownership of a tort claim is first vested in the PCT by the Plan; then divested from the PCT and vested in the RCT based on the actions of a third party; but, then what happens? Is the tort claim divested from the RCT and "re-vested" in the PCT if the contribution claim fails? And what happens to the rights of the injured creditors in the interim? The purpose of a bankruptcy plan is to divide the debtor's assets for the benefit of creditors once, and for all time. To suggest that this Plan created, or was intended to create, a carnival sideshow of collateral, "claim ownership" litigation is not supported by the Plan language. The Bankruptcy Court simply did not abuse its discretion in declining to embrace such a farcical interpretation of the Plan. Dean's appeal should be denied.

### 3.    Dean's Citations to Caselaw Are Misguided.

The cases Dean cites in support of its proposition that a claim against a third party who might sue a Reclamation Creditor for indemnity constitutes an "indirect" claim against that Reclamation Creditor are mis-cited and distinguishable.   The one thing the cases have in common is that they show that federal courts use of the term "indirect claim" in the context of contribution and indemnification to refer to *the claim belonging to the defendant who has been sued and seeks recovery from a third party*.   Applying such a definition to the Fleming Plan would result in assigning to the RCT contribution and indemnification claims that *never belonged to the* estate, but rather, to individuals and entities such as the Vendor Officers and Deloitte.

*Monarch Life Ins. Co. v. Ropes & Gray*, for example, involved a bankruptcy plan in which the Debtor (Monarch Life) released claims against Monarch Capital, who had allegedly committed torts that had pushed the Debtor into bankruptcy.   65 F.3d 973, 975-75 (1st Cir. 1995).   As part of the bankruptcy plan, the parties had agreed upon and obtained an injunction against proceedings "arising from or related to a claim against [Monarch Capital] *or affecting . . . any property of [Monarch Capital]*."   *Id.* (brackets in original) (emphasis added).   *Id.* at 975. Post confirmation, the Debtor investigated and brought a claim against Ropes & Gray, counsel for Monarch Capital, alleging participation in Monarch Capital's strategy to abuse the Debtor; Ropes & Gray defended with the injunction.   *Id.* at 976.   The issue before the First Circuit was whether the Debtor was collaterally estopped from attacking the bankruptcy court's authority to discharge "debts of a nondebtor" (*i.e.*, to let Ropes & Gray off the liability hook), where the

Debtor had previously supported and acquiesced in the plan's confirmation and the injunction. *Id.* at 977-78.[17]

 *Monarch Life* is thus distinguishable in three respects. First, in contrast to the Fleming Plan, which includes in the RCT's assets merely claims "against Reclamation Creditors," the injunction in *Monarch Life* enjoined a much broader category of claims -- all claims "against . . . or *affecting . . . any property of*" Monarch Capital. *Id.* at 975. Second, the issue before the court in *Monarch Life* – collateral estoppel with regard to an injunction -- was drastically different from the interpretational issue facing the Bankruptcy Court in the case at bar. Finally, and most importantly, the First Circuit *did not hold, or even state in dicta,* that the Debtor's claim against a party who subsequently seeks indemnification or contribution from a third party transforms the Debtor's claim into an "indirect claim" against the third party. On the contrary, the court's use of "indirect claim" was in reference to the claim the potential indemnitee (Ropes & Gray) would hold against the potential indemnitor (Monarch Capital), in the event that the indemnitee were sued. *See id.* at 980.

 Similarly, *United States v. Monsanto* involved defendants who, upon being sued, filed a third-party complaint seeking contribution from third parties. 182 F.2d 385, 393 (D.N.J. 2000). The District Court, while summarizing the case's procedural history, referred to the *defendants'* claims for contribution or indemnification as "indirect claims against" the third parties. *See id.* *Overthrust Constructors, Inc. v. Home Ins. Co.*, another case cited by Dean, similarly used the term "indirect claim" to refer to indemnification or contribution claims belonging to a defendant

---

[17] Dean's citation to *Monarch Life* rests on the court's use, in passing, of the terms "indirect claim" in reference to a claim by Ropes & Gray for indemnification against Monarch Capital. *See* 65 F.3d at 980 (where a "non-'contributing' party holds an indirect claim against a would-be 'contributing' party, such as a contingent claim for indemnification or contribution . . . ").

