IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) |
| | ) |
| Fleming Companies, Inc. et al. [1], | ) Case No. 03-10945 (MFW) |
| | ) |
| Dean Foods Company, | ) |
| | ) |
| Appellant, | ) |
| | )Civil Action No. 05-835 (SLR) |
| v. | ) |
| | ) Appeal No. 05-79 |
| Post Confirmation Trust, | ) |
| | ) |
| Appellee. | ) |

**APPENDIX IN SUPPORT OF**
**ANSWERING BRIEF OF APPELLEE POST CONFIRMATION TRUST**

**PACHULSKI STANG ZIEHL YOUNG JONES & WEINTRAUB LLP**
Laura Davis Jones (Bar No. 2436)
Scotta E. McFarland (Bar No. 4184)
James E. O'Neill (Bar No. 4042
919 North Market Street, 17th Floor
Post Office Box 8705
Wilmington, Delaware 19899-8705
Telephone: (302) 652-4100
Facsimile: (312) 652-4400

And

**GIBBS & BRUNS, L.L.P.**
Kathy D. Patrick
Texas Bar No.15581400
1100 Louisiana, Suite 5300
Houston, TX 77002
Telephone: (713) 650-8805
Facsimile: (713) 750-0903

Co- Counsel for Appellee, Post Confirmation Trust

Date: October 10, 2006

---

[1] At pertinent places herein, references are made to "Fleming" for Fleming Companies, Inc., public parent company of the following Debtors whose cases remain open: Core-Mark International, Inc.; Fleming Companies, Inc.; ASI Office Automation, Inc.; C/M Products, Inc.; Core-Mark Interrelated Companies, Inc.; Core-Mark Mid-Continent, Inc.; General Acceptance Corporation; Head Distributing Company; Marquise Ventures Company, Inc.; and Minter-Weisman Co.

## TABLE OF CONTENTS

<u>DOCUMENT</u>                                                                                                                     <u>TAB</u>

Debtors' and Official Committee of Unsecured Creditors'
Third Amended and Revised Joint Plan of Reorganization of
Fleming Companies, Inc. and its Filing Subsidiaries Under
Chapter 11 of the United States Bankruptcy Code ....................................................1

Response of Kemps LLC in Support of the Motion of the
Reclamation Creditors' Trust To:  (i) Enforce the Reorganization Plan
 and Confirmation Order, (ii) Enjoin the Post-Confirmation Trust from
Pursuing Claims Against Employees of Reclamation Creditors
Employers and, (iii) Determine that the PCT's Claims Against
Employees of Reclamation Creditors Constitute RCT Assets

Kraft Foods Global Inc.'s Response in Opposition to the Post-Confirmation
Trust's Motion for Declaratory Judgment and Joinder in the
Reclamation Creditor Trust's Motion to Enforce

Food Marketing Group, Inc.'s (A) Joinder to Motion by the Reclamation
Creditors' Trust to:  (i) Enforce the Reorganization Plan and
Confirmation Order, (ii) Enjoin the Post-Confirmation
Trust from Pursuing Claims Against Employees of Reclamation
Creditors Employers and, (iii) Determine that the PCT's
Claims Against Employees........................................................................................2

Reclamation Claim Summary by Claimant, November 21, 2003 .............................3

**TAB 1**

Debtors' and Official Committee of Unsecured Creditors' Third Amended and Revised Joint Plan of Reorganization of Fleming Companies, Inc. and its Filing Subsidiaries Under Chapter 11 of the United States Bankruptcy Code

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Fleming Companies, Inc., et al.,[1] | ) | Case No. 03-10945 (MFW) |
| | ) | (Jointly Administered) |
| | ) | |
| Debtors. | ) | |

---

**DEBTORS' AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS' THIRD AMENDED AND
REVISED JOINT PLAN OF REORGANIZATION OF FLEMING COMPANIES, INC. AND ITS FILING
SUBSIDIARIES UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

---

KIRKLAND & ELLIS LLP
James H. M. Sprayregen, P.C.
Richard L. Wynne
Janet S. Baer
Geoffrey A. Richards
200 East Randolph Drive
Chicago, IL 60601-6436
Telephone: (312) 861-2000
Facsimile: (312) 861-2200


and

PACHULSKI, STANG, ZIEHL, YOUNG,
JONES & WEINTRAUB P.C.
Laura Davis Jones
Ira D. Kharasch
919 North Market Street, Sixteenth Floor, P.O.
Box 8705
Wilmington, Delaware 19899-8705 (Courier No.
19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400

Co-Counsel for the Debtors and Debtors in
Possession

MILBANK TWEED HADLEY & MCCLOY LLP
Paul S. Aronzon
Dennis F. Dunne
One Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

and

PEPPER HAMILTON LLP
I. William Cohen
Robert S. Hertzberg
Dennis S. Kayes
100 Renaissance Center
Suite 3600
Detroit, MI 48243-1157
(313) 259-7110

Co-Counsel for the Official Committee of
Unsecured Creditors

Dated: July 20, 2004

---

[1] The Debtors are the following entities: Core-Mark International, Inc.; Fleming Companies, Inc.; ABCO Food Group, Inc.; ABCO Markets, Inc.; ABCO Realty Corp.; ASI Office Automation, Inc.; C/M Products, Inc.; Core-Mark Interrelated Companies, Inc.; Core-Mark Mid-Continent, Inc.; Dunigan Fuels, Inc.; Favar Concepts, Ltd.; Fleming Foods Management Co., L.L.C., Fleming Foods of Texas, L.P.; Fleming International, Ltd.; Fleming Supermarkets of Florida, Inc.; Fleming Transportation Service, Inc.; Food 4 Less Beverage Company, Inc.; Fuelserv, Inc.; General Acceptance Corporation; Head Distributing Company; Marquise Ventures Company, Inc.; Minter-Weisman Co.; Piggly Wiggly Company; Progressive Realty, Inc.; Fleming Retail Holdings, Inc. f/k/a Rainbow Food Group, Inc.; Retail Investments, Inc.; Retail Supermarkets, Inc.; RFS Marketing Services, Inc.; and Richmar Foods, Inc.

## TABLE OF CONTENTS

Page

ARTICLE I. RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, RESERVATION OF RIGHTS AND DEFINED TERMS ...................................................... 1
    A.    Rules of Interpretation, Computation of Time and Governing Law ................................ 1
    B.    Defined Terms ...................................................................................................... 1

ARTICLE II. UNCLASSIFIED CLAIMS ................................................................................ 1
    A.    Administrative Claims ......................................................................................... 13
    B.    Priority Tax Claims ............................................................................................. 13
    C.    DIP Claims ......................................................................................................... 15

ARTICLE III. CLASSIFICATION AND TREATMENT OF CLASSIFIED CLAIMS AND EQUITY INTERESTS ............................................................................................................... 15
    A.    Summary ............................................................................................................ 15
    B.    Classification and Treatment ............................................................................... 15
    C.    Additional Provisions Governing Reclamation Claims .......................................... 16
    D.    Special Provision Governing Unimpaired Claims ................................................. 21

ARTICLE IV. ACCEPTANCE OR REJECTION OF THE PLAN ............................................ 22
    A.    Voting Classes ................................................................................................... 22
    B.    Acceptance by Impaired Classes .......................................................................... 22
    C.    Presumed Acceptance of Plan .............................................................................. 22
    D.    Presumed Rejection of Plan ................................................................................. 22
    E.    Non-Consensual Confirmation ............................................................................. 22

ARTICLE V. MEANS FOR IMPLEMENTATION OF THE PLAN ......................................... 22
    A.    Substantive Consolidation ................................................................................... 22
    B.    Continued Corporate Existence and Vesting of Assets in the Reorganized Debtors ... 23
    C.    Cancellation of Old Notes, Old Stock and Other Equity Interests .......................... 23
    D.    Issuance of New Securities; Execution of Related Documents ................................ 23
    E.    Restructuring Transactions .................................................................................. 23
    F.    Corporate Governance, Directors and Officers, and Corporate Action ................... 23
    G.    PCT .................................................................................................................. 24
    H.    RCT .................................................................................................................. 25
    I.    Creation of Professional Fee Escrow Account ...................................................... 28

ARTICLE VI. DEBTORS' RETAINED CAUSES OF ACTION .............................................. 29
    A.    Maintenance of Causes of Action ......................................................................... 29
    B.    Preservation of Causes of Action .......................................................................... 29
    C.    Preservation of All Causes of Action Not Expressly Settled or Released ................. 30

ARTICLE VII. FUNDING OF THE PLAN ............................................................................ 32
    A.    Exit Financing Facility, Obtaining Cash for Plan Distributions and Transfers of Funds Among the Debtors and the Reorganized Debtors ................................................. 33
    B.    Tranche B Loan .................................................................................................. 33
    C.    Sale of Assets ..................................................................................................... 33

ARTICLE VIII. TREATMENT OF EXECUTORY CONTRACTS, UNEXPIRED LEASES AND INSURED CLAIMS ....................................................................................................... 34
    A.    Assumption/Rejection of Executory Contracts and Unexpired Leases .................... 34
    B.    Claims Based on Rejection of Executory Contracts or Unexpired Leases ............... 34
    C.    Cure of Defaults for Executory Contracts and Unexpired Leases Assumed ............ 34
    D.    Indemnification of Directors, Officers and Employees .......................................... 34

ii

Page

    E.        Compensation and Benefit Programs ................................................................34
    F.        Insured Claims ..................................................................................................35

ARTICLE IX. PROVISIONS GOVERNING DISTRIBUTIONS ...........................................37
    A.        Distributions for Claims Allowed as of the Effective Date..............................37
    B.        Distributions by Core-Mark Newco, the PCT and the RCT ............................37
    C.        Interest on Claims ............................................................................................37
    D.        Compliance with Tax Requirements/Allocations.............................................38
    E.        Delivery of Distributions and Undeliverable or Unclaimed Distributions.......38
    F.        Distribution Record Date .................................................................................39
    G.        Timing and Calculation of Amounts to be Distributed ....................................39
    H.        Minimum Distribution .....................................................................................39
    I.        Allowance or Resolution Setoffs .....................................................................39
    J.        Old Notes .........................................................................................................39
    K.        Failure to Surrender Canceled Instruments .....................................................40
    L.        Lost, Stolen, Mutilated or Destroyed Debt Securities.....................................40
    M.        Share Reserve...................................................................................................40
    N.        Settlement of Claims and Controversies ..........................................................40
    O.        Setoff/Recoupment by Holders of Claims .......................................................40

