**TAB 2**

Response of Kemps LLC in Support of the Motion of the Reclamation Creditors' Trust To: (i) Enforce the Reorganization Plan and Confirmation Order, (ii) Enjoin the Post-Confirmation Trust from Pursuing Claims Against Employees of Reclamation Creditors Employers and, (iii) Determine that the PCT's Claims Against Employees of Reclamation Creditors Constitute RCT Assets

Kraft Foods Global Inc.'s Response in Opposition to the Post-Confirmation Trust's Motion for Declaratory Judgment and Joinder in the Reclamation Creditor Trust's Motion to Enforce

Food Marketing Group, Inc.'s (A) Joinder to Motion by the Reclamation Creditors' Trust to: (i) Enforce the Reorganization Plan and Confirmation Order, (ii) Enjoin the Post-Confirmation Trust from Pursuing Claims Against Employees of Reclamation Creditors Employers and, (iii) Determine that the PCT's Claims Against Employees of Reclamation Creditors Constitute RCT Assets and (B) Response to PCT Cross-Motion

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| | ) | |
| Fleming Companies, Inc. et al., | ) | Case No. 03-10945 (MFW) |
| | ) | Jointly Administered |
| | ) | |
| | ) | |
| Debtors. | ) | Re: Docket No. 11559 |
| | ) | **Objection Deadline:** October 4, 2005 |
| | ) | **Hearing Date:** October 19, 2005 at 9:30 a.m. |

## RESPONSE OF KEMPS LLC IN SUPPORT OF THE MOTION OF THE RECLAMATION CREDITORS' TRUST TO: (i) ENFORCE THE REORGANIZATION PLAN AND CONFIRMATION ORDER, (ii) ENJOIN THE POST-CONFIRMATION TRUST FROM PURSUING CLAIMS AGAINST EMPLOYEES OF RECLAMATION CREDITORS TO RECOVER RCT ASSETS FROM THEIR RECLAMATION CREDITOR EMPLOYERS AND, (iii) DETERMINE THAT THE PCT'S CLAIMS AGAINST EMPLOYEES OF RECLAMATION CREDITORS CONSTITUTE RCT ASSETS

Kemps LLC (f/k/a Marigold Foods, LLC) ("Kemps"), by its undersigned counsel, hereby responds in support of the Motion of the Reclamation Creditors' Trust To (i) Enforce the Reorganization Plan and Confirmation Order, (ii) Enjoin the Post Confirmation Trust From Pursuing Claims Filed Against Employees of Reclamation Creditors To Recover RCT Assets From Their Reclamation Creditor Employers, and (iii) Determine that the PCT's Claims Against Employees of Reclamation Creditors Constitute RCT Assets (Docket No. 11559) (the "Motion").

In this response, Kemps fully joins in the arguments stated by the RCT in the Motion and amplifies and expands on those arguments. In support of this response, Kemps states as follows:

## OVERVIEW

Kemps is a Reclamation Creditor, as that term is defined in the Third Amended and Revised Joint Plan of Reorganization of Fleming Companies, Inc. and Its Filing Subsidiaries

1292781

Under Chapter 11 of the Bankruptcy Code (the "Plan").[1]  As this Court is well aware the appropriate treatment and value of Reclamation Claims was a major issue in the Debtors' bankruptcy proceedings.  The Debtors and the Reclamation Creditors had very different views as to the treatment and value of Reclamation Claims.  The conflict between the parties resulted in the formation of the Official Committee of Reclamation Creditors (the "OCRC").  Ultimately a resolution between the Debtors and the Reclamation Creditors was reached as evidenced by the Plan and the Reclamation Creditors Trust Agreement dated August 17, 2004 (the "RCT Trust Agreement").  The resolution called for the creation of the RCT, which on the Effective Date of the Plan would have various assets transferred to it.  The transferred assets are defined as the RCT Assets and they include, among other things, Causes of Action, which include indirect causes of action, against Reclamation Creditors.

Notwithstanding that the Plan and the RCT Trust Agreement expressly provide that the RCT may exclusively enforce, commence, pursue and settle the RCT Causes of Action, the PCT on March 31, 2005, filed its Cross-Complaint and Original Complaint of the Post-Confirmation Trust and Original Answer of Defendants the Fleming Companies, the Post-Confirmation Trust and Core-Mark (the "Cross Complaint") in a pending securities class action in the United States District Court for the Eastern District of Texas, Texarkana Division, asserting indirect causes of action against Kemps and other Reclamation Creditors.  Those Causes of Action constitute RCT Assets.  Accordingly, the PCT has blatantly violated the terms of the Plan and the RCT Trust Agreement.  Such action should not be permitted.  Therefore, Kemps respectfully requests that the Motion be granted and that the PCT be enjoined from further violating the terms of the Plan.

---

[1]    Initially capitalized terms used herein and not otherwise defined herein are used as defined in the Plan.

1292781

2

APP    0060

## BACKGROUND

A.    The Bankruptcy Case

1.    The Debtors, Fleming Companies, Inc., et al., filed their Chapter 11 bankruptcy petitions on April 1, 2003 with the United States Bankruptcy Court for the District of Delaware (the "Court").

2.    At the very outset of the case, the Debtors filed a motion to establish procedures for treatment of Reclamation Claims (docket no. 8), recognizing that vendors' claims to reclaim goods delivered to the Debtors would be a significant aspect of the case, and a significant factor in the Debtors' ability to reorganize.  A Reclamation Procedures Order (docket no. 559) was entered as a result.[2]

3.    After the Debtors' further attempt to deal with Reclamation Claims collectively by motion practice was rejected by the Court, the Debtors filed 576 adversary actions against Reclamation Creditors on or about January 31, 2004 to address, among other things, Reclamation Claims (collectively, the "Reclamation Adversary Actions").

4.    With the issues involving vendors with Reclamation Claims continuing, on February 2, 2004, the Court directed the appointment of the OCRC, to represent specifically the interests of Reclamation Creditors, as distinct from the Official Committee of Unsecured Creditors (the "Creditors Committee"), which represented the interests of unsecured creditors generally.

---

[2]    Addressing another set of significant vendor issues at the outset of the case, the Debtors filed a first day motion concerning prepetition vendor claims arising under the Perishable Agricultural Commodities Act ("PACA"), similar state statutes such as the Minnesota Wholesale Produce Dealers Act ("MWPDA"), and the Packers and Stockyard Act ("PASA") (docket no. 12).  The Court entered an order authorizing procedures for reconciliation and payment of valid PACA or related claims (docket no. 725).

A separate set of vendor issues in the case involved vendors having claims arising from the direct shipment of goods to retailers.  A DSD Settlement Agreement was entered into between the Debtors and the DSD class plaintiffs on February 5, 2004, which broadly resolved these disputes.

5.      The Debtors, along with the Creditors Committee, filed the Plan. The Plan was confirmed by Order of the Bankruptcy Court on July 27, 2004 (docket no. 9045) (the "Confirmation Order").

6.      The Effective Date of the Plan was August 23, 2004.

B.      Kemps as a Creditor and Interested Party in the Case

7.      Kemps was a supplier of dairy products to the Debtors.

8.      Pursuant to the Plan, Kemps is the holder of a Class 5 – Non-TLV Reclamation Claim.[3]  In addition, Kemps has been or is the holder of Class 3(C) – DSD Trust Claims, Class 4 – PACA/PASA Claims, Class 6(a) – General Unsecured Claims, and Administrative Claims. Kemps' Class 4 – PACA/PASA Claim has been resolved and Kemps has received partial payment on its Class 3(C) – DSD Trust Claim. Kemps' remaining claims are still unresolved.

9.      One of the Reclamation Adversary Actions commenced by the Debtors was against Kemps. The RCT was substituted as the party plaintiff in the Reclamation Adversary Actions as of the Effective Date pursuant to that certain Order on Motion of Official Committee of Reclamation Creditors, Conditioned Upon Plan Effective Date, to Substitute RCT as Plaintiff and to Further Stay Reclamation Adversary Proceedings, and the Withdrawal of Debtors' Motion for Partial Summary Judgment, Conditioned Upon Plan Effective Date dated September 15, 2004.

10.     Kemps and the RCT have been and continue to actively negotiate the resolution of Kemps' claims against the estate and the estate's alleged claims against Kemps. Both parties anticipate that a resolution will be reached in the near future.

---

[3]      The term "Non-TLV Reclamation Claim" is defined in the Plan. Plan, § I.B.105. The holders of such claims, as well as the holders of "TLV Reclamation Claims", meet the definition of "Reclamation Creditor" set forth in the Plan. Plan, § I.B.148.

APP    0062

C.    The Plan, the Confirmation Order, the PCT, and the RCT

*(1) Establishment of Core-Mark Newco, the PCT and the RCT*

11.    The Plan provides for the wholesale convenience stores distribution business to be reorganized into a new entity. The new entity constituting the reorganized debtors is described in the Plan as "Core-Mark Newco."