(vis-à-vis his employer) who had been sued. 676 F. Supp. 1086, 1089-90 (D. Utah 1987) (applying Utah law).

Simply put, not one of these cases supports Dean's interpretation that the phrase "indirect claim against a Reclamation Creditor" includes claims brought against one party who, in turn, seeks indemnification from a third party. At a minimum, all three cases cited by Dean serve to show that courts at times use the term "indirect claim against a party" to refer to an *indemnification or contribution claim brought against a third party by one who has been sued – i.e., not the claim of the original plaintiff.* As explained above in Part VI.B.1(c), the Plan does not even attempt to assign these indemnity claims – which belong to the individuals who have been sued – to either trust.

### C.    Dean Misconstrues The Nature Of The Plan's Contemplated Independence Of The Vendor And Officer Claims.

Undoubtedly, it is in Dean's interest as Robinson's employer (and potential indemnifier) to urge an interpretation of the Plan that renders released all claims against Robinson, despite the fact that both Dean and Robinson admitted to writing a side letter at Fleming's request misidentifying a $2.5 million dollar payment that was actually being paid to secure a supply agreement as a "rebate" for "past performance." *See* R. App. at 256. However, this Court should not be swayed by Dean's gross exaggeration and misconstruction of the implications of Bankruptcy Court's interpretation of the Plan it confirmed. Ignoring basic principles of the law governing torts and recovery, Dean finds hard to believe that the Plan could divide claims against Reclamation Creditors and claims against their tortfeasor agents among two trusts – one of which was formed mainly to litigate reclamation-related claims for and against Reclamation Creditors, and the other mainly to litigate claims against individuals and entities who contributed to the improprieties at Fleming which caused its eventual bankruptcy, including vendor officers,

outside professionals, and former Fleming officers. Even a cursory review of the law and the Plan, however, reveals the errors in Dean's arguments that the Bankruptcy Court's interpretation will lead to "problems" such as double recovery or inconsistent judgments.

### 1.    The Bankruptcy Court's Interpretation of the Plan Will Not Result in Double Recovery.

Dean argues that "splitting" the claims against the Reclamation Creditors from the claims against those creditors' officers may result in the Reclamation Creditors having to pay twice for the damages it caused Fleming as a result of vendor wrongdoing. This argument ignores basic principles of law prohibiting and preventing such a result.

First, the PCT's claims against the Vendor Officers are independent from the RCT's claims against the Reclamation Creditors. As noted previously, in Texas, an agent is independently liable for his own torts. *Kollision King v. Calderon*, 968 S.W.2d 20, 25 (Tex. App. -- Corpus Christi 1998, no pet). The Vendor Officers the PCT has sued are thus liable for the damages they caused Fleming's creditors regardless of whether they acted as agents for their principals, the Reclamation Creditors, and regardless of whether their acts were within the scope of their employment. This is not, therefore, a case in which the *same* claim has been unlawfully split between two lawsuits. These are two separate claims, and it is the responsibility of the PCT to pursue one and of the RCT to pursue the other.

Under the Plan, the RCT may recover for the injury to Fleming caused by the Reclamation Creditors, and the PCT may recover for the injury to Fleming caused by the individual officers. Dean repeatedly blurs the line between these two separate and independent claims by asserting that Dean is liable for no more than the actions of Robinson. This argument ignores the notion that officers can be personally liable for misconduct when acting outside the scope of employment (*i.e.*, leaving the corporation *not* liable for such acts), and it also ignores

30

the notion that a corporation can be liable for acts and omissions *beyond* and/or *separate from* those of specific agents acting within the scope of their employment. *See Morrow v. Wyeth*, Civil Action B-05-209, 2005 U.S. Dist. LEXIS 43194, *13 (S.D. Tex. Oct. 13, 2005) (under Texas law, corporations have certain duties that "do not create an independent duty in the employee" are therefore breachable by the corporation but not is agents) (citing *Leitch v. Hornsby*, 935 S.W.2d 114, 117 (Tex. 1996)); *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 391-92 (Tex. 1997) (punitive damages may be recovered from corporation where conduct was that of "corporation rather than the act of its 'ordinary servants'"; corporation has "non-delegable . . . duty to exercise ordinary care to select careful and competent fellow servants or co-employees") (citation omitted).