ARTICLE X. PROCEDURES FOR RESOLUTION OF DISPUTED, CONTINGENT AND
        UNLIQUIDATED CLAIMS.............................................................................40
    A.        Resolution of Disputed Claims ........................................................................40
    B.        Allowance of Claims........................................................................................41
    C.        Controversy Concerning Impairment...............................................................42
    D.        Impact on Pending Litigation; Pension Plans..................................................42
    E.        Settlement of Claims and Controversies..........................................................43
    F.        Special Provisions Regarding Reclamation Claims .........................................43

ARTICLE XI. CONDITIONS PRECEDENT TO CONFIRMATION AND OCCURRENCE OF THE
        EFFECTIVE DATE OF THE PLAN .................................................................45
    A.        Conditions Precedent to Confirmation.............................................................45
    B.        Conditions Precedent to Occurrence of the Effective Date..............................45
    C.        Waiver of Conditions.......................................................................................46
    D.        Effect of Non-occurrence of Conditions to Occurrence of the Effective Date.............46

ARTICLE XII. DISCHARGE, RELEASE, INJUNCTION AND RELATED PROVISIONS ...................46
    A.        Subordination...................................................................................................46
    B.        **Mutual Releases by Releasees** ...................................................................46
    C.        **Releases by Holders of Claims** .................................................................47
    D.        **Indemnification** .........................................................................................47
    E.        **Exculpation** ...............................................................................................48
    F.        **Discharge of Claims and Termination of Equity Interests** .......................48
    G.        **Injunction**..................................................................................................48
    H.        Police and Regulatory Powers .........................................................................48

ARTICLE XIII. RETENTION OF JURISDICTION .................................................................48

ARTICLE XIV. MISCELLANEOUS PROVISIONS..................................................................49
    A.        Effectuating Documents, Further Transactions and Corporation Action ........49
    B.        Dissolution of Committee and OCRC...............................................................50
    C.        Payment of Statutory Fees ...............................................................................50
    D.        Modification of Plan ........................................................................................50
    E.        Revocation of Plan...........................................................................................50
    F.        Environmental Liabilities.................................................................................50
    G.        Successors and Assigns....................................................................................50

                                                                                    **Page**

H.      Reservation of Rights..................................................................................................51
I.      Section 1146 Exemption ............................................................................................51
J.      Further Assurances......................................................................................................51
K.      Entire Agreement........................................................................................................51
L.      Service of Documents ................................................................................................51
M.      Filing of Additional Documents................................................................................52

APP      0004

TABLE OF EXHIBITS FILED WITH THE PLAN

Exhibit A    Schedule of Retained Causes of Action
Exhibit B    Excluded Releasees

**DEBTORS' AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS' THIRD AMENDED AND REVISED JOINT PLAN OF REORGANIZATION OF FLEMING COMPANIES, INC. AND ITS FILING SUBSIDIARIES UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

Pursuant to Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, Fleming Companies, Inc. and its Filing Subsidiaries, debtors and debtors-in-possession in the above-captioned and numbered case, and their Official Committee of Unsecured Creditors hereby respectfully propose the following Third Amended and Revised Joint Plan of Reorganization of Fleming Companies, Inc. and its Filing Subsidiaries Under Chapter 11 of the United States Bankruptcy Code:

## ARTICLE I.

### RULES OF INTERPRETATION, COMPUTATION OF TIME, GOVERNING LAW, RESERVATION OF RIGHTS AND DEFINED TERMS

A.    *Rules of Interpretation, Computation of Time and Governing Law*

1.    For purposes herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and the neuter gender; (b) any reference herein to a contract, instrument, release, indenture or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference herein to an existing document or exhibit Filed, or to be Filed, shall mean such document or exhibit, as it may have been or may be amended, modified or supplemented; (d) unless otherwise specified, all references herein to Sections, Articles and Exhibits are references to Sections, Articles and Exhibits hereof or hereto; (e) the words "herein," "hereof" and "hereto" refer to the Plan in its entirety rather than to a particular portion of this Plan; (f) captions and headings to Articles and Sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation hereof; (g) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; and (h) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be.

2.    In computing any period of time prescribed or allowed hereby, the provisions of Bankruptcy Rule 9006(a) shall apply.

3.    Except to the extent that the Bankruptcy Code or Bankruptcy Rules are applicable, and subject to the provisions of any contract, instrument, release, indenture or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflict of laws thereof.

B.    *Defined Terms*

Unless the context requires otherwise, the following terms shall have the following meanings when used in capitalized form herein:

1.    "5¼% Convertible Senior Subordinated Notes" means the 5¼% Convertible Senior Subordinated Notes, CUSIP numbers 339130AQ9 and 339130AR7, due 2009 issued by Fleming pursuant to the 5¼ Convertible Senior Subordinated Notes Indenture in the original principal amount of $150 million and guaranteed by all of the Filing Subsidiaries.

2.    "5¼% Convertible Senior Subordinated Notes Indenture" means that certain indenture dated March 15, 2001, between Bank One, N.A. and any predecessor or successor in interest, as indenture trustee, and Fleming, as amended or supplemented.

3.    "9¼% Senior Notes" means the 9¼% Senior Notes, CUSIP number 339130AX4, due 2010 issued by Fleming pursuant to the 9¼ Senior Notes Indenture in the original principal amount of $200 million and guaranteed by all of the Filing Subsidiaries.

4.    "9¼% Senior Notes Indenture" mean that certain indenture dated June 18, 2002, between The Bank of New York., as successor trustee to Manufacturers and Traders Trust Company, and Fleming, as amended or supplemented.

5.    "9⅞% Senior Subordinated Notes" means the 9⅞% Senior Subordinated Notes, CUSIP number 339130AW6, due 2012 issued by Fleming pursuant to the 9⅞% Senior Notes Indenture in the original principal amount of $260 million and guaranteed by all of the Filing Subsidiaries.

6.    "9⅞% Senior Subordinated Notes Indenture" means that certain indenture dated April 15, 2002, between Bank One, N.A. and any predecessor or successor in interest, as indenture trustee, and Fleming, as amended or supplemented.

7.    "10⅛% Senior Notes" means the 10⅛% Senior Notes, CUSIP number 339130AP1, due 2008 issued by Fleming pursuant to the 10⅛% Senior Notes Indenture in the original principal amount of $355 million and guaranteed by all of the Filing Subsidiaries.

8.    "10⅛% Senior Notes Indenture" means that certain indenture dated March 15, 2001, between The Bank of New York, as successor indenture trustee to Bankers Trust Company, and Fleming, as amended or supplemented.

9.    "10⅝% Senior Subordinated Notes" means the Series B and D 10⅝% Senior Subordinated Notes, CUSIP numbers 339130AL0 and 339130AT3, due in 2007 issued by Fleming pursuant to the 10⅝% Senior Subordinated Notes Indenture in the original principal amount of $400 million and guaranteed by all of the Filing Subsidiaries.

10.    "10⅝% Senior Subordinated Notes Indenture" means that certain indenture dated July 25, 1997, between Bank One, N.A. and any predecessor or successor in interest as indenture trustee, and Fleming as amended or supplemented.

11.    "Additional Carve-Out" means that additional carve-out provided for Professional Fees and expenses of $6.0 million, which are entitled to payout prior to the payment of Administrative Claims to Allowed Approved Trade Creditor Lien Claim Holders, as outlined in the Final DIP Order.

12.    "Administrative Claim" means a Claim for costs and expenses of administration under section 503(b), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, but not limited to: (a) the actual and necessary costs and expenses incurred after the Petition Date of preserving the Estates and operating the businesses of the Debtors (including Approved Trade Creditor Lien Claims as well as wages, salaries or commissions for services and payments for goods and other services and leased premises); (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or allowed under sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise; and (c) all fees and charges assessed against the Estates under chapter 123 of Title 28 United States Code, 28 U.S.C. §§ 1911-1930.

13.    "Administrative Claims Guarantee" has the meaning ascribed to it in the Revised Term Sheet.

14.    "Agents" mean Deutsche Bank Trust Company Americas, acting in its capacity as administrative agent for the Post-Petition Lenders, and JPMorgan Chase Bank, acting in its capacity as collateral agent for the Post-Petition Lenders.

15.    "Aggregate Limit" means the aggregate or per-occurrence maximum amount of insurance for a particular insurance policy (or policies, as the case may be) owned by the Debtors.

16.    "Allowed" means, with respect to any Claim except as otherwise provided herein: (a) a Claim that has been scheduled by a Debtor in its schedule of liabilities as other than disputed, contingent or unliquidated and as to which the Debtors or any other party in interest has not Filed an objection by the Objection Deadline; (b) a Claim

that either is not a Disputed Claim or has been allowed by a Final Order; (c) a Claim that is determined by the Debtors, the PCT or the RCT as applicable, to be allowed; (d) a Claim that is allowed:  (i) in any stipulation of amount and nature of Claim executed prior to the Effective Date; (ii) in any stipulation with the PCT or RCT of amount and nature of Claim executed on or after the Effective Date; or (iii) in or pursuant to any contract, instrument, indenture or other agreement entered into or assumed in connection herewith; (e) a Claim relating to a rejected executory contract or unexpired lease that either (i) is not a Disputed Claim or (ii) has been allowed by a Final Order, in either case only if a proof of Claim has been Filed by the Claims Bar Date or has otherwise been deemed timely Filed under applicable law; or (f) a Claim as to which a proof of Claim has been timely filed and as to which the Debtors, the PCT, the RCT or any party in interest has not filed an objection by the Objection Deadline; and with respect to all Claims only after reduction for unpaid pre-petition and post-petition deductions, preference payments and other applicable setoff rights, subject to, and as consistent with, the treatment provided in Class 3(B) and Class 5 for the Holders of Reclamation Claims.

17.     "Allowed Claim" means an Allowed Claim in the particular Class described.

18.     "Allowed Defense Costs" means certain costs incurred by an Insurer in the defense and/or liquidation of an Insured Claim, for which the Debtors are obligated to reimburse the respective Insurers.

19.     "Approved Trade Creditor" means a trade creditor who elected to participate in the Trade Credit Program established under the Final DIP Order and provided post-petition trade credit thereunder.

20.     "Approved Trade Creditor Lien" means the junior lien of an Approved Trade Creditor in the amount of actual trade credit provided pursuant to the agreement with the Debtors and as outlined in the Trade Credit Program.

21.     "Approved Trade Creditor Lien Claim" means the Claim of an Approved Trade Creditor in the amount of actual unpaid trade credit provided pursuant to the agreement with the Debtors and as outlined in the Trade Credit Program.

22.     "Assumption Schedule" means the schedule to be filed 15 days prior to the Voting Deadline, of executory contracts and unexpired leases that are to be assumed by the Reorganized Debtors on the Effective Date.

23.     "Avoidance Actions" means those avoidance actions available pursuant to Chapter 5 of the Bankruptcy Code.