12.    The PCT and the RCT were both established pursuant to the Plan.

13.    The Debtors' collective assets are described in the Plan, and were allocated among the newly created entities.

14.    Exhibit A to the Plan sets forth a comprehensive, 12-part, 1,334-page list of the claims and causes of action of the Debtors that were preserved under the Plan.[4]

*(2)    No Overlap Between the PCT and the RCT in Authority over Assets*

15.    One aspect of the respective authorities of the PCT and the RCT that is clear from the numerous provisions in the Plan is that there is to be absolutely *no overlap* in authority over assets between the PCT and the RCT.

16.    The Plan provides that Core-Mark Newco, the PCT, or the RCT, as applicable, shall retain and enforce the Debtors' Claims and Causes of Action, "provided the PCT may commence, pursue and settle non-RCT Causes of Action, as outlined more fully in the PCT Agreement and the RCT may commence, pursue and settle the RCT Causes of Action as outlined more fully in the RCT Agreement and the Revised Term Sheet." Plan, § VI. A.

17.    The stated purpose of the RCT under the Plan is to "administer certain post-confirmation responsibilities under the Plan, including but not necessarily limited to those

---

[4]    Although the Plan contains the typical language stating that any listing of the actual or potential causes of action belonging to the estate is not meant to be all-inclusive, and that claims not listed are also meant to be preserved, nonetheless the listings in Exhibit A to the Plan of the claims and causes of action that the Debtors believed they held as of the time that Plan confirmation was being sought are extraordinarily comprehensive.

responsibilities associated with the pursuit and collection of the RCT Assets and payment of Reclamation Claims. Plan, § V.H.1. In other words, the RCT was established to have full authority on all matters concerning or affecting Reclamation Creditors, except as expressly set forth in the Plan.

18.    The stated purpose of the PCT under the Plan is to "administer certain post-confirmation responsibilities under the Plan, including but not necessarily limited to, those responsibilities associated with the pursuit and collection of the Litigation Claims and Causes of Action *other than those which are RCT Assets* and the reconciliation and payment of Claims, other than Reclamation Claims (except that reconciliation of Class 6(A) Claims of the Reclamation Creditors, but not the payment of such Claims, shall be the responsibility of the RCT)." Plan, § V.G.1 (emphasis added).

19.    The Plan repeatedly states that: "*The PCT Assets do not include any RCT Assets*." Plan, § V.G.3 (emphasis added). It further states: "Subject to the preceding exclusion of all RCT Assets, the PCT Assets shall consist of all of the following assets . . . ." *Id.* Then, after setting forth a list, from (a) to (k), of PCT Assets, the Plan reiterates: "The PCT Assets do not include: (1) any of the RCT Assets . . . ." *Id.*

20.    The Confirmation Order restates that the PCT's responsibilities exclude any authority over the RCT Assets. It provides that the PCT will have responsibilities associated with the "pursuit and collection of the Litigation Claims and Causes of Action *other than those which are RCT Assets* and the reconciliation and payment of Claims, other than Reclamation Claims . . . " Confirmation Order, ¶ 18 (emphasis added).

    (3)    *The RCT Assets and the RCT's Authority*

21.    The RCT Assets are defined in the Plan, and they include, *inter alia*, "Vendor

6

Deductions, over-wires, preference claims, Causes of Action and other rights of the Debtors as against Reclamation Creditors . . . " Plan, § V.H.2[5].

22.     The term "Reclamation Creditor" is defined in the Plan to mean "any Claim Holder that asserts that all, or any portion, of its Claim is entitled to be granted priority and/or to be secured by a lien in accordance with 546(c)(2) of the Bankruptcy Code and also those identified on the Reclamation Claim Summary by Claimant of the Debtors dated November 21, 2003." Plan, § I.B.148. This includes holders of Non-TLV Reclamation Claims, such as Kemps.

23.     The term "Causes of Action" is defined in the Plan to mean any form of claim of the Debtors, the Debtors in Possession, and/or the Estates, and including but not limited to those listed in the Plan, Exhibit A to the Plan, or the Disclosure Statement, "whether direct, indirect, derivative or otherwise and whether asserted or unasserted, known or unknown." Plan, §. I.B.36.

24.     Thus, as the RCT observes in the Motion, any indirect claim against a Reclamation Creditor is equally an RCT Asset as a direct claim against a Reclamation Creditor.

25.     Since the Plan plainly was formulated to preclude overlap of authority of claims by both the PCT and the RCT, the PCT has no authority over any indirect claims against Reclamation Creditors.

26.     The Plan provides that the allowance of Non-TLV Reclamation Claims "shall be determined solely by RCT and the affected Creditor without standing of any other party to object (unless resolution is referred to the PCT on such terms as the PCT and RCT shall determine)." Plan, § VI. F.1(a) & 2(a).

27.     The Plan also charges the RCT with the allowance of the Class 6 general unsecured claims of Reclamation Creditors, though in this instance subject to a mechanism for

---

[5]     The only exception set forth in the provision, not relevant here, involves certain rights of the Debtors that were transferred to Core-Mark Newco. Plan, § V.H.2.

approval by the PCT Advisory Board for settlements exceeding a specified percentage. Plan, §
VI. F.3.

28.    The RCT's authority thus extends to the reconciliation and recovery of RCT
Assets, and the reconciliation and satisfaction of the RCT's liabilities (defined as the
"Reclamation Liabilities" in the Plan, §V.H.). It is charged to do so through a "consensual"
approach, based on a uniform set of rules to be adopted by the RCT advisory board, governing
the consideration of claims and defenses. Plan, §X.F.4. In other words, the approach provided
for in the Plan for the RCT in dealing with Reclamation Creditors is expressly designed to
promote consensual resolutions in lieu of litigation. *See id.*

29.    After collecting and liquidating the RCT Assets, the RCT is charged with
distributing them to the Reclamation Creditors. If a balance remains after such distributions are
completed, the Plan provides a set of priorities for the further distribution of that balance. The
final recipient of any such balance, after the other priorities are satisfied, is the PCT. Plan,
§X.F.5.

D.    Negotiations Between Kemps and the RCT

30.    Pursuant to the Plan, Kemps has, for much of the past year, been engaged in
extensive negotiations with the RCT with the goal of seeking global resolution of the remaining
claims and disputes between Kemps and the Debtors' estate, encompassing a range of pre- and
post-petition transactions.

31.    Initially, encompassed within those negotiations have been not only Kemps' Class
5 – Non-TLV Reclamation Claim, Class 6(a) – General Unsecured Claim and Administrative
Claims but also the potential claims against Kemps that were identified in Exhibit A to the Plan.

These included alleged preferences, post-petition deductions, and a duplicative wire, as set forth in Exhibit A-3, and the Reclamation Adversary Action against Kemps, listed in Exhibit A-4.

32.     It was not until February, 2005 that Kemps was advised by the RCT that the PCT believed there was a cause of action against Kemps arising from their alleged participation in the Debtors' pre-petition accounting fraud involving financial statement irregularities and earnings overstatements (the "Kemps EO Claim").[6]

33.     The RCT advised Kemps that the RCT would undertake its own investigation into the merits and value of the Kemps EO Claim to determine whether such claim had any merit. Further, the RCT advised Kemps that the RCT would not be in a position to resolve the claims and disputes involving Kemps until the RCT had concluded its investigation of the Kemps EO Claim.

34.     The RCT requested, and Kemps voluntarily provided, substantial information concerning the Kemps EO Claim.

35.     As the RCT describes in its Motion in connection with Reclamation Creditors generally, Kemps has exchanged substantial information with the RCT, on a confidential basis, with the understanding that all the claims and disputes between Kemps and the Debtors' estate were being addressed.

---

[6]     It is important to note that a cause of action against Kemps, Green and/or Thorpe arising from their alleged participation in the Debtors' pre-petition accounting fraud involving financial statement irregularities and earnings misstatements is not identified in the 776 pages of Exhibit A-3 (potential vendor-related actions), or in the 181 pages of Exhibit A-4 (pending and potential litigation), or anywhere else in the 1334 total pages of Exhibit A.

The absence of the disclosure of such claims is all the more notable because of the description in the Disclosure Statement in support of the Plan of an investigation by the SEC into Fleming's vendor trade practices. The Disclosure Statement ("D/S") says the SEC investigation began informally in November 2002 and was converted to a formal inquiry in February 2003. D/S, p. 29. It acknowledges that three Reclamation Creditors – Kraft Foods, Dean Foods and Frito-Lay – announced they had been notified by the SEC of the possibility of charges against them. Id. And it states that, after receiving notice of the SEC inquiry, Fleming undertook an independent investigation into the same topics. Id.

9

APP     0067

36.    These negotiations would be substantially jeopardized if the PCT were allowed to infringe on the authority of the RCT, and the RCT Assets, in the manner they are seeking to do.

E.    PCT's Efforts to Usurp RCT Assets

   (1)    The PCT's Claims Against Deloitte, and Its Effort to Expand Them with Claims Against the Reclamation Creditors

37.    As well described in the RCT's Motion, the PCT had sought to exercise its own authority with respect to claims against certain Reclamation Creditors – including Kemps – arising from their alleged participation in Fleming's pre-petition accounting fraud involving financial statement irregularities and earnings overstatements. The RCT Motion refers to these as the "EO Claims".