To the extent that either trust has already recovered from a vendor an amount to satisfy that particular vendor's liability based on *respondiat superior* for a particular officer or employee's conduct, no Texas court will *allow* for, nor does the PCT seek, redundant recovery of such an amount from the vendor. *See, e.g.*, TEX. CIV. PRAC. & REM. CODE § 33.012 (b) (allowing for reduction of recovery in form of settlement credits). However, the PCT is still entitled to recover damages from Robinson and other Vendor Officers -- whether ultimately paid out of the Vendor Officers' pockets, those of their employers as indemnitors, or some third-party insurer – up until the amount of loss which Fleming suffered as a result of the respective officers' torts has been recovered. The fact that this right belongs to the PCT, while the right to recover damages from the Reclamation Creditors belongs to the RCT, is no reason for this Court to disturb the Plan as written and as interpreted by the Bankruptcy Court.

2.    **The Unlikely Chance of Inconsistent Judgments Does Not Call For Reversal of the Bankruptcy Court's Order.**

Another unsupported reason Dean asserts to ask that this Court reverse the Bankruptcy Court's interpretation of the Plan is the unexplained risk of inconsistent outcomes. Putting aside the fact that Dean cites no authority for the proposition that this *chance* is a reason for reversal of a Bankruptcy Court's interpretation of the explicit terms of a plan, the PCT points out that the RCT has not been shy about its hesitance to sue it "own creditors," thus eliminating any chance that "inconsistent" judgments would be entered against a Reclamation Creditor and its officer. In fact, the RCT has settled its claims with Appellant, rendering *impossible* the scenario of conflicting judgments against Dean and Robinson.

Further, as previously explained, the claims against the Reclamation Creditors and their officers are separate and distinct; the officers are liable for their torts, and the vendors for theirs. Finally, even if there is a chance of theoretical "inconsistency" as a result of the way in which the Plan has split up the claims, it is one the Plan's signatories agreed to take under the express terms of the Plan.

VII.    **CONCLUSION**

This Court should reject Dean's attempt to distract its attention from the unambiguous terms of the Plan with inapplicable caselaw and hypothetical (but unlikely) civil procedure issues with which courts deal every day. The Bankruptcy Court did not abuse its discretion in determining that the PCT owns the claims it has brought against the Vendor Officers and denying the RCT's attempt (aided now by Dean) to sabotage the PCT's diligent efforts in recovering for the creditors what they are due as a result of the Vendor Officers' torts. Even putting aside all notions of fairness and real world impact of the Bankruptcy Court's decision, the Plan speaks for itself. It assigns to the RCT claims against Reclamation Creditors – *not*

claims against their directors, officers, managers, and employees – and to the PCT all other claims. Thus, the Bankruptcy Court's order should be given the deference it is owed and should be affirmed.

Respectfully submitted,

PACHULSKI, STANG, ZIEHL, YOUNG, JONES & WEINTRAUB, P.C.

_James E. O'Neill_

Laura Davis Jones (Bar No. 2436)
Scotta E. McFarland (Bar No. 4184)
James E. O'Neill (Bar No. 4042)
919 North Market Street, 16th Floor
Post Office Box 8705
Wilmington, Delaware 19899-8705
(Courier No. 19801)
Telephone No. (302) 652-4100
Facsimile No. (302) 652-4400

and

GIBBS & BRUNS, LLP.
Kathy Patrick (Texas Bar No. 15581400)
1100 Louisiana Street, Suite 5300
Houston, Texas 77002
Telephone No.: (713) 650-8805
Facsimile No.: (713) 750-0903

Co-Counsel for Appellee, Post Confirmation Trust