24.     "Ballots" means the ballots accompanying the Disclosure Statement upon which Holders of Impaired Claims entitled to vote shall indicate their acceptance or rejection of the Plan in accordance with the Plan and the Voting Instructions.

25.     "Bank Guarantees" means those guarantees issued by the Filing Subsidiaries in favor of the Pre-Petition Lenders, guaranteeing the obligations of Fleming on the Pre-Petition Credit Agreement.

26.     "Bankruptcy Code" means Title 11 of the United States Code, and applicable portions of Titles 18 and 28 of the United States Code.

27.     "Bankruptcy Court" means the United States District Court having jurisdiction over the Chapter 11 Cases and, to the extent of any reference made pursuant to section 157 of Title 28 of the United States Code and/or the General Order of such District Court pursuant to section 151 of Title 28 of the United States Code, the bankruptcy unit of such District Court.

28.     "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure, as amended from time to time, as applicable to the Chapter 11 Cases, promulgated under 28 U.S.C. § 2075 and the General, Local and Chambers Rules of the Bankruptcy Court.

29.     "Beneficial Holder" means the Person or Entity holding the beneficial interest in a Claim or Equity Interest.

30.     "Bondholders" mean the Beneficial Holders of the Old Notes.

31.    "Business Day" means any day, other than a Saturday, Sunday or "legal holiday" (as defined in Bankruptcy Rule 9006(a)) in Wilmington, Delaware.

32.    "Canadian CCAA Court" means the Supreme Court of British Columbia or such other court in Canada having jurisdiction over Core-Mark International Inc.'s proceedings under the CCAA from time to time.

33.    "Carve-Out" means the carve-out provided for in the Final DIP Order or any Court Order or credit agreement executed with respect to a refinancing of the DIP Credit Facility or Pre-Petition Credit Agreement which includes but is not necessarily limited to (i) in the event of the occurrence and during the continuation of a Termination Event (as defined in the Final DIP Order), the payment of allowed and unpaid professional fees and disbursements incurred by the Debtors, the Committee or the OCRC in an aggregate amount not in excess of $4.0 million (plus all unpaid professional fees and disbursements incurred prior to the occurrence of such Termination Event strictly in accordance with the budget described in the Final DIP Order and to the extent allowed by the Bankruptcy Court), and (ii) the payment of all fees required to be paid pursuant to 28 U.S.C. § 1930(c)(6) and all unpaid fees payable to the Clerk of this Court or the United States Trustee.

34.    "Cash" means cash and cash equivalents.

35.    "Casualty Insurance Program" means the certain insurance policies maintained by the Debtors pursuant to the Insurance Program, including, but not limited to: automobile liability, general liability, property damage and other, similar types of insurance coverage.

36.    "Cause of Action" means, including but is not limited to, all Claims, actions, choses in action, causes of action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims and cross claims (including, but not limited to, all claims in any avoidance, recovery, subordination or other actions against Insiders and/or any other Persons under the Bankruptcy Code, including sections 510, 542, 543, 544, 545, 547, 548, 549, 550, 551 and 553) of the Debtors, the Debtors in Possession and/or the Estates (including, but not limited to, those actions listed in this Plan, Exhibit A filed herewith and the Disclosure Statement that are or may be pending on the Effective Date or instituted by Core-Mark Newco, the Reorganized Debtors, the PCT or the RCT as applicable, after the Effective Date against any Person based on law or equity, including, but not limited to, under the Bankruptcy Code, whether direct, indirect, derivative, or otherwise and whether asserted or unasserted, known or unknown.

37.    "CCAA" means the Companies' Creditors Arrangement Act (Canada).

38.    "Chapter 11 Cases" means the chapter 11 bankruptcy cases filed by the Debtors on April 1, 2003, in the Bankruptcy Court.

39.    "Claim" means (a) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured; or (b) any right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured, as defined in section 101(5) of the Bankruptcy Code.

40.    "Claim Holder" means the Holder of a Claim.

41.    "Claims Bar Date" means September 15, 2003.

42.    "Class" means a category of Claims or Equity Interests as set forth in Article III herein.

43.    "Class 3B Preferred Interests" means those certain secured preferred interests to be issued by the RCT in favor of the Holders of Allowed Class 3B Claims pursuant to the terms of the Revised Term Sheet.

44.    "Class 5 Preferred Interests" means those certain junior secured preferred interests to be issued by the RCT in favor of the Holders of Allowed Class 5 Claims pursuant to the terms of the Revised Term Sheet.

45.    "COBRA Claims" means those Claims for continuation of health plan coverage as required in section 4980B of the Internal Revenue Code of 1986, as amended.

46.    "Confirmation" means the entry of the Confirmation Order.

47.    "Confirmation Date" means the date upon which the Confirmation Order is entered by the Bankruptcy Court on its docket, within the meaning of Bankruptcy Rule 5003.

48.    "Confirmation Hearing" means that hearing before the Bankruptcy Court wherein the Debtors seek confirmation of the Plan as provided for in section 1128 of the Bankruptcy Code.

49.    "Confirmation Order" means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Bankruptcy Code.

50.    "Convenience Claims" means those General Unsecured Claims in Class 7 herein, as described in section III.B.11 herein.

51.    "Core-Mark Newco" means the Delaware corporation to be formed on the Effective Date, as well as Core-Mark Holdings I, Core-Mark Holdings II and Core-Mark Holdings III, as further described in section V.E. herein. However, for purposes of distribution of the New Common Stock, "Core-Mark Newco" shall not include Core-Mark Holdings I, Core-Mark Holdings II and Core-Mark Holdings III.

52.    "Covered Allowed Insured Claims" means a Claim covered by the Casualty Insurance Program where the sum of the amount of the Insured Claim plus the Debtors' expenses on account of such Claim, exceeds the Deductible Amount but does not exceed the Aggregate Limit for that particular policy (or policies, as the case may be).

53.    "Creditors' Committee" or "Committee" means the Official Committee of Unsecured Creditors appointed in the Chapter 11 Cases by the United States Trustee on April 14, 2003.

54.    "D&O Policies" means the insurance policies purchased by the Debtors to provide coverage for certain amounts owed by directors and officers to third parties on account of actions taken by directors and officers during the course of their roles as officers and/or directors of the Debtors.

55.    "D&O Releasees" means all officers, directors, employees, attorneys, financial advisors, accountants, investment bankers, agents and representatives of each Debtor and their respective subsidiaries, in each case in their capacity as such as of the Petition Date or thereafter whose identities shall be mutually agreed upon by the Debtors and the Committee, plus former director Guy Osborne, but excluding the Excluded Releasees,.

56.    "Debtors" means Fleming and its Filing Subsidiaries, as debtors in the Chapter 11 Cases.

57.    "Deductible Amount" means the per-occurrence deductible amount payable by the applicable Debtor(s) under a respective insurance policy.

58.    "DIP Claim" means a Claim arising under or as a result of the DIP Credit Facility, including letters of credit issued thereunder.

59.    "DIP Credit Facility" means the commitment secured by the Debtors for debtor-in-possession financing from the post-petition lenders authorized in the Final DIP Order or any refinancing thereof, including but not limited to a refinancing whereby the refinancing lender takes an assignment of the DIP Credit Facility or the Claims of the Post-Petition Lenders thereunder.

60.    "Disclosure Statement" means the Third Amended and Revised Disclosure Statement in Support of Debtors' and Official Committee of Unsecured Creditors' Third Amended and Revised Joint Plan of Reorganization of Fleming Companies, Inc., and its Filing Subsidiaries under Chapter 11 of the Bankruptcy Code dated May 25, 2004, as amended, supplemented, or modified from time to time, describing the Plan, that is prepared and distributed in accordance with the Bankruptcy Code.

61.    "Disputed" means, for purposes of this Plan, with respect to any Claim or Equity Interest, any Claim or Equity Interest: (a) listed on the Schedules as unliquidated, disputed or contingent and for which a timely Objection has been filed; or (b) as to which any Debtor, the PCT, the RCT or any other party in interest has interposed a timely objection or request for estimation in accordance with the Bankruptcy Code and the Bankruptcy Rules which has not been withdrawn or determined by a Final Order.

62.    "Distribution Record Date" means the Effective Date unless a different date is ordered by the Bankruptcy Court.

63.    "DSD Settlement Agreement" means that Statement of Settlement Agreement between Debtors and DSD Class Plaintiffs dated February 5, 2004.

64.    "DSD Settlement Fund" means the fund established under the DSD Settlement Agreement in the amount of $17.5 million.

65.    "DSD Trust Claims" means those Claims brought by all persons who participated in the Drop Ship Delivery (DSD) and/or Central Billing Program (also known as a "bill through" or "pass through" program) of the Debtors who provided goods for non-Debtor entities prior to April 1, 2003, and for which remittances have been collected by the Debtors but not turned over to those persons.

66.    "DTC" means The Depository Trust Company.

67.    "Effective Date" means the date selected by the Debtors and the Committee on which: (a) no stay of the Confirmation Order is in effect, and (b) all conditions specified in Article XI herein have been (i) satisfied or (ii) waived pursuant to Section XI.C. The Effective Date is anticipated to be ten days after the Confirmation Date.

68.    "Entity" means an entity as defined in section 101(15) of the Bankruptcy Code.

69.    "Equity Interest" means (a) any equity interest in Fleming, including, but not limited to, all issued, unissued, authorized or outstanding shares or stock (including the Old Stock) and (b) any interest, including but not limited to, any warrant, options, conversion privileges or contract rights to purchase or acquire any equity security of Fleming at any time.

70.    "Estate" means the estate of each Debtor created by section 541 of the Bankruptcy Code upon the commencement of the Chapter 11 Cases.

71.    "Exceeded Allowed Insured Claims" means a Claim covered by the Casualty Insurance Program where the sum of the Insured Claim plus the Debtor's expenses on account of such Claim exceeds the Aggregate Limit.

72.    "Exchange Agent" means the institution engaged by the Debtors to conduct the exchange of certain securities as provided for herein.

73.    "Excluded Releases" means those parties listed on Exhibit B filed herewith, which Exhibit shall be mutually agreed upon by the Debtors and the Committee.

74.    "Exit Financing Facility" means the senior secured term and revolving credit facilities in the anticipated aggregate amount of $250 million, that will be entered into by Core Mark Newco on the Effective Date on substantively the terms set forth on Exhibit 7 to the Disclosure Statement.

75.    "File" or "Filed" means file or filed with the Bankruptcy Court in the Chapter 11 Cases.