38.    There is a consolidated multi-district litigation for the securities class action cases commenced against Fleming and others pending in the United States District Court for the Eastern District of Texas (the "Texas Litigation"). The PCT, for purposes of the Texas litigation, is the successor to Fleming. The securities class action cases assert a Fleming accounting fraud and fraudulent public statements/disclosures by Fleming regarding Fleming business operations and profits.

39.    Fleming's pre-petition auditor, Deloitte and Touche LLP ("Deloitte") is a defendant in those cases.

40.    The PCT was apparently developing its own claims against Deloitte. Motion, p. 2. In Exhibit A-8 to the Plan, the Debtors expressly identified and preserved their potential claims against Deloitte as well as other professionals formerly employed by the Debtors.

41.    According to the Motion, the PCT told the RCT that the EO claims against the six Reclamation Creditors would support the PCT's strategy against Deloitte. Motion, p. 2.

42.    The RCT states that the PCT requested of the RCT in March 2005 that it be permitted to commence EO litigation against six Reclamation Creditors, including Kemps.

43.    According to the Motion, the RCT refused the PCT's request, and reiterated the ongoing nature of its own investigations. Motion, ¶ 31.

(2)    *The PCT's Assertion of EO Claims Against Officers of Six Reclamation Creditors*

44.    The PCT, evidently acknowledging its inability to proceed directly against Kemps and the other Reclamation Creditors, sought another way to accomplish the same goal.

45.    On March 31, 2005, the PCT filed the Cross Complaint in the Texas Litigation which included a cross complaint against Deloitte and cross complaints against certain officers of the six Reclamation Creditors, including James Green ("Green") and Christopher Thorpe ("Thorpe"), the CEO and Vice President, respectively, of Kemps. The Reclamation Creditors are referred to in the Cross Complaint as the Vendors, and their officers named as defendants are referred to as the Vendor Officers.

46.    The fact that the PCT's claims are in truth directed at the Reclamation Creditors themselves is not far from the surface in the allegations of the Cross Complaint. Indeed, the allegations made in the Cross Complaint themselves suggest that the claims against the individual Vendor Officers are not properly laid; that the Reclamation Creditors are the real target of the allegations and would be parties if the PCT thought they could assert claims against them; and that the PCT recognizes that the Reclamation Creditors would be called upon to indemnify their officers in the event of any recovery against them (whether based on state law or corporate by-laws).

47.    The PCT alleges that the Vendor Officers acted "on behalf of their respective employers . . . and each had actual and apparent authority to engage in transactions with Fleming [on behalf of those employers]". Cross Complaint, ¶ 3.

48.    The PCT also alleges that the "Vendor Officers, and the Vendors who employed them, knowingly participated and induced the breach of fiduciary obligations owed to Fleming by the Fleming Officer Defendants." Cross Complaint, ¶ 4.

49.    The PCT further alleges that "[e]ach of the Vendor Officer Defendants was acting within the scope of their employment as officers, agents or employees of the Vendors that employed them. The Vendors are, therefore, responsible to indemnify the Vendor Officer Defendants for any damages they are compelled to pay to the PCT as a result of this recovery in this action." Cross Complaint, ¶ 120.

50.    By the second sentence of Paragraph 120, quoted above, the PCT has expressly set forth its goal of recovering damages from the Reclamation Creditors, in the claims asserted against their employee-officers. Ultimately, the PCT will be looking to the six Reclamation Creditors for any recovery on any of the claims they have (improperly) asserted against the officers of these Reclamation Creditors.

51.    Nowhere in the Cross-Complaint does the PCT identify the source of its authority, in the Plan or related documents, for asserting claims against the Vendor Officers.

52.    Both Green and Thorpe filed answers to the Cross Complaint on August 30, 2005.

53.    In each of their answers to the Cross Complaint, Green and Thorpe asserted that the PCT lacks standing or authority to assert the claims against them, and that the Cross Complaint is "a transparent and improper effort by the PCT to sue Kemps LLC and others in contravention of orders of the Bankruptcy Court in the Fleming bankruptcy proceedings." Thorpe Answer, ¶¶ 2, 7, and Aff. Def. 1; Green Answer, ¶¶ 7, 11 and Aff. Def. 1.

## REQUEST FOR RELIEF

A.    The Bankruptcy Court Has Jurisdiction over this Core Matter

54.    Under the Confirmation Order, this Court has retained jurisdiction in this case to,

*inter alia,*

(vi)    enter such orders as may be necessary or appropriate to implement or . . .
enforce the provisions hereof and all contracts, instruments, releases,
indentures and other agreements or documents created in connection with
the Plan or the Disclosure Statement;

(vii)    resolve any cases, controversies, suits or disputes that may arise in
connection with the . . . interpretation or enforcement of the Plan or any
Person's or Entity's obligations incurred in connection with the Plan;

(viii)    issue injunctions, enter and implement other orders or take such other
actions as may be necessary or appropriate to restrain interference by any
Person or Entity with . . . enforcement of the Plan, except as otherwise
provided herein; [and]

(xi)    determine any other matters that may arise in connection with or relate to
this Plan, the Disclosure Statement, the Confirmation Order or any contract,
instrument, release, indenture or other agreement or document created in
connection with the Plan or the Disclosure Statement . . . .

Confirmation Order, ¶ 36.

55.    Since the subject matter presented in the RCT's Motion directly concerns the

implementation and enforcement of the Plan and certain documents created pursuant to the Plan,

including the PCT Agreement and the RCT Agreement, and the PCT's wrongful attempt to

exercise authority over RCT Assets, this Court has clear and proper jurisdiction over the dispute.

56.    The instant dispute, involving interpretation of the Plan and the Confirmation

Order, is a core matter within 28 U.S.C. § 157(b)(2), including subsections (A) ("matters

concerning the administration of the estate"), (L) ("confirmations of plans"), (M) ("orders

approving the use . . . of property"), and (O) ("other proceedings affecting the liquidation of the

assets of the estate . . .").

1292781

13

APP    0071

57.    "[B]ankruptcy courts have core jurisdiction to interpret and enforce their orders."
In re World Access, Inc., 324 B.R. 662, 680 (Bankr. N.D.Ill. 2005), citing Cox v. Zale
Delaware, Inc., 239 F.3d 910, 917 (7th Cir.2001). See also In re AKF Foods, Inc., 58 B.R. 1016,
1018 (D.Me.1986) (issues involving "an interpretation of the Confirmation Order . . .appear to
be within an area of general bankruptcy court expertise," and "the general policy of the
Bankruptcy Amendments and Federal Judgeship Act of 1984 is that, except in unusual
circumstances, the Bankruptcy Court hears all proceedings within its jurisdiction.").

58.    Whether core or not, a bankruptcy court's interpretation of its own plan
confirmation order is entitled to greater deference than would be accorded the interpretation of a
ruling rendered by another court. See, e.g., Monarch Life Insurance Company v. Ropes & Gray,
65 F.3d 973, 983 (1st Cir. 1995)[7].

59.    Notwithstanding the core nature of the instant dispute, the PCT has taken upon
itself to interpret the Confirmation Order and Plan documents in its own favor, with the filing of
the Cross-Complaint, with no attempt to bring the matter to this Court for resolution. The RCT's
Motion properly returns the issue to this Court.

---

[7]    The Monarch Life court held:

"Even though our interpretation of the confirmation order essentially presents a question of law, . . . , the
bankruptcy court in this case was interpreting its own order of confirmation. We think customary
appellate deference is appropriate in these circumstances with respect to the bankruptcy court's
determination that the confirmation order was sufficiently broad to confer '"incidental' protection to
noncontributing parties like Ropes & Gray. _ Similarly, because the bankruptcy court was directly engaged
in the give-and-take of the confirmation proceedings and had the better vantage point for determining
whether the parties had been fairly apprised of the 'jurisdictional' issue, we likewise think it prudent to
accord some deference to its determination that the section 105(a) issue was 'actually litigated'."

65 F.3d at 983.

B.    The Plan and Confirmation Order Unambiguously Assign All Indirect Claims
      Against Reclamation Creditors to the RCT, and the PCT's Claims Against
      Officers of Reclamation Creditors Are in This Category.

60.    Kemps joins in the RCT's request that the PCT be enjoined from pursuing the

claims it has asserted against Green, Thorpe, and the other officers of Reclamation Creditors in

the Texas Litigation.

61.    In the context of *respondeat superior*, the PCT has only sued these individuals as

having acted in their official capacity as officers of their companies – there is no claim against

Green, Thorpe, or the others purely in their individual capacities.  Regardless of whatever

defenses Green and Thorpe may  have upon which they could seek dismissal of the claims

asserted by the PCT, it is beyond cavil that those claims are asserted against them only insofar as

they stand in the shoes of Kemps, their employer.  Since Kemps is a Reclamation Creditor, any

right to assert those claims belongs with the RCT.

62.    There can be no doubt that the EO Claims now being asserted by the PCT against

Green and Thorpe are claims that fall within the definition of RCT Assets that could be asserted

by the RCT.[8]  The RCT holds the right to all indirect claims against the Reclamation Creditors,

and indirect claims against the Reclamation Creditors must necessarily include claims against

their employees who would in turn seek indemnification from them, under the corporate by-laws

and/or applicable state law, if liability against the employees were established. The claims

against Thorpe and Green unquestionably constitute indirect claims against Reclamation Creditor

Kemps, and therefore meet the definition of RCT Assets.