76.    "Filing Subsidiaries" means Core-Mark International, Inc.; ABCO Food Group, Inc.; ABCO Markets, Inc.; ABCO Realty Corp.; ASI Office Automation, Inc.; C/M Products, Inc.; Core-Mark Interrelated Companies, Inc.; Core-Mark Mid-Continent, Inc.; Dunigan Fuels, Inc.; Favar Concepts, Ltd.; Fleming Foods Management Co., L.L.C., Fleming Foods of Texas, L.P.; Fleming International, Ltd.; Fleming Supermarkets of Florida, Inc.; Fleming Transportation Service, Inc.; Food 4 Less Beverage Company, Inc.; Fuelserv, Inc.; General Acceptance Corporation; Head Distributing Company; Marquise Ventures Company, Inc.; Minter-Weisman Co.;

Piggly Wiggly Company; Progressive Realty, Inc.; Fleming Retail Holdings, Inc. f/k/a Rainbow Food Group, Inc.; Retail Investments, Inc.; Retail Supermarkets, Inc.; RFS Marketing Services, Inc.; and Richmar Foods, Inc.

77.  "Final Decree" means the decree contemplated under Bankruptcy Rule 3022.

78.  "Final DIP Order" means that Final Order entered by the Bankruptcy Court on May 6, 2003, providing final authorization for the Debtors to utilize the DIP Credit Facility.

79.  "Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, which has not been reversed, stayed, modified or amended, and as to which the time to appeal or seek certiorari has expired and no appeal or petition for certiorari has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be filed has been resolved by the highest court to which the order or judgment was appealed or from which certiorari was sought.

80.  "First Administrative Bar Date" means January 15, 2004.

81.  "First Substantial Contribution Claims Bar Date" means June 28, 2004, which shall be the last date by which (i) a professional not retained by the Debtors, the Committee or the OCRC under section 327 or 363 of the Bankruptcy Code may file a Claim for fees incurred on or before June 1, 2004, alleged to be beneficial or necessary towards completion of the Chapter 11 Cases as outlined in section 330 of the Bankruptcy Code and/or (ii) any other party may file a Claim for fees incurred on or before June 1, 2004, alleged to be for a substantial contribution under section 503(b) of the Bankruptcy Code.

82.  "First Administrative Bar Date Order" means the Order Establishing Deadline for Filing Requests for Allowance of Certain Administrative Expense Claims, Approving Form and Manner of Notice thereof and Approving Proof of Administrative Claim Form dated December 3, 2003.

83.  "Fleming" means Fleming Companies, Inc.

84.  "Fleming Convenience" means Core-Mark International Inc., Core-Mark Interrelated Companies, Inc., Core-Mark Mid Continent Inc., Minter-Weisman Co., Head Distributing Company and the Debtors' other related convenience store operations.

85.  "FSA Participants" means those creditors who are entitled to assert "Offset Rights" against the FSA Reserve because they have met all the requirements specifically set forth under paragraph 6 of the Bankruptcy Court's Order entered on August 15, 2003 (Docket No. 3142) approving the sale of the Debtors' Wholesale Distribution Business to C&S.

86.  "FSA Reserve" means the $75 million reserve established under paragraph 6 of the Bankruptcy Court's Order entered on August 15, 2003 (Docket No. 3142) approving the sale of the Debtors' Wholesale Distribution Business to C&S, which reserve has been reduced pursuant to the Bankruptcy Court's Order entered on December 23, 2003 (Docket No. 5224).

87.  "General Unsecured Claim" means any Claim against any Debtor that is not a Claim within Classes 1, 2, 3(A), 3(B), 3(C), 4, 5, 8 and 9 and is not an Administrative Claim, Priority Tax Claim or DIP Claim.

88.  "Holder" and, collectively, "Holders" mean a Person or Entity holding an Equity Interest or Claim, including a Holder of the Old Notes or the Old Stock, and with respect to a vote on the Plan, means the Beneficial Holder as of the Record Date or any authorized signatory who has completed and executed a Ballot or on whose behalf a Master Ballot has been completed and executed in accordance with the Voting Instructions.

89.  "Impaired" means with respect to any Class of Claims or Equity Interests, that such Claims or Equity Interests will not be paid in full upon the effectiveness of this Plan, will not be reinstated or will be changed by the reorganization effectuated hereby.

90.  "Impaired Claim" means a Claim classified in an Impaired Class of Claims.

91.  "Impaired Class" means each of the Classes that is not an Unimpaired Class.

7

92.    "Indentures" means, collectively, the 5¼% Convertible Senior Subordinated Notes Indenture, the 9¼% Senior Notes Indenture, the 9⅜% Senior Subordinated Notes Indenture, the 10¼% Senior Notes Indenture and the 10⅝% Senior Subordinated Notes Indenture.

93.    "Insurance Program" means the comprehensive collection of insurance policies maintained by the Debtors, which includes, but is not limited to, policies for (i) workers' compensation, (ii) directors & officers liability, and (iii) casualty events.

94.    "Insurance Security" means the certain letters of credit issued by third-parties to secure the Debtors' liabilities to the Insurers under the Insurance Program.

95.    "Insurers" means the insurance carriers that provide insurance policies to the Debtors pursuant to the Insurance Program, provided, however, that the ACE-USA Companies (which shall include but are not limited to Ace American Insurance Company, ACE Financial Solutions, ACE Insurance Company of Texas (f/k/a CIGNA Insurance Company of Texas), Insurance Company of North America, Pacific Employers Insurance Company, Indemnity Insurance Company of North America, Illinois Union Insurance Company, Bankers Standard Insurance Company, Atlantic Employers Insurance Company, ESIS, Inc., and other related and affiliated companies) (collectively, "Ace") shall not be considered an Insurer for the purposes of the Casualty Insurance Program described in section VIII.F.3 herein.

96.    "Intercompany Claims" means any Claim held by any Debtor against any other Debtor or any Claim held by a Debtor subsidiary that is not a Filing Subsidiary against any Debtor.

97.    "Inventory" means products and supplies of the Debtors, on hand or in transit on the Petition Date, specifically excluding Cash, property, plant and equipment, capital leases or similar items.

98.    "Litigation Claims" means all Avoidance Actions and Vendor Deductions.

99.    "Management Incentive Plan" means that certain equity incentive program (the terms of which shall be outlined in a term sheet to be filed 15 days prior to the Voting Deadline) pursuant to which certain key employees of the Reorganized Debtors or its subsidiaries will receive or have the right to receive shares of New Common Stock in accordance with the forthcoming term sheet.

100.    "Master Ballots" mean the master ballots accompanying the Disclosure Statement upon which the Nominee Holders of the Old Notes shall indicate the beneficial Holders of the Old Notes' acceptance or rejection of the Plan in accordance with the Voting Instructions.

101.    "Net Non-TLV Reclamation Claims" means total Allowed Non-TLV Reclamation Claims reduced by $13 million.

102.    "New Common Stock" means the shares of Core-Mark Newco common stock, par value $.01 per share, to be authorized pursuant to its Certificate of Incorporation which shall be issued pursuant to this Plan.

103.    "Nominee" means any broker, dealer, commercial bank, trust company, savings and loan, financial institution or other nominee in whose name or held of record on behalf of a Beneficial Holder.

104.    "Non-TLV Guaranty" means that certain secured junior guaranty provided by Core-Mark Newco to the Holders of Allowed Non-TLV Reclamation Claims, the terms and conditions of which are set forth in the Revised Term Sheet.

105.    "Non-TLV Reclamation Claim" means a Claim the Holder of which (i) did not participate in the Trade Credit Program (or failed to comply with the terms of such program) and (ii) asserts that all, or any portion, of such Claim is entitled to be granted priority and/or to be secured by a lien in accordance with 546(c)(2) of the Bankruptcy Code.

106.    "Objection Deadline" means that date which is one year after the Effective Date or such later date as the Court may allow upon request by the Reorganized Debtors, the PCT Representative or the RCT

APP    0013

Representative, as applicable, by which the Debtors, the PCT Representative, the RCT Representative or any party in interest has to file an objection to any Claim not previously allowed.

107.    "OCRC" means the Official Committee of Reclamation Creditors.

108.    "Old Notes" means the 5¼% Convertible Senior Subordinated Notes, the 9¼% Senior Notes, the 9⁷⁄₈% Senior Subordinated Notes, the 10¹⁄₈% Senior Notes and the 10⁵⁄₈% Senior Subordinated Notes.

109.    "Old Notes Trustees" means Manufacturers and Traders Trust Company, Bank One, N.A, The Bank of New York, Bankers Trust Company and any of their predecessors or successors in interest.

110.    "Old Republic Letters of Credit" means the letters of credit obtained by the Debtors, for the benefit of Old Republic Insurance Company, to secured any obligations owed by the Debtors to Old Republic Insurance Company pursuant to the Old Republic Program agreement and the Old Republic Policies that were issued thereunder.

111.    "Old Republic Policies" means the insurance policies issued to the Debtors by Old Republic Insurance Company pursuant to the Old Republic Program Agreement, as amended.

112.    "Old Republic Program Agreement" means the agreement, as amended, between the Debtors and Old Republic Insurance Company, dated July 1, 2002, pursuant to which Old Republic issued insurance policies that provided insurance coverage to the Debtors from July 1, 2002 through January 1, 2005.

113.    "Old Senior Notes" means the 9¼% Senior Notes and the 10¹⁄₈% Senior Notes.

114.    "Old Senior Subordinated Notes" means the 5¹⁄₄% Convertible Senior Subordinated Notes, the 9⁷⁄₈% Senior Subordinated Notes and the 10⁵⁄₈% Senior Subordinated Notes.

115.    "Old Stock" means all of the issued and outstanding shares of Fleming common stock, $.01 par value per share.

116.    "Other Priority Non-Tax Claim" means any Claim accorded priority in right of payment under section 507(a) of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Claim.

117.    "Other Secured Claims" means secured claims not in Classes 1(B), 2, 3(B) or 3(C).

118.    "Other Securities Claims and Interests" means (a) any Equity Interest (other than Old Stock), including, but not limited to, any warrants, options, conversion privileges or contract rights to purchase or acquire any equity securities of Fleming at any time, and (b) any Claims, obligations, rights, suits, damages, causes of action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, currently existing or hereafter arising, in law, equity or otherwise arising from the purchase or sale of a security of Fleming or the rescission of a purchase or sale of a security of Fleming (including the Old Notes and Old Stock) or the purchase or sale of a security of any affiliate of Fleming or the rescission of a purchase or sale of a security of any affiliate of Fleming, for damages arising from the purchase, sale or holding of such securities or the exercise of an option, warrant, conversion privilege or contractual right to such purchase or sale, or for reimbursement, indemnification or contribution allowed under section 502 of the Bankruptcy Code on account of such a Claim.

119.    "Over-Deductible Amount" means that portion of an Insured Claim that exceeds the Deductible Amount.