---

[8]    The issue of whether the EO Claims against Green, Thorpe and Kemps were adequately preserved in the
Plan and Disclosure Statement is not presently before the Court on the RCT's Motion.  Kemps does not waive
raising such issue at a later appropriate time.  Accordingly, Kemps hereby denies any liability with respect to the EO
Claims and hereby reserves all of its rights to contest the EO Claims and the availability of any party to assert EO
Claims against Green, Thorpe and/or Kemps.

1292781

63.     Given that the claims against Green and Thorpe are ones that the RCT is authorized to pursue under the Plan, then by definition the PCT is *not* authorized to pursue them, since PCT Assets are expressly defined to exclude any RCT Assets.

64.     A bankruptcy court's order of confirmation is treated as a final judgment with *res judicata* effect. Stoll v. Gottlieb, 305 U.S. 165, 170-71 (1938). Pursuant to Section 1141(a) of the Bankruptcy Code, all parties are bound by the terms of a confirmed plan of reorganization. 11 U.S.C. § 1141(a); *see also* In re Varat Enterprises, Inc., 81 F.3d 1310, 1315 (4th Cir. 1996).

65.     In asserting its cross-claims against the Reclamation Creditors' officers in the Texas Litigation, the PCT has exceeded the bounds of its legal authority and has attempted to exercise control over potential Causes of Action that are the property of the RCT. For this conduct, the PCT should be enjoined.

66.     For present purposes, to the extent that these EO Claims against Kemps and its officers, Green and Thorpe, were at all preserved, it is clear that they are the bailiwick of the RCT.

C.     Allowing the PCT to Proceed Against the Vendor Officers Could Lead to an Inequitable Outcome of Double Recoveries

67.     Allowing the PCT to proceed on the causes of action asserted against Green and Thorpe could create the inequitable possibility of double recoveries from Kemps arising from the same cause of action. If the PCT and the RCT were permitted to split the direct and indirect rights against the Reclamation Creditors (contrary to the Plan language but in accordance with the PCT's strategy), the RCT could, if it so chose, pursue a direct claim against Kemps for these EO Claims, while the PCT would pursue its claims against Vendor Officers, Green and Thorpe, who in turn could be entitled to indemnification from Kemps.

16

APP     0074

68.    The doctrine of election of remedies, which derives from the equitable doctrine of estoppel (Gens v. Resolution Trust Corp., 112 F.3d 569, 572 n.1  (1st Cir. 1997)), has as its primary purpose the prevention of double or sequential recoveries for the same wrong. *Id.* at 573. "The rule prohibits a party, in asserting his rights, from occupying inconsistent positions 'in relation to the facts which form the basis of his respective remedies.'" In re Princeton-New York Investors, Inc., 255 B.R. 376, 386 (Bankr. D.N.J. 2000).

69.    This equitable doctrine comes to the fore because the PCT and the RCT each only have rights to specified assets that belonged to the Debtors, but they are now separate entities pursuing their own separate interests. (Indeed, the assignment of both direct and indirect claims against Reclamation Creditors to the RCT was precisely designed to avoid this inequitable scenario.)  In effect, the PCT and the RCT are asserting inconsistent positions as to which of them holds the rights to indirect claims against the Reclamation Creditors, such as the claims against Green and Thorpe.

70.    This situation stands in sharp contrast to one where a debtor or trustee pursues claims against multiple persons or entities on the basis of the same transaction, because in those other situations, the debtor or trustee will necessarily be limited to a single recovery. *See, e.g.,* In re Princeton-New York Investors, Inc., 255 B.R. at 385 (trustee pursuing strong-arm claims was entitled to recover from any combination of entities liable in connection with challenged transfer, as long as there was no double recovery).

71.    Here, for the afore-stated reasons, the PCT's position is at once inconsistent with the language and intent of the Plan and also with the position appropriately asserted by the RCT. Accordingly, as an equitable matter, the PCT should be barred from pursuing its claims against Green and Thorpe.

1292781

72.    This Court, as a court of equity, should consider equitable principles in the resolution of this matter.

WHEREFORE, Kemps respectfully requests this Court enter an Order granting the Motion and enjoining the PCT from pursuing the EO Claims against Green and Thorpe in the Texas Litigation and determining that any such claims, to the extent they exist, without making such a finding, would constitute RCT Assets.

Dated: October 3, 2005

MORRIS, JAMES, HITCHENS & WILLIAMS LLP

Stephen M. Miller (DE No. 2610)
Douglas N. Candeub (DE No. 4211)
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, Delaware 19899
Telephone: (302) 888-6800
Telecopy: (302) 571-1750
Email: smiller@morrisjames.com
Email: dcandeub@morrisjames.com

*Attorneys for Kemps LLC*
*(f/k/a Marigold Foods, LLC)*

18

APP    0076

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| FLEMING COMPANIES, INC., et al., | ) | Case No. 03-10945 (MFW) |
| | ) | |
| | ) | Jointly Administered |
| Debtors. | ) | |

**AFFIDAVIT OF WILLIAM WELLER, PARALEGAL**

STATE OF DELAWARE    :
                     : SS:
NEW CASTLE COUNTY    :

    I, William Weller, certify that I am, and at all times during the service, have been an employee of Morris, James, Hitchens & Williams LLP, not less than 18 years of age and not a party to the matter concerning which service was made. I certify further that on October 4, 2005, I caused to be served:

> **RESPONSE OF KEMPS LLC IN SUPPORT OF THE MOTION OF THE**
> **RECLAMATION CREDITORS' TRUST TO: (i) ENFORCE**
> **THE REORGANIZATION PLAN AND CONFIRMATION ORDER,**
> **(ii) ENJOIN THE POST-CONFIRMATION TRUST FROM PURSUING**
> **CLAIMS AGAINST EMPLOYEES OF RECLAMATION CREDITORS**
> **TO RECOVER RCT ASSETS FROM THEIR RECLAMATION CREDITOR**
> **EMPLOYERS AND, (iii) DETERMINE THAT THE PCT'S CLAIMS AGAINST**
> **EMPLOYEES OF RECLAMATION CREDITORS CONSTITUTE RCT ASSETS**

    Service was completed upon the following parties in the manner as indicated.

Date: October 4, 2005

_____
'William Weller

SWORN AND SUBSCRIBED before me this 4th day of October, 2005.

_____
NOTARY

My commission expires: _____

**VIA HAND DELIVERY**

Steven K. Kortanek, Esq.
Michael W. Yurkewicz, Esq.
Klehr, Harrison, Harvey, Branzburg &
    Ellers LLP
919 Market Street, Suite 1000
Wilmington, DE 19801
(Counsel to the Reclamation Creditors' Trust)

David Fournier, Esq.
Wilmer C. Bettinger, Esq.
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street
Post Office Box 1709
Wilmington, DE 19899
(Co-Counsel for the PCT)

Laura Davis Jones, Esq.
James E. O'Neil, Esq.
Scotta E. McFarland, Esq.
Pachulski, Stang, Ziehl, Young, Jones
    & Weintraub P.C.
919 North Market Street, 16th Floor
Post Office Box 8705
Wilmington, DE 19801
(Co-Counsel for the PCT)

Office of the United States Trustee
Joseph McMahon, Esq.
J. Caleb Boggs Federal Building
844 N. King Street, Suite 2313'
Lockbox 35
Wilmington, DE 19801
(US Trustee)

**VIA FIRST CLASS MAIL**

Mark J. Friedman, Esq.
DLA Piper Rudnick Gray Cary US LLP
6225 Smith Avenue
Baltimore, MD 21209
(Counsel to the Reclamation Creditors' Trust)

Richard L. Wynne, Esq.
Erin N. Brady, Esq.
Kirkland & Ellis LLP
777 South Figueroa Street
Los Angeles, CA 90017
(Co-Counsel for the PCT)

*APP* *0078*

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Fleming Companies, Inc., et al. | ) | Case No. 03-10945 (MFW) |
| | ) | (Jointly Administered) |
| Debtors. | ) | |
| | ) | Hearing date: Oct. 19, 2005 |

Re Docket No. 11822

## KRAFT FOODS GLOBAL INC.'S RESPONSE IN OPPOSITION TO THE POST-CONFIRMATION TRUST'S MOTION FOR DECLARATORY JUDGMENT AND JOINDER IN THE RECLAMATION CREDITOR TRUST'S MOTION TO ENFORCE

Kraft Foods Global, Inc. ("Kraft") is a TLV Reclamation Creditor of the Debtors. Kraft has reached a settlement with the Reclamation Creditors' Trust of the Fleming Companies ("RCT") that resolves all issues between Kraft and the RCT. In that settlement, Kraft agreed to compromise reclamation claims worth over $19.3 million and other rights of set-off, in exchange for a payment of $3.89 million by the RCT and mutual releases between Kraft and the RCT.