120.    "PACA/PASA Claims" means Claims asserted pursuant to the Perishable Agricultural Commodities Act, 7 U.S.C. §499a et seq., the Packers and Stockyard Act, 7 U.S.C. §181 et seq., or state statutes of similar import.

121.    "PCT Advisory Board" means that board created to advise the PCT, as outlined in section V.G.2 herein.

122.    "PCT Agreement" means that agreement, a draft of which is attached to the Disclosure Statement as Exhibit 9, that shall be entered into by the Debtors, the Committee and the PCT Representative on or before the Effective Date, and which shall govern the PCT.

123.    "PCT Representative" means the trustee under the PCT Agreement.

124.    "PCT" means that trust that shall be created pursuant to the Plan and the PCT Agreement for the purposes of carrying out certain provisions of the Plan.

125.    "Person" means a person as defined in section 101(41) of the Bankruptcy Code.

126.    "Petition Date" means April 1, 2003, the date on which the Debtors filed their petitions for relief commencing the Chapter 11 Cases.

127.    "Plan" means this Chapter 11 Plan of Reorganization, either in its present form or as it may be altered, amended, modified or supplemented from time to time in accordance with the Plan, the Bankruptcy Code and the Bankruptcy Rules.

128.    "Plan Supplement" means the document to filed approximately seven days prior to the Confirmation Date and will include the Exit Financing Facility, Tranche B Loan and Management Incentive Plan agreements.

129.    "Post-Petition Lenders" means the lenders under the DIP Credit Facility or any lender participating in the refinancing of the DIP Credit Facility, including but not limited to a refinancing lender which takes an assignment of the DIP Credit Facility or the Claims of the Post-Petition Lenders thereunder.

130.    "Preference Actions" means those avoidance actions provided for in section 547 of the Bankruptcy Code.

131.    "Pre-Petition Agent" means each agent under, and as defined in, the Pre-Petition Credit Agreement, including, each Joint Book Manager and each Joint Lead Arranger, in each case under, and as defined in, the Pre-Petition Credit Agreement.

132.    "Pre-Petition Credit Agreement" means the Credit Agreement dated June 18, 2002, as amended, among the Debtors and the lenders party thereto providing for secured credit borrowing term loans and letters of credit in an aggregate amount of $755,000,000 or any refinancing thereof, including but not limited to a refinancing whereby the refinancing lender takes an assignment of the Pre-Petition Credit Agreement or the Claims of the Pre-Petition Lenders thereunder.

133.    "Pre-Petition Lenders" means the lenders pursuant to the Pre-Petition Credit Agreement or any lender to a refinancing of the Pre-Petition Credit Agreement, including, but not limited to, a lender which takes an assignment of the Pre-Petition Credit Agreement or the Claims of the Pre-Petition Lenders thereunder.

134.    "Pre-Petition Lenders' Secured Claims" means the Claims arising under the Pre-Petition Credit Agreement.

135.    "Pre-Petition Non-TLV Reclamation Claim Reduction" means $13 million.

136.    "Priority Property Tax Claim" means a claim of a governmental unit for taxes owing with respect to real or personal property owned by the Debtors, including ad valorem taxes, which claim may be but is not necessarily secured by the real or personal property on which the tax is owing.

137.    "Priority Tax Claim" means a Claim of a governmental unit (including any Canadian taxing authority) of the kind specified in section 507(a)(8) of the Bankruptcy Code, including Claims of a governmental unit for which a surety bond may be posted, but excluding Priority Property Tax Claims.

138.    "Professional," or, collectively, "Professionals" means a Person or Entity (a) employed pursuant to a Final Order in accordance with sections 327 and 1103 or 363 of the Bankruptcy Code and to be compensated for

services rendered prior to the Effective Date pursuant to sections 327, 328, 329, 330 and 331 or 363 of the Bankruptcy Code, or (b) for which compensation and reimbursement has been allowed by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code.

139.     "Professional Fee Escrow Account" means the account established by the Reorganized Debtors on the Effective Date, solely for the purpose of paying all accrued and anticipated Professional Fees through the Effective Date.

140.     "Professional Fees" means all fees and expenses (including, but not limited to, success fees, if any) for services rendered by all Professionals in the Chapter 11 Cases through the Effective Date that the Bankruptcy Court has not denied by Final Order, regardless of whether a fee application has been filed for such fees.

141.     "PMSI" means a purchase money security interest as defined in Section 9-312 of the Uniform Commercial Code.

142.     "Ratable Proportion" means the ratio (expressed as a percentage) of the amount of an Allowed Claim in a Class to the aggregate amount of all Allowed Claims in the Class.

143.     "RCT" means that trust that shall be created pursuant to the Plan and the RCT Agreement for the purposes of carrying out certain provisions of the Plan.

144.     "RCT Agreement" means that agreement, a draft of which is attached to the Disclosure Statement as Exhibit 12, that shall be entered into by the Debtors, the OCRC and the RCT Representative on or before the Effective Date and which shall govern the RCT.

145.     "RCT Assets" means deductions, over-wires, preference claims, Causes of Action and other rights of the Debtors as against the Reclamation Creditors, other than the post-petition deductions and post-petition overwires with respect to the Fleming Convenience business which shall be transferred to Core-Mark Newco.

146.     "RCT Representative" means the representative selected to administer the RCT.

147.     "Reclamation Claims" means TLV Reclamation Claims and Non-TLV Reclamation Claims.

148.     "Reclamation Creditor" means any Claim Holder that asserts that all, or any portion, of its Claim is entitled to be granted priority and/or to be secured by a lien in accordance with 546(c)(2) of the Bankruptcy Code and also those identified on the Reclamation Claim Summary by Claimant of the Debtors dated November 21, 2003.

149.     "Reclamation Liabilities" means any and all claims asserted against the Debtors by the Reclamation Creditors, including Administrative Claims (other than Administrative Claims against Fleming Convenience), Priority Claims, TLV Reclamation Claims and Non-TLV Reclamation Claims, but not including any PACA/PASA Claims, DSD Trust Claims or General Unsecured Claims held by Reclamation Creditors.

150.     "Record Date" means May 25, 2004.

151.     "Releasees" means each of the Debtors, the Reorganized Debtors, Core-Mark Newco, each of the Pre-Petition Lenders, the Agents, the Pre-Petition Agents, the Old Notes Trustees, the Post-Petition Lenders, the Tranche B Lenders, the Committee, the OCRC, each member of the Committee and the OCRC, the PCT, the PCT Representative, the PCT Advisory Board, the RCT, the RCT Representative and the RCT Advisory Board, and the affiliates, agents and professionals of each of the foregoing, including, without limitation, professionals acting as officers of the Debtors, each in their capacity as such; provided however that Excluded Releasees shall not be Releasees.

152.     "Remaining Pension Plans" means, collectively, the Pension Plan of S.M. Flickinger Co., Inc., the Godfrey Company subsidiaries Pension Plan, the ABComarkets, Inc. Retirement Plan for Arizona Warehouse and Distribution Employees and Core-Mark International, Inc. Non-Bargaining Employees Pension Plan.

153.     "Reorganized Debtors" means collectively, Core-Mark International, Inc., Core-Mark Mid-Continent, Inc., General Acceptance Inc., C/M Products, Inc., ASI Office Automation, Inc., E.A. Morris

Distributors, Inc., Head Distributing Company, Marquise Ventures Company, Inc. and Minter-Weisman Co. or any successor thereto by merger, consolidation, or otherwise, on and after the Effective Date.

154.    "Restated By-laws" means the restated by-laws of the Reorganized Debtors, if necessary, the form of which shall be Filed 20 days prior to the Confirmation Hearing.

155.    "Restated Certificate of Incorporation" means those certain Restated Certificates of Incorporation of the Reorganized Debtors which, pursuant hereto, are to be filed with the Secretary of State of the State of Delaware, the form of which shall be filed 20 days prior to the Confirmation Hearing.

156.    "Revised Term Sheet" means the Revised Term Sheet to Resolve Objections to the Debtors' Chapter 11 Plan and for Treatment of Reclamation Claims entered into on May 3, 2004 and attached as Exhibit 13 to the Disclosure Statement.

157.    "Schedules" mean the schedules of assets and liabilities, schedules of executory contracts, and the statement of financial affairs filed by the Debtors pursuant to section 521 of the Bankruptcy Code, the Official Bankruptcy Forms and the Bankruptcy Rules, as they have been and may be amended and supplemented from time to time.

158.    "Second Administrative Bar Date" means that date that is forty-five (45) days after the Effective Date.

159.    "Second Substantial Contribution Claims Bar Date" means the date 45 days after the Effective Date, which shall be the last date by which (i) a professional not retained by the Debtors, the Committee or the OCRC under section 327 or 363 of the Bankruptcy Code may file a Claim for fees incurred after June 1, 2004, alleged to be beneficial or necessary towards completing of the Chapter 11 Cases as outlined in section 330 of the Bankruptcy Code and/or (ii) any other party may file a Claim for fees incurred after June 1, 2004 alleged to be for a substantial contribution under section 503(b) of the Bankruptcy Code.

160.    "Securities Act" means the Securities Act of 1933, 15 U.S.C. sections 77a-77aa, as now in effect or hereafter amended, or any similar federal, state or local law.

161.    "Senior Note Claims" means those Claims derived from or based upon the Old Senior Notes.

162.    "Senior Notes Indentures" means the 9¼% Senior Notes Indenture and the 10¼ Senior Notes Indenture.

163.    "Senior Notes Indenture Trustee" means The Bank of New York.

164.    "Senior Subordinated Note Claims" means those Claims derived from or based upon 5¼% Convertible Senior Subordinated Notes, the 9⅞% Senior Subordinated Notes and the 10¼% Senior Subordinated Notes.

165.    "TLV Guaranty" means that certain secured guaranty provided by Core-Mark Newco to the Holders of Allowed TLV Reclamation Claims, the terms and conditions of which are set forth in the Revised Term Sheet.

166.    "TLV Reclamation Claim" means a Claim the Holder of which (i) participated in the Trade Credit Program as outlined in the Final DIP order and (ii) asserts that all, or any portion, of such Claim is entitled to be granted priority and/or to be secured by a lien in accordance with 546(c)(2) of the Bankruptcy Code.

167.    "Trade Credit Program" means that program established under the Final DIP Order providing a junior lien to Approved Trade Creditors and Holders of TLV Reclamation Claims who made post-petition credit available to the Debtors.

168.    "Tranche B Lenders" means those lenders who are participants in the Tranche B Loan.

169.    "Tranche B Loan" means the loan of up to $70,000,000 of term credit extensions to be made by the Tranche B Lenders to Core-Mark Newco on the Effective Date on substantially the terms set forth on Exhibit 8 to the Disclosure Statement.