The PCT, for its part, has conceded in its recent Cross-Motion for Declaratory Relief that it is *not* entitled to any monetary recovery from Kraft because the RCT alone owns any Causes of Action the Debtors might have against reclamation creditors like Kraft. At the same time, however, the PCT has filed a complaint in Texas against one of Kraft's former employees that wrongfully blames Kraft and other vendors for Fleming's pre-bankruptcy scheme to fraudulently inflate its earnings. The PCT admits that its Texas action may result in an indemnity claim against Kraft for the same injuries to the Debtors that Kraft recently settled with the RCT. Nevertheless, the PCT now seeks a declaration from this Court that it may pursue litigation claims against Kraft's employee, notwithstanding the RCT's settlement agreement with Kraft and the RCT's sole ownership of the Debtors' claims against Kraft.

Kraft has filed this response brief because the PCT's Cross-Motion seeks relief that is contrary to the plain meaning of the Plan of Reorganization. The Plan does not allow for the causes of action against a reclamation creditor to be split between the RCT and the PCT. Corporations can only act through their agents and employees. Allowing the PCT to bring claims against Kraft's former employee, as the PCT seeks, would duplicate the RCT's claims against the reclamation creditors, and be contrary to the Plan's assignment of both direct *and indirect* claims against reclamation creditors to the RCT. The PCT's position is also contrary to the Plan's terms granting reclamation creditors the right to resolve *all* claims by and against the RCT in a practical, consensual negotiation process.

The PCT's brief also paints a false picture of the RCT's potential claims against Kraft and ignores the RCT's intrusive and expensive investigation of those claims. Kraft *never* entered into a consent judgment with the SEC. To the contrary, the SEC gave Kraft a "no action" letter and declined to bring any aiding and abetting or other charges against Kraft. Kraft's former employee did not "admit" to anything at all, and his consent order with the SEC did not involve "scienter" or knowing assistance in the fraud masterminded by Fleming. The RCT investigated these matters thoroughly, subjecting both senior and low-level employees in Kraft's Sales and Finance departments to hours of interviews. Given the weakness in any RCT claims that could have been brought against Kraft, the size of Kraft's reclamation claim, Kraft's likely offsets against any causes of action the RCT might have filed, and the massive disruption such a case would have caused in the process the Plan provided for resolving reclamation creditors' claims, the RCT wisely agreed to a global settlement with Kraft.

For all these reasons, as further discussed below, Kraft opposes the PCT's Cross-Motion for Declaratory Judgment and joins the RCT's Motion to Enforce the Reorganization Plan.

*APP* *0080*

### The Plan Of Reorganization Assigns The Debtors' Direct And Indirect
### Causes of Action Against Reclamation Creditors to the RCT, Not The PCT

1.      The PCT's core argument is that the Plan must be read to distinguish between the reclamation creditors and their employees. The PCT claims this is compelled by the Plan's plain language, which limits the RCT's Assets to "reclamation deductions, over-wires, preference claims, Causes of Action and other rights of the Debtors *as against the holders of Reclamation Claims ...*" PCT Cross-Motion at 9. According to the PCT, since the reclamation creditors' employees are not "holders of Reclamation Claims," any claims against them must belong to the PCT, and not the RCT. The PCT thus would have this Court interpret the Plan to assign claims against the vendor *entities* to the RCT, but claims against the vendor's *employees* to the PCT.

2.      The obvious flaw in this argument is that it splits the Debtors' causes of action for a single injury between the RCT and PCT. Kraft and other reclamation creditors are corporate entities that can only act through their agents. Any cause of action against a reclamation creditor for injury to the Debtors necessarily includes potential parallel causes of action against reclamation creditor employees involved in the injury. If the Plan were interpreted as the PCT suggests, the RCT and the PCT would be able to file independent causes of action seeking recovery for the same underlying injury. It would not be clear which post-confirmation entity was allowed to recover for the Debtors' injury, and the reclamation creditors would be unfairly exposed to the risk of duplicative or inconsistent damages claims and proceedings.

3.      The Plan avoids any such inefficient result by broadly defining the "Causes of Action" owned by the RCT to include both direct *and indirect* claims against the reclamation creditors. Plan at Art. I.B.36, ("Causes of Action"), I.B.145 ("RCT Assets") (pp. 4, 11). Claims against the reclamation creditors' employees are necessarily "indirect" claims against the reclamation creditors themselves, because the employees may have contractual or common-law

3

rights of indemnity against their employers that would expose their employers to the same risks and expense as RCT claims. The Plan also makes clear that "RCT Assets" and "PCT Assets" do not overlap, and are exclusive of each other: the Plan defines "PCT Assets" as everything that is not an "RCT Asset", and vice-versa. Plan at Art. V.G.1 (PCT administers "Causes of Action other than those which are RCT Assets"), V.G.3 ("The PCT Assets do not include any RCT Assets") (p. 25). Taken together, these terms make the Plan's meaning and intent clear: the RCT alone owns causes of action to recover for injuries to the Debtors allegedly caused by the reclamation creditors and their employees. The Plan does not allow for splitting the cause of action as the PCT requests in its Cross-Motion.

4.      The PCT asserts that, in suing the reclamation creditor employees in Texas, it does not seek any recovery from the reclamation creditors themselves, but this is disingenuous. The PCT has *not* agreed to limit its damages recovery in Texas to the vendor employees' personal assets – to the contrary, the PCT suggests that its Texas claims against the reclamation creditor employees are worth "millions" of dollars. PCT Cross-Motion at 15. This can only be true if the PCT intends to collect against vendor entities themselves, perhaps by obtaining a judgment against the individuals, and then seeking an assignment of the individuals' indemnity rights or coverage claims (if any) against the vendors or their insurers.

5.      Indeed, the PCT's Texas complaint makes clear that the PCT intends for the reclamation creditors to face direct exposure. Most obviously, the complaint contains a separate count (Count VI) styled "Course and Scope of Employment, Liability of Agent." Paragraph 120 of that count alleges that "Each of the Vendor Officer Defendants was acting within the course and scope of their employment as officers, agents or employees of the Vendors that employed them. The Vendors are, therefore, responsible to indemnify the Vendor Officer Defendants for

4

any damages they are compelled to pay to the PCT as a result of its recovery in this action." The pleading of a separate count suggests the PCT will seek findings of fact or law on this point, if not an actual damages award. In addition, the complaint alleges that the reclamation creditors themselves were wrongdoers, in addition to their employees. (See, e.g., paragraphs 61-66, making numerous untrue allegations against Kraft directly, as well as its former employee.)

6.      Finally, the PCT's proposed interpretation of the Plan is contrary to the plain meaning of the Plan's provisions creating a "consensual reconciliation" process for resolving claims as between the RCT and the reclamation creditors. Plan at Art. X.F.4. Reclamation creditors like Kraft agreed to give up significant rights against the Debtors in return for a practical, negotiated process that would avoid expensive adversary proceedings between the vendors and the Debtors' estate. This expectation would be entirely undermined if it turned out that the reclamation creditors remained indirectly exposed to such adversary proceedings through litigation filed against their present or former employees by the PCT. At bottom, the Plan established the RCT in order to achieve *finality* of claims by and against reclamation creditors. The PCT's suggestion that the Debtors should be permitted a second chance to pursue claims that are interconnected with claims the Debtor's estate has already settled is totally at odds with the obvious purpose of the Plan as whole.

### Fleming's Fraudulent Scheme Investigated By The SEC

7.      Kraft also feels compelled to respond to the PCT's statement that "the vendors and their employees have admitted in the Consent Judgments [to the SEC] that they participated in a scheme with a handful of Fleming officers to falsify Fleming's supply contracts, forge critical audit confirmations, and make false entries in Fleming's financial statements." PCT Cross-Motion at 2. At least as to Kraft, this is false.

APP    0083

5

8.     The events referred to by the PCT concern legitimate business agreements that Kraft entered into with Fleming in 2001 and 2002 to make the parties' promotional spending more efficient. In those agreements, called "no-divert" agreements, Kraft agreed to make multi-million dollar payments in return for Fleming's agreement to abandon inefficient practices such as diverting Kraft products and assessing 10% administrative fees on Kraft promotions.

9.     Unbeknownst to Kraft, a senior officer at Fleming approached a regional sales manager at Kraft, Mr. Ken Adams, and dictated letters to him purporting to confirm the parties' no-divert agreements. These letters used deceptive language that Fleming apparently planned to use to report Kraft's no-divert payments prematurely. Mr. Adams (who was not a finance person, had no training in accounting, and said he did not understand such matters) signed the letters drafted by Fleming's procurement officers. He has testified that he either believed them to be true or, in one instance, did not read the letter with sufficient care to spot the inaccuracy.

10.     Kraft's regional sales manager did not think the letters that Fleming dictated were of any importance because he believed they did not alter the terms of the business agreements. Kraft performed and accounted for the business agreements as written. No-one at Kraft senior to Mr. Adams, and no-one in Kraft's finance, legal or other staff functions, ever saw or was aware of these letters until the SEC subpoenaed Kraft in April of 2003 to produce documents related to Fleming. Importantly, neither Kraft nor Mr. Adams received *any monetary benefit* or other consideration from providing the requested letters, which did not change the payment terms or performance requirements that Fleming and Kraft had agreed to.