170.    "Unclassified Claims" means those Administrative and Priority Claims described in Article II herein.

171.    "Under-Deductible Insured Claims" means a Claim under the Casualty Insurance Program, where the sum of the amount of the Insured Claim plus the Debtors' expenses on account of such Claim, equals or is less than the applicable per-occurrence deductible amount payable by the applicable Debtor(s) under the relevant insurance policies.

172.    "Unimpaired Claims" means Claims in an Unimpaired Class.

173.    "Unimpaired Class" means an unimpaired Class within the meaning of section 1124 of the Bankruptcy Code.

174.    "Unsecured Claim" means any Claim against any Debtor that is not a Secured Claim, Administrative Claim, DIP Claim, Priority Tax Claim, Other Priority Claim, Other Secured Claim or a Class 3B or Class 5 Claim consistent with the Revised Term Sheet.

175.    "Vendor Deductions" means the amounts owed by vendors to the Debtors, relating to the provision of pre-petition and post-petition goods and services that remain unpaid as of the Effective Date.

176.    "Voting Class" means any class of Claims entitled to vote on the Plan.

177.    "Voting Deadline" means the date stated in the Voting Instructions by which all Ballots must be received.

178.    "Voting Instructions" mean the instructions for voting on the Plan contained in section III of the Disclosure Statement entitled "Voting and Confirmation of the Plan" and in the Ballots and the Master Ballots.

179.    "Wholesale Distribution Business" means that business segment of the Debtors sold under section 363 of the Bankruptcy Code pursuant to the Bankruptcy Court's Order dated August 15, 2003.

180.    "Workers' Compensation Program" means the workers' compensation insurance maintained by the Debtors to insure against injuries to their employees that were incurred while certain employees were performing in their respective employment positions with the Debtors.

## ARTICLE II.

## UNCLASSIFIED CLAIMS

A.    *Administrative Claims*

Subject to the provisions of section 330(a) and 331 of the Bankruptcy Code, each Holder of an Allowed Administrative Claim, including Holders of Allowed Approved Trade Creditor Lien Claims, but excluding claims for Professional Fees, will be paid the full unpaid amount of such Allowed Administrative Claim in Cash (i) on the Effective Date or as soon as practicable thereafter, or (ii) if such Administrative Claim is Allowed after the Effective Date, as soon as practicable after the date such Claim is Allowed, or (iii) upon such other terms as may be agreed upon by such Holder and the PCT or RCT, as applicable or otherwise upon an order of the Bankruptcy Court; *provided that* Allowed Administrative Claims including Allowed Approved Trade Creditor Lien Claims representing obligations incurred in the ordinary course of business or otherwise assumed by the Debtors or Reorganized Debtors pursuant hereto will be assumed on the Effective Date and paid or performed by the applicable Reorganized Debtor when due in accordance with the terms and conditions of the particular agreements governing such obligations.

Except as provided herein, Holders of Administrative Claims that arose on or before October 31, 2003 to which the First Administrative Bar Date did not apply and Holders of Administrative Claims that arose after October 31, 2003 that have not been paid as of the Effective Date, must file an Administrative Claim by the Second Administrative Bar Date. If an Administrative Claim is not timely filed by the First Administrative Bar Date or the Second Administrative Bar Date, as applicable, then such Administrative Claim shall be forever barred and shall not be enforceable against the Debtors, the Reorganized Debtors, the PCT, the RCT and their successors, their assigns or their property[2]. The foregoing requirements to file Administrative Claims by the relevant bar date shall not apply to the (i) Administrative Claims of Professionals retained pursuant to sections 327, 328, and 363 of the Bankruptcy Code; (ii) expenses of members of the Official Committee of Unsecured Creditors and the OCRC; (iii) all fees payable and unpaid under 28 U.S.C. § 1930; (iv) any fees or charges assessed against the estates of the Debtors under 28 U.S.C. § 123; (v) Intercompany Claims between Debtors and their affiliates; and (vi) Administrative Claims arising in the ordinary course of business relating to inventory, services or supplies provided by trade vendors or service providers which are paid or payable by the Debtors in the ordinary course of business. An objection to an Administrative Claim filed pursuant to this provision must be filed and properly served within 220 days after the Effective Date. The Debtors, the PCT Representative and the RCT Representative, as applicable, reserve the right to seek an extension of such time to object.

All Professionals that are awarded compensation or reimbursement by the Bankruptcy Court in accordance with sections 330, 331 or 363 of the Bankruptcy Code that are entitled to the priorities established pursuant to sections 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code, shall be paid in full, in Cash, the amounts allowed by the Bankruptcy Court: (a) on or as soon as reasonably practicable following the later to occur of (i) the Effective Date; and (ii) the date upon which the Bankruptcy Court order allowing such Claim becomes a Final Order; or (b) upon such other terms as may be mutually agreed upon between such Professional and the PCT. On or before the Effective Date and prior to any distribution being made under the Plan, the Debtors shall escrow into the Professional Fee Escrow Account, the Carve-Out and the Additional Carve-Out as outlined in the Final DIP Order and any additional estimated accrued amounts owed to Professionals through the Effective Date. Any liability for Professional Fees above the amount in the Professional Fee Escrow Account including amounts awarded to a professional not retained by the Debtors, the Committee, or the OCRC under section 327 or 363 of the Bankruptcy Code for fees alleged to be necessary or beneficial toward completion of this case as outlined in section 330 of the Bankruptcy Code or otherwise to any other party for allegedly making a substantial contribution under section 503(b) of the Bankruptcy Code, shall be a liability of the PCT and shall be paid by the PCT as an Administrative Claim.[3]

Except as otherwise provided by Court order for a specific Professional, Professionals or other entities requesting compensation or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) and 1103 or 363 of the Bankruptcy Code for services rendered prior to the Confirmation Date must file and serve an application for final allowance of compensation and reimbursement of expenses no later than forty-five (45) days after the Effective Date. All such applications for final allowance of compensation and reimbursement of expenses will be subject to the authorization and approval of the Court. Any objection to the Claims of Professionals shall be filed on or before sixty (60) days after the later of (i) the date of the filing of the application for final compensation or (ii) forty-five (45) days after the occurrence of the Effective Date.

---

[2]    Those professionals not retained by the Debtors, the Committee or the OCRC under section 327 or 363 of the Bankruptcy Code filing a Claim for fees alleged to be necessary or beneficial towards completion of the Chapter 11 Cases as outlined in section 330 of the Bankruptcy Code, or any other party making a Claim for fees for allegedly making a substantial contribution under section 503(b) of the Bankruptcy Code are bound by the First and Second Substantial Contribution Claims Bar Dates.

[3]    The Professional Fee Escrow Account shall be held and administered by the PCT and any excess amount remaining in the Professional Fee Escrow Account after all Professional Fee Claims have been paid shall be retained by the PCT.

Allowed Administrative Claims, which shall be paid in full under the Plan, are currently estimated to be in the range of $96 to $125 million as of the Effective Date.[4]

B.     *Priority Tax Claims*

In full satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Tax Claim that is due and payable on or prior to the Effective Date: (i) if payment of the Allowed Priority Tax Claim is not secured or guaranteed by a surety bond or other similar undertaking, commencing on the Effective Date or as soon as practicable thereafter, the Holder of such Claim shall be paid the principal amount of such Claim plus simple interest of 5% from the Effective Date on any outstanding balance, in equal quarterly deferred Cash payments over a period not to exceed six years after the date of assessment of the tax on which such Claim is based, commencing on, or as soon as practicable after, the Effective Date unless the Debtor and Holder mutually agree to a different treatment or as otherwise ordered by the Court; (ii) if payment of the Allowed Priority Tax Claim is secured or guaranteed by a surety bond or other similar undertaking, the Holder of the Allowed Priority Tax Claim shall be required to seek payment of its Claim from the surety in the first instance and only after exhausting all right to payment from its surety bond or other similar undertaking shall the Holder be permitted to seek payment from the Debtors under this Plan as a holder of an Allowed Priority Tax Claim and the remainder owing on an Allowed Claim after deducting all payments received from the surety, shall be treated as outlined in clause (i) above.

Allowed Priority Tax Claims, which shall be paid in full under the Plan, are currently estimated to be in the range of $11 to 13 million as of the Effective Date.

C.     *DIP Claims*

On the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed DIP Claim shall be paid in full in Cash in full satisfaction, settlement, release and discharge of and in exchange for each and every Allowed DIP Claim, unless such Holder consents to other treatment.

Allowed DIP Claims, which are comprised of letters of credit outstanding and which shall be paid in full under the Plan, are currently estimated to be in the range of $25 to 30 million as of the Effective Date.

### ARTICLE III.

### CLASSIFICATION AND TREATMENT
### OF CLASSIFIED CLAIMS AND EQUITY INTERESTS

A.     *Summary*

| Class | | *Class* | *Status* | | *Voting Rights* |
|---|---|---|---|---|---|
| Class 1(A) | – | Other Priority Non-Tax Claims | Unimpaired | -- | not entitled to vote |
| Class 1(B) | – | Priority Property Tax Claims | Impaired | -- | entitled to vote |
| Class 2 | – | Pre-Petition Lenders' Secured Claims | Unimpaired | -- | not entitled to vote |
| Class 3(A) | -- | Other Secured Claims that are not Class 1(B) Claims | Unimpaired | -- | not entitled to vote |
| Class 3(B) | -- | TLV Reclamation Claims | Impaired | – | entitled to vote |
| Class 3(C) | -- | DSD Trust Claims | Impaired | – | entitled to vote |

---

[4]   This estimate does not include accounts payable and accrued liabilities incurred in the ordinary course of business and carried through the Effective Date by Core-Mark Newco.

**APP    0020**

| Class | | | Status | | Voting Rights |
|---|---|---|---|---|---|
| Class 4 | – | PACA/PASA Claims | Unimpaired | – | not entitled to vote |
| Class 5 | – | Non-TLV Reclamation Claims | Impaired | – | entitled to vote |
| Class 6(A) | – | General Unsecured Claims other than Convenience Claims and Senior Subordinated Note Claims | Impaired | – | entitled to vote |
| Class 6(B) | – | Senior Subordinated Note Claims | Impaired | – | entitled to vote |
| Class 7 | – | Convenience Claims | Impaired | – | entitled to vote |
| Class 8 | – | Equity Interests | Impaired | – | not entitled to vote |
| Class 9 | – | Intercompany Claims | Impaired | – | not entitled to vote |
| Class 10 | – | Other Securities Claims and Interests | Impaired | – | not entitled to vote |

B.    *Classification and Treatment*

    1.    *Class 1(A)—Other Priority Non-Tax Claims*

        (a)    *Classification:* Class 1(A) consists of all Allowed Other Priority Non-Tax Claims.