11.     Contrary to the PCT's misrepresentations to the Court, upon conclusion of the SEC's investigation, Kraft did *not* enter into a "Consent Judgment" with the SEC. Kraft produced its documents and fully cooperated in the SEC's investigation. The agency made clear

6

that Kraft's own accounting practices, the Fleming business agreements themselves, and Kraft's payments under the agreements were not being challenged.  Kraft made presentations to the SEC's enforcement staff demonstrating that the evidence did not support any "aiding and abetting" charges against Kraft for the unknowing acts of a single mid-level manager who, contrary to company policy and management expectations, never informed his superiors or professional support resources of the letters dictated by Fleming.  Ultimately, in September 2004, the SEC gave Kraft a "no action" letter and declined to bring any charges against Kraft.

12.    Kraft's employee, for his part, was *not* an officer of Kraft, and expressly did *not* "admit" any wrongdoing, as the PCT has falsely asserted.  PCT Cross-Motion at 2.  The SEC's consent order against Mr. Adams states that he neither admits nor denies the matters set forth therein, and it is not admissible as evidence of liability.[1]  The PCT also falsely asserts that Mr. Adams admitted "knowing" misconduct.  PCT Cross-Motion at 6.  Under the plain terms of the SEC consent order, however, Mr. Adams did *not* settle charges involving "scienter" or knowing assistance in Fleming's securities fraud.  The $25,000 settled fine levied against him by the SEC was the least serious penalty the agency meted out in connection with its Fleming investigation. In contrast, the senior officers of Fleming who masterminded the scheme have recently been charged in a federal securities fraud complaint filed by the SEC in Texas District Court.

### The RCT Correctly Concluded After An Extensive
### Investigation That Any Claims Against Kraft Were Meritless

13.    Having obtained a letter from the SEC in September 2004 indicating that no charges would be brought against Kraft concerning its business dealings with Fleming, Kraft assumed it was done with the issue.  Much to Kraft's surprise, however, in February 2005, the

---

[1]  See, e.g., *Berke v. Pressteck, Inc.*, 188 F.R.D. 179, 180 (D.N.H. 1998) ("[T]he SEC's factual findings, included in the consent decrees, cannot be used to prove liability."); *In re PaineWebber Ltd. Partnerships Litig.*, 171 F.R.D. 127 n.42, (S.D.N.Y. 1997) ("the SEC Order, by its terms, does not adjudicate the merits of any claims and is not admissible to prove the underlying facts of liability").

APP    0085

RCT approached Kraft and indicated that, prior to reaching a settlement of Kraft's reclamation claims in these bankruptcy proceedings, the RCT wished to investigate its purported claims against Kraft related to Kraft's alleged assistance in Fleming's securities fraud. After getting over an initial sense of shock and anger that Fleming's Plan trustees would even consider bringing claims against Kraft for *Fleming's own misconduct*, Kraft agreed to cooperate and allow the RCT to fully investigate its potential claims related to Kraft's relationship with Fleming – the very same matters that had been recently investigated by the SEC.

14.     The PCT suggests throughout its Cross-Motion that the RCT has been less than diligent in pursuing potential claims against Kraft and several other reclamation creditors related to their alleged participation in Fleming's securities fraud. At least as to Kraft, this too is a gross misstatement of the record. Kraft wishes to inform this Court that, over the course of several months, it incurred considerable expense and devoted significant time and effort to its responses to the RCT's thorough and intrusive investigation. Kraft submitted to this only because it knew the facts better than the RCT, and was confident that once the facts came out, the RCT would conclude (as had the SEC) that no claims against Kraft were warranted.

15.     The RCT began its investigation by demanding that Kraft produce all documents that Kraft had produced to the SEC. Kraft complied. Kraft then prepared a written submission to the RCT's Board, much as it had to the SEC, explaining the history of Kraft's agreements with Fleming, and discussing the evidence that one Kraft regional sales manager had provided letters, dictated by Fleming, that Fleming apparently used to record payments from Kraft in an earlier period than Fleming's actual performance under the agreements. Kraft demonstrated that this evidence did not give rise to any RCT claims against Kraft for several reasons.

16.    First, in contrast to the SEC, private litigants such as the RCT are barred from
pursuing aiding and abetting claims against third parties who allegedly assist in another entity's
securities fraud. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S.
164 (1994). Since *Central Bank*, for a private plaintiff to attempt to hold a peripheral actor like
Kraft liable as a "primary violator," the plaintiff must show that the prospective defendant *itself*
made a material misstatement "in connection with" a purchase or sale of securities. *Wright v.
Ernst & Young*, 152 F.3d 169, 175 (2d Cir. 1998); *Ziemba v. Cascade Int'l*, 256 F.3d 1194, 1205
(11th Cir. 2001); *Anixter v. Home-Stake Products*, 77 F.3d 1215, 1226 (10th Cir. 1996). Here, of
course, Kraft made no public statements whatsoever in connection with purchases or sales of
Fleming's securities, so the RCT had no securities fraud claims against Kraft whatsoever.

17.    A second problem the RCT faced in bringing any claims against Kraft was that
the RCT (and the PCT) are only authorized under Fleming's Plan of Reorganization to bring
causes of action of the debtor -- Fleming itself. See Plan at Art. VI. Under the Wagoner Rule, a
bankrupt corporation's representative lacks standing to bring a claim against a third party for
defrauding or misleading the corporation with the cooperation of the corporation's management.
*Shearson Lehman Hutton, Inc. v. Wagoner*, 944 F.2d 114, 120 (2d Cir. 1991). See *Caplin v.
Marine Midland Grace Trust Co. of New York*, 406 U.S. 416 (1972) (bankruptcy trustee has no
standing generally to sue third parties on behalf of the estate's creditors, but may only assert
claims held by bankrupt corporation itself). Given that Fleming's management prepared and
solicited the very statements signed by Kraft's former employee in this matter, any attempted
claim against Kraft by the RCT would be barred based on these principles.

18.    A related problem with the RCT's prospective claims was that Fleming *itself* was
the architect and beneficiary of the scheme to misstate its earnings. Kraft urged the RCT to

9                    **APP    0087**

reject any suggestion that a perpetrator can sue his alleged cooperators for helping him to commit fraud. In any common law claims advanced by the RCT, Kraft would have been able to assert *in pari delicto*, unclean hands and related proportionate fault defenses that would defeat or negate any affirmative claims asserted by the RCT. In the Third Circuit, whose law governs the Fleming case, for causes of action of the debtor brought by an estate representative such as a trustee or committee, the estate's representative is *not* an innocent successor, but stands in the shoes of the debtor and is subject to the doctrine of *in pari delicto*. *Official Committee of Unsecured Creditors v. R.F. Lafferty & Co., Inc.*, 267 F.3d 340 (3rd Cir. 2001). Other Circuit Courts of Appeal have also applied the *in pari delicto* defense to bar claims of a trustee. See *In re Hedged-Investments Assocs., Inc.*, 84 F.3d 1281 (10th Cir. 1996); *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085 (2d Cir. 1995); *In re Dublin Secs., Inc.*, 133 F.3d 377 (6th Cir. 1997).

19.     Finally, even if the RCT or its assignee could somehow escape having Fleming's actions and misconduct imputed to itself for purposes of any lawsuit, Kraft showed that there was still no basis for claims against Kraft. Kraft explained that if its employee had acted *knowingly* when he signed the letters at issue in the SEC investigation, then his actions were beyond his authority, and could not be attributed to Kraft, because he would have violated Kraft's policies and effectively amended a business agreement adverse to Kraft's interests. An employer cannot be liable for violations committed by its employee unless the employee "act[ed] within the course and scope of his employment and ... within his actual or apparent authority." *Paul F. Newton & Co. v. Texas Commerce Bank*, 630 F.2d 1111, 1119 (5th Cir. 1980); *Williams v. United States*, 71 F.3d 502, 506 (5th Cir. 1995). Similarly, "where the agent is found to have acted adversely to the principal, the knowledge or notice acquired by such agent will not be imputed to his principal." *In re Bennett Funding Group, Inc.*, 336 F.3d 94, 100 (2d Cir. 2003);

APP      0088

accord *Standard Oil Co. of Tex. v. United States,* 307 F.2d 120, 128 (5th Cir. 1962); *Inryco, Inc. v. CGR Bldg. Systems, Inc.,* 780 F.2d 879, 883 (10th Cir. 1986). Although the evidence did not support a conclusion that Kraft's employee acted knowingly in joining a conspiracy by Fleming, nevertheless, if true, this would have barred the RCT from attributing the former employee's conduct to Kraft. The actions of Kraft's former employee could not be imputed to Kraft if he was "acting adversely to the [corporation] *and entirely for his own or another's purposes.*" *FDIC v. Shrader & York,* 991 F.2d 216, 223 (5th Cir. 1993) (emphasis added).[2]

20.    Despite Kraft's presentation, the RCT insisted on launching an investigation to further explore the facts and its potential causes of action. The RCT retained outside special counsel, the Venable law firm, and assembled a team that included one senior bankruptcy attorney, Richard Wasserman, and two litigation attorneys, Nancy Grunberg and LaShon Kell, both of whom formerly worked in the SEC's enforcement division. Kraft expended dozens of hours of its employees' time preparing for and submitting to the Venable interview process. Witnesses interviewed included a sales colleague of Kraft's former employee Mr. Adams; Mr. Adams' secretary; Mr. Adams' sales vice president and supervisor; a regional sales accountant; two vice presidents of finance; and two other finance personnel whose names appeared on documents related to Fleming that Venable had reviewed in the course of its investigation. Kraft spent over $125,000 on outside attorneys in responding to and defending itself in the RCT/Venable investigation.