        (b)    *Treatment:* In full satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Other Priority Non-Tax Claim that is due and payable on or prior to the Effective Date, on the Effective Date or as soon as practicable thereafter, the Holder of such Claim shall be paid the principal amount of such Claim, unless the Holder consents to other treatment.

        (c)    *Voting:* Class 1(A) is not impaired and the Holders of Class 1(A) Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class 1(A) are not entitled to vote to accept or reject the Plan.

        (d)    *Claims Estimate:* Allowed Class 1(A) Claims are currently estimated to be in the range of $6 to 15 million as of the Effective Date.

    2.    Class 1(B)—Priority Property Tax Claims

        (a)    *Classification:* Class 1(B) consists of all Allowed Property Tax Claims.

        (b)    *Treatment:* In full satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed Priority Property Tax Claim that is due and payable on or prior to the Effective Date, commencing on the Effective Date or as soon as practicable thereafter, the Holder of such Allowed Priority Property Tax Claim shall be paid the principal amount of such Claim plus simple interest of 5% from the Effective Date on any outstanding balance, in quarterly deferred Cash payments over a period not to exceed three years after the date of assessment of the tax on which such Claim is based, unless the Debtor and Holder mutually agree to a different treatment.

        (c)    *Voting:* Class 1(B) is impaired and the Holders of Class 1(B) Claims are entitled to vote to accept or reject the Plan.

        (d)    *Claims Estimate:* Allowed Class 1(B) Claims are currently estimated to be in the range of $5-6 million as of the Effective Date.

    3.    *Class 2—Pre-Petition Lenders' Secured Claims*

        (a)    *Classification:* Class 2 consists of all Allowed Pre-Petition Lenders' Secured Claims.

(b)    *Treatment*: On the Effective Date, or as soon as practicable thereafter, unless such Holder consents to other treatment, each Holder of an Allowed Pre-Petition Lenders' Secured Claim shall be paid in full in Cash and its liens on the Debtors' assets shall be terminated. The Exit Financing Facility and the Tranche B Loan shall not be secured by the assets transferred to the PCT or the RCT. Any default with respect to any Class 2 Claim that existed immediately prior to the filing of the Chapter 11 Cases shall be deemed cured upon the Effective Date.

(c)    *Voting*: Class 2 is not impaired and the Holders of Class 2 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class 2 are not entitled to vote to accept or reject the Plan.

(d)    *Claims Estimate*: Allowed Class 2 Claims which shall be paid in full under the Plan are currently estimated to be approximately $200-220 million as of the Effective Date.

4.    *Class 3(A)*— Other Secured Claims that are not Class 1(B) Claims

(a)    *Classification*: Class 3(A) consists of all Allowed Other Secured Claims that are not Class 1(B) Claims.

(b)    *Treatment*: On the Effective Date or as soon as practicable thereafter, each Holder of an Allowed Other Secured Claim that is not a Class 1(B) Claim (e.g. PMSI Holders, equipment financing lenders, etc.) shall receive one of the following treatments, at the Debtors' option, such that they shall be rendered unimpaired pursuant to section 1124 of the Bankruptcy Code: (i) the payment of such Holder's Allowed Other Secured Claim in full, in Cash; (ii) the sale or disposition proceeds of the property securing such Allowed Other Secured Claim to the extent of the value of the Holder's interests in such property; or (iii) the surrender to the Holder of the property securing such Claim. As to Allowed Claims of FSA Participants, those Claims shall be treated pursuant to the terms of the Bankruptcy Court Orders establishing the FSA Reserve (Docket Nos. 3142 and 5224).

(c)    *Voting*: Class 3(A) is unimpaired and Holders of Class 3(A) Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class 3(A) are not entitled to vote to accept or reject the Plan.

(d)    *Claims Estimate*: Allowed Class 3(A) Claims that are not Allowed Claims of FSA Participants are currently estimated to be in the range of $750,000 to $2 million as of the Effective Date. Unresolved Claims of FSA Participants to the FSA Reserve may be subject to litigation by the PCT. As of the Effective Date, the Debtors estimate that there will be $16.2 million of unresolved Claims of FSA Participants fully reserved for with restricted cash transferred to the PCT's FSA Reserve.

5.    *Class 3(B)—TLV Reclamation Claims*

(a)    *Classification*: Class 3(B) consists of all Allowed TLV Reclamation Claims.

(b)    *Treatment*: On the Effective Date, or as soon as practicable thereafter, the RCT, shall issue the Class 3B Preferred Interests in favor of the Holders of Allowed TLV Reclamation Claims in the estimated aggregate amount of such Allowed Claims under the terms and conditions set forth in the Revised Term Sheet (with the interests to be reissued as such Claims are Allowed by Final Order or settlement) and grant a first priority lien to such Holders on the RCT Assets entitling each Holder of an Allowed TLV Reclamation Claim to its Ratable Proportion of the RCT Assets up to the total amount of each Holder's Allowed TLV Reclamation Claim, in full satisfaction, settlement, release and discharge of each Allowed TLV Reclamation Claim against the RCT Assets. Reconciliation of Class 3(B) Claims shall be done in accordance with section III.C. herein. The Class 3B Preferred Interests shall earn interest which shall begin to accrue 60 days after the Effective Date at the Wall Street Journal listed prime rate.

As additional security for the Class 3B Preferred Interests, Core-Mark Newco shall provide a junior secured guarantee under the terms outlined in the Revised Term Sheet.

(c)    *Voting*:  Class 3(B) is impaired and Holders of Class 3(B) Claims are entitled to vote to accept or reject the Plan.

(d)    *Claims Estimate*:  Assuming the treatment outlined in the Revised Term Sheet and herein is approved by the Court, Allowed Class 3(B) Claims are currently estimated to be in the range of $43-$60 million as of the Effective Date prior to giving effect to any of the deductions asserted by the Debtors as of the Effective Date which shall be transferred to the RCT and will be paid in full under the Plan by the RCT or Core-Mark Newco as outlined in the Disclosure Statement and the Revised Term Sheet filed therewith.

6.    Class 3 (C)—DSD Trust Claims

(a)    *Classification:*  Class 3(C) consists of all Allowed DSD Trust Claims.

(b)    *Treatment:*  Each Holder of an Allowed DSD Trust Claim shall be paid in full satisfaction, settlement, release and discharge of each Allowed DSD Trust Claim in Cash their Ratable Proportion of the DSD Settlement Fund as outlined in the DSD Settlement Agreement.

(c)    *Voting:*  Class 3(C) is impaired and Holders of Claims in Class 3(C) are entitled to vote to accept or reject the Plan.

(d)    *Claims Estimate:*  The DSD Settlement Fund pursuant to the DSD Settlement Agreement shall be in the amount of $17.5 million.

7.    *Class 4—PACA/PASA Claims*

(a)    *Classification:*  Class 4 consists of all Allowed PACA/PASA Claims.

(b)    *Treatment:*  In full satisfaction, settlement, release, and discharge of, and in exchange for, each Allowed PACA/PASA Claim that is due and payable on or prior to the Effective Date, on the Effective Date or as soon as practicable thereafter, the Holder of such Claim shall be paid the Allowed amount of such Claim, unless the Holder consents to other treatment.

(c)    *Voting:*  Class 4 is unimpaired and Holders of Allowed Claims in Class 4 are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class 4 are not entitled to vote to accept or reject the Plan.

(d)    *Claims Estimate*:  Allowed Class 4 Claims which shall be paid in full under the Plan are currently estimated to be in the range of $8-$14 million as of the Effective Date.

8.    *Class 5—Non-TLV Reclamation Claims*

(a)    *Classification:*  Class 5 consists of Non-TLV Reclamation Claims.

(b)    *Treatment:*  On the Effective Date, or as soon as practicable thereafter, the RCT, shall issue the Class 5 Preferred Interests in favor of the Holders of Allowed Non-TLV Reclamation Claims in the estimated aggregate amounts of their Allowed Claims under the terms and conditions outlined in the Revised Term Sheet (with the interests to be reissued as such Claims are Allowed by Final Order or settlement) and grant a second priority lien on the RCT Assets entitling each Holder to its Ratable Proportion of the RCT Assets after (i) all Class 3(B) Claims are paid in full; and (ii) Core-Mark Newco is reimbursed for any payment under the TLV Guaranty.  Reconciliation of Class 5 Claims shall be done in accordance with section III.C herein.

As additional security for the Class 5 Preferred Interests Core-Mark Newco shall provide a junior secured guarantee under the terms outlined in the Revised Term Sheet.

(c)    *Voting:*  Class 5 is impaired and Holders of Allowed Claims in Class 5 are entitled to vote to accept or reject the Plan.

(d)    *Claims Estimate*:  Assuming the treatment outlined in the Revised Term Sheet and herein is approved by the Court, Allowed Class 5 Claims are currently estimated to be in the range of $62-$90 million as of the Effective Date prior to giving effect to any of the deductions asserted by the Debtors. Holders of Class 5 claims will be paid a Ratable Proportion of their Allowed Non-TLV Reclamation Claim, up to the full amount of their Allowed Net Non-TLV Reclamation Claim by the RCT or Core-Mark Newco as outlined in the Disclosure Statement and the Revised Term Sheet.  Further, in the event the RCT has proceeds for distribution after satisfaction of all Allowed TLV Reclamation Claims and Net Non-TLV Reclamation Claims and repayment to Core-Mark Newco of advances under the TLV or Non-TLV Guarantees, the Holders of Allowed Class 5 Claims shall be entitled to be paid their pro rata share of the remaining RCT Assets up to the full amount of their Allowed Non-TLV Reclamation Claim.

9.    *Class 6(A)—General Unsecured Claims other than Convenience Claims and Senior Subordinated Note Claims*

(a)    *Classification*:  Class 6(A) consists of all Allowed General Unsecured Claims other than Convenience Claims and Senior Subordinated Note Claims.

(b)    *Treatment*:  On the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed General Unsecured Claim other than Convenience Claims and Senior Subordinated Note Claims shall be paid in full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed General Unsecured Claim other than Convenience Claims and Senior Subordinated Note Claims, at the Debtors' option, in one or a combination of the following manners:  (i) issuance of a Ratable Proportion of New Common Stock, with such Ratable Proportion to be determined as if Classes 6(A) and 6(B) were a single Class, and subject to dilution from the issuance of warrants to the Tranche B Lenders, to the Holders of Senior Subordinated Notes and through the Management Incentive Plan; and/or (ii) in the event the Debtors, with the consent of the Creditors Committee, elect to sell some or all of their assets as outlined herein, a Ratable Proportion of Cash remaining from the sale of such assets after all of the Allowed Unclassified Claims and Claims of Holders in Classes 1 through 5 have been satisfied in full, with such Ratable Proportion to be determined as if Classes 6(A) and 6(B) were a single Class.