---

[2]  The information Kraft provided to the RCT failed to support any claim that Kraft's employee acted knowingly to join Fleming's fraud. Rather, the record suggested he was duped by Fleming's officers into providing the requested letters and did not understand their significance or connect them to financial reporting. As Kraft explained to the RCT, Kraft's employee had no finance or accounting training, and the confirmation letters did not alter the business deals. For these and other reasons, the PCT's Texas litigation claim against Kraft's employee is meritless, and the facts disclosed to the RCT simply do not support the elements of the claims pled by the PCT in Texas.

**APP    0089**

21.    The RCT investigation of Kraft began in late March 2005 and ended in June. Ultimately, based on its exhaustive interview process and a review of the complete document production that Kraft had provided in connection with the SEC's investigation, the RCT informed Kraft that it was willing to enter into a comprehensive settlement agreement with Kraft. Under that agreement, Kraft agreed to compromise reclamation claims of over $19 million, in return for a payment by the RCT of approximately $3.8 million and an exchange of mutual releases.    Kraft asked the RCT to refund Kraft's considerable costs in submitting to the investigation, but the RCT refused, thereby diluting Kraft's actual recovery under the settlement.

## Conclusion

22.    Any case the RCT could have brought against Kraft or its employee would suffer from severe legal and factual weaknesses that Kraft has summarized in this response, along with others Kraft has not mentioned.    The RCT prudently exercised its judgment and responsibilities to creditors by conducting a thorough and intrusive investigation of Kraft and ultimately agreeing to reach a global settlement with Kraft.    From Kraft's perspective, this bankruptcy has seen more than its share of excessive contentiousness and administrative expenses prior to adoption of the Plan, and the PCT's claim in Texas against Kraft's former employee and others is more of the same.    Most importantly, however, consideration of the Plan's terms as a whole shows that the RCT is entitled to the relief requested in its Motion to Enforce, and the PCT's Cross-Motion should be denied as contrary to the plain meaning of the Plan.

WHEREFORE, Kraft requests that the Court enter an order, consistent with the Plan interpretation set forth in this brief, confirming that all Causes of Action of the Debtors against the Reclamation Creditors and their employees are RCT Assets.

Date: October 12, 2005

KLETT ROONEY LIEBER & SCHORLING

*Mary Caloway*

Mary F. Caloway (No. 3059)
1000 West Street
Suite 1410
Wilmington, DE 19801
(302) 552-4200
(302) 552-4295 (facsimile)

-and-

MAYER, BROWN, ROWE & MAW LLP
Daniel G. Hildebrand
71 South Wacker Drive
Chicago, IL 60606
(312) 701-7787
(312) 706-8640 (facsimile)

Attorneys for Kraft Foods Global Inc.

13

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | Case No. 03-10945 (MFW) |
| Fleming Companies, Inc., *et al.*, | ) | (Jointly Administered) |
| | ) | |
| | ) | Objection Deadline:  October 12, 2005 @ 4:00 p.m. |
| | ) | Hearing Date:  October 19, 2005 at 9:30 a.m. |
| Debtors. | ) | Related Docket No. 11559 |

### FOOD MARKETING GROUP, INC.'S (A) JOINDER TO MOTION BY THE RECLAMATION CREDITORS' TRUST TO: (I) ENFORCE THE REORGANIZATION PLAN AND CONFIRMATION ORDER, (II) ENJOIN THE POST-CONFIRMATION TRUST FROM PURSUING CLAIMS AGAINST EMPLOYEES OF RECLAMATION CREDITORS TO RECOVER RCT ASSETS FROM THEIR RECLAMATION CREDITOR EMPLOYERS, AND (III) DETERMINE THAT THE PCT'S CLAIMS AGAINST EMPLOYEES OF RECLAMATION CREDITORS CONSTITUTE RCT ASSETS AND (B) RESPONSE TO PCT CROSS-MOTION

Food Marketing Group, Inc., n/k/a Daymon Worldwide Inc. ("FMG"), as and for its (A)
Joinder in support of the Motion by the RCT[1] to: (i) Enforce the Reorganization Plan and
Confirmation Order, (ii) Enjoin the Post-Confirmation Trust from Pursuing Claims against
Employees of Reclamation Creditors to Recover RCT Assets from their Reclamation Creditor
Employers, and (iii) Determine that the PCT's Claims Against Employees Of Reclamation
Creditors Constitute RCT Assets and (B) Response to the PCT's Cross-Motion, respectfully
represents:

### INTRODUCTION

1.     FMG is a Reclamation Creditor and was a participant in Fleming's post-petition
Trade Lien Vendor Program which was approved by this Court.  FMG supported the creation of

---

[1] Capitalized terms which are not defined herein shall have the meanings set forth in the Motion, the Plan and the Confirmation Order.

the Official Committee of Reclamation Creditors (the "OCRC") and it supported the heavily negotiated Plan and Confirmation Order.

2.    FMG was never a member of the OCRC and it has never been a member of any governing body of the RCT. Thus, any decision of the OCRC with respect to FMG was entirely independent of any undue influence.

3.    After confirmation of the Debtors' Plan, FMG cooperated with the RCT's in-depth investigation of FMG's business transactions with the Debtor. That in-depth investigation included a full and detailed review of the issues previously investigated by the Securities and Exchange Commission ("SEC"), including whether FMG had aided and abetted Fleming in its accounting fraud. Like the SEC, the RCT concluded that neither FMG nor any of its officers, directors or employees had engaged in any wrongdoing in their handling of Fleming contracts and audit confirmation letters.

4.    After the conclusion of the in-depth investigation, the RCT and FMG reached a resolution for a final reconciliation of FMG's Reclamation Claim against the Reclamation Creditors' Trust. As a part of that final reconciliation, FMG will receive a release from the RCT, "to the full extent of the RCT Assets," on behalf of itself and "all of its current and former directors, partners, members, officers, agents, employees, assigns, attorneys . . . ", from any and all claims that the RCT has or ever had. FMG cooperated with the RCT's investigation because the Plan provides the RCT with the exclusive right to investigate, pursue, and settle all direct and indirect claims against Reclamation Creditors; FMG reasonably believed that included the right to pursue the claims that are now the subject of the Texas litigation.

5.    Nonetheless, and despite the resolution reached with the RCT, FMG has also had to spend considerable time, resources and expense in the Texas Litigation defending the PCT's

2

action against Peter Frank, who the PCT alleges was an officer of FMG. In the Texas Litigation, the PCT seeks an indemnification recovery from FMG, a Reclamation Creditor, for actions that the PCT alleges were taken by Mr. Frank as a Vendor Officer Defendant within the scope of his employment by FMG. Those litigation claims improperly undermine the release that the RCT is alone authorized under the Plan to deliver to FMG.

## JOINDER IN SUPPORT OF RCT MOTION

6.      The PCT is circumventing the Plan and the Confirmation Order by suing Mr. Frank. The PCT acknowledges that it cannot sue FMG because it is a Reclamation Creditor. Instead, the PCT has sued Mr. Frank for the expressed purpose of implicating indemnification obligations that FMG may have in favor of Mr. Frank.

7.      Although the PCT asserts that it is not pursuing FMG in the Texas Litigation, its actions and pleadings in that litigation demonstrate just the opposite. There is no claim against Mr. Frank solely in his individual capacity. Instead, in paragraph 120 of the PCT's Cross-Complaint in the Texas Litigation, the PCT asserts: "each of the Vendor Officer Defendants was acting within the course and scope of their employment as officers, agents, or employees of the Vendors that employed them. The Vendors are, therefore, responsible to indemnify the Vendor Officer Defendants for any damages they are compelled to pay to the PCT as a result of its recovery in this Action."

8.      This "end-run" litigation tactic by the PCT violates the express terms of the Plan, which provides the RCT with the exclusive right to administer RCT Assets. The RCT Assets include: "deduction, over-wires, preference claims, Causes of Action and other rights of the Debtors as against Reclamation Creditors . . . ". Plan, Article I.B. The Plan defines Causes of

3

Action broadly to include any form of claim "whether direct, indirect, derivative or otherwise."
Plan, Article I.B.36.

9.     Consequently, the PCT's EO Claims against Mr. Frank fall squarely within the
Plan definition of Causes of Action, which were transferred exclusively to the RCT as RCT
Assets. Although couched as indemnification liability claims, the PCT's EO Claims against Mr.
Frank are actually Causes of Action, direct or indirect, against FMG – a Reclamation Creditor -
that belong to the RCT. The PCT's attempts to argue otherwise contradict the plain meaning of
the Plan and the clear intent of the parties in the Plan to designate the RCT as the sole party with
the authority to assert and settle any claims against Reclamation Creditors and their officers and
employees.