(c)    As additional consideration, each Holder of an Allowed General Unsecured Claim in Class 6(A) shall be entitled to a Ratable Proportion of excess proceeds, if any, available from the PCT after payment by the PCT of all Claims and obligations required to be made by the PCT under the Plan or the PCT Agreement, with such Ratable Proportion to be determined as if Classes 6(A) and 6(B) were a single Class. Pursuant to the Revised Term Sheet, the RCT shall pay any excess proceeds, if available, after payment of all Claims and obligations of the RCT, to the PCT.

(d)    *Voting*:  Class 6(A) is impaired and Holders of Claims in Class 6(A) are entitled to vote to accept or reject the Plan.

(e)    *Claims Estimate*:  Allowed Class 6(A) Claims are currently estimated to be in the range of $1.8-$2.6 billion as of the Effective Date.  Based on this estimated range of Allowed Claims and the estimated value of New Common Stock, the Holders of Class 6(A) Claims shall be receiving stock on the Effective Date in Core-Mark Newco with a value equal to approximately 4% to 7% of the Allowed Amount of each such Holders' Claim[5].

10.    *Class 6(B)—Senior Subordinated Note Claims*

(a)    *Classification*:  Class 6(B) consists of all Allowed Senior Subordinated Note Claims.

---

[5]    Holders of Senior Notes shall receive a higher recovery due to their contractual seniority to the Holders of Senior Subordinated Notes.  Holders of Senior Notes shall receive stock in Core-Mark Newco with a value equal to approximately 11.5% of the Allowed amount of such Holder's Claim.

(b)     *Treatment*: On the Effective Date, or as soon as practicable thereafter, each Holder of an Allowed Senior Subordinated Note Claim shall be paid in full satisfaction, settlement, release, and discharge of and in exchange for each and every Allowed Senior Subordinated Note Claim, subject to the contractual seniority of the Senior Notes, their Ratable Proportion of $330,000 in cash and, at the Debtors' option, additional consideration in one or a combination of the following manners,: (i) issuance of a Ratable Proportion of New Common Stock, with such Ratable Proportion to be determined as if Classes 6(A) and 6(B) were a single Class, and subject to dilution from the issuance of warrants to the Tranche B Lenders, the Holders of Senior Subordinated Notes and through the Management Incentive Plan; and/or (ii) in the event the Debtors, with the consent of the Creditors Committee, elect to sell some or all of their assets as outlined herein, a Ratable Proportion of Cash remaining from the sale of such assets after all of the Allowed Unclassified Claims and Claims of Holders in Classes 1 through 5 have been satisfied in full, with such Ratable Proportion to be determined as if Classes 6(A) and 6(B) were a single Class. As additional consideration, subject to the contractual seniority of the Senior Notes, each Holder of a Senior Subordinated Note Claim in Class 6(B) shall be entitled to a Ratable Proportion of excess proceeds, if any, available from the PCT after payment by the PCT of all Claims and obligations required to be made by the PCT under the Plan or the PCT Agreement, with such Ratable Proportion to be determined as if Classes 6(A) and 6(B) were a single Class. Pursuant to the Revised Term Sheet, the RCT shall pay any excess proceeds, if available, after payment of all Claims and obligations of the RCT, to the PCT.

(c)     As further consideration, not subject to the contractual seniority of the Senior Notes, Holders of Class 6(B) Claims shall receive their Ratable Proportion of $569,000 in cash and a distribution of nondilutive warrants that when struck will result in the Holders of Senior Subordinated Notes receiving 8% of the New Common Stock on a fully diluted basis. The strike price of the warrants shall be determined using Core-Mark Newco's reorganization value, determined on a per share basis and adding a premium equal to 35% per share. The warrants shall expire 7 years after the Effective Date.

(d)     *Voting*: Class 6(B) is impaired and Holders of Claims in Class 6(B) are entitled to vote to accept or reject the Plan.

(e)     *Claims Estimate*:     Allowed Class 6(B) Claims are currently estimated to be approximately $830 million as of the Effective Date. Based on this estimate of Allowed Claims, the Holders of Class 6(B) Claims shall be receiving value equal to approximately .05% to 1.0% of the Allowed amount of each such Holder's Claim.[6]

11.     *Class 7 - Convenience Claims*

(a)     *Classification*: Class 7 consists of all General Unsecured Claims, other than the Claims of Holders of Old Notes, of $5,000 or less held by a single Holder. Holders of Old Notes and General Unsecured Claims in excess of $5,000 may not opt into Class 7.

(b)     *Treatment*: On or as soon as practicable after the Effective Date, each Holder of an Allowed Class 7 Claim shall receive, in full and final satisfaction of such Claim, a Cash distribution equal to 10% of the amount of its Class 7 Claim, *provided however*, the aggregate amount of such Allowed Class 7 Claims shall not exceed $10,000,000. If the aggregate amount of the Allowed Class 7 Claims exceeds $10,000,000, each Holder of an Allowed Class 7 Claim shall receive its Ratable Proportion of $1,000,000.

(c)     *Voting*: Class 7 is impaired, and Holders of Class 7 Claims are entitled to vote to accept or reject the Plan.

---

[6]     These warrants will have no intrinsic value as of the Effective Date because the strike price is in excess of Core-Mark Newco's reorganization value per share, and are valued at approximately $5-6 million using a warrant valuation model based on Black-Scholes.

(d)    *Claims Estimate*:  Allowed Class 7 Claims are currently estimated to be in the range of $5-$10 million as of the Effective Date.

12.    *Class 8 - Equity Interests*

(a)    *Classification*:  Class 8 consists of all Equity Interests.

(b)    *Treatment*:  Receives no distribution and are canceled as of the Effective Date.

(c)    *Voting*:  Class 8 is impaired, but because no distributions will be made to Holders of Class 8 Equity Interests nor will such Holders retain any property, such Holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 8 is not entitled to vote to accept or reject the Plan.

13.    *Class 9 - Intercompany Claims*

(a)    *Classification:*  Class 9 consists of all Intercompany Claims.

(b)    *Treatment:*  Receives no distribution and are canceled as of the Effective Date.

(c)    *Voting*:  Class 9 is impaired, but because no distributions will be made to Holders of Class 9 Claims nor will such Holders retain any property, such Holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 9 is not entitled to vote to accept or reject the Plan.

14.    *Class 10 – Other Securities Claims and Interests*

(a)    *Classification:*  Class 10 consists of all Other Securities Claims and Interests of whatever kind or nature.

(b)    *Treatment:*  Receives no distribution and are cancelled and discharged as of the Effective Date.

(c)    *Voting:*  Class 10 is impaired, but because no distributions will be made to Holders of Class 10 Claims, such Holders are deemed to reject the Plan pursuant to section 1126(g) of the Bankruptcy Code.  Class 10 is not entitled to vote to accept or reject the Plan.

C.    *Additional Provisions Governing Reclamation Claims*

The total amount of Allowed Reclamation Claims to be satisfied by the RCT shall be reconciled pursuant to the methodology described in Exhibit A attached to the Revised Term Sheet, but in any event shall not exceed $150 million prior to the application of any reduction including the Prepetition Non-TLV Reclamation Claim Reduction. In the event the Allowed Reclamation Claims exceed $150 million, the Allowed Non-TLV Reclamation Claims shall be reduced pro rata.

D.    *Special Provision Governing Unimpaired Claims*

Except as otherwise provided in the Plan, nothing under the Plan shall affect the Debtors' or the Reorganized Debtors' rights in respect of any Unimpaired Claims, including, but not limited to, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, such Unimpaired Claims.

## ARTICLE IV.

### ACCEPTANCE OR REJECTION OF THE PLAN

A.    *Voting Classes*

Each Holder of an Allowed Claim in Classes 1(B), 3(B), 3(C), 5, 6(A), 6(B) and 7 shall be entitled to vote to accept or reject the Plan.

B.    *Acceptance by Impaired Classes*

An Impaired Class of Claims shall have accepted the Plan if (a) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of at least two-thirds in amount of the Allowed Claims actually voting in such Class have voted to accept the Plan and (b) the Holders (other than any Holder designated under section 1126(e) of the Bankruptcy Code) of more than one-half in number of the Allowed Claims actually voting in such Class have voted to accept the Plan.

C.    *Presumed Acceptance of Plan*

Classes 1(A), 2, 3(A) and 4 are unimpaired under the Plan and, therefore, are presumed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code.

D.    *Presumed Rejection of Plan*

Classes 8, 9 and 10 are impaired and shall receive no distributions and, therefore, are presumed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code.

E.    *Non-Consensual Confirmation*

The Debtors and the Committee will seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code, to the extent applicable based on the deemed rejection by Classes 8, 9 and 10 and if any Voting Class fails to accept the Plan in accordance with section 1129(a)(8) of the Bankruptcy Code. The Debtors and the Committee reserve the right (a) to request that the Bankruptcy Court confirm the Plan in accordance with section 1129(b) of the Bankruptcy Code and/or (b) to modify the Plan in accordance with section XIV.D. hereof.

### ARTICLE V.

### MEANS FOR IMPLEMENTATION OF THE PLAN

A.    *Substantive Consolidation*

This Plan is premised upon the limited substantive consolidation of the Debtors solely for purposes of actions associated with the Confirmation of this Plan and occurrence of the Effective Date, including, but not limited to, voting, confirmation and distribution. As a result of this limited substantive consolidation, a Holder of Claims against one or more of the Debtors arising from or relating to the same underlying debt that would otherwise constitute Allowed Claims against two or more Debtors, including, without limitation, Claims based on joint and several liability, contribution, indemnity, subrogation, reimbursement, surety, guaranty, co-maker and similar concepts, shall have only one Allowed Claim on account of such Claims. This Plan does not contemplate the merger or dissolution of any Debtor which is currently operating or which currently owns operating assets or the transfer or further commingling of any asset of any Debtor, except that the assets of Fleming and certain Filing Subsidiaries already being used by Fleming Convenience in its operations shall be formally vested in Core-Mark Newco, or one of the Reorganized Debtors and except to accomplish the distributions under this Plan. Such limited substantive consolidation shall not affect (other than for Plan voting, treatment, and/or distribution purposes) (i) the legal and corporate structures of the Reorganized Debtors or (ii) Equity Interests in the Filing Subsidiaries.

This Plan shall serve as a motion seeking entry of an order substantively consolidating the Chapter 11 Cases, as described herein. Unless an objection to substantive consolidation is made in writing by any creditor affected by this Plan as herein provided on or before 10 days prior to the date that is fixed by the Bankruptcy Court