10.     When interpreting an agreement such as a plan, the "Court is guided by the
principal that it should avoid interpreting contractual language in such a way as to render any
term of the contract meaningless or superfluous." Combustion Eng'g., Inc., 366 F.Supp 224, 231
(D.N.J. 2005); General Datacomm Indus., Inc., 309 B.R. 848, 853 (D. De. 2004)(the absence of a
definition in a contract does not prevent the Bankruptcy Court from construing the contract in
such a way as to give the contract the meaning that was intended by the parties).

11.     The Plan expressly provides the RCT with the exclusive right to "enforce any and
all such Claims, rights or Causes of Action," whether direct or indirect, against Reclamation
Creditors, and to "commence, pursue and *settle* the Causes of Action." Plan, Article VI.A
(emphasis added). The PCT's indirect claim against FMG in the Texas Litigation violates the
Plan, and the PCT's arguments in support of that claim would render these express Plan
provisions meaningless and superfluous by undermining the settlements and releases that the
RCT is expressly authorized to negotiate and execute.

4

**APP     0095**

12.     The PCT's actions and arguments also impermissibly destroy the level of
predictability that was created by the express provisions of the Plan. The RCT has the express
and exclusive power to pursue and settle direct and indirect claims against Reclamation
Creditors, and the PCT should not be permitted now to destroy that power by asserting indirect
claims against Reclamation Creditors in a foreign jurisdiction. In re Carretta, 220 B.R. 203, 214
(D. N.J. 1998); Teamsters Indus. Emp. Welfare Fund v. Rolls-Royce Motor Cars, Inc., 989 F.2d
132, 137 (3rd Cir. 1993). FMG and, apparently, other Reclamation Creditors reasonably relied
upon the RCT's Plan authority, responded to the RCT's investigatory demands concerning the
EO Claims and engaged in settlement negotiations. FMG's reliance upon the provisions of the
Plan should not be destroyed by the tortured interpretation that is now urged by the PCT.

13.     The claims asserted against Mr. Frank in the Texas Litigation are demonstrably
claims against FMG, a reclamation creditor. As such, those claims belong to the RCT, and the
Court should declare that the PCT's litigation tactics: violate the Plan; improperly undermine
the RCT's exclusive power to release FMG and its officers and employees; and should be
terminated.

## RESPONSE TO PCT CROSS-MOTION

14.     To justify its conduct in the Texas Litigation, the PCT paints with a broad
brush in its Cross-Motion to include FMG as one of a "half dozen Reclamation Creditors" that
are 'bad actors' that allegedly caused harm to the Debtors and their estates. The PCT also
asserts: "with rare exceptions, every Defendant PCT sued has already admitted liability in
Consent Judgments they entered into with the Securities and Exchange Commission." PCT
Cross-Motion, para. 30. The PCT's characterizations and allegations are erroneous as to FMG
and are contradicted by facts:

5

- The SEC fully investigated FMG's business transactions with the Debtors and determined not to bring any action against FMG or any of its officers and employees because no wrongful conduct occurred. The SEC did not seek or obtain any Consent Judgment from FMG or any of its officers or employees, and, thus none of them made any admissions of any improper conduct in connection with FMG's business transactions with the Debtors;

- FMG and its representatives have always denied any wrongdoing in connection with FMG's business transactions with the Debtors;

- Contrary to the PCT's argument that the RCT is acting to protect its members, FMG was never a member of the OCRC or any governing body of the RCT.    Consequently, the RCT's conclusions and settlement with FMG cannot be said to compromise any of the RCT's fiduciary duties; and

- The RCT conducted an exhaustive investigation of FMG's business transactions with the Debtors including, without limitation, review of volumes of documents, information and testimony transcripts in connection with its investigation concerning the Debtors' financial affairs. The RCT reviewed all information obtained by, and reached the same conclusion as, the SEC.

15.    The RCT independently concluded, after extensive diligence, that FMG did not act improperly in its business with the Debtors. The PCT's allegation that FMG or its employees engaged in "particularly egregious" conduct is unsupported and is squarely contradicted by the informed conclusions reached by the SEC and the RCT, both of whom concluded that neither FMG nor its officers and employees had engaged in any wrongdoing with respect to Fleming.

16.    FMG relied upon the authority of this Court when it supported the creation of the OCRC and confirmation of the Plan so that it could resolve all of its claims with the Debtors in one forum – this Court. Contrary to the PCT's unsupported allegations, FMG spent considerable time and resources responding to investigatory demands made by the RCT concerning the EO Claims. FMG participated and responded to the RCT's investigatory demands because the Plan

6

provides the RCT – not the PCT – with the authority to "commence, pursue and settle" all direct and indirect Causes of Action against Reclamation Creditors.

17.    Paragraph 120 of the PCT's Cross-Complaint expressly describes the PCT's goal of recovering damages from FMG by means of the indemnification claims that it hopes will be asserted by Mr. Frank.[2] This is at best an indirect Cause of Action that belongs to the RCT.

18.    The PCT's actions undermine the authority of this Court and the parties' reliance upon the Plan and process that it set in motion, and the PCT's actions have caused prejudice to FMG.

## CONCLUSION

Based upon the foregoing and for all of the reasons contained in the Motion, FMG joins and supports the Motion.

---

[2] Nothing contained herein is intended to waive or otherwise prejudice any right, claim or defenses in favor of Mr. Frank in the Texas Litigation or in this Court.

7

**WHEREFORE**, FMG requests entry of an Order granting the RCT's Motion.

Dated: October 12, 2005

COZEN O'CONNOR

Mark E. Felger (No. 3919)
Jeffrey R. Waxman (No. 4159)
Chase Manhattan Centre, Suite 1400
1201 North Market Street
Wilmington, DE 19801-1147
Telephone:   (302) 295-2000
Facsimile:   (302) 295-2013

- and -

TOGUT SEGAL & SEGAL LLP

/s/ Neil Berger
NEIL BERGER (NB-3599)
A Member of the Firm
One Penn Plaza
New York, New York 10119
Telephone:   (212) 594-5000
Facsimile:   (212) 967-4258

Counsel for Food Marketing Group, Inc. and
Daymon Worldwide Inc.

8

APP    0099

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| Fleming Companies, Inc., *et al.*, | ) | Case No. 03-10945 (MFW) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |

## CERTIFICATE OF SERVICE

I, Jeffrey R. Waxman, certify that I am not less than 18 years of age, and that service of *Food Marketing Group Inc.'s (A) Joinder to Motion by the Reclamation Creditors' Trust To: (I) Enforce the Reorganization Plan and Confirmation Order; (II) Enjoin the Post-Confirmation Trust From Pursuing Claims Against Employees of Reclamation Creditors to Recover RCT Assets From Their Reclamation Creditor Employers; and (III) Determine That the PCT's Claims Against Employees Of Reclamation Creditors Constitute RCT Assets and (B) Response to PCT Cross-Motion* was made on October 12, 2005 upon the following parties in the manner indicated:

### *Hand Delivery*

Laura Davis Jones, Esquire
Scotta E. McFarland, Esquire
Pachulski, Stang, Ziehl, Young, Jones &
Weintraub P.C.
919 North Market Street, 16th Floor
Wilmington, DE 19801
*(Counsel for the Post Confirmation Trust)*

David M. Fournier, Esquire
Pepper Hamilton LLP
1201 Market Street, Suite 1600
Wilmington, DE 19801
*(Counsel for the Post Confirmation Trust)*

### *Federal Express*

Richard Wynne, Esquire
Shirley S. Cho, Esquire
Kirkland & Ellis
777 South Figueroa Street
Los Angeles, CA 90017
*(Counsel for the Post Confirmation Trust)*

Kathy D. Patrick, Esquire
Gibbs & Bruns, L.L.P.
1100 Louisiana, Suite 5300
Houston, TX 77002
*(Counsel for the Post Confirmation Trust)*

**APP    0100**

**Hand Delivery**

Steven K. Kortanek, Esquire
Michael W. Yurkewicz, Esquire
Klehr, Harrison, Harvey, Branzburg & Ellers
919 Market Street, Suite 1000
Wilmington, DE 19801
*(Counsel to the Reclamation Creditors' Trust)*

Joseph McMahon, Esquire
Office of the United States Trustee
844 N. King Street, Room 2313
Wilmington, DE 19801
*(U.S. Trustee)*

Stephen M. Miller, Esquire
Douglas N. Candeub, Esquire
Morris James Hitchens & Williams
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
*(Counsel for Kemps LLC)*

**Federal Express**

Mark J. Friedman, Esquire
DLA Piper Rudnick Gray Cary US LLP
6225 Smith Avenue
Baltimore, MD 21209
*(Counsel to the Reclamation Creditors' Trust)*

Janice L. Duban, Esquire
DLA Piper Rudnick Gray Cary US LLP
203 North LaSalle Street, Suite 1800
Chicago, IL 60601
*(Counsel to the Reclamation Creditors' Trust)*

Therese D. Pritchard, Esquire
Bryan Cave
700 Thirteenth Street N.W.
Washington, DC 20005
*(Counsel to Food Marketing Group, Inc.)*

Under penalty of perjury, I declare that the foregoing is true and correct.

Dated: October 12, 2005

COZEN O'CONNOR

Jeffrey R. Waxman (No. 4159)

2

**APP    0101**